<u>**EXHIBIT A**</u>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| RAC Dealership, LLC, | Case No. 23-10318-BLS |
| Debtors. |  |

## DECLARATION OF ERIC BROWN IN SUPPORT OF
## JOINT MOTION FOR RELIEF FROM STAY

Eric Brown declares as follows:

1.　　My name is Eric Brown, and I am over 18 years of age.  I am competent and qualified to execute this declaration.

2.　　I am a Director of Credit and Collections for NextGear Capital, Inc. ("NextGear"), a secured creditor of RAC Dealership, LLC (the "Debtor"), which holds a security interest in the Collateral.[1]  I have personal knowledge of the facts set forth herein, except where otherwise noted.

3.　　I have read the Motion and am familiar with the matters alleged therein. The allegations contained in the Motion with respect to NextGear's extension of credit and collateral are true and correct, and each is hereby verified as if it were reproduced herein.  Further, **Exhibits B, C, E, F, G, H, I**, and **J** to the Motion are true and accurate copies of the documents described in the Motion.

4.　　NextGear owns and holds the NextGear Note.

---

[1]　　All capitalized terms not defined herein shall have such meaning as set forth in *Joint Motion for Relief from Stay Pursuant to 11 U.S.C. § 362* (the "Motion").

5.      On or about June 29, 2021, NextGear, Hancock Whitney Bank ("HWB"), and the Debtor entered into that the Intercreditor Agreement pursuant to which NextGear and HWB agreed to the relative priority of their security interests in inventory and the proceeds thereof.  The Debtor acknowledged and agreed to the Intercreditor Agreement.

6.      Pursuant to the Intercreditor Agreement, NextGear and HWB agreed that NextGear-financed inventory would be subject to a first priority security interest in favor of NextGear.  Likewise, if HWB financed inventory for the Debtor, then HWB would have a first priority security interest in HWB-financed inventory.  If both NextGear and HWB financed the same item of inventory, the first to finance the specific vehicle would have first lien priority in such vehicle.

7.      On or about February 24, 2023, the Debtor informed NextGear and HWB (through counsel) of the Debtor's intention to cease operations immediately and to file for relief under chapter 7 of the Bankruptcy Code.  The Debtor also indicated to NextGear and HWB (through counsel) the Debtor's request to voluntarily surrender possession of the NextGear-financed inventory to NextGear and the HWB-financed inventory to HWB prior to the filing of the Debtor's bankruptcy.  After advising NextGear and HWB of the Debtor's intentions in this regard, the Debtor facilitated an introduction between NextGear and HWB, so that NextGear and HWB could coordinate the repossession of all vehicle collateral pre-bankruptcy.

8.      In connection with the repossession process, on February 28, 2023, HWB and NextGear entered into that certain Transportation Agreement, which was acknowledged by the Debtor.  Pursuant to the Transportation Agreement, NextGear,

through Strategic Remarketing Solutions, coordinated the repossession of vehicle collateral at multiple sites in several states, and delivered all of the repossessed vehicle collateral (collectively, the "Repossessed Collateral") to several auction houses. The Repossessed Collateral is currently being stored in the auction houses (the "Auction Houses").

9.      As of the Petition Date, no fewer than 1,067 vehicles constitute Collateral under the NextGear Note.

10.     The total prepetition principal balance owing under the NextGear Note is not less than $15,364,688.40 (the "NextGear Petition Date Balance"), inclusive of all interest and fees accrued under the NextGear Note.

11.     In addition to the NextGear Petition Date Balance, interest, fees, and other charges under the NextGear Note continue to accrue under the NextGear Note.

12.     Interest under the NextGear Note accrues on all Liabilities under the NextGear Note on a "compounded daily" basis. Therefore, there is no true "per diem" rate on the outstanding balance as a whole.

13.     Based upon NextGear's experience in matters of this nature, the vehicles comprising the Remaining Collateral and the Repossessed Collateral will depreciate very quickly due to the seasonal nature of the automotive business. In particular, because many consumers will be receiving tax refunds in the near future, car dealers are ramping up their inventory now to have the lots full when tax refunds arrive. Additionally, if the collateral is kept at the Auction Houses for more than the period of time that is customary to the industry, the Auction Houses will begin to charge storage fees to the Movants.

14.     Furthermore, for at least 575 of the vehicles that are subject to this Motion, there are consumers who purchased these vehicles who cannot currently register their cars because the titles are still in the Debtor's name. The title work needs to be processed immediately, putting the titles in the consumers' names with the proper lienholder on the face of each title, in order for each consumer to be able to register his or her car.

15.     However, NextGear and its affiliates have the ability to address this quandary quickly because of their familiarity with this industry.

16.     I declare that the foregoing is true and correct based upon my personal knowledge of NextGear's books and business records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 17, 2023.

 _/s/ Eric Brown_____
Eric Brown

**EXHIBIT B**

## DEMAND PROMISSORY NOTE
## AND LOAN AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of NextGear Capital, Inc. ("Lender"), with its principal office at 11799 North College Avenue, Carmel, Indiana 46032, or such other place as Lender may designate in writing or on the Discover Portal from time to time, in lawful money of the United States of America, the principal sum of Thirty Million Dollars and Zero Cents ($30,000,000.00), or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time, together with all costs, interest, fees, and expenses as provided for under this Note and the other Loan Documents. Unless otherwise stated in an addendum to this Note, this Note shall become effective on the date of Borrower's execution hereof as set forth below Borrower's signature (such date, or the effective date otherwise stated in the applicable addendum, the "Effective Date").

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein, Borrower and Lender (each, a "Party" and collectively, the "Parties") agree as follows:

1.  DEFINITIONS. Capitalized terms used in this Note or in the other Loan Documents without definition shall have the respective meanings as set forth in Appendix A attached hereto and incorporated herein by reference (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein or in another Loan Document, but not otherwise defined herein or in such other Loan Document, as the case may be, shall have the meanings ascribed to them in the UCC.

2.  GRANT OF SECURITY INTEREST. In order to secure full and prompt payment of all Liabilities and performance of all obligations of Borrower to Lender, its Affiliates, and/or their respective successors or assigns:

    (a)  Borrower grants to Lender a continuing security interest in all of Borrower's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; all vehicles and vehicle parts; all Inventory now owned or hereafter acquired, including, without limitation, all Lender Financed Inventory now owned or hereafter acquired; all amounts in Borrower's Reserve held by or on behalf of Lender, if any; all documents, documents of title, deposit accounts, accounts receivable, manufacturer rebates and incentive payments, chattel paper, including, without limitation, all Receivables and general intangibles now owned or hereafter acquired by Borrower; all cash reserves; all of Borrower's books and records (including any books and records contained on computer hardware or software or otherwise stored by or on behalf of Borrower in electronic or digital form); and all additions, accessions, accessories, replacements, substitutions, and proceeds of any of the foregoing (collectively, the "Collateral").

    (b)  The security interest given to Lender in Section 2(a) is given to Lender to secure payment of all Liabilities and the performance of all obligations of Borrower to Lender, and its Affiliates, including all obligations of Borrower under this Note, under any other Loan Document, or otherwise, all without relief from valuation or appraisement Laws. Upon the request of Lender, Borrower shall promptly execute and deliver to Lender or its designee such further documents and instruments, and shall take such further actions, in each case as Lender may deem necessary or desirable to protect Lender's interest in the Collateral or otherwise effectuate the provisions of this Note and the other Loan Documents. Without limiting the generality of the foregoing, Borrower shall, upon the request of Lender, (i) use its best efforts to secure all consents and approvals that may be necessary or appropriate for the assignment to Lender of any Collateral (including any contract of Borrower that constitutes any portion of the Collateral), or that may be necessary in order for Lender to receive the full benefit of all Collateral and to enforce its security interest in the Collateral; (ii) provide Lender and its Representatives with full access to all Collateral, including any and all books and records relating thereto; and (iii) deliver to Lender all Collateral consisting of negotiable documents, chattel paper, and instruments not deposited for collection in the aggregate (in each case, accompanied by any related bills of sale or any other instruments of transfer executed for Borrower), in each case promptly after Borrower receives the same.

    (c)  Borrower authorizes Lender to file any UCC financing statements and any amendments thereto and any continuation statements under the UCC, in each case to the extent necessary or desirable in Lender's sole discretion to effect or preserve the security interest granted by Borrower hereunder or under any other Loan Document. Further, Borrower hereby acknowledges, ratifies and approves any UCC financing statements or other filings under the UCC that may have been made by or on behalf of Lender and its Affiliates prior to the Effective Date. The security interest granted by Borrower in Section 2(a) shall be in addition to, and not a substitution for, any right of offset, netting, or reclamation that Lender or any of its Affiliates may have against Borrower, whether pursuant to this Note, any other Loan Document, any Law or otherwise.

3.  INTEREST RATE. Interest shall accrue on Borrower's Liabilities to Lender in accordance with the following schedule:

    (a)  All outstanding Liabilities relating to a Floorplan Advance shall accrue Interest on a per annum basis from the Floorplan Date based upon a 360-day year, and such Interest shall be compounded daily at the Base Rate, plus the Contract Rate, until such outstanding Liabilities are paid in full.

    (b)  The Base Rate may be amended or modified by Lender from time to time in Lender's sole discretion by posting such amendment or modification on the Finance Program Rate, Fee and Term Schedule. However, Lender may increase the Base Rate by no more than fifty (50) basis points (i.e. one-half of one percent) in any thirty (30) day period.

4.  BORROWER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS. At the time of Borrower's execution of this Note and continuing at all times thereafter until all Liabilities have been indefeasibly paid and satisfied in full and this Note and all other Loan Documents terminated in accordance with their respective terms, Borrower hereby represents, warrants, covenants, and agrees:

(a) To sell, lease, or rent Lender Financed Inventory only in the Ordinary Course of Business and in accordance with Law, and not to sell or otherwise dispose of any Lender Financed Inventory except as herein provided.

(b) To keep Lender Financed Inventory only at Borrower's Place of Business and not to remove any Lender Financed Inventory from such place for a period exceeding twenty-four (24) hours, unless such item of Lender Financed Inventory is the subject of an active daily rental agreement (and floorplanned pursuant to a rental Advance Schedule executed by Borrower and Lender), or such removal has been previously authorized in writing by Lender. Notwithstanding the foregoing, Borrower may request Lender to authorize Borrower to consign certain Lender Financed Inventory to another licensed dealer at such consignee dealer's place of business. Borrower's request to consign Lender Financed Inventory as referenced above is subject to Borrower and the consignee dealer executing and delivering to Lender any documentation that Lender may require, including a UCC financing statement or other similar filing on consignee dealer, or an authorization for Lender to make any such filing. Lender may deny Borrower's request to consign Lender Financed Inventory in Lender's sole and absolute discretion.

(c) To keep Inventory in good repair and insured against all physical risks in such amounts and under such policies issued by such insurance companies as are deemed necessary and satisfactory by Lender; provided, however, that any insurance company issuing required coverage to Borrower pursuant to the requirements of this Section 4(c) shall have been assigned to an A.M. Best Financial Size Category (FSC) of "X" or higher, and shall have a minimum A.M. Best Financial Strength (FSR) rating of "A-". Lender shall be named "loss payee" on such insurance policies. Borrower shall provide Lender with a certificate or certificates of insurance evidencing that the above-mandated insurance requirements have been satisfied and specifying that the applicable insurance carriers will mail direct written notice to Lender at least thirty (30) days prior to any cancellation or non-renewal of any of the above-mandated policies. Alternatively, and unless the Unit of Lender Financed Inventory has been branded as "salvage" or is otherwise ineligible for the Collateral Protection Program, Borrower may satisfy the insurance coverages required under this Section 4(c) by voluntarily enrolling in Lender's Collateral Protection Program and satisfying and adhering to all conditions and other terms thereof at all times during Borrower's enrollment in the Collateral Protection Program. In the event Borrower fails to procure, maintain or provide proof of the insurance coverages required under this Section 4(c), Lender may enroll Borrower in Lender's Collateral Protection Program, or, alternatively, Lender may secure on Borrower's behalf such policies of insurance as Lender, in its sole discretion, deems necessary, in each case from such insurers, in such amounts and with such coverages and deductibles as Lender, in its sole discretion, deems necessary. Charges incurred under the Collateral Protection Program are calculated as of the Floorplan Date from the amount of each original Floorplan Advance related to a Unit of Lender Financed Inventory, through the life of the Floorplan Advance. Upon Borrower's enrollment in the Collateral Protection Program (whether voluntary or otherwise), Borrower shall be subject to, and at all times comply with and adhere to, the terms and conditions applicable to the Collateral Protection Program and Borrower's enrollment and participation therein. Borrower understands and agrees that Lender has an insurable interest in the Collateral, including all Lender Financed Inventory, by virtue of Borrower's pledge of the Collateral as security to Lender for the repayment of all Liabilities by Borrower to Lender. Fees, charges and other terms and conditions for the Collateral Protection Program are published in the Finance Program Rate, Fee and Term Schedule or on the documents referenced therein.

(d) To keep at all times complete and accurate records of Borrower's Business and provide to Lender promptly (but in any event within two (2) Business Days) copies of such records and any financial information regarding Borrower's Business or Borrower's financial condition generally, in each case as Lender may request. Borrower authorizes Lender to share such information and any and all other information that Lender may possess regarding Borrower's Credit Line or Borrower's relationship with Lender, including information regarding this Note and the other Loan Documents; Borrower's loan history; account history; payment history; audit history; account balance; loan application; credit worthiness; credit availability; and such other general business information (other than Borrower's Financial Statements, as that term is defined in the Loan Documents, and proprietary business model information not readily available to the public) regarding Borrower's Credit Line and Borrower's relationship with Lender, to any and all Persons, other than Borrower's direct competitors, that Lender, in its sole discretion, deems reasonable, including auctions. Without limiting the generality of the foregoing, Borrower shall maintain complete and accurate records and financial statements for all Advances requested or made hereunder, and all other transactions hereunder, including bank statements, cancelled checks, sales invoices, proofs of payment, and other sales files, in each case for at least a period of five (5) years after the date on which such Advance was made or such transaction occurred, as the case may be.

(e) To allow Lender and its Representatives to inspect Lender Financed Inventory during normal business hours and at other reasonable times at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located and to inspect and make copies of Borrower's books and records, provided that absent the occurrence and continuation of an Event of Default, such audits and inspections will be limited to one per fiscal quarter. Borrower shall pay Lender for the costs and expenses incurred by Lender or its Representatives to undertake such audits of any Lender Financed Inventory and such inspections and copying of Borrower's books and records, in each case on the applicable Maturity Date.

(f) To hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for such Unit of Lender Financed Inventory, in each case no later than the next Monday or Friday (whichever comes first) following Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(g) [Reserved.]

(h) [Reserved.]

(i) That any request for an Advance shall constitute an affirmative representation by Borrower to Lender that Borrower is in full compliance with all terms, conditions, representations, warranties and covenants made under this Note and the other Loan Documents, in each case as of the date of such request.

(j)   That Borrower now has, and will have at the time of any Advance and through the date of any repayment of the Liabilities thereunder, (i) sufficient cash and equity capital to conduct its Business and pay its debts as they mature; (ii) sufficient capital and other financial resources necessary to engage in the Business and perform its obligations under any agreement to which it is a party and any transaction in which it may engage hereafter; and (iii) ownership of property (including property of all wholly-owned and partially-owned subsidiaries of Borrower) having an aggregate fair market value that is greater than the sum of Borrower's debts (which shall include debts of all wholly-owned and partially-owned subsidiaries of Borrower).

(k)   That, without Lender's prior written consent (which consent may be withheld by Lender in its sole discretion), Borrower shall not (i) make any distributions of its property or assets (including any cash), except for tax and other distributions that (A) are made in the Ordinary Course of Business and, (B) are made in compliance with all Laws, and (C) will not render Borrower or any of its Affiliates insolvent, or otherwise impair the ability of Borrower or any of its Affiliates to satisfy their respective financial obligations when and as such obligations become due; (ii) undertake or permit any of its equity holders to undertake any transaction or series of transactions that would result in York Special Opportunities Fund II GP, LLC and its Affiliates, as of the Effective Date, beneficially owning and controlling less than fifty percent (50%) of all classes of the outstanding equity of Borrower on a fully-diluted basis; or (iii) engage in any transaction or series of transactions to sell, liquidate, or otherwise transfer, all or substantially all of its assets. If Borrower desires to engage in any transaction or series of transactions that would, absent the written consent of Lender, be prohibited under this Section 4(k), Borrower shall provide Lender with no less than ten (10) days' prior written notice describing the proposed transaction or series of transactions in reasonable detail, and Lender may, in its sole discretion, consent in writing to such transaction or series of transactions, as the case may be. For purposes of clarity, in no event shall any failure to respond by Lender be construed as acceptance or acquiescence to any transaction or series of transactions hereunder, or any waiver by Lender with respect to any transaction or series of transactions prohibited under this Section 4(k).

(l)   To pay immediately and to remain current with all levied taxes, assessments, charges, judgments, and expenses which may now or hereafter be entered, levied, or assessed against Borrower, Borrower's Business or any other business in which Borrower may be involved, and/or any of the Collateral. Lender may, in its sole discretion, make an Advance to a third party on Borrower's behalf to pay such taxes, assessments, charges, judgments, and expenses to protect Lender's interests, and may thereafter collect the amount of any such Advance, together with any associated costs and expenses of Lender, from Borrower as an Administrative Charge pursuant to the terms of this Note.

(m)   That Borrower has obtained all necessary permits and licenses required by Law to operate its Business as a wholesale or retail seller, and, if applicable, either a lessor or renter of Inventory, and that Borrower has complied with all filing requirements to operate as the entity or business type on record with the appropriate governmental office(s).

(n)   That no legal, administrative, or arbitration proceedings are pending or threatened against Borrower which could reasonably affect in any material and adverse respect Borrower, its Business or any Collateral, or which could materially and adversely affect any other business of Borrower or any properties, or the general condition, financial or otherwise, of Borrower, or Borrower's ability to repay all Liabilities and otherwise meet its obligations under this Note and the other Loan Documents.

(o)   That Borrower shall immediately notify Lender in writing of any tax warrant, tax levy or any legal, administrative, or arbitration proceedings to which Borrower becomes a party after the Effective Date.

(p)   That all payments made by Borrower to Lender via check or ACH, or debited or drawn from any of Borrower's designated accounts by Lender or its Representatives pursuant to any ACH authorization or other request for electronic payments provided by Borrower, in each case at the time of issuance by Borrower or initiation by Lender (as the case may be), will be written, debited or drawn upon an account that contains immediately available funds sufficient to cover the dollar amount of such check, ACH or other electronic payment (as the case may be).

(q)   That Borrower's legal name and address as they appear in Section 15 are accurate and complete, and Borrower shall immediately notify Lender in writing of any change in Borrower's Place of Business, bank account information, legal name, physical address, contact information for Borrower or any principal of Borrower (including any change in telephone number), mailing address, business type, state of organization, ownership, management, or control and shall execute any and all documents requested by Lender at any time to bring Borrower into compliance with this Note and any other Loan Document.

(r)   That Borrower and all Guarantors are legally competent and have all necessary power and authority to enter into and perform their respective obligations under this Note and the other Loan Documents.

(s)   That Borrower shall not disclose to any third party (other than its Representatives and Affiliates), without the written consent of Lender, any terms and conditions applicable to Borrower's Credit Line, whether such terms and conditions are set forth on the applicable Advance Schedule, this Note or any other Loan Document.

(t)   That Borrower may have an account with Lender where information can be accessed and transmissions can be sent through the Discover Portal or by other electronic means, and Borrower shall have the means and the affirmative obligation to control access to the account information of Borrower by passwords and a Borrower account number. Borrower shall be solely responsible for any unauthorized access to Borrower's account. Access to Borrower's account may be revoked or otherwise restricted by Lender at any time, in Lender's sole discretion, without prior notice to Borrower.

(u)   That Borrower shall use Advances solely for Business purposes and not for personal, family, or household purposes. This means, among other things, that Borrower may not use Advances to purchase a vehicle for Borrower's personal, family, or household use, and no Lender Financed Inventory may be used for Borrower's personal, family, or household use. This Note and all Advances requested or made hereunder

shall be requested and made only for commercial purposes and Borrower hereby expressly and unconditionally waives, to the fullest extent permitted by Law, the protections of any Law intended to protect consumers or regulate consumer loans.

(v)   That Borrower will provide Lender the name of each individual authorized to buy Inventory and make Advance requests hereunder on Borrower's behalf. Notwithstanding the foregoing or anything to the contrary in any Loan Document, Borrower shall be responsible and liable for all Advance requests and other Liabilities incurred by any such appointed individual or any other actual or apparent representative or agent of Borrower (regardless of whether such Person is specifically appointed by Borrower as contemplated above).

5.   CREDIT TERMS AND CONDITIONS. Borrower understands and agrees to the following terms, conditions, covenants, and other agreements relating to its Credit Line and any Advances made under this Note and the other Loan Documents, and acknowledges that any failure by Borrower to adhere to any such terms, conditions, covenants, or other agreements shall result in Lender having the right (in addition to any other right that Lender may have), in its sole discretion and without notice to Borrower, to declare a Maturity Event with respect to all Advances:

(a)   The decision to make an Advance to or on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred, and Borrower understands that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Borrower or any Guarantors of such decision. Borrower is not obligated to finance any Inventory or Receivable through Lender.

(b)   Borrower's Credit Line may require a Reserve as a credit underwriting condition to the grant of credit and as additional security for the repayment of Liabilities by Borrower. In the event a Reserve is either requested by Borrower or required by Lender, Borrower will be required to execute a reserve agreement, and the applicable Required Reserve Amount and Reserve Charge will be indicated on the applicable Advance Schedule.

(c)   Borrower must deliver or cause to be delivered to Lender the Title or MSO for any Unit of Inventory at the time of any related Floorplan Advance request, or, in the event of a Universal Source Purchase, within seven (7) days after Lender funds the related Floorplan Advance.

(d)   [Reserved.]

(e)   Borrower must be in complete compliance with this Note and the other Loan Documents before an Advance request may be approved by Lender. Additionally, Lender may require certain other information from Borrower to be submitted before Lender will consider an Advance request.

(f)   Borrower shall pay all Liabilities, without notice, that concern or relate to a Floorplan Advance for any Unit of Lender Financed Inventory on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Floorplan Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Floorplan Advance, and the Liabilities relating to such Floorplan Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(g)   [Reserved.]

(h)   Borrower shall pay all Liabilities, without notice, which do not concern or relate to a Floorplan Advance, including Administrative Charges and other account level charges, in each case on their respective Maturity Dates.

(i)   With respect to payments that relate to a Floorplan Advance which exceed the outstanding Liabilities owed by Borrower in connection with such Floorplan Advance, and with respect to payments for all other Liabilities, the order and method of application of such payments shall be at the sole discretion of Lender. Notwithstanding anything herein to the contrary, in the event Lender declares an Event of Default, Lender may apply all subsequent payments, including payments directly related to a Floorplan Advance, in any manner or order. Payments initiated or received by Lender after 5:00PM EST may be applied the next Business Day.

(j)   Unless either (i) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Floorplan Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Floorplan Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Floorplan Advance, Borrower shall pay the accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, unless (a) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (b) Borrower has notified Lender that Borrower has disposed of the subject Unit of Lender Financed Inventory by sale or otherwise, Borrower shall be deemed to have requested, and Lender may, in its sole discretion, automatically approve and process, an Extension with respect to such Floorplan Advance. With respect to any Extension, the Period, rate of Interest, Floorplan Fee, any other fees, including Floorplan Advance related fees, and the principal reduction required to be paid by Borrower for such Extension shall, in each case, be equal in all respects to those of the last Period, and, upon the processing of such Extension, Borrower shall pay such accrued Interest, accrued Floorplan Fee, any other fees, including accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, for each Extension, Borrower shall be charged any applicable Universal Program Fee (including any related Extension fee) set forth in the Finance Program Rate, Fee, and Term Schedule for the applicable Finance Program.

(k)   [Reserved.]

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

(l)  Lender or its Affiliates may hold any property (and proceeds thereof) or funds belonging to or payable to Borrower or any of its Affiliates ("Setoff Funds") and apply such Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender, and Borrower hereby grants to Lender and its Affiliates, as the case may be, a lien on such Setoff Funds. Lender and its Affiliates may at any time apply any or all of the Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender. Borrower expressly waives any requirement of maturity or mutuality among Lender and its various Affiliates.

(m) Any statement of Borrower's account furnished or made available to Borrower by Lender, to the extent no objection is made in writing by Borrower within thirty (30) days after Borrower's receipt of such statement, shall constitute a definitive statement of Borrower's Credit Line and Liabilities as of the date of such statement and shall be binding upon Borrower.

(n)  Borrower hereby expressly authorizes Lender and its Affiliates to communicate with Borrower via facsimile transmissions, email, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Borrower agrees that such express permission shall extend to any and all of the contact information that Borrower has provided herein, including physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Borrower may provide to Lender or that Lender may obtain from any third party at a later date.

(o)  So long as Borrower is not in default of this Note or any other Loan Document, Borrower may sell Lender Financed Inventory to bona fide buyers in the Ordinary Course of Business, but nothing herein shall be deemed to waive or release any interest Lender may have hereunder or under any other agreement in any proceeds or replacements of such Lender Financed Inventory until the unpaid balance of the Liabilities relating to such unit of Lender Financed Inventory has been paid in full. Upon the sale of any Unit of Lender Financed Inventory, Borrower shall hold the proceeds from such sale in trust for the benefit of Lender, and Borrower shall pay to Lender, in accordance with this Note and the other Loan Documents, an amount equal to the unpaid balance of the Liabilities relating to such Unit of Lender Financed Inventory.

(p)  Borrower shall allow Lender and its Representatives to access Borrower's books and records at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located, in order to conduct audits of Borrower's Lender Financed Inventory, in each case without prior notice to Borrower of such audits. Borrower shall be responsible for and agrees to pay all of Lender's expenses in conducting such audits.

(q)  Each Unit of Lender Financed Inventory must be physically verified at the time of any audit conducted by or on behalf of Lender to be at Borrower's Place of Business, or such other place as Lender may authorize. In the event that any Unit of Lender Financed Inventory is not so verified, Lender may, in its sole discretion, provide Borrower an opportunity to produce such Unit of Lender Financed Inventory at Borrower's Place of Business, or such other place as Lender may authorize.

(r)  Borrower may request from Lender, for a legitimate business purpose, the Title to a Unit of Lender Financed Inventory, but Lender reserves the right to grant or deny such request in its sole discretion. In the event Lender grants any such request, any Title provided to Borrower or to any other Person on Borrower's behalf, must be returned to Lender by the close of business on the seventh (7th) day after the date of Lender's release of such Title.

(s)  Borrower and each Guarantor authorize Lender to obtain and share credit information relating to Borrower and its Guarantors from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. Borrower also authorizes Lender to contact any third parties, other than Borrower's direct competitors, to disclose information, other than Borrower's Financial Statements, as that term is defined in the Loan Documents, and proprietary business model information not readily available to the public, but including information contained in the Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, if a Credit Line is granted, Borrower and each Guarantor authorize Lender to review Borrower's account periodically, which may include obtaining additional credit information on Borrower and each Guarantor through any available medium.

(t)  Borrower's account is subject to "NSF" fees in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for each check or ACH issued by Borrower and each ACH or other electronic payment debited or drawn from any of Borrower's designated accounts by Lender or its Representatives pursuant to an ACH authorization or other request for electronic payments provided by Borrower which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Borrower's and/or Lender's depository institution.

(u)  Lender may process checks electronically, at first presentment and any re-presentments, by transmitting the amount of the check, routing number, account number, and check serial number to Borrower's financial institution. By submitting a check for payment, Borrower authorizes Lender to initiate an electronic debit from Borrower's bank account. When Lender processes Borrower's check electronically, Borrower's payment may be debited from Borrower's bank account as soon as the same day Lender receives Borrower's check.

(v)  Borrower's account is subject to a late fee in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for any Unit of Lender Financed Inventory for which Borrower fails to remit payment under this Note or any other Loan Document when due. Borrower acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's additional administrative burden and costs incurred due to the delay and inconvenience to Lender associated with a late payment.

(w) Borrower's account is subject to Administrative Charges. Borrower acknowledges and agrees that any such Administrative Charge charged by Lender is permitted under this Note and the other Loan Documents, and Borrower consents to the assessment of any such Administrative Charge to Borrower's account.

(x) Borrower's account is subject to Universal Program Fees. Lender maintains and publishes the "Finance Program Rate, Fee, and Term Schedule" for each Finance Program applicable to Borrower's Credit Line via posting the same on the Discover Portal. Borrower may request a copy of the Finance Program Rate, Fee, and Term Schedule from Lender in writing at any time. All universal or generally applicable rates and fees and any amendments to the Terms and Conditions shall be published therein, incorporated herein by reference and made a part of this Note and any other applicable Loan Documents. The rates and fees applied to Borrower's Liabilities under this Note, any amended Terms and Conditions, or any applicable event sale or promotional terms in effect with respect to an eligible Floorplan Advance shall be (i) the applicable rates and fees set forth on the applicable Advance Schedule; (ii) the rates, fees, and amendments to the Terms and Conditions most recently published on the applicable Finance Program Rate, Fee, and Term Schedule; and (iii) the rates, fees, terms, and conditions as set forth in the applicable marketing materials outlining event sale and/or promotional terms. Lender may amend the rates, fees, terms and/or Terms and Conditions from time to time, at Lender's sole discretion, and without additional notice to Borrower other than the publication of such amendments on the Discover Portal.

(y) Lender maintains and publishes the Lender Guide on the Discover Portal. Borrower acknowledges and agrees that the Lender Guide and the content found therein are not part of this Note or any other Loan Document, are for informational purposes only, and do not create any new or additional contract rights or obligations for Borrower or Lender. Borrower acknowledges and agrees that the Lender Guide and the content therein is subject to change by Lender at any time without notice. To the extent the Lender Guide and the content therein are determined to create or provide additional contractual rights for Borrower and a conflict exists between this Note or any other Loan Document, on the one hand, and the Lender Guide, on the other hand, the provision of this Note or the other Loan Document, as the case may be, shall prevail.

(z) Borrower waives demand, presentment for payment, notice of dishonor, protest, and notice of protest, and expressly agrees that this Note and all payments coming due under it and any other Loan Documents may be extended or modified from time to time without in any way affecting Borrower's liability under this Note or any other Loan Document. Borrower and Guarantors understand that notwithstanding the nonoccurrence of an Event of Default, Lender may, at any time and upon one hundred eighty (180) days' prior written notice to Borrower, demand that this Note immediately be paid in full. The demand nature of this Note does not limit Lender's election of remedies upon an Event of Default by Borrower, and Borrower and Guarantors acknowledge that upon Lender's declaration of an occurrence of an Event of Default, all Liabilities of Borrower shall automatically accelerate and Lender may, at any time and without notice to Borrower, demand immediate payment of all Liabilities of Borrower and take such further action as may be contemplated under Section 7 or otherwise permitted by Law or in equity. Borrower shall have the right to pay all Liabilities in full at any time.

(aa) Notwithstanding Section 4(f), upon any disposition of a Unit of Lender Financed Inventory, whether by sale or otherwise, or the receipt by Borrower (or any other Person on behalf of Borrower) of full or partial payment by or on behalf of the purchaser of such Unit of Lender Financed Inventory, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Floorplan Advance.

(bb) [Reserved.]

(cc) The receipt, by Lender or Borrower, or any third party on Borrower's behalf, of proceeds or other consideration related to any Unit of Lender Financed Inventory shall constitute conclusive proof of the sale or other disposition of such Unit of Lender Financed Inventory for purposes of this Note and the other Loan Documents.

(dd) Borrower acknowledges that Cox Automotive, Inc. (formerly Manheim, Inc.) and Manheim Remarketing, Inc., together with each of their respective direct and indirect subsidiaries and affiliated U.S. auctions (collectively "Manheim"), are Affiliates of Lender. Borrower may from time to time purchase a Unit through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels). For any Unit purchased by Borrower through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels) that remains unsettled with Manheim (each, an "Unsettled Unit"), Borrower hereby requests, directs and authorizes Lender, as of the date Lender receives a request for payment from Manheim with respect to such Unsettled Unit, to process and approve, in Lender's sole discretion, a Floorplan Advance on Borrower's Credit Line, which Lender may pay and remit directly to Manheim on Borrower's behalf for such Unsettled Unit. Borrower acknowledges that if any such request is received by Lender from Manheim within seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Universal Source Purchase, and if any such request is received by Lender from Manheim outside of seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Specific Source Purchase.

6. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Note and the other Loan Documents (each, an "Event of Default"):

(a) Borrower or any Guarantor fails to repay any Liability when due under this Note or any Loan Document.

(b) Other than as set forth in Section 6(a) herein, Borrower or any Guarantor fails to perform any of its obligations, undertakings, or covenants under this Note or under any other Loan Document, or breaches or otherwise violates any provision of this Note or any of the other Loan Documents, and such breach or violation is not cured within ten (10) days after written notice from Lender.

(c) Borrower makes any representation or warranty to Lender, or provides to Lender any schedule, certificate, financial statement, report, notice, or other writing, which is false or misleading in any material respect when made or delivered.

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

(d) Any damage or destruction of any Inventory and appropriate insurance naming Lender as "Loss Payee" is not in effect as required under Section 4(c).

(e) Borrower or any Guarantor, or any of their respective Parent Companies, has defaulted in the payment or performance of any debt or obligation under any other agreement, whether to Lender or to a third party.

(f) Borrower or any Guarantor, or any of their respective Parent Companies, becomes insolvent or consents to the appointment of a trustee, receiver, or other custodian for such Borrower, Guarantor, or Parent Company, as the case may be, or for any property belonging to any of the foregoing Persons; or such Borrower, Guarantor, or Parent Company, as the case may be, makes a general assignment for the benefit of its creditors; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency Law, or a dissolution or liquidation proceeding, is commenced by or against such Borrower, Guarantor, or Parent Company, as the case may be.

(g) Any material change in the ownership or control of Borrower or its Parent Company occurs (unless such material change has been consented to in writing by Lender) in violation of Section 4(k) herein.

(h) The voluntary or administrative dissolution of Borrower or any Guarantor, or any of their respective Parent Companies.

(i) Any change in the financial condition of Borrower or any Guarantor, or any of their respective Parent Companies, which Lender in good faith deems adverse.

(j) Borrower or any Guarantor, or any of their respective Parent Companies, admits in writing that it is unable to pay its debts as they become due.

(k) Borrower fails to deliver after reasonable notice, revokes or amends (other than at the written request of Lender) any power of attorney or similar authorization that it has executed in favor of Lender.

(l) Lender in good faith deems itself insecure for any reason.

7.  RIGHTS AND REMEDIES. Upon any Event of Default, Lender may, at its option and without notice to Borrower, exercise any or all of the following rights in a separate, successive, or concurrent fashion, and Lender's exercise of any rights hereunder shall not preclude Lender from pursuing other rights and remedies in conjunction therewith or at a later time:

(a) Demand immediate payment of all Liabilities and other indebtedness and amounts owed to Lender and its Affiliates by Borrower and its Affiliates. Lender shall have all rights and remedies available hereunder and under the other Loan Documents, and all rights and remedies available to Lender at law or in equity, including the rights and remedies of a secured party under the UCC. These rights and remedies include the right to cancel any unfunded Advances; to enter into Borrower's premises with or without legal process, but without force, and to take possession of and remove any Collateral; and to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of Lender. Lender shall have the right to contact any third parties, including auctions, governmental agencies, Borrower's licensing authorities, consumer finance companies, floorplan companies, other finance companies, consumers, other borrowers, Auction Insurance Agency, and such other Persons as Lender may elect to contact in its sole discretion, and to share such information as is necessary, in Lender's sole discretion, for any reason, including for purposes of and related to collection of any Liabilities of Borrower. At Lender's request, and to the extent Borrower may lawfully do so, Borrower shall assemble, prepare for removal, and make available to Lender at a place designated by Lender which is reasonably convenient for Lender and Borrower such Collateral as Lender may request.

(b) Initiate proceedings to appoint a receiver in any court of competent jurisdiction. To the extent permitted by Law, Borrower waives the right to notice and hearing of the appointment of a receiver and consents to such appointment without requiring Lender to post a bond.

(c) To the extent permitted by Law, Borrower gives consent to Lender to proceed in any action to collect on or execute against any and all bonds that Borrower or its Affiliates may have posted with any governmental authorities or third parties.

(d) Without limiting the foregoing, Lender may take control of any funds generated by any Collateral, and in Lender's name or Borrower's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept returns of, foreclose, or realize upon any Collateral. Borrower waives any and all rights it may have to notice prior to seizure by Lender of any Collateral. Borrower agrees that private sale of any Lender Financed Inventory at the amount then owed to Lender on such Lender Financed Inventory, less costs reasonably incurred by Lender in preparation of disposition of such Lender Financed Inventory, shall be a commercially reasonable method of disposition of such Collateral. Additionally, Borrower further agrees that any Inventory Collateral repossessed or otherwise obtained by Lender after an Event of Default may be disposed of by Lender, in Lender's sole discretion, at any regular or online sale of any wholesale auto auction that may be an Affiliate of Lender, or at any National Auto Auction Association member, and, in each case, any such a sale is and shall be deemed commercially reasonable for all purposes. Borrower shall be liable to Lender for any deficiency resulting from Lender's disposition of the Collateral. Borrower agrees that the Collateral is of the type customarily sold on a recognized market and that Lender therefore has no obligation to notify Borrower prior to a sale of any Collateral. Lender shall not be responsible for the accuracy or validity of any document or for the existence or value of any Collateral. Lender shall not be required to marshal any assets in favor of Borrower. Lender has no obligation to pursue any third party for any liability or obligation owed to Borrower. Borrower further agrees to pay all reasonable attorneys' fees and other collection costs incurred by Lender and its Affiliates in enforcing this Note and any other Loan Document after any Event of Default. To the extent not prohibited by Law, Borrower waives all appraisement, valuation, anti-deficiency, homestead, exemption, and usury Laws now or hereafter in effect, and releases all right to appeal after payment in full.

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

8.  LOAN DOCUMENTS. In addition to the execution and delivery of this Note, upon the request of Lender, Borrower shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be amended, restated, renewed, extended or otherwise modified from time to time, the "Loan Documents"), each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative; (b) prior to Lender making any Advances under this Note, an Advance Schedule for each unique set of terms for the Finance Program applicable to Borrower, which may be amended from time to time; (c) such corporate guaranties of Borrower's Liabilities as Lender has requested; (d) a reserve agreement in favor of Lender; (e) prior to Lender authorizing Borrower to place any Lender Financed Inventory on consignment with another licensed dealer, a consignment agreement acceptable to Lender; (f) such ACH authorization and requests for automated payments as Lender may request from time to time; and (g) such other documents or certifications as Lender may reasonably request or require from Borrower or any Guarantor from time to time.

9.  ASSIGNMENT. This Note and any other Loan Document may be assigned by Lender without notice to Borrower, but Borrower may not assign this Note or any other Loan Document without the prior written consent of Lender.

10. THIRD PARTY BENEFICIARIES. Neither this Note nor any other Loan Document is intended to confer upon any Person other than the Parties any rights or remedies hereunder; provided, however, that the rights and remedies afforded to Lender under Sections 2, 5(l), 5(n), 5(s), 5(dd), 7, 11 and 14 shall also inure to the benefit of the Affiliates of Lender and such Affiliates shall be intended third party beneficiaries of the provisions thereof.

11. INDEMNIFICATION. Borrower shall, at its expense, defend, indemnify and hold harmless Lender and its Affiliates, and each of their respective directors, officers, principals, partners, shareholders or holders of any ownership interest, as the case may be, employees, Representatives, attorneys, and agents (together with Lender, the "Lender Parties") from and against any and all claims, judgments, losses, damages, demands, payments, fines, costs, expenses (including reasonable attorneys' fees and court costs), and liabilities of any nature or description incurred by a Lender Party to the extent arising from or relating to any of the following: (a) any personal injury or property damage caused by Borrower or any of its Representatives; (b) any breach by Borrower of this Note or any other Loan Document, including the breach of any representation, warranty, or other agreement contained in this Note or in any other Loan Document; and (c) Borrower's operation of its Business or any of Borrower's operations or activities.

12. NO JOINT VENTURE, PARTNERSHIP, OR AGENCY. Nothing contained in this Note or in any other Loan Document shall subject Lender or its Affiliates or any of its or their respective Representatives to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of the Borrower. This Note does not constitute and shall not be characterized as a joint venture, partnership, or agency between Lender and Borrower. Nothing in this Section 12 shall limit any of the Liabilities of Borrower, or any of the other obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents.

13. AMENDMENT; MERGER. This Note and the other Loan Documents are intended by the Parties to be an amendment to and restatement of any prior Demand Promissory Note and Loan and Security Agreement or similar document or instrument (including any prior promissory note, loan and security agreement or similar contract) between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Borrower. With the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, this Note may be modified or amended only upon the written consent of Lender and Borrower. In the case of the other Loan Documents, with the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, such other Loan Documents may be modified or amended only upon the written consent of Lender and the Person to whom such amendment relates. Additionally, the Finance Programs, Lender Guide, descriptions of specific terms of Lender Financed Inventory, amounts and terms of Advances, Maturity Dates, Extensions, Interest, Base Rates, Administrative Charges, Lender Universal Program Fees, late fees, NSF fees, and other charges allowed by this Note or any other Loan Document may be proven by the records kept by Lender. Notwithstanding the foregoing, any advance and/or loan originated pursuant to one or more agreements between Borrower and Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc. prior to the Effective Date for which indebtedness from Borrower remains outstanding as of the Effective Date, shall remain subject to the terms and conditions of such prior agreement(s) for all intents and purposes until such indebtedness has been indefeasibly repaid and satisfied in full.

14. EXECUTION. The Parties understand and agree that Lender may execute this Note and any other Loan Documents by affixing the signature of an authorized representative of Lender via signature stamp. Additionally, Lender may execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature, which electronic or digital signature shall for all purposes be deemed effective to constitute the valid signature of Lender. Any electronic or digital signature affixed to this Note or any other Loan Documents by Lender shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. Notwithstanding the foregoing, Borrower may execute this Note and any other Loan Documents only by original signature of an authorized representative of Borrower, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Borrower and/or any Guarantor to execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature of an authorized representative of Borrower or of any Guarantor, as applicable. Borrower and each Guarantor acknowledges and agrees that any electronic or digital signature of Borrower or any such Guarantor shall for all purposes be deemed effective and constitute the valid signature of Borrower or any such Guarantor, as the case may be, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the E-Sign Act, and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of signatures on this Note and any other Loan Documents shall be deemed original signatures for all

intents and purposes. This Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute one and the same agreement.

15. NOTICES. All notices, demands and requests required or permitted to be given under this Note and any other Loan Document shall be (a) in writing, (b) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Borrower (through written notice, via the Discover Portal, or otherwise) for purposes of directing future notices, demands or requests):

| If to Lender: | NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032<br>Telephone: (317) 571-3721 |
| | |
| | with a copy to: |
| | |
| | NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032<br>Telephone: (317) 571-3721<br>Attention: Legal Department |
| | |
| If to Borrower: | RAC Dealership, LLC dba American Car Center<br>6775 Lenox Center Ct Ste 100, Memphis, TN 38115-4441<br>Telephone: (901) 322-5839<br>Email: John.Moses@americancarcenter.com |

16. NO WAIVER. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any of the Terms or Conditions will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

17. TERMINATION. No termination of this Note shall alter Borrower's Liabilities or any outstanding obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents, including any outstanding obligations relating to Advances and amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including the security interest granted herein and the rights of Lender as a secured party hereunder, shall extend until all Liabilities of Borrower have been indefeasibly paid and satisfied in full.

18. LEGAL FEES AND COLLECTION COSTS. Borrower shall pay to Lender all reasonable legal fees, expenses, and collection costs incurred by any Lender Parties, including Lender as a result of any Event of Default, or any failure by Borrower or any Guarantor to perform any obligation or satisfy any Liability of Borrower, including any prosecution by Borrower or any Guarantor or any of their respective Representatives of affirmative claims or counterclaims against Lender Parties.

19. SEVERABILITY. Any provision of this Note or any other Loan Document that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note and the other Loan Documents or affecting the validity or enforceability of any provision of this Note or any other Loan Document in any other jurisdiction.

20. GOVERNING LAW. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 22 (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Note and the other Loan Documents shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

21. JURISDICTION AND VENUE. As evidenced by Borrower's signature below, subject to the provisions noted in Section 22, Borrower submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Note or any other Loan Document, or to any matter arising out of or related to this Note or any other Loan Document, which are initiated by Borrower against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 22 below, shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Borrower expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue, or forum non conveniens with respect to any such action. Borrower acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Borrower in any court of competent jurisdiction, and Borrower consents to such forum as Lender may elect.

22. MANDATORY BINDING ARBITRATION; WAIVER OF CLASS ACTION RIGHTS.

(a) In most cases, any disputes or claims that Borrower may have can be resolved quickly and to Borrower's satisfaction by contacting Lender regarding such dispute or claims. In the unlikely event that Lender is unable to resolve a dispute or claim that Borrower may have, Borrower agrees to arbitrate any such dispute or claim in accordance with this Section 22. This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Note or any other Loan Document or any aspect of Borrower's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen prior to the Effective Date or from any prior dealings, contract or agreement between Borrower and Lender (including all disputes, claims and counterclaims relating to any marketing or advertising by Lender); and (iii) any disputes, claims and counterclaims that may arise after the termination of this Note and any other Loan Document. Additionally, Borrower acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

that it may have against Borrower, with any such arbitration being governed by the provisions of this Section 22. BY AGREEING TO ARBITRATION, BORROWER UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Borrower, at its election, may opt-out of the arbitration provisions set forth in Sections 22(a), 22(c) and 22(d) by providing written notice of its election to opt-out no later than thirty (30) days after the Effective Date, which notice shall be provided to Lender pursuant to Section 15 ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Borrower's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Borrower acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Borrower shall in all events be subject to the provisions of Section 22(b).

(b) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE ARISING UNDER OR RELATING TO THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR TO ANY ASPECT OF BORROWER'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. BORROWER AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. BORROWER AGREES THAT, BY ENTERING INTO THIS NOTE, BORROWER IS WAIVING ITS RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES, ARE UNIQUE TO AND NEGOTIATED BY BORROWER, AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS.

(c) Any dispute or claim subject to arbitration pursuant to this Section 22 shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 22 and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect on the Effective Date (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 22 will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Note and the other Loan Documents and may not limit, expand, or otherwise modify any term or provision of this Note or any other Loan Document or any other contract or document between Borrower and Lender. The arbitrator shall not have the power to award to Borrower any damages that are excluded or that have been waived by Borrower under this Note or any other Loan Document, and Borrower irrevocably waives any claim that it may have thereto. The arbitrator shall have the power to order reasonable pre-hearing discovery of documents and the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

(d) This Note and the other Loan Documents evidence transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 22, notwithstanding the provisions of Section 20.

23. WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR BORROWER. NEITHER LENDER NOR BORROWER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR BORROWER EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND BORROWER.

24. LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR ANY ADVANCES MADE BY LENDER HEREUNDER OR THEREUNDER), EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY LENDER HEREUNDER OR THEREUNDER) THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THIS NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE

EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

25. WAIVER OF BOND. BORROWER WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY ON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER DURING ATTEMPTS TO RECOVER COLLATERAL OR OTHERWISE.

26. CALIFORNIA BORROWERS. In the event Borrower's Place of Business is in the State of California, Borrower acknowledges and agrees that any initial Advance made under this Note must be in the amount of at least Five Thousand Dollars and Zero Cents ($5,000), and Borrower shall neither request nor accept any initial Advance under this Note in an amount less than Five Thousand Dollars and Zero Cents ($5,000).

27. DISCLAIMER. THE DISCOVER PORTAL LICENSED OR PROVIDED HEREUNDER IS PROVIDED AS A CONVENIENCE TO BORROWER AND ON AN "AS-IS" BASIS. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, TITLE, ACCURACY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LENDER MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE DISCOVER PORTAL WILL OPERATE ERROR-FREE OR ON AN UNINTERRUPTED BASIS, AND LENDER SHALL IN NO EVENT BE LIABLE OR RESPONSIBLE FOR ANY OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY WITH RESPECT TO THE DISCOVER PORTAL, AND NO SUCH OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY SHALL EXCUSE ANY FAILURE BY BORROWER TO TIMELY PERFORM ALL OF ITS OBLIGATIONS TO LENDER UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS.

28. DESCRIPTIVE HEADINGS; INTERPRETATION. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Note. As used in this Note and the other Loan Documents, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import. Words (including the defined terms set forth in Appendix A) of one gender shall be held to include the other gender as the context requires. Any references in this Note or in the other Loan Documents to a particular statute or regulation shall be deemed to include all amendments thereto, rules and regulations thereunder and any successor statute, rule, or regulation, or published clarifications or interpretations with respect thereto, in each case as in effect from time to time.

29. EFFECTIVE DATE OF OTHER LOAN DOCUMENTS. Unless otherwise stated in the applicable Loan Document, the effective date of any Loan Document executed by a party shall be the later of (a) the Effective Date of this Note, or (b) the date of Borrower's execution thereof as set forth below Borrower's signature thereon (or, in the case of any guaranty, the date of Guarantor's execution thereof as set forth below Guarantor's signature thereon). In the event that the date of Borrower's or Guarantor's execution of any Loan Document is not set forth below Borrower's or Guarantor's signature thereon, then the effective date of such Loan Document shall be deemed to be the Effective Date of this Note.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Demand Promissory Note and Loan and Security Agreement on the dates set forth below.

**LENDER:**

NEXTGEAR CAPITAL, INC.

By:
Name:   Shane O'Dell
Title:   President

Date:   11/14/17

**BORROWER:**

RAC Dealership, LLC dba American Car Center

By:
Name:   Bob Michael Shivers, Jr
Title:   CEO

Date:   11-14-17

# APPENDIX A

(1)  "<u>Administrative Charge</u>" shall mean any expense charged by Lender to Borrower that is reasonable or necessary, in Lender's sole discretion, to administer or monitor Borrower's account, to preserve any Collateral, or to collect any Liabilities owed by Borrower.

(2)  "<u>Advance</u>" shall mean any discretionary loan or payment in any amount, for any purpose, made pursuant to this Note by Lender to Borrower or on Borrower's behalf to any third party.

(3)  "<u>Advance Schedule</u>" shall mean any addendum or other document executed pursuant to this Note, in each case as modified from time to time, which indicates the applicable specific terms regarding Borrower's Floorplan Fees, Receivable Fees, Contract Rate of Interest, Period(s), Required Reserve Amount, Reserve Charge, required principal reduction to obtain a Curtailment of the Maturity Date, and number of available Curtailments.

(4)  "<u>ACH</u>" shall mean any payment by or on behalf of Borrower to Lender made via a nationwide electronic funds transfer network processing electronic debit and credit entries to or from Borrower's bank accounts.

(5)  "<u>Affiliate</u>" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first-named Person (which shall, for purposes of clarity, include any parent company and any direct or indirect subsidiary of such first-named Person) and, if such first-named Person is a natural person, also includes any member of such first-named Person's immediate family.  For purposes of this definition, the term "<u>control</u>" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

(6)  "<u>Base Rate</u>" shall mean the greater of that variable rate of interest or that fixed rate of interest as stated in the Finance Program Rate, Fee, and Term Schedule.

(7)  "<u>Borrower</u>" shall have the meaning set forth in the Preamble.

(8)  "<u>Borrower's Place of Business</u>" shall mean all locations at which Borrower sells, leases or rents Inventory, whether at wholesale or retail, provided that Borrower has previously provided Lender with written notice that Borrower sells, leases or rents Inventory at such location and Lender has subsequently approved such location in writing to Borrower as a Borrower's Place of Business.

(9)  "<u>Business</u>" shall mean Borrower's business, as it relates to the purchase and sale, lease, or rent of Inventory and/or the origination of any Receivables.

(10)  "<u>Business Day</u>" shall mean any day other than a Saturday, Sunday, federal holiday or day on which banking institutions in Carmel, Indiana are authorized or obligated by Law or executive order to be closed.

(11)  "<u>Check</u>" shall mean any payment by or on behalf of Borrower to Lender not made in cash, via certified funds, wire transfer, or ACH.

(12)  "<u>Collateral</u>" shall have the meaning set forth in Section 2(a).

(13)  "<u>Collateral Protection Program</u>" shall mean that certain program in which Borrower may participate in lieu of providing third party insurance as required under this Note.

(14)  "<u>Contract Rate</u>" shall mean that rate of interest as stated on the applicable Advance Schedule.

(15)  "<u>Credit Line</u>" shall mean Borrower's floorplan line of credit with Lender pursuant to and under this Note.

(16)  "<u>Curtailment</u>" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance for an additional Period.  The number of allowable Curtailments for a Floorplan Advance shall be as stated on the applicable Advance Schedule.

(17)  "<u>Discover Portal</u>" shall mean that certain web-based portal located at http://www.nextgearcapital.com (or any similar successor or related portal, interface or website including any mobile or tablet application or website) owned, operated or maintained by Lender and, subject to the Terms and Conditions, to which Borrower shall have access to from time to time as determined by Lender.

(18)  "<u>Effective Date</u>" shall have the meaning set forth in the Preamble.

(19)  "<u>E-Sign Act</u>" shall have the meaning set forth in Section 14.

(20)  "<u>Event of Default</u>" shall have the meaning set forth in Section 6.

(21)  "<u>Extension</u>" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance beyond the last Period as stated on the applicable Advance Schedule.

(22) "Finance Program" shall mean any finance program offered by Lender and available to Borrower for the financing of Inventory or Receivables pursuant to an Advance under this Note.

(23) "Finance Program Rate, Fee, and Term Schedule" shall mean that current schedule of applicable universal interest rates, fees and term and condition amendments for each Finance Program, including Universal Program Fees; late fees; fees relating to returned checks or ACH payments due to insufficient funds; the Base Rate; Collateral Protection Program fees; and notice of amendments to the Terms and Conditions, published by Lender via posting such schedule of such universal rates and fees and notice of amendments to the Terms and Conditions on the Discover Portal.

(24) "Floorplan Advance" shall mean an Advance made pursuant to this Note relating to a Unit of Inventory to be offered for sale, lease or rent, or leased or rented by Borrower in the Ordinary Course of Business.

(25) "Floorplan Date" shall mean (a) for a Universal Source Purchase, the sale date, regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Specific Source Purchase, the date the request for the Floorplan Advance is received by Lender, regardless of the date such Floorplan Advance is actually funded.

(26) "Floorplan Fee" shall mean the fee charged by Lender to Borrower, as set forth on the applicable Advance Schedule, for each Unit of Lender Financed Inventory for each Period, including any Extensions thereof.

(27) "Guarantor" shall mean any Person executing this Note as a Guarantor or any Person executing any guaranty pursuant to this Note.

(28) "Interest" shall mean the aggregate rate of interest which accrues on all outstanding Liabilities of Borrower under or arising under this Note or any of the other Loan Documents.

(29) "Inventory" shall mean all Units held by Borrower for wholesale or retail sale, lease, or rent, or leased or rented by Borrower. "Inventory" includes Lender Financed Inventory.

(30) "JAMS" shall have the meaning set forth in Section 22(c).

(31) "JAMS Comprehensive Rules" shall have the meaning set forth in Section 22(c).

(32) "JAMS Streamlined Rules" shall have the meaning set forth in Section 22(c).

(33) "Law" or "Laws" shall mean applicable common law and any applicable statute, permit, ordinance, code or other law, rule, regulation or order enacted, adopted, promulgated or applied by any governmental authority, all as in effect from time to time.

(34) "Lender" shall have the meaning set forth in the Preamble.

(35) "Lender Financed Inventory" shall mean all Units for which an Advance has been made under this Note.

(36) "Lender Guide" shall mean those procedures and instructions for the use of Lender's system and the Discover Portal, in each case as modified by Lender from time to time in Lender's sole discretion, which are available in hard copy upon Borrower's written request to Lender or by Borrower logging onto the Discover Portal.

(37) "Lender Parties" shall have the meaning set forth in Section 11.

(38) "Liabilities" shall mean any and all Advances, debts, financial obligations, Administrative Charges, Lender Universal Program Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from Borrower to Lender of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Note, any other Loan Document, or otherwise, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however acquired.

(39) "Liens" shall mean any claims, liabilities, security interests, liens, mortgages, deeds of trust, pledges, conditions, charges, claims, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions under any contract or agreement or encumbrances of any kind or nature whatsoever.

(40) "Loan Documents" shall have the meaning set forth in Section 8.

(41) "Maturity Date" shall mean (a) for all Liabilities concerning or relating to a Floorplan Advance, the earlier of the last day of the current Period or the day on which Lender declares a Maturity Event; (b) for all Liabilities not directly related to a Floorplan Advance, ten (10) days after the date such Liability is posted to Borrower's account; and (c) for One Day Loans, the date such One Day Loan is posted to Borrower's account. Notwithstanding the foregoing, upon the declaration of an Event of Default by Lender, the Maturity Date for all Liabilities shall be the earlier of (i) the date on which such Event of Default is declared by Lender, or (ii) the date on which such Event of Default first occurred. In the event the Maturity Date is not a Business Day, the Maturity Date shall be deemed to be the next Business Day.

(42)  "Maturity Event" shall mean any event, act or circumstance arising under this Note or any other Loan Document (including any failure by Borrower to adhere to any term or provision of this Note or any other Loan Document), which causes Lender to declare the event, act or circumstance a "Maturity Event" with respect to any Floorplan Advance.

(43)  "MSO" shall mean the manufacturer's statement of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

(44)  "Note" shall mean this Demand Promissory Note and Loan and Security Agreement and all present and future amendments, modifications, and addendums related thereto.

(45)  "One Day Loan" shall mean the amount of any Advance that is in excess of the market value of a Unit, as determined by Lender in its sole discretion. The determination of whether to approve an Advance which would result in the posting of a One Day Loan to Borrower's account shall be in Lender's sole discretion. One Day Loans mature on the date on which they post to Borrower's account.

(46)  "Opt-Out Notice" shall have the meaning set forth in Section 22(a).

(47)  "Ordinary Course of Business" shall mean the ordinary course of the Business of Borrower, consistent with past practices (but only to the extent such past practices were in compliance with Law and in accordance with prudent industry practices).

(48)  "Parent Company" shall mean, with respect to Borrower or any Guarantor, the Person(s) that, directly or indirectly, have the power to direct or cause the direction of the management and policies of Borrower or Guarantor, as the case may be, whether through the ownership of voting securities, by contract or otherwise.

(49)  "Party" or "Parties" shall have the meaning set forth in the Preamble.

(50)  "Period" shall mean the number of days set forth on the applicable Advance Schedule, which (a) in the case of a Floorplan Advance, shall be calculated beginning on the Floorplan Date.

(51)  "Person" shall mean any individual, corporation, joint stock company, association, partnership, joint ventures, trust, estate, limited liability company, limited liability partnership, governmental authority or other entity or organization.

(52)  "Receivable" shall mean chattel paper, including a retail installment contract or buy here pay here contract, evidencing a monetary obligation of a buyer for the purchase of a motor vehicle from Borrower and the granting of a security interest in the vehicle to Borrower as security for the repayment of the monetary obligation.

(53)  [Reserved.]

(54)  [Reserved.]

(55)  [Reserved.]

(56)  "Representative" shall mean, with respect to Borrower or Lender, as the case may be, the directors, managers, officers, stockholders, employees, trustees, agents, direct and indirect equity holders of Borrower, and representatives, including any investment banker, consultant, attorney, or accountant, of Borrower or Lender, as the case may be.

(57)  "Required Reserve Amount" shall mean the aggregate total amount of funds required to be remitted by Borrower to Lender, as set forth in the applicable Advance Schedule, and held in the Reserve as a condition to the grant of credit to Borrower under this Note and the other Loan Documents.

(58)  "Reserve" shall mean the cash deposited with Lender by Borrower on a voluntary basis or as required as an underwriting condition and held by Lender as additional security for Borrower's Liabilities, and other Obligations (as defined in the applicable reserve agreement) to the Lender Parties.

(59)  "Reserve Charge" shall mean that charge by Lender to Borrower, as set forth on the applicable Advance Schedule, assessed for the purpose of funding any Reserve.

(60)  "Setoff Funds" shall have the meaning set forth in Section 5(l).

(61)  "Specific Source Purchase" shall mean all purchases or other requests for an Advance, made by or on behalf of Borrower that do not constitute a Universal Source Purchase.

(62)  "Terms and Conditions" shall mean all provisions of this Note and the other Loan Documents, with the exception of terms specifically referenced on the applicable Advance Schedule.

(63)  "Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, commonwealth, province, or government agency.

(64)  "UCC" shall mean the Uniform Commercial Code as enacted in the State where the Collateral at issue is located.

(65)  "Unit" shall mean any manufactured item, including motor vehicles, for which there exists a Title, MSO, or other similar evidence of ownership acceptable to Lender.

(66)  "Universal Program Fee" shall mean any published fee, as stated in the Finance Program Rate, Fee, and Term Schedule, charged by Lender to Borrower pursuant to a Finance Program.

(67)  "Universal Source Purchase" shall mean any purchase made by or on behalf of Borrower for which (a) a request for an Advance is made by or on behalf of Borrower; (b) from an auction or third party business that has entered into a universal funding agreement with Lender; and (c) such request for an Advance is received by Lender within seven (7) days of Borrower's purchase of the vehicle that is the subject of such request.

## POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1.  No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2.  With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

    (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

    (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

    (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

    (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

    (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

    (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

    (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

    (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

    (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

    (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

    (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3.  Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

    (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

    (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER**:

RAC Dealership, LLC dba American Car Center

By: 
Name:    Bob Michael Shivers, Jr
Title:    CEO

Date:    11-14-17

STATE OF _Tennessee_ )
                                              )  SS:
COUNTY OF _Shelby_ )

Before me, a Notary Public in and for said County and State, personally appeared **Bob Michael Shivers, Jr**, known to me to be the CEO of **RAC Dealership, LLC dba American Car Center**, who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this _14th_ day of _Nov_ 20_17_.

Notary Signature    _Laura Cornwell_

Notary Name (Printed)    _Laura Cornwell_

My Commission Expires My Commission Expires March 16, 2021    County of Residence: _Shelby_

## ADVANCE SCHEDULE
(Retail)

| | | | |
|---|---|---|---|
| Borrower: | RAC Dealership, LLC dba American Car Center | Market: | Major Dealer Central |
| Account Number: | 111768 | Finance Program: | Major Dealer |

This Advance Schedule is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The following terms shall apply to Advances made under the Note and this Advance Schedule:

The Floorplan Fee, the Period(s), and the required principal reduction for Curtailment for each Advance made pursuant to the Note and this Advance Schedule shall be as follows:

| Period | Number of Days in Period | Required Principal Reduction for Curtailment of Maturity Date | Floorplan Fee |
|---|---|---|---|
| 1 | 90 | 0% | $0.00 |
| 2 | 60 | 0% | $0.00 |
| 3 | 30 | N/A – No Further Curtailments Available | $0.00 |

Contract Rate: -1.5%

Additional fees, charges, and other terms applicable to Advances made pursuant to the Note and this Advance Schedule are set forth on the Finance Program Rate, Fee, and Term Schedule, which can be found on the Discover Portal.

The undersigned Borrower hereby expressly acknowledges that this Advance Schedule shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this Advance Schedule, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Advance Schedule may be executed by affixing to this Advance Schedule an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Advance Schedule on the dates set forth below.

**LENDER**:

NEXTGEAR CAPITAL, INC.

By:
Name:  Shane O'Dell
Title:  President

Date:  11-14-17

**BORROWER**:

RAC Dealership, LLC dba American Car Center

By:
Name:  Bob Michael Shivers Jr
Title:  CEO

Date:  11-14-17

**ADDENDUM FOR SPECIFIC SOURCE PURCHASE TITLE DELIVERY**
**(ACH Authorization)**

This Addendum for Specific Source Purchase Title Delivery ("Addendum") forms a part of the ACH Authorization dated of even date herewith and delivered to Lender by Borrower. Borrower acknowledges and understands that pursuant to Paragraph 5(c) of the Note, Borrower must deliver or cause to be delivered to Lender the Title or MSO for any Unit of Inventory at the time of any related Floorplan Advance request which is the product of a Specific Source Purchase. Notwithstanding the foregoing, in accordance with this Addendum, and subject to Lender's discretion and all other terms and conditions of the Note, Borrower shall have seven (7) days from the Floorplan Date of a Floorplan Advance which is the product of a Specific Source Purchase to deliver to Lender the Title or MSO for the Unit of Inventory which is the subject of the Floorplan Advance. Borrower further acknowledges and understands that failure to deliver to Lender the subject Title or MSO within seven (7) days from the Floorplan Date of a Floorplan Advance will result in the declaration of a Maturity Event for the related Floorplan Advance.

Borrower hereby requests Lender to initiate an Elective Payment on the Maturity Date for a Floorplan Advance which a Maturity Event has been declared in accordance with this Addendum. Borrower agrees that each Elective Payment made pursuant to this request shall be deemed an Authorized Debit under the ACH Authorization and Request.

The undersigned Borrower hereby expressly acknowledges that this Addendum shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this Addendum, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Addendum may be executed by affixing to this Addendum an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

WHEREFORE, Borrower, by its duly authorized representative(s), has executed this Addendum on the date(s) set forth below.

**BORROWER**:

RAC Dealership, LLC dba American Car Center

By:

Name:   Bob Michael Shivers Jr

Title:   CEO

Date:   11-14-17

**EXHIBIT C**

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Phone: (800) 331-3282 Fax: (818) 662-4141 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   16554 - NextGear Capital

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

61418692

TNTN

File with: Secretary of State, TN

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modfy, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| RAC DEALERSHIP, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 6775 Lenox Center Ct Ste 100 | Memphis | TN / 38115-4431 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| American Car Center | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 6775 Lenox Center Ct Ste 100 | Memphis | TN / 38115-4431 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| NEXTGEAR CAPITAL, INC. | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1320 CITY CENTER DR., STE 100 | CARMEL | IN / 46032 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Debtors assets and properties wherever located, including without limitation all equipment of any kind or nature, all vehicles, vehicle parts and inventory now owned or hereafter acquired, without limitation, purchase money inventory, the purchase of which was financed or floorplanned by NextGear Capital, Inc. for Debtor of whatever kind or nature, and all returns, repossessions, exchanges, substitutions, attachments, additions, accessions, accessories, replacements, and proceeds thereof; all accounts, accounts receivable, chattel paper, and general intangibles now owned or hereafter acquired by Debtor together with the proceeds thereof; all of Debtors documents, books and records relating to the forgoing.

Maximum Principal Indebtedness for Tennessee recording tax purposes is $30,000,000.00.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

| 8. OPTIONAL FILER REFERENCE DATA: | | |
|---|---|---|
| 61418692 | 556 | 111768 |

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282



**Tre Hargett**
Secretary of State

# Division of Business Services
## Department of State
State of Tennessee
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102

LIEN SOLUTIONS
PO BOX 29071
GLENDALE, CA  91209-9071

November 16, 2017 1:19 PM

Financing Statement Doc #:    427817132
DLN #:  B0451-7564

## UCC Financing Statement Acknowledgment

This acknowledges the filing of the attached UCC1 document.  Please review the data to ensure database information corresponds with information on the submitted UCC form.  In the event a discrepancy is found, please note the error and return the entire package to our office.  If we may be of any further service to you, please contact us at the number noted below.

*Tre Hargett*

Tre Hargett
Secretary of State

Enclosures:  Original Documents

### DEBTOR INFORMATION

| | |
|---|---|
| RAC DEALERSHIP, LLC | 6775 LENOX CENTER CT<br>STE 100<br>MEMPHIS, TN 38115-4431 |
| AMERICAN CAR CENTER | 6775 LENOX CENTER CT<br>STE 100<br>MEMPHIS, TN 38115-4431 |

### SECURED PARTY INFORMATION

| | |
|---|---|
| NEXTGEAR CAPITAL, INC. | 1320 CITY CENTER DR<br>STE 100<br>CARMEL, IN 46032 |

### RECORDING TAX
Maximum principal indebtedness for Tennessee recording tax purposes is:              $30,000,000.00

### FILING INFORMATION
Financing Statement Doc #:    427817132
Filing Date:                         11/16/2017 12:22 PM
Lapse Date:                         11/16/2022 11:59 PM
Optional Filer Ref Data          61418692 556 111768

## Document Receipt

Receipt # : 3662274

| | Fees Paid: | $30.00 |
|---|---|---|
| | Taxes Paid: | $34,497.70 |
| Payment-Check/MO  -  LIEN SOLUTIONS, GLENDALE, CA | | $34,527.70 |



430107900

# FINANCING STATEMENT AMENDMENT

This is a representation of a document created electronically at the Tennessee Secretary of State's web site.

| A. NAME & PHONE OF CONTACT AT FILER (Optional) |
| LIEN SOLUTIONS 800-331-3282 |

**B. EMAIL OF CONTACT AT FILER (Optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

LIEN SOLUTIONS
P O BOX 29071
GLENDALE, CA 91209-9071

Amendment Doc #: 430107900

FILED: 2/8/2019 4:22 PM

Tre Hargett, Secretary of State

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

INITIAL FINANCING STATEMENT FILE NUMBER
427817132

☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of Secured Party authorizing this Termination Statement

☐ ASSIGNMENT (full or partial)

☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

☐ PARTY INFORMATION CHANGE:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address    ☐ ADD name    ☐ DELETE name

☑ COLLATERAL CHANGE:    ☑ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☐ ASSIGN collateral

Indicate collateral:
ANY APPLICABLE DOC STAMP FEE HAS BEEN PAID

**The increase in the maximum principal indebtedness for Tennessee recording tax purposes is:**    $0.00

NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  (name of Assignor, if this is an Assignment) If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| OR | ORGANIZATION'S NAME |
| | NEXTGEAR CAPITAL, INC. |

| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

OPTIONAL FILER REFERENCE DATA:
TN-0-68478878-56549354

NOTE: All information on this form is public record.



430120362

# FINANCING STATEMENT AMENDMENT

This is a representation of a document created electronically at the Tennessee Secretary of State's web site.

Amendment Doc #: 430120362

FILED: 2/12/2019 3:57 PM

Tre Hargett, Secretary of State

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| A. NAME & PHONE OF CONTACT AT FILER (Optional) |
| LIEN SOLUTIONS 800-331-3282 |

| B. EMAIL OF CONTACT AT FILER (Optional) |
| uccfilingreturn@wolterskluwer.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

⌐ LIEN SOLUTIONS
P O BOX 29071
GLENDALE, CA  91209-9071 ⌐
⌐ ⌐

INITIAL FINANCING STATEMENT FILE NUMBER
427817132

☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of Secured Party authorizing this Termination Statement

☐ ASSIGNMENT (full or partial)

☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

☐ PARTY INFORMATION CHANGE:
This Change affects ☐ Debtor or ☐ Secured Party of record       ☐ CHANGE name and/or address       ☐ ADD name       ☐ DELETE name

☑ COLLATERAL CHANGE:       ☑ ADD collateral       ☐ DELETE collateral       ☐ RESTATE covered collateral       ☐ ASSIGN collateral

Indicate collateral:

UCC AMENDED TO REFLECT THE INCREASE OF INDEBTEDNESS FROM $30,000,000.00 TO $40,000,000.00.

**The increase in the maximum principal indebtedness for Tennessee recording tax purposes is:**       $0.00

NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  (name of Assignor, if this is an Assignment) If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| OR | ORGANIZATION'S NAME NEXTGEAR CAPITAL, INC. | | | |
| | INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

OPTIONAL FILER REFERENCE DATA:
TN-0-68517215-56561344

NOTE: All information on this form is public record.





433737165

# FINANCING STATEMENT AMENDMENT

This is a representation of a document created electronically at the Tennessee Secretary of State's web site.

| A. NAME & PHONE OF CONTACT AT FILER (Optional) |
| LIEN SOLUTIONS 800-331-3282 |
| B. EMAIL OF CONTACT AT FILER (Optional) |
| uccfilingreturn@wolterskluwer.com |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |

⌐ LIEN SOLUTIONS
P O BOX 29071
GLENDALE, CA  91209-9071
⌐        ⌐

Amendment Doc #: 433737165

FILED: 12/10/2020 9:31 AM

Tre Hargett, Secretary of State

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| INITIAL FINANCING STATEMENT FILE NUMBER<br>427817132 | ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of Secured Party authorizing this Termination Statement

☐ ASSIGNMENT (full or partial)

☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

☑ PARTY INFORMATION CHANGE:
This Change affects ☐ Debtor or ☑ Secured Party of record    ☑ CHANGE name and/or address    ☐ ADD name    ☐ DELETE name

PARTIES

CURRENT RECORD INFORMATION:

OR
| a. ORGANIZATION'S NAME<br>NEXTGEAR CAPITAL, INC. | | | |
| b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change (use exact full name; do not omit, modify or abbreviate any part of the name)

OR
| a. ORGANIZATION'S NAME<br>NEXTGEAR CAPITAL, INC. |
| b. INDIVIDUAL'S SURNAME |

| INDIVIDUAL'S FIRST PERSONAL NAME |

| INDIVIDUAL'S ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

| c. MAILING ADDRESS<br>11799 NORTH COLLEGE AVENUE | | | |
| CITY<br>CARMEL | STATE<br>IN | POSTAL CODE<br>46032 | COUNTRY<br>USA |

☐ COLLATERAL CHANGE:    ☐ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☐ ASSIGN collateral
Indicate collateral:

**The increase in the maximum principal indebtedness for Tennessee recording tax purposes is:**    $0.00



## FINANCING STATEMENT AMENDMENT

This is a representation of a document created electronically at the Tennessee Secretary of State's web site.

**A. NAME & PHONE OF CONTACT AT FILER (Optional)**
LIEN SOLUTIONS 800-331-3282

**B. EMAIL OF CONTACT AT FILER (Optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

LIEN SOLUTIONS
P O BOX 29071
GLENDALE, CA  91209-9071

Amendment Doc #: 433737165

FILED: 12/10/2020 9:31 AM

Tre Hargett, Secretary of State

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  (name of Assignor, if this is an Assignment) If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

OR

**ORGANIZATION'S NAME**
NEXTGEAR CAPITAL, INC.

| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |
|---|---|---|---|

**OPTIONAL FILER REFERENCE DATA:**
TN-0-78048299-60319715

NOTE: All information on this form is public record.




436797674

# FINANCING STATEMENT AMENDMENT

This is a representation of a document created electronically at the Tennessee Secretary of State's web site.

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (Optional) <br> LIEN SOLUTIONS 800-331-3282 | |
| B. EMAIL OF CONTACT AT FILER (Optional) <br> uccfilingreturn@wolterskluwer.com | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) <br><br> JOHN JAMES <br> 2929 ALLEN PKWY STE 3300 <br> HOUSTON, TX 77019 | |

Amendment Doc #: 436797674

FILED: 6/10/2022 10:32 AM

Tre Hargett, Secretary of State

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| INITIAL FINANCING STATEMENT FILE NUMBER <br> 427817132 | ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|

☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of Secured Party authorizing this Termination Statement

☐ ASSIGNMENT (full or partial)

☑ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

☐ PARTY INFORMATION CHANGE:
This Change affects ☐ Debtor or ☐ Secured Party of record      ☐ CHANGE name and/or address      ☐ ADD name      ☐ DELETE name

☐ COLLATERAL CHANGE:      ☐ ADD collateral      ☐ DELETE collateral      ☐ RESTATE covered collateral      ☐ ASSIGN collateral
Indicate collateral:

**The increase in the maximum principal indebtedness for Tennessee recording tax purposes is:**      $0.00

NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  (name of Assignor, if this is an Assignment) If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| OR | ORGANIZATION'S NAME <br> NEXTGEAR CAPITAL, INC. | | | |
|---|---|---|---|---|
| | INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

OPTIONAL FILER REFERENCE DATA:
TN-0-87039746-64083228

NOTE: All information on this form is public record.

# iLien Cover Page

Date Printed:  02/24/2023

Debtor:
RAC DEALERSHIP, LLC
6775 Lenox Center Ct Ste 100
Memphis, TN  38115-4431

bill code:  556
loan num:  111768
REF3:  2/8/2019
REF4:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  83483999
Order Confirmation #:  87040031

UserID:  315399
UserName:  REVA MOBLEY
Number of Collateral Pages Attached:  0

Transaction Type:  Continuation
Jurisdiction:  AL, Secretary of State

██████████
██████████
██████████

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**Lien Solutions**
Representation of filing

**This filing is Completed**
File Number : 17-0586964
File Date   : 14-Jun-2022

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**   16554 - NextGear Capital

┌
  Lien Solutions                      87040031
  P.O. Box 29071
  Glendale, CA  91209-9071            ALAL
└
                File with: Secretary of State, AL         **THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 17-0586964   11/14/2017   SS AL | (or recorded) in the REAL ESTATE RECORDS |
| | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION**: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial)**: Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ **CONTINUATION**: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                     AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION**: Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | RAC DEALERSHIP, LLC | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION**: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | | | |
| | 7b. INDIVIDUAL'S SURNAME | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ **COLLATERAL CHANGE**: Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT**: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | NEXTGEAR CAPITAL, INC. | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:  Debtor Name: RAC DEALERSHIP, LLC
87040031                     556                                         111768

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# iLien Cover Page

Date Printed:  02/24/2023

Debtor:
RAC DEALERSHIP, LLC
6775 Lenox Center Ct Ste 100
Memphis, TN  38115-4431

bill code:  556
loan num:  111768
REF3:  2/8/2019
REF4:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  83483999
Order Confirmation #:  87040032

UserID:  315399
UserName:  REVA MOBLEY
Number of Collateral Pages Attached:  0

Transaction Type:  Continuation
Jurisdiction:  DE, Secretary of State

# State of Delaware - Division of Corporations

**FAX**

## UNIFORM COMMERCIAL CODE FILING SHEET

| | | | | |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | | ☒ |
| Priority 1 (Two HR. Service) | Priority 2 (Same Day) | Priority 3 (24 Hour) | | Priority 6 (Reg. Work) |

DATE SUBMITTED:   02/24/2023
REQUESTOR NAME:   **Lien Solutions**
ADDRESS:   **P.O. Box 29071**
    **Glendale, CA  91209-9071**
ATTN:
PHONE:   **800-331-3282 Fax: 818-662-4141**
ACCOUNT NUMBER:   **9224820**

FILE DATE _____
FILE TIME _____

NAME OF COMPANY/ENTITY:   RAC DEALERSHIP, LLC
TRUST FORMED ON   _____
TRUST NAME/NUMBER IDENTIFIER   _____
TYPE OF DOCUMENT:   **UCC3**
    Original File # 20177545355

| FOR UCC FILING ONLY | METHOD of RETURN |
|---|---|
| BASE FEE   $ _____ | ____ MESSENGER/PICKUP<br>____ FED. EXPRESS Acct# _____<br>____ REGULAR MAIL |
| SPECIAL SERVICE FEE   $ _____ | ____ OTHER _____ |
| CHECK #   $ _____ | |
| | COMMENTS/FILING INSTRUCTIONS |
| TOTAL   $ _____ | |

| CREDIT CARD CHARGES |
|---|
| You have my authorization to charge my credit card for this service:<br><br>_____-_____-_____-_____   Exp. Date _____<br><br>Signature _____   Printed Name _____ |

**X**
**X**

| AGENT USE ONLY | INSTRUCTIONS |
|---|---|
| | 1. Full shade in the required Priority square using a dark pencil or marker, staying within the square.<br>2. Each Request must be submitted as a separate item, with its own Filing sheet as the FIRST PAGE. |

Order No: 87040032

**SODUCC4 03-02-98**

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

Lien Solutions
Representation of filing

**This filing is Completed**
File Number : 20224887717
File Date   : 10-Jun-2022

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141 | |
| B. E-MAIL CONTACT AT FILER (optional)<br>uccfilingreturn@wolterskluwer.com | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | 16554 - NextGear Capital |

⌐ Lien Solutions
  P.O. Box 29071
  Glendale, CA  91209-9071 ⌐

87040032

DEDE

File with: Secretary of State, DE

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1a. INITIAL FINANCING STATEMENT FILE NUMBER
20177545355   11/14/2017  SS DE

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and  also indicate affected collateral in item 8

4. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:     AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c

☐ ADD name: Complete item 7a or 7b, and item 7c

☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | | | |
|---|---|---|---|
| 6a. ORGANIZATION'S NAME | | | |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change  -  provide only one  name (7a or 7b)  (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | |
|---|---|---|---|
| 7a. ORGANIZATION'S NAME | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:   Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | | | |
|---|---|---|---|
| 9a. ORGANIZATION'S NAME<br>NEXTGEAR CAPITAL, INC. | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:  Debtor Name: RAC DEALERSHIP, LLC
87040032                    556                                           111768

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# iLien Cover Page

Date Printed:  02/24/2023

Debtor:
RAC DEALERSHIP, LLC
6775 Lenox Center Ct Ste 100
Memphis, TN  38115-4431

bill code:  556
loan num:  111768
REF3:  2/8/2019
REF4:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  83483999
Order Confirmation #:  87040033

UserID:  315399
UserName:  REVA MOBLEY
Number of Collateral Pages Attached:  0

Transaction Type:  Continuation
Jurisdiction:  FL, Department of State

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)** 16554 - NextGear Capital

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

87040033

FLFL

File with: Department of State, FL

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
201703241906  11/13/2017  SS FL

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination
Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is
continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                              AND Check one of these three boxes to:

☐ This Change affects ☐ Debtor or ☐ Secured Party of record      ☐ CHANGE name and/or address: Complete      ☐ ADD name: Complete item      ☐ DELETE name: Give record name
item 6a or 6b; and item 7a or 7b and item 7c        7a or 7b, and item 7c        to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|OR|RAC DEALERSHIP, LLC| | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|OR| | | | |
| | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|OR|NEXTGEAR CAPITAL, INC.| | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:** Debtor Name: RAC DEALERSHIP, LLC
87040033                     556                                                  111768

**FILING OFFICE COPY —** UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# iLien Cover Page

Date Printed:  02/24/2023

Debtor:
RAC DEALERSHIP, LLC
6775 Lenox Center Ct Ste 100
Memphis, TN  38115-4431

bill code:  556
loan num:  111768
REF3:  2/8/2019
REF4:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  83483999
Order Confirmation #:  87040034

UserID:  315399
UserName:  REVA MOBLEY
Number of Collateral Pages Attached:  0

Transaction Type:  Continuation
Jurisdiction:  MS, Secretary of State

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

16554 - NextGear Capital

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

87040034

MSMS

File with: Secretary of State, MS

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 20172445732A   11/13/2017  SS MS | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                                    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record | ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c | ☐ ADD name: Complete item 7a or 7b, and item 7c | ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| RAC DEALERSHIP, LLC | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTY |
|---|---|---|---|---|
| | | | | |

8. ☐ **COLLATERAL CHANGE:**  Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:**   Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| NEXTGEAR CAPITAL, INC. | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:  Debtor Name: RAC DEALERSHIP, LLC
87040034                             556                                             111768

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# iLien Cover Page

Date Printed:  02/24/2023

Debtor:
RAC DEALERSHIP, LLC
6775 Lenox Center Ct Ste 100
Memphis, TN  38115-4431

bill code:  556
loan num:  111768
REF3:  2/8/2019
REF4:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  83483999
Order Confirmation #:  87040035

UserID:  315399
UserName:  REVA MOBLEY
Number of Collateral Pages Attached:  0

Transaction Type:  Continuation
Jurisdiction:  TN, Secretary of State

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

16554 - NextGear Capital

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

87040035

TNTN

File with: Secretary of State, TN

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
427817132  11/16/2017  SS TN

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| OR | 7b. INDIVIDUAL'S SURNAME | |
|---|---|---|
| | INDIVIDUAL'S FIRST PERSONAL NAME | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| NEXTGEAR CAPITAL, INC. | | | |

| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|

**10. OPTIONAL FILER REFERENCE DATA:** Debtor Name: RAC DEALERSHIP, LLC
87040035                556                                            111768

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

## **EXHIBIT D-1**

*Execution Version*

# CREDIT AGREEMENT

dated as of

June 29, 2021

among

RAC DEALERSHIP, LLC,
as Borrower,

RAC KING, LLC and Certain Subsidiaries of the Borrower Party Hereto,
as Guarantors,

The Lenders Party Hereto,

and

HANCOCK WHITNEY BANK,
as Administrative Agent

_____

HANCOCK WHITNEY BANK,
as Sole Bookrunner and Sole Lead Arranger

# TABLE OF CONTENTS

Page

Article 1 Definitions ........................................................................................................... 1

Section 1.01    Defined Terms ........................................................................... 1

Section 1.02    Classification of Loans and Borrowings. ................................. 31

Section 1.03    Terms Generally. ...................................................................... 32

Section 1.04    Accounting Terms; GAAP; Rounding. ..................................... 32

Section 1.05    Interest Rates; LIBOR Notification. ......................................... 33

Section 1.06    Pro Forma Adjustments for Acquisitions and Dispositions. ....... 33

Section 1.07    Status of Obligations. .............................................................. 34

Section 1.08    Limited Condition Acquisitions. .............................................. 34

Article 2 The Credits ........................................................................................................ 35

Section 2.01    Revolving Commitments. ........................................................ 35

Section 2.02    Loans and Borrowings. ............................................................ 35

Section 2.03    Requests for Borrowings. ........................................................ 36

Section 2.04    Increase in Revolving Commitments. ....................................... 36

Section 2.05    Revolving Commitment Extension Option. ............................... 38

Section 2.06    Funding of Borrowings. ........................................................... 38

Section 2.07    Interest Elections. ................................................................... 39

Section 2.08    Termination and Reduction of Commitments; Increase in Revolving Commitments. 39

Section 2.09    Repayment of Loans; Evidence of Debt. ................................... 40

Section 2.10    Prepayment of Loans. .............................................................. 41

Section 2.11    Fees. ....................................................................................... 41

Section 2.12    Interest. ................................................................................... 42

Section 2.13    Alternate Rate of Interest; Illegality. ....................................... 43

Section 2.14    Increased Costs. ...................................................................... 44

Section 2.15    Withholding of Taxes; Gross-Up. ............................................. 45

Section 2.16    Payments Generally; Allocation of Proceeds; Sharing of Setoffs ................ 48

Section 2.17    Mitigation Obligations; Replacement of Lenders. ..................... 50

Section 2.18    Defaulting Lenders. ................................................................. 51

Section 2.19    Returned Payments. ................................................................ 53

Section 2.20    Banking Services and Swap Agreements ................................. 53

Section 2.21    Swingline Loans. ..................................................................... 53

Article 3 Representations and Warranties ........................................................................ 54

Section 3.01    Organization; Powers. ............................................................. 54

Section 3.02    Authorization; Enforceability ................................................... 54

Section 3.03       Governmental Approvals; No Conflicts.................................................... 55
Section 3.04       Financial Condition; No Material Adverse Effect. ................................... 55
Section 3.05       Properties. ............................................................................................. 55
Section 3.06       Litigation and Environmental Matters. ................................................... 56
Section 3.07       Compliance with Laws and Agreements; No Default.............................. 56
Section 3.08       Investment Company Status.................................................................... 56
Section 3.09       Taxes. ..................................................................................................... 56
Section 3.10       ERISA. ................................................................................................... 56
Section 3.11       Disclosure. .............................................................................................. 56
Section 3.12       Material Agreements............................................................................... 57
Section 3.13       Solvency. ................................................................................................ 57
Section 3.14       Insurance. ............................................................................................... 57
Section 3.15       Capitalization and Subsidiaries. ............................................................. 57
Section 3.16       Security Interest in Collateral................................................................. 58
Section 3.17       Employment Matters. ............................................................................. 58
Section 3.18       Margin Regulations. ............................................................................... 58
Section 3.19       Use of Proceeds. ..................................................................................... 58
Section 3.20       No Burdensome Restrictions. .................................................................. 58
Section 3.21       Anti-Corruption Laws and Sanctions. .................................................... 58
Section 3.22       Affected Financial Institutions. .............................................................. 59
Section 3.23       Plan Assets; Prohibited Transactions. .................................................... 59
Section 3.24       Casualty. ................................................................................................. 59
Article 4 Conditions ........................................................................................................... 59
Section 4.01       Closing Date............................................................................................ 59
Section 4.02       Each Credit Event. .................................................................................. 61
Article 5 Affirmative Covenants ........................................................................................ 62
Section 5.01       Financial Statements; Borrowing Base and Other Information. .............. 62
Section 5.02       Notices of Material Events...................................................................... 65
Section 5.03       Existence. ............................................................................................... 66
Section 5.04       Payment of Obligations........................................................................... 66
Section 5.05       Maintenance of Properties....................................................................... 66
Section 5.06       Books and Records; Inspection Rights; Field Audits.............................. 66
Section 5.07       Compliance with Laws and Material Contractual Obligations. ............... 67
Section 5.08       Use of Proceeds....................................................................................... 67
Section 5.09       [Reserved]. ............................................................................................. 67
Section 5.10       Insurance. ............................................................................................... 67

Section 5.11    Casualty and Condemnation. ............................................................. 67

Section 5.12    Post-Closing Covenants. ................................................................... 68

Section 5.13    Additional Guarantors; Further Assurances. .................................... 68

Article 6 Negative Covenants ............................................................................................. 69

Section 6.01    Indebtedness. .................................................................................... 69

Section 6.02    Liens. ................................................................................................ 70

Section 6.03    Fundamental Changes. ...................................................................... 71

Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions. ........ 72

Section 6.05    Asset Sales. ....................................................................................... 74

Section 6.06    Sale and Leaseback Transactions. ..................................................... 74

Section 6.07    Swap Agreements. ............................................................................ 74

Section 6.08    Restricted Payments; Certain Payments of Indebtedness. ............... 75

Section 6.09    Transactions with Affiliates. ............................................................ 75

Section 6.10    Restrictive Agreements. .................................................................... 76

Section 6.11    Amendment of Material Documents. ................................................ 76

Section 6.12    Financial Covenants. ........................................................................ 76

Section 6.13    Equity Cure Right. ............................................................................ 76

Section 6.14    Use of Proceeds. ............................................................................... 77

Section 6.15    Accounting Changes. ........................................................................ 78

Section 6.16    Capital Expenditures. ....................................................................... 78

Section 6.17    Payments under the NextGear Credit Agreement. ........................... 78

Article 7 Events of Default ................................................................................................. 78

Article 8 The Administrative Agent ..................................................................................... 81

Section 8.01    Authorization and Action. ................................................................ 81

Section 8.02    Administrative Agent's Reliance, Indemnification, Etc. ................. 83

Section 8.03    Posting of Communications. ............................................................. 84

Section 8.04    The Administrative Agent Individually. ........................................... 85

Section 8.05    Successor Administrative Agent. ...................................................... 85

Section 8.06    Acknowledgements of Lenders. ........................................................ 86

Section 8.07    Collateral Matters. ............................................................................ 87

Section 8.08    Credit Bidding. ................................................................................. 88

Section 8.09    Certain ERISA Matters. ................................................................... 89

Section 8.10    Flood Laws. ...................................................................................... 90

Section 8.11    Erroneous Payments. ........................................................................ 90

Article 9 Miscellaneous ...................................................................................................... 91

Section 9.01    Notices. ............................................................................................. 91

Section 9.02        Waivers; Amendments. ................................................................ 93

Section 9.03        Expenses; Indemnity; Damage Waiver. ....................................... 95

Section 9.04        Successors and Assigns. ............................................................. 96

Section 9.05        Survival. .................................................................................... 100

Section 9.06        Counterparts; Integration; Effectiveness; Electronic Execution. ............ 101

Section 9.07        Severability. .............................................................................. 101

Section 9.08        Right of Setoff. .......................................................................... 101

Section 9.09        Governing Law; Jurisdiction; Consent to Service of Process. ................. 102

Section 9.10        WAIVER OF JURY TRIAL. ...................................................... 103

Section 9.11        Headings. ................................................................................... 103

Section 9.12        Confidentiality. .......................................................................... 103

Section 9.13        Several Obligations; Nonreliance; Violation of Law. ................. 104

Section 9.14        USA PATRIOT Act. .................................................................. 104

Section 9.15        Disclosure. ................................................................................. 104

Section 9.16        Appointment for Perfection. ...................................................... 104

Section 9.17        Interest Rate Limitation. ........................................................... 104

Section 9.18        No Fiduciary Duty, etc. .............................................................. 105

Section 9.19        Marketing Consent. ................................................................... 105

Section 9.20        Acknowledgement and Consent to Bail-In of Affected Financial Institutions. ........ 106

Section 9.21        Acknowledgement Regarding Any Supported QFCs. ............... 106

Article 10 Loan Guaranty ............................................................................................ 107

Section 10.01       Guaranty. ................................................................................... 107

Section 10.02       Guaranty of Payment. ............................................................... 107

Section 10.03       No Discharge or Diminishment of Loan Guaranty. ................... 107

Section 10.04       Defenses Waived. ...................................................................... 108

Section 10.05       Rights of Subrogation. .............................................................. 108

Section 10.06       Reinstatement; Stay of Acceleration. ....................................... 108

Section 10.07       Information. ............................................................................... 109

Section 10.08       Termination. ............................................................................... 109

Section 10.09       Taxes. ......................................................................................... 109

Section 10.10       Maximum Liability. ................................................................... 109

Section 10.11       Contribution. ............................................................................. 109

Section 10.12       Liability Cumulative. ................................................................. 110

Section 10.13       Keepwell. ................................................................................... 110

iv

SCHEDULES:

Schedule I        –        Commitment Schedule
Schedule 3.05   –        Properties, etc.
Schedule 3.12   –        Material Agreements
Schedule 3.15   –        Capitalization and Subsidiaries
Schedule 6.01   –        Existing Indebtedness
Schedule 6.02   –        Existing Liens
Schedule 6.04   –        Existing Investments
Schedule 6.10   –        Existing Restrictions

EXHIBITS:

Exhibit A        –        Form of Assignment and Assumption
Exhibit B-1      –        Form of Borrowing Request
Exhibit B-2      –        Form of Interest Election Request
Exhibit C-1      –        Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit C-2      –        Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit C-3      –        Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit C-4      –        Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D        –        Form of Compliance Certificate
Exhibit E        –        Form of Joinder Agreement
Exhibit F        –        Form of Borrowing Base Certificate

This CREDIT AGREEMENT dated as of June 29, 2021 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "*Agreement*"), among RAC DEALERSHIP, LLC, a Delaware limited liability company, as Borrower, the other Loan Parties party hereto, the Lenders party hereto, and HANCOCK WHITNEY BANK, as Administrative Agent.

R E C I T A L S

WHEREAS, Borrower has requested that the Lenders provide a Sixty Million Dollar ($60,000,000) revolving credit facility in favor of the Borrower; and

WHEREAS, in each case subject to the terms and conditions provided herein, the Lenders are willing severally to provide the requested revolving credit facility.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, each of the Borrower, the Lenders and the Administrative Agent hereby agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"*ABR*", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, is bearing interest at a rate determined by reference to the Alternate Base Rate.

"*ABS Bonds*" means any asset-backed notes or other securities issued by RAC Asset Holdings or any subsidiary of RAC Asset Holdings.

"*Account*" has the meaning assigned to such term in the Security Agreement.

"*Account Debtor*" means any Person obligated on an Account.

"*Acquisition*" means any transaction, or any series of related transactions, consummated on or after the Closing Date, by which any Loan Party (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

"*Adjusted LIBO Rate*" means, with respect to any Eurodollar Borrowing or for any ABR Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate multiplied by (b) the Statutory Reserve Rate.

"*Administrative Agent*" means Hancock Whitney Bank, in its capacity as administrative agent for the Lenders hereunder.

1

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affected Financial Institution*" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"*Affiliate*" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"*Agent Indemnitee*" has the meaning assigned to it in <u>Section 9.03(c)</u>.

"*Aggregate Revolving Exposure*" means, at any time, the aggregate Revolving Exposure of all the Lenders at such time (with the Swingline Exposure of each Lender calculated assuming that all of the Lenders have funded their participations in all Swingline Loans outstanding at such time).

"*Alternate Base Rate*" means, for any day, a rate per annum equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus one half of one percent (0.50%) and (c) the Adjusted LIBO Rate for a one-month term in effect on such day (taking into account any LIBO Rate floor under the definition of "*Adjusted LIBO Rate*") plus one percent (1.00%); <u>provided</u> that if the Alternate Base Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or such Adjusted LIBO Rate, respectively.  If the Alternate Base Rate is being used as an alternate rate of interest pursuant to <u>Section 2.13</u> (for the avoidance of doubt, only until any amendment has become effective pursuant to <u>Section 2.13(c)</u>), then the Alternate Base Rate shall be the greater of <u>clause (a)</u> and <u>(b)</u> above and shall be determined without reference to <u>clause (c)</u> above.  For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than one percent (1.00%), such rate shall be deemed to be than one percent (1.00%) for purposes of this Agreement.

"*Anti-Corruption Laws*" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"*Applicable Parties*" has the meaning assigned to it in <u>Section 8.03(c)</u>.

"*Applicable Percentage*" means, at any time with respect to any Lender, a percentage equal to a fraction the numerator of which is such Lender's Revolving Commitment at such time and the denominator of which is the aggregate Revolving Commitments at such time (<u>provided</u> that, if the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon such Lender's share of the Aggregate Revolving Exposure at such time); <u>provided</u> that, in accordance with <u>Section 2.18</u>, so long as any Lender shall be a Defaulting Lender, such Defaulting Lender's Commitment shall be disregarded in the calculations above.

"*Applicable Rate*" means, for any day, with respect to any Loan (other than any Swingline Loan), or with respect to the Commitment Fees payable hereunder, as the case may be, the applicable rate per annum set forth below under the caption "Revolving Commitment ABR Spread", "Revolving Commitment Eurodollar Spread" or "Commitment Fee Rate", as the case may be, based upon the Debt to Tangible Net Worth Ratio as of the most recent determination date, <u>provided</u> that until the delivery to the Administrative Agent, pursuant to <u>Section 5.01</u>, of the Borrower's consolidated financial information for the Borrower's

first fiscal quarter ending after the Closing Date, the "Applicable Rate" shall be the applicable rates per annum set forth below in Category 1:

| Category | Debt to Tangible Net Worth Ratio | Revolving Commitment ABR Spread | Revolving Commitment Eurodollar Spread | Commitment Fee Rate |
|:---:|:---:|:---:|:---:|:---:|
| 1 | $\leq$ 5.00 to 1.00 | 2.00% | 3.00% | 0.25% |
| 2 | > 5.00 to 1.00 | 2.50% | 3.50% | 0.25% |

For purposes of the foregoing, (a) the Applicable Rate shall be determined as of the end of each fiscal quarter of Holdings, based upon the annual or quarterly financial statements delivered pursuant to Section 5.01 and (b) each change in the Applicable Rate resulting from a change in the Debt to Tangible Net Worth Ratio shall be effective during the period commencing on and including the date of delivery to the Administrative Agent of such consolidated financial statements indicating such change and ending on the date immediately preceding the effective date of the next such change, provided that at any time that an Event of Default has occurred and is continuing, the Debt to Tangible Net Worth Ratio shall be deemed to be in Category 2 during the period from the expiration of the time for delivery thereof until such consolidated financial statements are delivered.

If at any time the Administrative Agent determines that the financial statements upon which the Applicable Rate was determined were incorrect (whether based on a restatement, fraud or otherwise), or any ratio or compliance information in a Compliance Certificate or other certification was incorrectly calculated, relied on incorrect information or was otherwise not accurate, true or correct, the Borrower shall be required to retroactively pay any additional amount that the Borrower would have been required to pay if such financial statements, Compliance Certificate or other information had been accurate and/or computed correctly at the time they were delivered.

"*Approved Electronic Platform*" has the meaning assigned to it in Section 8.03(a).

"*Approved Fund*" means, for the purposes of Section 9.04(b), any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Arranger*" means Hancock Whitney, in its capacity as sole bookrunner and sole lead arranger hereunder.

"*Assignment and Assumption*" means an assignment and assumption agreement entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form (including electronic records generated by the use of an electronic platform) approved by the Administrative Agent.

"*Availability*" means, at any time, an amount equal to (a) the lesser of (i) the aggregate Revolving Commitments and (ii) the Borrowing Base minus (b) the Aggregate Revolving Exposure (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Applicable Percentage of all outstanding Borrowings).

"*Availability Period*" means the period from and including the Closing Date to but excluding the earlier of the Revolving Credit Maturity Date and the date of termination of the Revolving Commitments.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"*Banking Services*" means each and any of the following bank services provided to any Loan Party by any Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, and (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, any direct debit scheme or arrangement, overdrafts and interstate depository network services and cash pooling services).

"*Banking Services Obligations*" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy", as now or hereafter in effect, or any successor thereto, as hereafter amended.

"*Bankruptcy Event*" means, with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof; provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"*Benchmark Replacement*" means the sum of: (a) the alternate benchmark rate (which may be a SOFR-Based Rate) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBO Screen Rate for Dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than zero (0), the Benchmark Replacement will be deemed to be zero (0) for the purposes of this Agreement; provided further that any such Benchmark

Replacement shall be administratively feasible as determined by the Administrative Agent in its sole discretion.

"*Benchmark Replacement Adjustment*" means the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Screen Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Screen Rate with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time (for the avoidance of doubt, such Benchmark Replacement Adjustment shall not be in the form of a reduction to the Applicable Rate).

"*Benchmark Replacement Conforming Changes*" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "*Alternate Base Rate*", timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"*Benchmark Replacement Date*" means the earlier to occur of the following events with respect to the LIBO Screen Rate:

(a)  in the case of clause (a) or (b) of the definition of "*Benchmark Transition Event*", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the LIBO Screen Rate permanently or indefinitely ceases to provide the LIBO Screen Rate; or

(b)  in the case of clause (c) of the definition of "*Benchmark Transition Event*", the date of the public statement or publication of information referenced therein.

"*Benchmark Transition Event*" means the occurrence of one or more of the following events with respect to the LIBO Screen Rate:

(a)  a public statement or publication of information by or on behalf of the administrator of the LIBO Screen Rate announcing that such administrator has ceased or will cease to provide the LIBO Screen Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Screen Rate;

(b)  a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Screen Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the LIBO Screen Rate, a resolution authority with jurisdiction over the administrator for the LIBO Screen Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the LIBO Screen Rate, in each case which states that the administrator of the LIBO Screen Rate has ceased or will cease to provide the LIBO Screen Rate permanently or

indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Screen Rate; and/or

        (c)     a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Screen Rate announcing that the LIBO Screen Rate is no longer representative.

"*Benchmark Transition Start Date*" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"*Benchmark Unavailability Period*" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Screen Rate and solely to the extent that the LIBO Screen Rate has not been replaced with a Benchmark Replacement, the period (a) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Screen Rate for all purposes hereunder in accordance with <u>Section 2.13</u> and (b) ending at the time that a Benchmark Replacement has replaced the LIBO Screen Rate for all purposes hereunder pursuant to <u>Section 2.13</u>.

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" means 31 C.F.R. § 1010.230.

"*Benefit Plan*" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"*BHC Act Affiliate*" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"*Borrower*" means RAC Dealership, LLC, a Delaware limited liability company.

"*Borrowing*" means (a) Revolving Loans of the same Type, made, converted or continued on the same date and (b) a Swingline Loan.

"*Borrowing Base*" means, at any time, eighty percent (80%) of the Borrower's Eligible Inventory, valued at cost, as evidenced by auction or other seller receipts, invoices, bills of sales or other supporting documentation, in each case, reasonably acceptable to the Administrative Agent, <u>plus</u> reasonable reconditioning expenses, as evidenced by the Borrower's company records as in turn supported by records and/or such other documentation as reasonably requested by the Administrative Agent.

"*Borrowing Base Certificate*" means a certificate, signed and certified as accurate and complete by a Financial Officer, in substantially the form of Exhibit F or another form which is acceptable to the Administrative Agent in its sole discretion.

"*Borrowing Request*" means a request by the Borrower for a Borrowing in accordance with Section 2.03, which shall be substantially in the form of Exhibit B-1 hereto or any other form approved by the Administrative Agent.

"*Burdensome Restrictions*" means any consensual encumbrance or restriction of the type described in clause (a) or (b) of Section 6.10.

"*Business Day*" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "*Business Day*" shall also exclude any day on which banks are not open for general business in London.

"*Capital Expenditures*" means, without duplication, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Borrower and the Subsidiaries of the Borrower prepared in accordance with GAAP.

"*Capital Lease Obligations*" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"*Change in Control*" means (a) at any time prior to the creation of a Public Market, York Capital Management, together with its controlled funds and controlled Affiliates, shall cease to own and control, directly or indirectly, free and clear of all Liens or other encumbrances, more than fifty percent (50%) of (i) the outstanding voting Equity Interests in Holdings and (ii) the outstanding voting Equity Interests in King, in each case on a fully diluted basis; (b) at any time after the creation of a Public Market, any "person" or "group" (in each case, within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date) other than York Capital Management or B. Michael Shivers Jr. shall, directly or indirectly, acquire more than thirty-five percent (35%) of the outstanding voting equity Interests in King or any direct or indirect parent of King, as determined on a fully diluted basis; (c) King shall cease to own, free and clear of all Liens or other encumbrances, one hundred percent (100%) of the outstanding voting Equity Interests in the Borrower on a fully diluted basis; or (d) the Borrower shall cease to own, free and clear of all Liens or other encumbrances, one hundred percent (100%) of the outstanding voting Equity Interests in each of its Subsidiaries (if any) on a fully diluted basis.

"*Change in Law*" means the occurrence after the date of this Agreement (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement) of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) compliance by any Lender (or, for purposes of Section 2.14(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof,

and (ii) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "*Change in Law*", regardless of the date enacted, adopted, issued or implemented.

"*Charges*" has the meaning assigned to such term in Section 9.17.

"*Closing Date*" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"*Code*" means the Internal Revenue Code of 1986.

"*Collateral*" means any and all Collateral (as defined in the Security Agreement).

"*Collateral Documents*" means, collectively, the Security Agreement and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the Administrative Agent.

"*Commitment*" means, with respect to each Lender, the sum of such Lender's Revolving Commitment. The initial amount of each Lender's Commitment is set forth on the Commitment Schedule, or in the Assignment and Assumption or other documentation or record (as such term is defined in Section 9-102(a)(70) of the New York Uniform Commercial Code) as provided in Section 9.04(b)(ii)(C), pursuant to which such Lender shall have assumed its Commitment, as applicable.

"*Commitment Fee*" has the meaning assigned to it in Section 2.11(a).

"*Commitment Schedule*" means the Schedule attached hereto identified as such.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"*Communications*" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Agreement, including through an Approved Electronic Platform.

"*Competitor*" means any competitor of any Loan Party or any Subsidiary that is in the used car sales and/or leasing business or the subprime auto finance business (whether through sale financing or lease financing) and is designated as such in writing from time to time by the Borrower to the Administrative Agent.

"*Compliance Certificate*" means a certificate of a Financial Officer in substantially the form of Exhibit D.

"*Compounded SOFR*" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include

compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable) being established by the Administrative Agent in accordance with:

(a)    the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; provided that:

(b)    if, and to the extent that, the Administrative Agent determines that Compounded SOFR cannot be determined in accordance with clause (a) above, then the rate, or methodology for this rate, and conventions for this rate that the Administrative Agent determines in its reasonable discretion are substantially consistent with any evolving or then-prevailing market convention for determining compounded SOFR for Dollar-denominated syndicated credit facilities at such time;

provided, further, that if the Administrative Agent decides that any such rate, methodology or convention determined in accordance with clause (a) or clause (b) is not administratively feasible for the Administrative Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "*Benchmark Replacement*".

"*Connection Income Taxes*" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Corresponding Tenor*" with respect to a Benchmark Replacement means a tenor (including overnight) having approximately the same length (disregarding business day adjustment) as the applicable tenor with respect to the LIBO Rate.

"*Covered Entity*" means any of the following:

(a)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R.§ 47.3(b); or

(c)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R.§ 382.2(b).

"*Covered Party*" has the meaning assigned to it in Section 9.21.

"*Credit Party*" means the Administrative Agent, the Swingline Lender, or any other Lender.

"*Cure Notice*" has the meaning assigned to it in Section 6.13.

"*Days Inventory Outstanding Ratio*" means, for any calendar month, the ratio of (a) average Inventory balance per day of the Borrower and any Subsidiaries of the Borrower for such month *divided* by (b) the Sales Per Day for such month.

"*Debt to Tangible Net Worth Ratio*" means, on any date, the ratio of (a) Total Indebtedness less Subordinated Indebtedness of King and its Subsidiaries on a consolidated basis in accordance with GAAP on such date to (b) Tangible Net Worth on such date.

"*Default*" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"*Default Right*" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"*Defaulting Lender*" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Swingline Loans or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of <u>clause (i)</u> above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Loans and participations in then outstanding Swingline Loans under this Agreement, <u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this <u>clause (c)</u> upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) has become the subject of (i) a Bankruptcy Event or (ii) a Bail-In Action.

"*Designated Limited Condition Acquisition*" has the meaning assigned to it in <u>Section 1.08(a)</u>.

"*Disposition*" or "*Dispose*" means the sale, transfer, exclusive license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by any Person (including any sale and leaseback transaction and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Disqualified Lender*" means, on any date, (a) any financial institution, institutional lender or investment fund identified by name by the Borrower as a "Disqualified Lender" by written notice delivered to the Administrative Agent prior to the Closing Date, (b) any Competitor that is separately identified by its legal name by the Borrower as a "Disqualified Lender" by written notice delivered to the Administrative Agent and (c) any Affiliate of any Person identified by the Borrower pursuant to <u>clause (a)</u> or <u>(b)</u> that, in each case, is either (i) identified by its legal name by the Borrower as a "Disqualified Lender" by written notice delivered to the Administrative Agent or (ii) clearly identifiable (solely on the basis that such Person's name has the name of the applicable financial institution, institutional lender or Competitor in such Person's legal name) as an Affiliate of such Person; <u>provided</u> that (x) any designation contemplated in the foregoing <u>clauses (b)</u> and <u>(c)</u> designating any such Person as a Disqualified Lender shall become effective two (2) Business Days after the date that such written designation is delivered to the Administrative Agent, (y) any Person that is a Lender and subsequently becomes a Disqualified Lender (but was not a Disqualified Lender on the Closing Date or at the time it became a Lender, as applicable) shall be deemed to not be a Disqualified Lender hereunder and (z) "Disqualified Lender" shall exclude any

Person that the Borrower has designated as no longer being a "Disqualified Lender" by written notice delivered to the Administrative Agent from time to time.

"*Dividing Person*" has the meaning assigned to it in the definition of "*Division*".

"*Division*" means the division of the assets, liabilities and/or obligations of a Person (the "*Dividing Person*") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"*Division Successor*" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division.  A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"*Document*" has the meaning assigned to such term in the Security Agreement.

"*Dollars*" or "*$*" refers to lawful money of the U.S.

"*Domestic Subsidiary*" means any Subsidiary of the Borrower that is organized under the laws of any political subdivision of the United States.

"*DQ List*" has the meaning assigned to such term in Section 9.04(e)(iv).

"*Early Opt-in Election*" means the occurrence of:

(a)        (i) a determination by the Administrative Agent or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that Dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.14 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the LIBO Rate, and

(b)        (i) the election by the Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.

"*ECP*" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"*EEA Financial Institution*" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Electronic Signature*" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"*Electronic System*" means any electronic system, including e-mail, e-fax, web portal access for the Borrower and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent and any of its Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"*Eligible Inventory*" means, at any time, the Inventory of the Borrower which is acceptable to the Administrative Agent in its Permitted Discretion determined in good faith for lending purposes. Without limiting the Administrative Agent's discretion provided herein, the Administrative Agent shall, in general, consider Inventory to be Eligible Inventory if it meets, and so long as it continues to meet, the following requirements:

(a)      (i) it is owned by the Borrower, (ii) the purchase price thereof has funded as evidenced by a cleared check, wire confirmation or other evidence of payment to the seller thereof, (iii) the Borrower has the right to subject it to a security interest in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, and (iv) it is subject to a first priority perfected security interest in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Encumbrances;

(b)      (i) it is at auction awaiting shipment to the Borrower; (ii) it is located on, or in transit to, one of the owned or leased premises of the Borrower, such locations are within the United States and are acceptable to the Administrative Agent; or (iii) in the possession of any sales manager or sales regional manager in the ordinary course of business and consistent with the Borrower's policies applicable thereto;

(c)      if held for sale or lease or furnishing under contracts of service, it is (except as the Administrative Agent may otherwise consent in writing) used and lawfully suitable for sale or lease;

(d)      it is not Inventory with respect to which any covenant, representation or warranty contained in this Agreement or in the Security Agreement has been breached or is not true;

(e)      it is valued at the cost of each item of Inventory;

(f)      it has not been located on a Borrower lot for more than one hundred eighty (180) days;

(g)      it has not been previously leased by the Borrower to a customer and returned by a customer, except in connection with (i) customer contract unwinds in the ordinary course of business or (ii) repossessions conducted by an Affiliate of the Borrower in the ordinary course of business in which the re-purchase of the repossessed vehicle by the Borrower from the Affiliate complies with the Borrower's arms-length, commercially reasonably repossession re-purchase procedure; and

(h)      it contains global positioning satellite monitors subject to access by the

Administrative Agent.

In the event that Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, the Borrower shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate.

"*Environmental Laws*" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (a) the environment, (b) preservation or reclamation of natural resources, (c) the management, Release or threatened Release of any Hazardous Material or (d) health and safety matters.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equipment*" has the meaning assigned to such term in the Security Agreement.

"*Equity Interests*" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of the Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, in critical status or in reorganization, within the meaning of Title IV of ERISA.

"*Erroneous Payment*" has the meaning assigned to such term in Section 8.11(a).

"*Erroneous Payment Notice*" has the meaning assigned to such term in Section 8.11(b).

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Eurodollar*", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted LIBO Rate.

"*Event of Default*" has the meaning assigned to such term in Article 7.

"*Exchange Act*" means the Securities Exchange Act of 1934.

"*Excluded Swap Obligation*" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP at the time the Guarantee of such Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.17(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.15(f) and (d) any withholding Taxes imposed under FATCA.

"*FATCA*" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"*Federal Funds Effective Rate*" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its

CHAR1\1782959v16

public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) zero percent (0%).

"*Federal Reserve Board*" means the Board of Governors of the Federal Reserve System of the United States of America.

"*Financial Officer*" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"*Flood Laws*" has the meaning assigned to such term in <u>Section 8.10</u>.

"*Foreign Lender*" means a Lender that is not a U.S. Person.

"*Funding Account*" has the meaning assigned to such term in <u>Section 4.01(a)(viii)</u>.

"*GAAP*" means generally accepted accounting principles in the U.S.

"*Governmental Authority*" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Guarantee*" of or by any Person (the "*guarantor*") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; <u>provided</u> that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"*Guaranteed Obligations*" has the meaning assigned to such term in <u>Section 10.01</u>.

"*Guarantors*" means (a) King, (b) each other Person that joins as a Guarantor pursuant to <u>Section 5.13</u>, (c) with respect to Banking Services Obligations (determined before giving effect to <u>Sections 10.10</u>) under the Loan Guaranty hereunder, the Borrower, and (d) their successors and permitted assigns.

"*Hancock Whitney*" means Hancock Whitney Bank, a Mississippi state chartered bank, in its individual capacity, and its successors.

"*Hazardous Materials*" means: (a) any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302 and amendments thereto); and (c) any substance, material, or waste that is

CHAR1\1782959v16

petroleum, petroleum-related, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide, or any other agricultural chemical.

"*Headquarters Audit*" has the meaning assigned to such term in <u>Section 5.06(b)</u>.

"*Holdings*" means RAC Investment Holdings, LLC, a Delaware limited liability company.

"*IBA*" has the meaning assigned to such term in <u>Section 1.05</u>.

"*Indebtedness*" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) [reserved], (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations (contingent or otherwise) under any letter of credit agreement, banker's acceptance agreement or similar agreement, (j) [reserved], (k) obligations under any earn-out arising out of purchase and sale contracts with respect to which the amount due has been ascertained (as determined by the Borrower in good faith) and is due and payable, (l) any other Off-Balance Sheet Liability, and (m) obligations, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all Swap Agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a), Other Taxes.

"*Indemnitee*" has the meaning assigned to such term in <u>Section 9.03(b)</u>.

"*Ineligible Institution*" means, for the purposes of <u>Section 9.04(b)</u>, a (a) natural person, (b) a Defaulting Lender or its Parent, (c) holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof; <u>provided</u> that, with respect to this <u>clause (c)</u>, such holding company, investment vehicle or trust shall not constitute an Ineligible Institution if it (i) has not been established for the primary purpose of acquiring any Loans or Commitments, (ii) is managed by a professional advisor, who is not such natural person or a relative thereof, having significant experience in the business of making or purchasing commercial loans, and (iii) has assets greater than $25,000,000 and a significant part of its activities consist of making or purchasing commercial loans and similar extensions of credit in the ordinary course of its business, (d) a Loan Party or a Subsidiary or other Affiliate of a Loan Party, or (e) subject to <u>Section 9.04(e)</u>, a Disqualified Lender.

"*Information*" has the meaning assigned to such term in <u>Section 9.12</u>.

"*Information Memorandum*" means the Confidential Information Memorandum dated March 2021 relating to the Borrower and the Transactions.

"*Intangible Assets*" means the aggregate amount of: (a) all assets classified as intangible assets under GAAP, including, without limitation, goodwill, trademarks, patents, copyrights, service marks, brand names, organization expenses, franchises, licenses, trade names, brand names, mailing lists, catalogs, excess of cost over book value of assets acquired, and bond discount and underwriting expenses; and (b) loans or advances to, investments in, or receivables from (i) any Affiliate or shareholder of Holdings or the Borrower or (ii) any Person if such loan, advance, investment or receivable is outside the Borrower's ordinary course of business.

"*Interest Election Request*" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07, which shall be substantially in the form of Exhibit B-2 hereto or any other form approved by the Administrative Agent.

"*Interest Expense*" means, with reference to any period, total interest expense (including that attributable to Capital Lease Obligations) of King and its Subsidiaries for such period with respect to all outstanding Indebtedness of King and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in respect of interest rates, to the extent such net costs are allocable to such period in accordance with GAAP), calculated for King and its Subsidiaries on a consolidated basis for such period in accordance with GAAP.

"*Interest Payment Date*" means, (a) with respect to any Swingline Loan, the day that such Loan is required to be repaid and the Revolving Credit Maturity Date and, (b) with respect to any other Loan, the last day of each calendar month.

"*Inventory*" has the meaning assigned to such term in the Security Agreement.

"*IRS*" means the United States Internal Revenue Service.

"*Joinder Agreement*" means a Joinder Agreement in substantially the form of Exhibit E.

"*King*" means RAC King, LLC, a Delaware limited liability company.

"*Lenders*" means the Persons listed on the Commitment Schedule and any other Person that shall have become a Lender hereunder pursuant to Section 2.04 or an Assignment and Assumption or otherwise, other than any such Person that ceases to be a Lender hereunder pursuant to an Assignment and Assumption or otherwise. Unless the context otherwise requires, the term "*Lenders*" includes the Swingline Lender.

"*LIBO Rate*" means, with respect to any Eurodollar Borrowing or for any ABR Borrowing, the LIBO Screen Rate at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of Borrowing.

"*LIBO Screen Rate*" means, for any day and time, with respect to any Eurodollar Borrowing or for any ABR Borrowing, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a period of one (1) month as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable

discretion); <u>provided</u> that, if the LIBO Screen Rate as so determined would be less than zero (0), such rate shall be deemed to zero (0) for the purposes of this Agreement.

"*Lien*" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"*Limited Condition Acquisition*": any Acquisition by any Loan Party (other than King) permitted pursuant to the Loan Documents whose consummation is not conditioned on the availability of, or on obtaining, third party financing and which has been designated as a Limited Condition Acquisition by the Borrower in writing to the Administrative Agent; <u>provided</u> that, upon the earlier to occur of (i) the date on which the applicable Limited Condition Acquisition Agreement is terminated or otherwise expires without the consummation of such Acquisition and (ii) the date that is 120 days following the entering into of the applicable Limited Condition Acquisition Agreement (or such later date as the Administrative Agent may agree in writing in its reasonable discretion), such Acquisition shall no longer constitute a Limited Condition Acquisition for any purpose hereunder.

"*Limited Condition Acquisition Agreement*": the definitive agreement with respect to any Limited Condition Acquisition.

"*Limited Condition Acquisition Test Date*" means, with respect to any Limited Condition Acquisition Agreement, the date on which such Limited Condition Acquisition Agreement is entered into.

"*Loan Documents*" means, collectively, this Agreement, each promissory note issued pursuant to this Agreement, the NextGear Intercreditor Agreement, each Collateral Document, each Compliance Certificate, the Loan Guaranty and each other agreement, instrument, document and certificate executed and delivered to, or in favor of, the Administrative Agent or any Lender and including each other pledge, power of attorney, consent, assignment, contract, notice, and each other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Administrative Agent or any Lender in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"*Loan Guaranty*" means <u>Article 10</u> of this Agreement.

"*Loan Parties*" means, collectively, the Borrower, the Guarantors (including the Borrower's Domestic Subsidiaries, if any) and any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement and their respective successors and assigns, and the term "*Loan Party*" means any one of them or all of them individually, as the context may require.

"*Loans*" means the loans and advances made by the Lenders pursuant to this Agreement, including Swingline Loans.

"*Margin Stock*" means margin stock within the meaning of Regulations T, U and X, as applicable.

"*Material Adverse Effect*" means a material adverse effect on (a) the financial condition, operations, business or properties of the Borrower or any of the other Loan Parties, taken as a whole, (b) the ability of

any of the Loan Parties, taken as a whole, to perform their respective obligations under this Agreement or any of the other Loan Documents to which they are party or (c) the legality, validity or enforceability of this Agreement or any other Loan Documents or the rights and remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"*Material Indebtedness*" means (a) indebtedness under the NextGear Credit Agreement and (b) other Indebtedness (other than the Loans), or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties and/or Subsidiaries of the Borrower in an aggregate principal amount exceeding $7,500,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of any Loan Party and/or any Subsidiary of the Borrower in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that any such Loan Party and/or Subsidiary of the Borrower would be required to pay if such Swap Agreement were terminated at such time.

"*Maximum Rate*" has the meaning assigned to such term in Section 9.17.

"*Moody's*" means Moody's Investors Service, Inc.

"*Multiemployer Plan*" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"*Net Income*" means, for any period, the consolidated net income (or loss) determined for King and its Subsidiaries, on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with King or any Subsidiary, (b) the income (or deficit) of any Person (other than a Subsidiary) in which King or any Subsidiary has an ownership interest, except to the extent that any such income is actually received by Holdings or such Subsidiary in the form of dividends or similar distributions, (c) the undistributed earnings of any Subsidiary, to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary and (d) any extraordinary gains or losses as determined by the Administrative Agent in its sole discretion.

"*Net Proceeds*" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"*NextGear Credit Agreement*" means that certain Demand Promissory Note and Loan and Security Agreement dated as of November 14, 2017 by and between NextGear Capital, Inc. and the Borrower.

"*NextGear Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of the Closing Date, by and among NextGear Capital, Inc., the Administrative Agent, on behalf of the Secured Parties, and the Borrower.

"*Non-Consenting Lender*" has the meaning assigned to such term in Section 9.02(d).

"*Obligated Party*" has the meaning assigned to such term in Section 10.02.

"*Obligations*" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Loan Parties to any of the Lenders, the Administrative Agent or any indemnified party, individually or collectively, existing on the Closing Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or other instruments at any time evidencing any thereof.

"*OFAC*" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"*Off-Balance Sheet Liability*" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"*Organization Documents*" means, with respect to any Person, any charter, articles or certificate of incorporation, articles or certificate of organization, registration or formation, certificate of partnership or limited partnership, bylaws, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other applicable documents relating to such Person's formation, organization or entity governance matters (including any shareholders' or equityholders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan, or any Loan Document).

"*Other Taxes*" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

CHAR1\1782959v16

"*Paid in Full*" or "*Payment in Full*" means, (a) the indefeasible payment in full in cash of all outstanding Loans, together with accrued and unpaid interest thereon, (b) the indefeasible payment in full in cash of the accrued and unpaid fees, if any, (c) the indefeasible payment in full in cash of all reimbursable expenses and other Secured Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement), together with accrued and unpaid interest thereon, (d) the termination of all Commitments, and (e) the termination of the Swap Agreement Obligations and the Banking Services Obligations or entering into other arrangements satisfactory to the Secured Parties counterparties thereto.

"*Parent*" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

"*Participant*" has the meaning assigned to such term in Section 9.04(c)(i).

"*Participant Register*" has the meaning assigned to such term in Section 9.04(c)(ii).

"*Payment Office*" means the office of the Administrative Agent located at Hancock Whitney Loan Syndications, Attn: Matthew Chivleatto, 701 Poydras Street, Suite 1600, New Orleans, LA 70139, or such other location as to which the Administrative Agent shall have given written notice to the Borrower and the other Lenders.

"*PBGC*" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"*Permitted Acquisition*" means an Acquisition by any Loan Party (other than King) of all of the outstanding Equity Interests of Persons (other than director's qualifying shares) or of other assets constituting an ongoing business, provided that, in each case, the following conditions are satisfied:

(a)        the applicable Loan Party that is the acquirer shall comply with the requirements of Section 5.13 within the applicable time periods specified therein;

(b)        after giving effect to such Acquisition, the Loan Parties shall be in compliance with the requirements of Section 6.03(c);

(c)        (A) with respect to the Acquisition of any Person, such Person is organized under the laws of the United States of America or any state thereof or the District of Columbia, or (B) with respect to an Acquisition of all or substantially all of the assets of a Person, or of any division, business unit or product line of a Person, substantially all of the assets, division, business unit or product line are located in the United States;

(d)        no Default or Event of Default shall have occurred and be continuing both immediately before and immediately after giving effect to such Acquisition and any transactions consummated in connection therewith (including, without limitation, the incurrence of any related Indebtedness and the use of proceeds thereof) on a pro forma basis; provided, in the case of a Designated Limited Condition Acquisition, the requirements of this clause (d) shall be satisfied if (i) no Default or Event of Default shall have occurred and be continuing on the date on which the applicable Limited Condition Acquisition Agreement is executed and delivered by the parties thereto and (ii) both immediately before and immediately after giving effect to the consummation such Acquisition and any transactions consummated in connection therewith (including, without limitation, the incurrence of any related Indebtedness and the use of proceeds thereof) on a pro forma basis, no Event of Default pursuant to clause (a), (b), (h), (i) or (j) of Article 7 shall have occurred and be continuing;

21

(e)    immediately prior thereto, and after giving pro forma effect thereto, the representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, (i) to the extent any such representation or warranty is already qualified by materiality or Material Adverse Effect, such representation or warranty shall be true and correct in all respects and (ii) for purposes of this clause (e), the representations and warranties contained in Section 3.04 shall be deemed to refer to the most recent statements pursuant to Sections 5.01(a)(i) and 5.01(a)(ii); provided further that in the case of a Designated Limited Condition Acquisition, (x) such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) only as of the Limited Condition Acquisition Test Date and (y) the only representations and warranties required to be true and correct at the time of the consummation of such Limited Condition Acquisition are (1) the Specified Representations and (2) such representations and warranties regarding the target of such Limited Condition Acquisition and its Subsidiaries made by or with respect to such target and its Subsidiaries as are material to the interests of the Administrative Agent and the Lenders, but only to the extent that the applicable Loan Party has the right to terminate its obligations under such Limited Condition Acquisition Agreement or to not consummate such Limited Condition Acquisition pursuant to such Limited Condition Acquisition Agreement as a result of the failure of such representations and warranties to be true and correct;

(f)    subject, in the case of a Designated Limited Condition Acquisition, to Section 1.08, upon giving effect to such Acquisition and any transactions consummated in connection therewith (including, without limitation, the incurrence of any Indebtedness and the use of proceeds thereof) on a pro forma basis, the Loan Parties would be in compliance with each of the financial covenants set forth in Section 6.12, recomputed as of the end of the most recent period of four (4) fiscal quarter for which financial statements and the related Compliance Certificate have been delivered pursuant to Section 5.01;

(g)    such Acquisition shall not be an Unfriendly Acquisition;

(h)    if the Total Consideration paid in connection with such Acquisition is in excess of $10,000,000, the Borrower shall have delivered to the Administrative Agent, at least five (5) Business Days prior to the date of consummation of such Acquisition (or such shorter period as the Administrative Agent may agree in its sole discretion), each of the following: (i) then-available drafts of the definitive agreement relating to such Acquisition, with a final version of such agreement to be delivered prior to the date of consummation of such Acquisition (or at such other time as the Administrative Agent may agree in its sole discretion), (ii) such prepared and available historical financial statements of the target of such Acquisition and its Subsidiaries for the most recent trailing four (4) fiscal quarter period for which any such financial statements are available; and (iii) such additional business and financial information and material acquisition documents relating to such Acquisition or the target of such Acquisition and its Subsidiaries as the Administrative Agent shall reasonably request to the extent available to the Borrower.

"*Permitted Discretion*" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"*Permitted Encumbrances*" means:

(a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

(b)    carriers', warehousemen's, landlords', sub-landlords', mechanics', materialmen's, repairmen's, construction contractors and other like Liens imposed by law, arising in the ordinary course

of business and securing obligations;

(c)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)      deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)      judgment Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article 7;

(f)      easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of any Loan Party or any Subsidiary of the Borrower;

(g)      statutory Liens on deposit accounts maintained with, or other property in the custody of, a depositary bank pursuant to its general business terms and in the ordinary course of business, provided that such Liens do not secure any Indebtedness;

(h)      Liens consisting of pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations to (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Loan Party, provided that, in each case, such obligation is not for borrowed money;

(i)      Liens that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers of Borrower in the ordinary course of business;

(j)      Liens on tangible property in favor of landlords securing obligations of any Loan Party under leases; provided that such Liens do not extend to or cover any tangible property other than tangible property located at such locations and other locations leased by the same landlord; and

(k)      automobile dealer bonds posted in the ordinary course of business.

"*Permitted Investments*" means:

(a)      direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b)      investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)      investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any state thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in <u>clause (c)</u> above;

(e)    money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

(f)    mutual funds investing solely in any one or more of the Permitted Investments described in the foregoing <u>clauses (a)</u> through <u>(e)</u>.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Plan*" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"*Plan Asset Regulations*" means 29 CFR § 2510.3-101 *et seq.*, as modified by Section 3(42) of ERISA, as amended from time to time.

"*Prime Rate*" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"*Projections*" has the meaning assigned to such term in <u>Section 5.01(a)(vi)</u>.

"*PTE*" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"*Public Market*" shall exist if (a) a Public Offering has been consummated, (b) any amount of Equity Interests of King or any direct or indirect parent of King has been distributed by means of an effective registration statement under the Securities Act of 1933 or (c) any business combination shall be consummated which results in the Borrower being owned, in whole or in part, directly or indirectly, by an entity the Equity Interests of which are listed on a national securities exchange or which are eligible for trading in a national securities market.

"*Public Offering*" means a public offering of the Equity Interests of King or any direct or indirect parent of King pursuant to an effective registration statement under the Securities Act of 1933.

"*Public-Sider*" means a Lender whose representatives may trade in securities of the Borrower or its Controlling person or any of its Subsidiaries while in possession of the financial statements provided by the Borrower under the terms of this Agreement.

"*QFC*" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"*QFC Credit Support*" has the meaning assigned to it in <u>Section 9.21</u>.

"*Qualified ECP Guarantor*" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Loan Guaranty or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"*RAC Asset Holdings*" means RAC Asset Holdings, LLC, a Delaware limited liability company.

"*Real Property*" means all real property that was, is now or may hereafter be owned, occupied or otherwise controlled by any Loan Party pursuant to any contract of sale, lease or other conveyance of any legal interest in any real property to any Loan Party.

"*Real Property Lease*" means any rented or leasehold interest in any Real Property pursuant to the terms of the applicable rental or lease agreement.

"*Recipient*" means, as applicable, (a) the Administrative Agent and (b) any Lender, or any combination thereof (as the context requires).

"*Register*" has the meaning assigned to such term in <u>Section 9.04(b)(iv)</u>.

"*Regulation D*" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"*Regulation T*" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"*Regulation U*" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"*Regulation X*" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"*Related Parties*" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"*Release*" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of any substance into the environment.

"*Relevant Governmental Body*" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or, in each case, any successor thereto.

"*Report*" means reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's assets from information furnished by or on behalf of the Borrower, after the Administrative Agent has exercised its rights of

CHAR1\1782959v16

inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent.

"*Required Lenders*" means, subject to Section 2.18, at any time, two (2) or more unaffiliated Lenders having Revolving Exposure (provided, that, as to any Lender, clause (a) of the definition of "*Swingline Exposure*" shall only be applicable in calculating a Lender's Revolving Exposure to the extent such Lender shall have funded its respective participations in the outstanding Swingline Loans) and Unfunded Commitments representing more than sixty-six and two thirds percent (66.67%) of the sum of the Aggregate Revolving Exposure and Unfunded Commitments at such time; provided that, as long as there are two (2) or fewer unaffiliated Lenders, Required Lenders shall mean all such Lenders.

"*Requirement of Law*" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Reserves*" means any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion, to maintain with respect to the Collateral or any Loan Party.

"*Resolution Authority*" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" means the president, Financial Officer or other executive officer of the Borrower.

"*Restricted Payment*" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary of the Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"*Revolving Commitment*" means, with respect to each Lender, the amount set forth on the Commitment Schedule opposite such Lender's name, or in the Assignment and Assumption or other documentation or record (as such term is defined in Section 9-102(a)(70) of the New York Uniform Commercial Code) as provided in Section 9.04(b)(ii)(C), pursuant to which such Lender shall have assumed its Revolving Commitment, as applicable, as such Revolving Commitment may be reduced or increased from time to time pursuant to (a) Section 2.04 and (b) assignments by or to such Lender pursuant to Section 9.04; provided, that at no time shall the Revolving Exposure of any Lender exceed its Revolving Commitment.  The initial aggregate amount of the Lenders' Revolving Commitments is $60,000,000.

"*Revolving Credit Maturity Date*" means (a) June 29, 2023 (if the same is a Business Day, or if not then the immediately next succeeding Business Day) as such date may be extended pursuant to Section 2.05, or (b) any earlier date on which the Revolving Commitments are reduced to zero (0) or otherwise terminated pursuant to the terms hereof.

"*Revolving Exposure*" means, with respect to any Lender, at any time, the sum of the aggregate outstanding principal amount of such Lender's Revolving Loans and Swingline Exposure at such time.

"*Revolving Lender*" means, as of any date of determination, a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"*Revolving Loan*" means a Loan made pursuant to Section 2.01(a).

"*S&P*" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"*Sale and Leaseback Transaction*" has the meaning assigned to such term in Section 6.06.

"*Sales Per Day*" means, for any period, an amount equal to (a) the aggregate amount of the cost of goods sold for the Borrower and its Subsidiaries during such period *divided* by (b) the applicable number of days for such period.

"*Sanctioned Country*" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"*Sanctioned Person*" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"*Sanctions*" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"*Scheduled Borrowing Base Reporting Date*" has the meaning assigned to it in Section 5.01(a)(vi).

"*SEC*" means the Securities and Exchange Commission of the U.S.

"*Secured Obligations*" means all Obligations, together with all (a) Banking Services Obligations and (b) Swap Agreement Obligations owing to one or more Lenders or their respective Affiliates; provided, however, that the definition of "*Secured Obligations*" shall not create any guarantee by any Guarantor of (or grant of security interest by any Guarantor to support, as applicable) any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of any Guarantor.

"*Secured Parties*" means (a) the Lenders, (b) the Administrative Agent, (c) each provider of Banking Services, to the extent the Banking Services Obligations in respect thereof constitute Secured Obligations, (d) each counterparty to any Swap Agreement, to the extent the obligations thereunder constitute Secured Obligations, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (f) the successors and assigns of each of the foregoing.

"*Security Agreement*" means that certain Security Agreement (including any and all supplements thereto), dated as of the date hereof, among the Loan Parties (other than King) and the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, and any other pledge or

security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Administrative Agent and the other Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.  For purposes of clarity, Holdings is not required to be or to become a "Grantor" under the Security Agreement.

"*SOFR*" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator), on the public website of the Federal Reserve Bank of New York.

"*SOFR-Based Rate*" means SOFR, Compounded SOFR or Term SOFR.

"*Specified Equity Contribution*" has the meaning assigned to it in Section 6.13.

"*Specified Representations*" means the representations and warranties made pursuant to Sections 3.01(a), 3.01(b), 3.02, 3.03(a), 3.03(b), 3.03(c)(i), 3.08, 3.13, 3.16, 3.18, 3.19, and 3.21.

"*Statements*" has the meaning assigned to such term in Section 2.16(f).

"*Statutory Reserve Rate*" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) established by the Federal Reserve Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D).  Such reserve percentages shall include those imposed pursuant to Regulation D of the Federal Reserve Board.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D of the Federal Reserve Board or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"*Subordinated Indebtedness*" of a Person means any Indebtedness of such Person, the payment of which is subordinated to payment of the Secured Obligations to the written satisfaction of the Administrative Agent in its Permitted Discretion.

"*subsidiary*" means, with respect to any Person (the "*parent*") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent and/or one or more subsidiaries of the parent.

"*Subsidiary*" means, with respect to any Person, any direct or indirect subsidiary of such Person; provided that unless otherwise specified, "Subsidiary" means any direct or indirect subsidiary of a Loan Party.

"*Supported QFC*" has the meaning assigned to it in Section 9.21.

"*Swap Agreement*" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower shall be a Swap Agreement.

"*Swap Agreement Obligations*" means any and all obligations of the Loan Parties and any of their respective Subsidiaries, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any Swap Agreement permitted hereunder with a Lender or an Affiliate of a Lender, and (b) any cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction permitted hereunder with a Lender or an Affiliate of a Lender.

"*Swap Obligation*" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"*Swingline Commitment*" means the amount set forth opposite Hancock Whitney's name on the <u>Commitment Schedule</u> as Swingline Commitment.

"*Swingline Exposure*" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time.  The Swingline Exposure of any Revolving Lender at any time shall be the sum of (a) its Applicable Percentage of the total Swingline Exposure at such time other than with respect to any Swingline Loans made by such Revolving Lender in its capacity as the Swingline Lender and (b) the principal amount of all Swingline Loans made by such Revolving Lender in its capacity as the Swingline Lender outstanding at such time (less the amount of participations funded by the other Lenders in such Swingline Loans).

"*Swingline Lender*" means Hancock Whitney, in its capacity as lender of Swingline Loans hereunder.  Any consent required of the Administrative Agent shall be deemed to be required of the Swingline Lender and any consent given by Hancock Whitney in its capacity as Administrative Agent shall be deemed given by Hancock Whitney in its capacity as Swingline Lender as well.

"*Swingline Loan*" means a Loan made pursuant to <u>Section 2.21</u>.

"*Tangible Net Worth*" means, with respect to King and its Subsidiaries on a consolidated basis in accordance with GAAP, (a) the sum of (i) common stock, (ii) preferred stock, (iii) capital surplus, (iv) retained earnings and (v) Indebtedness specifically subordinated to the Secured Obligations as evidenced by a properly executed subordination agreement in form and substance satisfactory to the Administrative Agent less (b) the sum of (i) all treasury stock, and (ii) all Intangible Assets.

"*Taxes*" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Term SOFR*" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"*Total Consideration*" means, with respect to any Acquisition, as at the date of entering into any agreement therefor, the sum of the following (without duplication): (a) the amount of any cash and fair market value of other property given by any Loan Party or any Subsidiary of the Borrower as consideration in connection with such Acquisition, (b) the amount of any Indebtedness incurred, assumed or acquired by any Loan Party or any Subsidiary of the Borrower in connection with such Acquisition and (c) all additional purchase price amounts in the form of earnouts and other contingent obligations that (i) are payable in cash and (ii) should be recorded on the consolidated financial statements of Holdings and its Subsidiaries in accordance with GAAP in connection with such Acquisition.

"*Total Indebtedness*" means, at any date, the aggregate principal amount of all Indebtedness determined for King and its Subsidiaries on a consolidated basis in accordance with GAAP at such date; provided that "Total Indebtedness" shall include, with respect to Indebtedness contemplated in clause (i) of the definition thereof, such Indebtedness of King and its Subsidiaries only to the extent of any amount that has been drawn under such agreement and not reimbursed.

"*Total Interest Coverage Ratio*" means, for any period, the ratio of (a) the sum of (i) Net Income *plus* (ii) Interest Expense *plus* (iii) income taxes of King and its Subsidiaries *plus* (iv) depreciation expense of King and its Subsidiaries *plus* (v) amortization expense of King and its Subsidiaries *plus* (vi) non-cash charges and expenses, in each case, approved by the Administrative Agent in its reasonable discretion *plus* (vii) extraordinary or non-recurring expenses approved by the Administrative Agent in its Permitted Discretion *minus* (viii) extraordinary gains, in each case for such period, to (b) Interest Expense paid in cash for such period.

"*Transactions*" means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions and the use of the proceeds thereof.

"*Type*", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate, or the Alternate Base Rate.

"*UCC*" means the Uniform Commercial Code as in effect from time to time in the State of New York or in any other state, the laws of which are required to be applied in connection with the issue of perfection of security interests.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Unadjusted Benchmark Replacement*" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment; provided that, if the Unadjusted Benchmark Replacement as so determined would be less than zero, the Unadjusted Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"*Unfriendly Acquisition*" means any acquisition that has not, upon the earlier to occur of (a) the time of the first public announcement of an offer relating thereto and (b) the execution of the definitive

documentation therefor, been duly approved by the board of directors (or other legally recognized governing body) of the Person to be acquired.

"*Unfunded Commitment*" means, with respect to each Lender, the Revolving Commitment of such Lender less its Revolving Exposure; provided, that, as to any Lender, clause (a) of the definition of "*Swingline Exposure*" shall only be applicable in calculating a Lender's Revolving Exposure to the extent such Lender shall have funded its respective participations in the outstanding Swingline Loans.

"*Unliquidated Obligations*" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is: (a) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (b) any other obligation (including any guarantee) that is contingent in nature at such time; or (c) an obligation to provide collateral to secure any of the foregoing types of obligations.

"*U.S.*" means the United States of America.

"*U.S. Person*" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"*U.S. Special Resolution Regime*" has the meaning assigned to it in Section 9.21.

"*U.S. Tax Compliance Certificate*" has the meaning assigned to such term in Section 2.15(f)(ii)(B)(III).

"*USA PATRIOT Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"*Warehouse Facility*" means that certain Loan and Security Agreement dated as of August 16, 2019 by and among ACC WH Trust 2019-A, a Delaware statutory trust, as the borrower, RAC Servicer, LLC, a Delaware limited liability company, as servicer, RAC Asset Holdings, LLC, a Delaware limited liability company, as residual holder, the lenders and group agents from time to time party thereto, Wells Fargo bank, N.A., as collateral agent, and Credit Suisse AG, New York Branch, as administrative agent (as amended by that certain First Amendment to Loan and Security Agreement dated as of October 18, 2019, that certain Second Amended to Loan and Security Agreement dated as of November 20, 2019, that certain Third Amendment to Loan and Security Agreement dated as of December 11, 2020 and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"*Withdrawal Liability*" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withholding Agent*" means the Borrower and the Administrative Agent.

"*Write-Down and Conversion Powers*" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan").  Borrowings also may be classified and referred to by Type (*e.g.*, a "Eurodollar Borrowing").

CHAR1\1782959v16

Section 1.03    Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities.  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04    Accounting Terms; GAAP; Rounding.

(a)    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request in writing, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Holdings, the Borrower or any Subsidiary at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(b)    Notwithstanding anything to the contrary in this Agreement, for purposes of

determining compliance with any covenant (including the computation of any financial covenant) contained herein, all liability amounts shall be determined excluding any liability relating to any operating lease, all asset amounts shall be determined excluding any right-of-use assets relating to any operating lease, all amortization amounts shall be determined excluding any amortization of a right-of-use asset relating to any operating lease, and all interest amounts shall be determined excluding any deemed interest comprising a portion of fixed rent payable under any operating lease, in each case to the extent that such liability, asset, amortization or interest pertains to an operating lease under which the covenantor or a member of its consolidated group is the lessee and would not have been accounted for as such under GAAP as in effect on December 31, 2015.

(c)    Any financial ratios required to be maintained by any Loan Party pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

(d)    Notwithstanding anything to the contrary in this Agreement or any other Loans Documents, any calculation of "extraordinary gains" and/or "extraordinary losses" shall, in each case for all purposes of this Agreement and the other Loan Documents, be determined by reference to GAAP as in effect immediately prior to giving effect to FASB's Accounting Standards Update No. 2015–01.

Section 1.05    Interest Rates; LIBOR Notification.    The interest rate on Eurodollar Loans is determined by reference to the LIBO Rate, which is derived from the London interbank offered rate. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "*IBA*") for purposes of the IBA setting the London interbank offered rate. As a result, it is possible that commencing in 2022, the London interbank offered rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Eurodollar Loans. In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate. Upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, Section 2.13(c) provides a mechanism for determining an alternative rate of interest. The Administrative Agent will promptly notify the Borrower, pursuant to Section 2.13(e), of any change to the reference rate upon which the interest rate on Eurodollar Loans is based. However, the Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "*LIBO Rate*" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (a) any such alternative, successor or replacement rate implemented pursuant to Section 2.13(c), whether upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, and (b) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 2.13(d)), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the LIBO Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

Section 1.06    Pro Forma Adjustments for Acquisitions and Dispositions.    To the extent the Borrower or any Subsidiary of King makes any acquisition permitted pursuant to Section 6.04 or disposition of assets outside the ordinary course of business permitted by Section 6.05 during the period of four (4) fiscal quarters of the Borrower most recently ended, the Debt to Tangible Net Worth Ratio shall be calculated after giving pro forma effect thereto (including pro forma adjustments arising out of events which

33

are directly attributable to the acquisition or the disposition of assets, are factually supportable and are expected to have a continuing impact, in each case as determined on a basis consistent with Article 11 of Regulation S-X of the Securities Act of 1933, as amended, as interpreted by the SEC, and as certified by a Financial Officer), as if such acquisition or such disposition (and any related incurrence, repayment or assumption of Indebtedness) had occurred in the first day of such four-quarter period.

Section 1.07    Status of Obligations.  In the event that the Borrower or any other Loan Party shall at any time issue or have outstanding any Subordinated Indebtedness, the Borrower shall take or cause such other Loan Party to take all such actions as shall be necessary to cause the Secured Obligations to constitute senior indebtedness (however denominated) in respect of such Subordinated Indebtedness and to enable the Administrative Agent and the Lenders to have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness.  Without limiting the foregoing, the Secured Obligations are hereby designated as "senior indebtedness" and as "designated senior indebtedness" and words of similar import under and in respect of any indenture or other agreement or instrument under which such Subordinated Indebtedness is outstanding and are further given all such other designations as shall be required under the terms of any such Subordinated Indebtedness in order that the Lenders may have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness.

Section 1.08    Limited Condition Acquisitions.

(a)    Notwithstanding anything to the contrary herein (except with respect to (x) the incurrence of Indebtedness under the Revolving Commitments and (y) any incurrence of Indebtedness under any increase in the Revolving Commitments pursuant to Section 2.04), for purposes of (i) determining compliance with any financial covenant set forth in Section 6.12, in each case, on a pro forma basis, (ii) determining capacity under any basket set forth herein with respect to the making of any Permitted Acquisition or any other Acquisition permitted hereunder, or (iii) determining compliance with any representation and warranty, or with any Default or Event of Default test or condition with respect to the making of any Permitted Acquisition or any other Acquisition permitted hereunder, in each case of the foregoing clauses (i), (ii) and (iii), in connection with a Limited Condition Acquisition, then, at the Borrower's election by written notice to the Administrative Agent on or prior to the Limited Condition Acquisition Test Date (any Limited Condition Acquisition so designated, a "*Designated Limited Condition Acquisition*"), the date of determination of whether such action is permitted hereunder (including, in the case of determining compliance with the financial covenants of Section 6.12, the reference date for determining the most recent period of four (4) consecutive fiscal quarters for which financial statements have been provided pursuant to Section 5.01) shall be deemed to be the applicable Limited Condition Acquisition Test Date; and if, after giving effect to such Limited Condition Acquisition and any other transactions to be entered into in connection therewith (including, without limitation, the incurrence of any related Indebtedness and the use of proceeds thereof) on a pro forma basis, the Borrower could have taken such action on the relevant Limited Condition Acquisition Test Date in compliance with such applicable financial covenant, basket, representation and warranty, or Default or Event of Default test or condition, in each such case of the foregoing, such financial covenant, basket, representation and warranty, or Default or Event of Default test or condition, as the case may be, shall be deemed to have been complied with.

(b)    For the avoidance of doubt, if the Borrower has designated any Acquisition as a Limited Condition Acquisition in accordance with the terms of the foregoing clause (a) and any applicable financial covenant, basket, representation and warranty, or Default or Event of Default test or condition, as the case may be, for which compliance was determined or tested as of the applicable Limited Condition Acquisition Test Date, would thereafter have failed to have been satisfied as a result of fluctuations in any such financial covenant or basket, or changes in compliance with such representation and warranty or such

Default or Event of Default test or condition, in each case of the foregoing, as of, or prior to, the date of consummation of the applicable Limited Condition Acquisition, then such financial covenant, basket, representation and warranty, and Default or Event of Default test or condition shall not be deemed to have failed to have been satisfied as a result of such fluctuations or changes.  If the Borrower has designated any Acquisition as a Limited Condition Acquisition in accordance with the terms of the foregoing clause (a), then, in connection with any subsequent calculation of any ratio (other than the testing of actual compliance with any of the financial covenants set forth in Section 6.12 and the determination of the Debt to Tangible Net Worth Ratio for purposes of calculating the Applicable Rate) or basket on, or following, the applicable Limited Condition Acquisition Test Date, and prior to the earlier of (A) the date on which such Limited Condition Acquisition is consummated and (B) the date on which such Acquisition ceases to constitute a Limited Condition Acquisition pursuant to the definition thereof, then any such ratio or basket: (i) shall be calculated on a pro forma basis, assuming that such Limited Condition Acquisition, and any other transactions consummated in connection therewith (including, without limitation, any incurrence of related Indebtedness and the use of proceeds thereof) have been consummated; and (ii) on a standalone basis, without giving effect to such Limited Condition Acquisition and any other transactions consummated in connection therewith (including, without limitation, any incurrence of related Indebtedness and the use of proceeds thereof).

ARTICLE 2
THE CREDITS

Section 2.01    Revolving Commitments. Subject to the terms and conditions set forth herein, each Lender severally (and not jointly) agrees to make Revolving Loans in Dollars to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result (after giving effect to any application of proceeds of such Borrowing pursuant to the proviso to Section 2.9(a)) in (a) such Lender's Revolving Exposure exceeding such Lender's Revolving Commitment or (b) the Aggregate Revolving Exposure exceeding the lesser of (i) the aggregate Revolving Commitments and (ii) the Borrowing Base.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.

Section 2.02    Loans and Borrowings.

(a)    Each Loan (other than a Swingline Loan) shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.  Any Swingline Loan shall be made in accordance with the procedures set forth in Section 2.21.

(b)    Subject to Section 2.13, each Revolving Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.  Each Swingline Loan shall bear interest at the rate per annum indicated in that certain letter agreement dated as of the Closing Date by and between the Borrower and the Administrative Agent.  Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan (and in the case of an Affiliate, the provisions of Sections 2.13, 2.14 and 2.15 shall apply to such Affiliate to the same extent as to such Lender); provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)    Each Eurodollar Revolving Borrowing shall be in an aggregate amount that is an integral multiple of $250,000 and not less than $1,000,000.  ABR Revolving Borrowings may be in any amount.  Each Swingline Loan shall be in an amount that is an integral multiple of $10,000 and not less

35

than $50,000. Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of ten (10) Eurodollar Borrowings outstanding.

Section 2.03    Requests for Borrowings.To request a Borrowing, the Borrower shall notify the Administrative Agent of such request either in writing (delivered by hand or fax) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, (a) in the case of a Eurodollar Borrowing, not later than 10:00 a.m., Eastern time, three (3) Business Days before the date of the proposed Borrowing, (b) in the case of an ABR Borrowing, not later than noon, Eastern time, on the date of the proposed Borrowing and (c) in the case of a Swingline Borrowing, at such times as required pursuant to Section 2.21. Each such Borrowing Request shall be irrevocable.  Each such Borrowing Request shall specify the following information in compliance with Section 2.01:

(i)    whether such Borrowing is a Borrowing of Revolving Loans or Swingline Loans;

(ii)    the aggregate amount of the requested Borrowing, and a breakdown of the separate wires comprising such Borrowing;

(iii)    the date of such Borrowing, which shall be a Business Day; and

(iv)    with respect to Revolving Borrowings; whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing.

With respect to any Revolving Borrowing, if no election as to the Type of Revolving Borrowing is specified then the requested Revolving Borrowing shall be an ABR Borrowing.  Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    Increase in Revolving Commitments.

(a)    The Borrower shall have the right to increase the Revolving Commitments by obtaining additional Revolving Commitments, either from one or more of the Lenders or another lending institution, provided that:

(i)    The aggregate amount of all increases in the Revolving Commitments pursuant to this Section 2.04 shall not exceed $40,000,000;

(ii)    any such request for an increase shall be in a minimum amount of $5,000,000 and in integral multiples of $1,000,000 in excess thereof;

(iii)    the Borrower may make a maximum of two (2) such requests;

(iv)    after giving effect to all increases in the Revolving Commitments pursuant to this Section 2.04, the sum of the total of the Commitments does not exceed $100,000,000;

(v)    no existing Lender shall be under any obligation to increase its Revolving Commitment, and any such decision whether to increase its Revolving Commitment shall be in such Lender's sole and absolute discretion;

CHAR1\1782959v16

(vi)    the Administrative Agent has approved any financial institution that is to become a Lender hereunder in connection with any increase pursuant to this Section 2.04), such approval not to be unreasonably withheld, conditioned or delayed, and any such new Lender shall assume all of the rights and obligations of a "Lender" hereunder (as evidenced by lender joinder documentation reasonably satisfactory to the Administrative Agent);

(vii)    any such increase in the Revolving Commitments shall be subject to receipt by the Administrative Agent of (A) a certificate of each Loan Party dated as of the date of such increase signed by an authorized officer of such Loan Party (1) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such increase, and (2) certifying that, before and after giving effect to such increase (and assuming that the entire amount of such increase in the Revolving Commitments is funded and that sufficient borrowing base capacity exists), (I) the representations and warranties contained in the Loan Documents (including, without limitation, the representations and warranties contained in Article 3 hereof) are true and correct in all material respects (or in all respects if already qualified by materiality) on and as of the date of such increase, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (or in all respects if already qualified by materiality) as of such earlier date, and except that for purposes of this Section 2.04, the representations and warranties contained in Section 3.04 shall be deemed to refer to the most recent statements furnished pursuant to Sections 5.01(a)(i) and 5.01(a)(ii), (II) no Default or Event of Default exists or shall arise as a result of such increase and (III) the Loan Parties are in compliance with Section 6.12 on a pro forma basis for the period of four (4) fiscal quarters most recently ended prior to the date of determination for which financial statements were delivered under Section 5.01(a) or (b); and (B) customary legal opinions, secretary's certificates, resolutions and such other documents as may be reasonably requested by the Administrative Agent;

(viii)    any increase in the aggregate Revolving Commitments under this Section 2.04 shall have terms identical to those for the Revolving Loans under this Agreement, except for fees payable to the Lenders providing commitments for such increase in the aggregate Revolving Commitments;

(ix)    neither the Arranger nor any Lender shall have any responsibility for arranging any such increased or additional Revolving Commitments without their prior written consent and subject to such conditions, including fee arrangements, as they may provide in connection therewith;

(x)    the Borrower shall have paid any applicable upfront and arrangement fees in connection with such increase in the Revolving Commitments; and

(xi)    the procedures described in Section 2.04(b) below have been satisfied.

(b)    On the effective date of any such increase or addition, (i) any Lender increasing (or, in the case of any newly added Lender, extending) its Revolving Commitment shall make available to the Administrative Agent such amounts in immediately available funds as the Administrative Agent shall determine, for the benefit of the other Lenders, as being required in order to cause, after giving effect to such increase or addition and the use of such amounts to make payments to such other Lenders, each Lender's portion of the outstanding Revolving Loans of all the Lenders to equal its revised Applicable Percentage of such outstanding Revolving Loans, and the Administrative Agent shall make such other adjustments among the Lenders with respect to the Revolving Loans then outstanding and amounts of principal, interest, commitment fees and other amounts paid or payable with respect thereto as shall be necessary, in the opinion of the Administrative Agent, in order to effect such reallocation and (ii) the Borrower shall be deemed to have repaid and reborrowed all outstanding Revolving Loans as of the date of any increase (or addition) in the Revolving Commitments (with such reborrowing to consist of the Types of Revolving Loans specified in a notice delivered by the Borrower, in accordance with the requirements

of <u>Section 2.03</u>).  The deemed payments made pursuant to <u>clause (ii)</u> of the immediately preceding sentence shall be accompanied by payment of all accrued interest on the amount prepaid.  Within a reasonable time after the effective date of any increase or addition, the Administrative Agent shall, and is hereby authorized and directed to, revise the Commitment Schedule to reflect such increase or addition and shall distribute such revised Commitment Schedule to each of the Lenders and the Borrower, whereupon such revised Commitment Schedule shall replace the old Commitment Schedule and become part of this Agreement.

Section 2.05    <u>Revolving Commitment Extension Option</u>.

(a)    The Borrower may, by written notice (an "*Extension Notice*") to the Administrative Agent delivered no later than sixty (60) days prior to the Revolving Credit Maturity Date, request an extension (an "*Extension*") of the maturity date of the Revolving Commitments by twelve (12) months.  Upon receipt of an Extension Notice and satisfaction of the conditions set forth in <u>clause (b)</u> below, the Administrative Agent shall promptly notify each Lender agreeing to any Extension as to the effectiveness of such Extension.

(b)    The following shall be conditions precedent to the effectiveness of an Extension: (i) no Default or Event of Default shall have occurred and be continuing immediately prior to and immediately after giving effect to such Extension, (ii) the representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects with the same effect as though made on and as of the effective date of such Extension (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date, and that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects), (iii) the Borrower shall have paid to Administrative Agent, for the pro rata benefit of each of the Lenders agreeing to the requested Extension, all fees required by such Lenders in connection with such Extension, (iv) the Administrative Agent shall have received the written consent to such Extension from each Lender and (v) except as modified by the terms of this <u>Section 2.05</u>, all of the terms and provisions of the Credit Agreement and the other Loan Documents shall remain in full force and effect.

(c)    Notwithstanding anything to the contrary contained herein, (i) no more than two (2) Extensions may occur during the term of this Agreement and (ii) each Lender shall, in its sole discretion, determine whether to grant an extension of its Revolving Commitments under this <u>Section 2.05</u>.

Section 2.06    <u>Funding of Borrowings.</u>

(a)    Each Lender shall make each Loan to be made by such Lender hereunder on the proposed date thereof solely by wire transfer of immediately available funds by 2:00 p.m., Eastern time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders in an amount equal to such Lender's Applicable Percentage; <u>provided</u> that Swingline Loans shall be made as provided in <u>Section 2.21</u>.The Administrative Agent will make such Loans available to the Borrower by promptly crediting the funds so received in the aforesaid account of the Administrative Agent to the Funding Account(s).

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>clause (a)</u> of this <u>Section 2.06</u> and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower each severally agree to pay to the Administrative Agent forthwith on

demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Revolving Loans.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing; provided, that any interest received from the Borrower by the Administrative Agent during the period beginning when Administrative Agent funded the Borrowing until such Lender pays such amount shall be solely for the account of the Administrative Agent.

Section 2.07    Interest Elections.

(a)    Each Revolving Borrowing initially shall be of the Type specified in the applicable Borrowing Request.  Thereafter, the Borrower may elect to convert such Revolving Borrowing to a different Type or to continue such Revolving Borrowing as provided in this Section 2.07.  The Borrower may elect different options with respect to different portions of the affected Revolving Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Revolving Borrowing, and the Revolving Loans comprising each such portion shall be considered a separate Revolving Borrowing.  This Section 2.07 shall not apply to any Borrowing of Swingline Loans, which may not be converted or continued.

(b)    To make an election pursuant to this Section 2.07, the Borrower shall notify the Administrative Agent of such election either in writing (delivered by hand or fax) by delivering an Interest Election Request signed by a Responsible Officer of the Borrower or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Revolving Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable.

(c)    Each Interest Election Request (including requests submitted through Electronic System) shall specify the following information in compliance with Section 2.02:

(i)    the Revolving Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Revolving Borrowing (in which case the information to be specified pursuant to clauses (ii) and (iii) below shall be specified for each resulting Revolving Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

(iii)    whether the resulting Revolving Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Revolving Borrowing.

Section 2.08    Termination and Reduction of Commitments; Increase in Revolving Commitments.

(a)    Unless previously terminated, all the Revolving Commitments shall terminate on

the Revolving Credit Maturity Date.

(b)      The Borrower may at any time terminate the Revolving Commitments upon the Payment in Full of the Secured Obligations.

(c)      The Borrower may from time to time reduce the Revolving Commitments in part; provided that (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $5,000,000 and not less than $10,000,000 and (ii) the Borrower shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.10, the Aggregate Revolving Exposure would exceed the lesser of (x) the aggregate Revolving Commitments and (y) the Borrowing Base.

(d)      The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under clause (b) or (c) of this Section 2.08 at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable; provided that a notice of termination of the Revolving Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.    Any termination or reduction of the Revolving Commitments shall be permanent.  Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Revolving Commitments.

Section 2.09      Repayment of Loans; Evidence of Debt.

(a)      The Borrower hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Revolving Lender the then unpaid principal amount of each Revolving Loan on the Revolving Credit Maturity Date, and (ii) to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the earlier of the Revolving Credit Maturity Date and the fifth (5th) Business Day after such Swingline Loan is made; provided that on each date that a Revolving Loan is made, the Borrower shall repay all Swingline Loans then outstanding and the proceeds of any such Revolving Loan shall be applied by the Administrative Agent to repay any Swingline Loans outstanding.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)      The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder and the Type thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)      The entries made in the accounts maintained pursuant to clauses (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form.

Section 2.10     Prepayment of Loans.

(a)     The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with clause (e) of this Section 2.10.

(b)     In the event and on such occasion that the Aggregate Revolving Exposure exceeds the aggregate Revolving Commitments, the Borrower immediately shall prepay the Revolving Loans and/or the Swingline Loans to the extent of such excess.

(c)     In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any Subsidiary of the Borrower from the incurrence by the Borrower or any Subsidiary of the Borrower of any Indebtedness other than Indebtedness permitted under Section 6.01, the Borrower shall, immediately after such Net Proceeds are received by the Borrower or any Subsidiary of the Borrower, prepay the Obligations as set forth in Section 2.10(e) below in an aggregate amount equal to one hundred percent (100%) of such Net Proceeds.

(d)     Upon the Borrower's delivery of a Borrowing Base Certificate by the Scheduled Borrowing Base Reporting Date pursuant to Section 5.1(a)(vi), in the event and on such occasion that the Aggregate Revolving Exposure exceeds the Borrowing Base, the Borrower shall (within one (1) Business Day) prepay the Revolving Loans and/or the Swingline Loans to the extent of such excess.

(e)     All prepayments required to be made pursuant to Section 2.10(c) shall be applied without a corresponding reduction in the Revolving Commitments.

(f)     The Borrower shall notify the Administrative Agent (and, in the case of prepayment of a Swingline Loan, the Swingline Lender) by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, of any prepayment under this Section 2.10: (i) in the case of prepayment of a Eurodollar Borrowing, not later than 10:00 a.m., Eastern time, three (3) Business Days before the date of prepayment, (ii) in the case of prepayment of an ABR Borrowing, not later than 10:00 a.m., Eastern time, one (1) Business Day before the date of prepayment, or (iii) in the case of prepayment of a Swingline Loan, not later than 11:00 a.m. Eastern time, on the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitments as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Revolving Borrowing or Term Loan shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.12.

Section 2.11     Fees.

(a)       The Borrower agrees to pay to the Administrative Agent a commitment fee (the "*Commitment Fee*") for the account of each Revolving Lender, which shall accrue at the Applicable Rate on the daily amount of the undrawn portion of the Revolving Commitment of such Lender during the period from and including the Closing Date to but excluding the date on which the Lenders' Revolving Commitments terminate, it being understood that the Swingline Exposure of a Lender shall be excluded from the drawn portion of the Revolving Commitment of such Lender for purposes of calculating the Commitment Fees.  Accrued Commitment Fees shall be payable in arrears on the last day of each calendar month of each year and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the date hereof.  All Commitment Fees shall be computed on the basis of a year of three hundred sixty (360) days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)       The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(c)       All fees payable hereunder shall be paid on the dates due, in Dollars in immediately available funds, to the Administrative Agent for distribution, in the case of Commitment Fees, to the Lenders entitled thereto.  Fees paid shall not be refundable under any circumstances.

Section 2.12    Interest.

(a)       The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)       The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate plus the Applicable Rate.

(c)       Each Swingline Loan shall bear interest at the rate per annum indicated in that certain letter agreement dated as of the Closing Date by and between the Borrower and the Administrative Agent.

(d)       Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, automatically in the case of any Event of Default under clause (a), (b), (h), (i), or (j) of Article 7 and otherwise at the election of the Required Lenders, by notice to the Borrower (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of Section 9.02 requiring the consent of "each Lender affected thereby" for reductions in interest rates), declare that (i) all Loans shall bear interest at two percent (2%) plus the rate otherwise applicable to such Loans as provided in the preceding clauses of this Section 2.12 or (ii) in the case of any other outstanding hereunder, such amount shall accrue at two percent (2%) plus the rate applicable to such fee or other obligation as provided hereunder.

(e)       Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and, in the case of Revolving Loans, upon termination of the Revolving Commitments; provided that (i) interest accrued pursuant to clause (d) of this Section 2.12 shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(f)       All interest hereunder shall be computed on the basis of a year of three hundred

sixty (360) days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.13    Alternate Rate of Interest; Illegality.

(a)    If prior to the advance of any Eurodollar Borrowing:

(i)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including, without limitation, because the LIBO Screen Rate is not available or published on a current basis); provided that no Benchmark Transition Event shall have occurred at such time; or

(ii)    the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate or the LIBO Rate, as applicable, will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or Loan) included in such Borrowing;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders through Electronic System as provided in Section 9.01 as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (A) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and any such Eurodollar Borrowing shall be repaid or converted into an ABR Borrowing immediately, and (B) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

(b)    If any Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, fund or continue any Eurodollar Borrowing, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make, maintain, fund or continue Eurodollar Loans or to convert ABR Borrowings to Eurodollar Borrowings will be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower will upon demand from such Lender (with a copy to the Administrative Agent), either prepay or convert all Eurodollar Borrowings of such Lender to ABR Borrowings immediately.  Upon any such prepayment or conversion, the Borrower will also pay accrued interest on the amount so prepaid or converted.

(c)    Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower, so long as the Administrative Agent has not received, by such time, written notice of objection to such proposed amendment from Lenders comprising the Required Lenders; provided that, with respect to any proposed amendment containing any SOFR-Based Rate, the Lenders shall be entitled to object only to the Benchmark Replacement Adjustment contained therein.  Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment.  No replacement of LIBO Rate with a Benchmark

43

Replacement will occur prior to the applicable Benchmark Transition Start Date.

(d)    In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(e)    The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section 2.13, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.13.

(f)    Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and any such Eurodollar Borrowing shall be repaid or converted into an ABR Borrowing immediately, and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

Section 2.14    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender; or

(iii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the

capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of or the Loans made by, or participations in Swingline Loans held by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in clause (a) or (b) of this Section 2.14 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.14 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.14 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.15    Withholding of Taxes; Gross-Up.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15), the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)    Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Recipient or required to be withheld or deducted from a

45

payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    <u>Indemnification by the Lenders.</u>  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 9.04(c)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to setoff and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this <u>clause (e)</u>.

(f)    <u>Status of Lenders.</u>

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.15(f)(ii)(A)</u>, <u>(ii)(B)</u> and <u>(ii)(D)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), an executed copy of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the

Administrative Agent), whichever of the following is applicable:

(I)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party (1) with respect to payments of interest under any Loan Document, an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (2) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    an executed copy of IRS Form W-8ECI;

(III)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (1) a certificate substantially in the form of Exhibit C-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "*U.S. Tax Compliance Certificate*") and (2) an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(IV)    to the extent a Foreign Lender is not the beneficial owner, an executed copy of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-2 or Exhibit C-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "*FATCA*" shall include any amendments made to FATCA after the date of this Agreement.

(iii)     Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this clause (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This clause (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Survival.  Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)     Defined Terms.  For purposes of this Section 2.15 the term "*applicable law*" includes FATCA.

Section 2.16     Payments Generally; Allocation of Proceeds; Sharing of Setoffs.

(a)     The Borrower shall make each payment or prepayment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under Sections 2.14 or 2.15, or otherwise) prior to 2:00 p.m., Eastern time, on the date when due or the date fixed for any prepayment hereunder, in immediately available funds, without setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices, except payments to be made directly to the Swingline Lender as expressly provided herein, at the Payment Office, except that payments pursuant to Sections 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)     (i)     All payments and any proceeds of Collateral received by the Administrative Agent (A) not constituting either (I) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower), or (II) a

mandatory prepayment (which shall be applied in accordance with <u>Section 2.10</u>) or (B) after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders so direct, shall be applied ratably <u>first</u>, to pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent or Swingline Lender from the Borrower (other than in connection with Banking Services Obligations or Swap Agreement Obligations), <u>second</u>, to pay any fees, indemnities, or expense reimbursements then due to the Lenders from the Borrower (other than in connection with Banking Services Obligations or Swap Agreement Obligations), <u>third</u>, to pay interest then due and payable on the Loans ratably, <u>fourth</u>, to prepay principal on the Loans and to pay any amounts owing in respect of Swap Agreement Obligations and Banking Services Obligations up to and including the amount most recently provided to the Administrative Agent pursuant to <u>Section 2.20</u>, ratably, and <u>fifth</u>, to the payment of any other Secured Obligation due to the Administrative Agent or any Lender from the Borrower or any other Loan Party.  The Administrative Agent and the Lenders shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Secured Obligations.

(ii)    Notwithstanding the foregoing, Secured Obligations arising under Banking Services Obligations or Swap Agreement Obligations shall be excluded from the application described above and paid in <u>clause fifth</u> if the Administrative Agent has not received written notice thereof, together with such supporting documentation as the Administrative Agent may have reasonably requested from the applicable provider of such Banking Services or Swap Agreements.

(c)    At the election of the Administrative Agent, all payments of principal, interest, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to <u>Section 9.03</u>), and other sums payable under the Loan Documents, may be paid from the proceeds of Borrowings made hereunder, whether made following a request by the Borrower pursuant to <u>Section 2.03</u> or a deemed request as provided in this <u>Section 2.16</u>.  The Borrower hereby irrevocably authorizes the Administrative Agent to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents and agrees that all such amounts charged shall constitute Loans (including, for purposes of clarity, Swingline Loans), and that all such Borrowings shall be deemed to have been requested pursuant to <u>Section 2.03</u>.

(d)    If, except as otherwise expressly provided herein, any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in Swingline Loans and accrued interest thereon than the proportion received by any other similarly situated Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in Swingline Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in Swingline Loans; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this <u>clause (d)</u> shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in Swingline Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this <u>clause (d)</u> shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such

49

participation.

(e)        Unless the Administrative Agent shall have received, prior to any date on which any payment is due to the Administrative Agent for the account of the Lenders pursuant to the terms hereof or any other Loan Document (including any date that is fixed for prepayment by notice from the Borrower to the Administrative Agent pursuant to Section 2.10(e)), notice from the Borrower that the Borrower will not make such payment or prepayment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)        The Administrative Agent shall provide the Borrower with monthly account statements or invoices with respect to any of the Secured Obligations (the "*Statements*"), provided, that any failure on the part of the Administrative Agent to provide such monthly account statements or invoices shall not relieve the Borrower of its payment obligations as set forth herein.  If the Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Administrative Agent, on behalf of the Lenders, of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Administrative Agent's or the Lenders' right to receive payment in full at another time.

Section 2.17    Mitigation Obligations; Replacement of Lenders.

(a)        If any Lender requests compensation under Section 2.14, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Sections 2.14 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)        If any Lender requests compensation under Section 2.14, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Sections 2.14 or 2.15) and obligations under this Agreement and other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent (and in circumstances where its consent would be required under Section 9.04, the Swingline Lender), which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and funded participations in Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the

50

assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.14 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  Each party hereto agrees that (x) an assignment required pursuant to this clause (b) may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and such parties are participants), and (y) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to and be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender, provided that any such documents shall be without recourse to or warranty by the parties thereto.

Section 2.18    Defaulting Lenders.

(a)    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(i)    fees shall cease to accrue on the unfunded portion of the Revolving Commitment of such Defaulting Lender pursuant to Section 2.11(a);

(ii)    any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 2.16(b) or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Swingline Lender hereunder; third, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fourth, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fifth, to the payment of any amounts owing to the Lenders or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender or Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document; sixth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document; and seventh, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (A) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (B) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans and unfunded and funded participations in the Borrower's obligations corresponding to such Defaulting Lender's Swingline Exposure

is held by the Lenders pro rata in accordance with the Commitments without giving effect to clause (iv) below.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.18 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto;

(iii)     such Defaulting Lender shall not have the right to vote on any issue on which voting is required (other than to the extent expressly provided in Section 9.02(b)) and the Commitment and Revolving Exposure of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder or under any other Loan Document; provided that, except as otherwise provided in Section 9.02, this clause (iii) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender directly affected thereby; and

(iv)     if any Swingline Exposure exists at the time such Lender becomes a Defaulting Lender, then:

(A)     all or any part of the Swingline Exposure of such Defaulting Lender (other than the portion of such Swingline Exposure referred to in clause (b) of the definition of such term) shall be reallocated among the non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent that such reallocation does not, as to any non-Defaulting Lender, cause such non-Defaulting Lender's Revolving Exposure to exceed its Revolving Commitment; and

(B)     if the reallocation described in clause (A) above cannot, or can only partially, be effected, the Borrower shall within one (1) Business Day following notice by the Administrative Agent prepay such Swingline Exposure and (after giving effect to any partial reallocation pursuant to clause (A) above).

(v)     so long as such Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan, unless it is satisfied that the related exposure will be one hundred percent (100%) covered by the Commitments of the non-Defaulting Lenders, and Swingline Exposure related to any such newly made Swingline Loan shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.18(a)(iv)(A) (and such Defaulting Lender shall not participate therein).

(b)     If (i) a Bankruptcy Event or a Bail-In Action with respect to the Parent of any Lender shall occur following the date hereof and for so long as such event shall continue or (ii) the Swingline Lender or has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, the Swingline Lender shall not be required to fund any Swingline Loan, unless the Swingline Lender shall have entered into arrangements with the Borrower or such Lender, satisfactory to the Swingline Lender to defease any risk to it in respect of such Lender hereunder.

(c)     In the event that each of the Administrative Agent, the Borrower and the Swingline Lender agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Commitment and on the date of such readjustment such Lender shall purchase at par such of the Loans of the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage.

Section 2.19    <u>Returned Payments.</u>    If, after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Administrative Agent or any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Administrative Agent or such Lender.  The provisions of this <u>Section 2.19</u> shall be and remain effective notwithstanding any contrary action which may have been taken by the Administrative Agent or any Lender in reliance upon such payment or application of proceeds.  The provisions of this <u>Section 2.19</u> shall survive the termination of this Agreement.

Section 2.20    <u>Banking Services and Swap Agreements.</u>    Each Lender or Affiliate thereof providing Banking Services for, or having Swap Agreements with, any Loan Party or any Subsidiary or Affiliate of a Loan Party shall deliver to the Administrative Agent, promptly after entering into such Banking Services or Swap Agreements, written notice setting forth the aggregate amount of all Banking Services Obligations and Swap Agreement Obligations of such Loan Party or Subsidiary or Affiliate thereof to such Lender or Affiliate (whether matured or unmatured, absolute or contingent).  In furtherance of that requirement, each such Lender or Affiliate thereof shall furnish the Administrative Agent, from time to time after a significant change therein or upon a request therefor, a summary of the amounts due or to become due in respect of such Banking Services Obligations and Swap Agreement Obligations.  The most recent information provided to the Administrative Agent shall be used in determining which tier of the waterfall, contained in <u>Section 2.16(b)</u>, such Banking Services Obligations and/or Swap Agreement Obligations will be placed.

Section 2.21    <u>Swingline Loans.</u>

(a)    Subject to the terms and conditions set forth herein, from time to time during the Availability Period, the Swingline Lender agrees to make Swingline Loans to the Borrower, in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of outstanding Swingline Loans exceeding the Swingline Lender's Swingline Commitment, (ii) the Swingline Lender's Revolving Exposure exceeding its Revolving Commitment, or (iii) the Aggregate Revolving Exposure exceeding the lesser of (A) the aggregate Revolving Commitments or (B) the Borrowing Base; <u>provided</u> that the Swingline Lender shall not be required to make a Swingline Loan to refinance an outstanding Swingline Loan.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Swingline Loans.  To request a Swingline Loan, the Borrower shall notify the Administrative Agent of such request by fax or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, not later than noon, Eastern time, on the day of a proposed Swingline Loan.  Each such notice shall be in a form approved by the Administrative Agent, shall be irrevocable and shall specify the requested date (which shall be a Business Day) and amount of the requested Swingline Loan.  The Administrative Agent will promptly advise the Swingline Lender of any such notice received from the Borrower.  The Swingline Lender shall make each Swingline Loan available to the Borrower by means of a credit to the Funding Account(s) by 2:00 p.m., Eastern time, on the requested date of such Swingline Loan.

(b)    The Swingline Lender may by written notice given to the Administrative Agent require the Revolving Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding.  Such notice shall specify the aggregate amount of Swingline Loans in which the Revolving Lenders will participate.  Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Revolving Lender, specifying in such notice such Lender's Applicable

Percentage of such Swingline Loan or Loans. Each Revolving Lender hereby absolutely and unconditionally agrees, promptly upon receipt of such notice from the Administrative Agent (and in any event, if such notice is received by 11:00 a.m., Eastern time, on a Business Day no later than 4:00 p.m., Eastern time on such Business Day and if received after 11:00 a.m., Eastern time, "on a Business Day" shall mean no later than 9:00 a.m. Eastern time on the immediately succeeding Business Day), to pay to the Administrative Agent, for the account of the Swingline Lender, such Lender's Applicable Percentage of such Swingline Loan or Loans. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Revolving Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Revolving Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, mutatis mutandis, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Revolving Lenders. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph, and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear; provided that any such payment so remitted shall be repaid to the Swingline Lender or to the Administrative Agent, as applicable, if and to the extent such payment is required to be refunded to the Borrower for any reason. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Borrower of any default in the payment thereof.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lenders on each date set forth in Section 4.01 and Section 4.02 and each other date set forth herein or in any other Loan Document as a date on which representations and warranties are required to be made or are deemed to be made pursuant to the express terms hereof or thereof that (and where applicable, agrees):

Section 3.01    Organization; Powers. Each Loan Party and each Subsidiary of the Borrower (a) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02    Authorization; Enforceability. The Transactions and related Guarantee of the Guaranteed Obligations are within each applicable Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational actions and, if required, actions by equity holders. Each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    <u>Governmental Approvals; No Conflicts.</u>  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party or any Subsidiary of the Borrower, (c) will not violate or result in a default under (i) any Organization Document of any Loan Party or (ii) any material contract or agreement binding upon any Loan Party or any Subsidiary of the Borrower or the assets of any Loan Party or any Subsidiary of the Borrower, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary of the Borrower, except individually or in the aggregate in the case of the preceding <u>clauses (b)</u> and <u>(c)(ii)</u> where it would not reasonably be expected to result in a Material Adverse Effect, and (d) will not result in the creation or imposition of, or other requirement to create, any Lien on any asset of any Loan Party or any Subsidiary of the Borrower, except Liens created pursuant to the Loan Documents.

Section 3.04    <u>Financial Condition; No Material Adverse Effect.</u>

(a)    Holdings has heretofore furnished to the Lenders (i) audited consolidated financial statements of Holdings and its Subsidiaries for the fiscal year ended December 31, 2020 and fiscal year ended December 31, 2019, in each case, together with internally-prepared schedules thereto setting forth the consolidated balance sheet and related statements of operations and cash flows of King and its Subsidiaries as of the end and for such fiscal years and (ii) the internally-prepared consolidated financial statements of Holdings and its consolidated Subsidiaries on a consolidated basis for the fiscal quarter ended December 31, 2020, together with internally-prepared schedules thereto setting forth the consolidated balance sheet and related statement of operations of King and its Subsidiaries as of the end and for such fiscal quarter.  Such financial statements present fairly, in all material respects, the financial position and results of operations of Holdings and its consolidated Subsidiaries (or King and its consolidated Subsidiaries, as applicable) as of such dates and for such periods in accordance with GAAP in all material respects, subject to normal year end audit adjustments and the absence of footnotes in the case of the statements referred to in <u>clause (ii)</u> above.

(b)    No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since December 31, 2020; <u>provided</u> that for purposes of this <u>clause (b)</u>, the impacts of the COVID-19 pandemic on the business operations and/or financial condition of the Loan Parties and the Subsidiaries of the Borrower shall be disregarded to the extent that such impacts (i) occurred prior to the Closing Date and (ii) were disclosed in writing to the Administrative Agent prior to the Closing Date.

Section 3.05    <u>Properties.</u>

(a)    As of the date of this Agreement, <u>Schedule 3.05</u> sets forth the address of each parcel of real property that is owned or leased by any Loan Party.  To the knowledge of the Loan Parties, no default by any party to any such lease or sublease exists.  Each of the Loan Parties and each Subsidiary of the Borrower has good and marketable title to, or valid leasehold interests in, all of its real and personal property (other than intellectual property, which is subject to <u>clause (b)</u> below) material to its business, in each case except for irregularities or deficiencies in title that individually or in the aggregate do not materially interfere with its ability to conduct its business as currently conducted or to utilize such assets for their intended purpose, free of all Liens other than those permitted by <u>Section 6.02</u>.

(b)    Each Loan Party and each Subsidiary of the Borrower owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on <u>Schedule 3.05</u>, and, to the knowledge of each applicable Loan Party and each applicable Subsidiary of the

Borrower, the use thereof by each Loan Party and each Subsidiary of the Borrower does not infringe in any material respect upon the rights of any other Person except individually or in the aggregate where it would not reasonably be expected to result in a Material Adverse Effect, and the rights thereto of each Loan Party and each Subsidiary of the Borrower are not subject to any licensing agreement or similar arrangement.

Section 3.06    <u>Litigation and Environmental Matters.</u>

(a)    There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any Subsidiary of the Borrower (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any Loan Document or the Transactions.

(b)    (i) No Loan Party or any Subsidiary of the Borrower has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any Subsidiary of the Borrower (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law (B) has become subject to any Environmental Liability, or (C) knows of any basis for any Environmental Liability.

Section 3.07    <u>Compliance with Laws and Agreements; No Default.</u>  Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Loan Party and each Subsidiary of the Borrower is in compliance with (a) all Requirement of Law applicable to it or its property and (b) all material contracts or agreements binding upon it or its property.  No Default has occurred and is continuing.

Section 3.08    <u>Investment Company Status.</u>  No Loan Party or any Subsidiary of the Borrower is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 3.09    <u>Taxes.</u>  Each Loan Party and each Subsidiary of the Borrower has timely filed or caused to be filed (in each case after giving effect to all extensions) all federal and other material Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary of the Borrower, as applicable, has set aside on its books adequate reserves.  No tax liens other than those constituting Permitted Encumbrances have been filed, and no claims are being asserted with respect to any Taxes of a Loan Party or Subsidiary of the Borrower.

Section 3.10    <u>ERISA.</u>  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount that could reasonably be expected to result in a Material Adverse Effect.

Section 3.11    <u>Disclosure.</u>

(a)    The Loan Parties have disclosed to the Lenders all material contracts and agreements and corporate or other restrictions to which any Loan Party or any Subsidiary of the Borrower

56

is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No written information, reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

(b)    As of the Closing Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

Section 3.12    Material Agreements.  No Loan Party or any Subsidiary of the Borrower is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any contract or agreement to which it is a party except with respect to any default that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.13    Solvency.

(a)    Immediately after the consummation of the Transactions to occur on the Closing Date, (i) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise; (ii) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) no Loan Party will have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Closing Date.

(b)    No Loan Party intends to, and no Loan Party believes that it will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its Indebtedness.

Section 3.14    Insurance.  The properties of the Loan Parties are insured with financially sound and reputable insurance companies not Affiliates of the Loan Parties, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and standard exclusions and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties operate.

Section 3.15    Capitalization and Subsidiaries.  Schedule 3.15 sets forth (a) a correct and complete list of the name and relationship to King of the Borrower and each Subsidiary of the Borrower, (b) a true and complete listing of each class of each of King's authorized Equity Interests, of which all of such issued Equity Interests are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 3.15, and (c) the type of entity of King, the Borrower and each Subsidiary of the Borrower.  All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable.

CHAR1\1782959v16

Section 3.16    <u>Security Interest in Collateral.</u>  Each Collateral Document delivered pursuant to <u>Article 4</u> and <u>Section 5.13</u> will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder under applicable Requirements of Law (to the extent required hereunder and thereunder), and (i) when appropriate filings or recordings are made in the appropriate offices as may be required under applicable Requirements of Law (to the extent required hereunder and thereunder), and (ii) upon the taking of possession, control or other action by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession, control or other action (which possession, control or other action shall be given to the Administrative Agent or taken by the Administrative Agent to the extent required by any Collateral Document), the Liens in favor of the Administrative Agent will constitute first priority fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case under applicable Requirements of Law (to the extent required hereunder and thereunder), subject to no Liens other than the applicable Permitted Encumbrances.

Section 3.17    <u>Employment Matters.</u>  As of the Closing Date, there are no strikes, lockouts or slowdowns against any Loan Party or any Subsidiary of the Borrower pending or, to the knowledge of any Loan Party, threatened.  The hours worked by and payments made to employees of the Loan Parties and the Subsidiaries of the Borrower have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters in any manner which could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.  All payments due from any Loan Party or any Subsidiary of the Borrower, or for which any claim may be made against any Loan Party or any Subsidiary of the Borrower, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary of the Borrower, except where the failure to do so could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

Section 3.18    <u>Margin Regulations.</u>  No Loan Party is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing hereunder will be used to buy or carry any Margin Stock.  Following the application of the proceeds of each Borrowing, not more than twenty-five percent (25%) of the value of the assets (either of any Loan Party only or of the Loan Parties and their Subsidiaries on a consolidated basis) will be Margin Stock.

Section 3.19    <u>Use of Proceeds.</u>  The proceeds of the Loans have been used and will be used, whether directly or indirectly as set forth in <u>Section 5.08</u>.

Section 3.20    <u>No Burdensome Restrictions.</u>  No Loan Party is subject to any Burdensome Restrictions except Burdensome Restrictions permitted under <u>Section 6.10</u>.

Section 3.21    <u>Anti-Corruption Laws and Sanctions.</u>  Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and directors and, to the knowledge of such Loan Party, its employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that could reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.  None of (a) any Loan Party, any Subsidiary, any of their respective directors or officers or, to the knowledge of any such Loan Party or Subsidiary, employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of

58

proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

Section 3.22    Affected Financial Institutions.  No Loan Party is an Affected Financial Institution.

Section 3.23    Plan Assets; Prohibited Transactions.  None of the Loan Parties or any Subsidiary of the Borrower is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery nor performance of the transactions contemplated under this Agreement, including the making of any Loan hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

Section 3.24    Casualty.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God (with the exception of impacts of the COVID-19 pandemic on the business operations and/or financial condition of the Loan Parties to the extent that such impacts (i) occurred prior to the Closing Date and (ii) were disclosed in writing to the Administrative Agent prior to the Closing Date) or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

ARTICLE 4
CONDITIONS

Section 4.01    Closing Date.

(a)    The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(i)    Credit Agreement and Loan Documents; Opinions of Counsel.  The Administrative Agent (or its counsel) shall have received (A) from each party hereto either (I) a counterpart of this Agreement signed on behalf of such party or (II) written evidence satisfactory to the Administrative Agent (which may include fax or other electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (B) duly executed copies of the Loan Documents and such other certificates, documents, instruments and agreements as the Administrative Agent shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including any promissory notes requested by a Lender pursuant to Section 2.09 payable to the order of each such requesting Lender and a written opinion of the Loan Parties' counsel, addressed to the Administrative Agent and the Lenders, all in form and substance satisfactory to the Administrative Agent.

(ii)    Financial Statements.  The Lenders shall have received (A) audited consolidated financial statements of Holdings and its Subsidiaries for the fiscal year ended December 31, 2020 and fiscal year ended December 31, 2019, in each case, together with internally-prepared schedules thereto setting forth the consolidated balance sheet and related statements of operations of King and its Subsidiaries as of the end and for such fiscal years, and (B) the internally-prepared consolidated financial statements of Holdings and its consolidated Subsidiaries on a consolidated basis for the fiscal quarter ended March 31, 2021, together with internally-prepared schedules thereto setting forth the consolidated balance sheet and related statement of operations of King and its Subsidiaries as of the end and for such fiscal quarter, and such financial statements shall not, in the reasonable judgment of the Administrative Agent, reflect any material adverse change in the consolidated financial condition of Holdings and its Subsidiaries as reflected in the audited, consolidated financial statements described in clause (A) of this clause (ii).

(iii)     Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (A) a certificate of each Loan Party, dated the Closing Date and executed by its secretary or assistant secretary, which shall (I) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (II) identify by name and title and bear the signatures of the officers of such Loan Party authorized to sign the Loan Documents to which it is a party and, in the case of the Borrower, its Financial Officers, and (III) contain appropriate attachments, including the charter, articles or certificate of organization or incorporation of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, management or partnership agreement, or other organizational or governing documents, and (B) a good standing certificate for each Loan Party from its jurisdiction of organization.

(iv)     No Default Certificate.  The Administrative Agent shall have received a certificate, signed by the a Financial Officer of the Borrower, dated as of the Closing Date (A) stating that no Default has occurred and is continuing, and (B) stating that the representations and warranties contained in the Loan Documents are true and correct in all material respects as of such date (other than any representation or warranty which is subject to any materiality qualifier, in which case, such representation or warranty shall be true and correct in all respects).

(v)     Fees.  The Lenders and the Administrative Agent shall have received all reasonable fees and expenses required to be paid or reimbursed in accordance with Section 9.03 and that certain Fee Letter dated February 26, 2021 between Hancock Whitney and the Borrower for which invoices have been presented two (2) Business Days prior to the Closing Date.

(vi)     Lien Searches.  The Administrative Agent shall have received the results of a recent lien search in the jurisdiction of organization of each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Closing Date pursuant to a pay-off letter or other documentation satisfactory to the Administrative Agent.

(vii)     Notice of Termination.  The Administrative Agent shall have received a notice of termination with respect to that certain Loan Agreement dated December 6, 2019 between Borrower, Hancock Whitney Bank and each of the other parties thereto from time to time.

(viii)     Funding Account; Borrowing Request; Funds Disbursement Agreement. The Administrative Agent shall have received (A) a notice setting forth the deposit account of the Borrower maintained at Hancock Whitney (the "*Funding Account*") to which the Administrative Agent is authorized by the Borrower to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement, (B) a duly executed Borrowing Request and (C) a duly executed funds disbursement agreement.

(ix)     Solvency.  The Administrative Agent shall have received a solvency certificate signed by a Financial Officer dated the Closing Date in form and substance reasonably satisfactory to the Administrative Agent.

(x)     Borrowing Base Certificate.  The Administrative Agent shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of the end of the Business Day immediately preceding the Closing Date.

(xi)     Filings, Registrations and Recordings.  Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in

favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by <u>Section 6.02</u>), shall be in proper form for filing, registration or recordation.

(xii)    <u>Insurance.</u>  The Administrative Agent shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Administrative Agent and otherwise in compliance with the terms of <u>Sections 5.10</u> and <u>5.12</u> of this Agreement and Section 4.12 of the Security Agreement.

(xiii)    <u>Field Audit</u>.  The Administrative Agent shall have received a field audit of the Collateral in such scope as the Administrative Agent reasonably requires, from an auditor reasonably approved by the Administrative Agent, and in form and substance reasonably satisfactory to the Administrative Agent.

(xiv)    <u>Required Consents and Approvals</u>.  The Loan Parties shall have received all consents (including necessary governmental consents), approvals, authorizations, registrations and filings and orders required or advisable to be made or obtained under any applicable Requirements of Law of, or with respect to, any Loan Party, or by any contractual obligation of any Loan Party, in connection with the execution, delivery, performance, validity and enforceability of the Loan Documents or any of the transactions contemplated thereby, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect and all applicable waiting periods shall have expired, and no investigation or inquiry by any Governmental Authority regarding the Loan Documents or any other transaction being financed with the proceeds thereof shall be ongoing.

(xv)    <u>Legal Due Diligence.</u>  The Administrative Agent and its counsel shall have completed all legal (including tax implications) and regulatory due diligence, including but not limited to compliance with all applicable requirements of Regulations U, T, and X of the Board of Governors of the Federal Reserve System, the results of which shall be satisfactory to Administrative Agent in its sole discretion.

(xvi)    <u>USA PATRIOT Act, Etc.</u>  (A) The Administrative Agent shall have received, (I) at least five (5) days prior to the Closing Date, all documentation and other information regarding the Borrower requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to the extent requested in writing of the Borrower at least ten (10) days prior to the Closing Date, and (II) a properly completed and signed IRS Form W-8 or W-9, as applicable, for each Loan Party, and (B) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five (5) days prior to the Closing Date, any Lender that has requested, in a written notice to the Borrower at least the (10) days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this <u>clause (B)</u> shall be deemed to be satisfied).

(xvii)    <u>Other Documents.</u>  The Administrative Agent shall have received such other documents as the Administrative Agent, any Lender or their respective counsel may have reasonably requested.

Section 4.02    <u>Each Credit Event.</u>

(a)    The obligation of each Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(i) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date, and that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects).

(ii) At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(iii) The Administrative Agent shall have received the most recent Borrowing Base Certificate required pursuant to Section 5.01(a)(vi).

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in clauses (a)(i), (a)(ii) and (a)(iii) of this Section 4.02.

ARTICLE 5
AFFIRMATIVE COVENANTS

Until all of the Secured Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lenders that:

Section 5.01    Financial Statements; Borrowing Base and Other Information.

(a) The Borrower will furnish to the Administrative Agent and each Lender, including their Public-Siders:

(i) within one hundred twenty (120) days after the end of each fiscal year of Holdings, its audited consolidated balance sheet and related statements of operations and cash flows as of the end of and for such year, together with internally-prepared schedules to such consolidated financial statements setting forth the balance sheet and related statements of operations and cash flows of King and its Subsidiaries as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, (A) with respect to the consolidated financial statements of Holdings and its Subsidiaries, all reported on by independent public accountants of recognized national standing (without a "going concern" or like qualification, commentary or exception, and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of Holdings and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, accompanied by any management letter prepared by said accountants, and (B) with respect to the internally-prepared schedules setting forth the financial results of King and its Subsidiaries, all certified by a Financial Officer to the effect that such financial statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of Holdings and its Subsidiaries;

(ii) within forty-five (45) days after the end of each of the first three fiscal quarters of Holdings, its consolidated balance sheet and related statement of operations as of the end of and for such fiscal quarter and the then elapsed portion of such fiscal year, together with internally-prepared schedules to such consolidated financial statements setting for the consolidated balance sheet and related statement of operations of King and its Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of such fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal

year, (i) with respect to the consolidated financial statements of Holdings and its Subsidiaries, all certified by a Financial Officer as presenting fairly in all material respects the financial condition and results of operations of Holdings and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) with respect to the internally-prepared schedules setting forth the financial results of King and its Subsidiaries, all certified by a Financial Officer to the effect that such financial statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of Holdings and its Subsidiaries;

(iii)    concurrently with any delivery of financial statements under clause (i) or (ii) above, a Compliance Certificate;

(iv)    such other information as the Administrative Agent reasonably requires in connection with monitoring the Collateral, at the times and in the manner reasonably requested by the Administrative Agent;

(v)    as soon as available, but in any event no later than March 31st of each calendar year, a copy of the plan and forecast (including a projected consolidated balance sheet and income statement) of Holdings and its Subsidiaries for the then-current fiscal year (the "*Projections*") in form reasonably satisfactory to the Administrative Agent;

(vi)    within twenty (20) days of the end of each calendar month (such date, the "*Scheduled Borrowing Base Reporting Date*") and at such other times as may be necessary to re-determine Availability hereunder or as may be reasonably requested by the Administrative Agent, as of the last day of such calendar month, a Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Administrative Agent may reasonably request;

(vii)    as soon as available but in any event within twenty (20) days of the end of each calendar month, a calculation of the Days Inventory Outstanding Ratio for such month, certified by a Financial Officer;

(viii)    so long as the NextGear Credit Agreement has not been terminated, upon request by the Administrative Agent, a current Inventory listing (if any Revolving Loans are outstanding at any point during the week);

(ix)    as soon as available, but in any event within twenty (20) of the end of each calendar month, a current Inventory listing (if any Revolving Loans are outstanding at any point during the month);

(x)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Loan Party or any Subsidiary of the Borrower with the SEC, or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities exchange, or distributed by the Borrower to its shareholders generally, as the case may be;

(xi)    promptly after receipt thereof by the Borrower or any Subsidiary of the Borrower, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by the SEC or such other agency regarding financial or other operational results of the Borrower or any Subsidiary thereof;

(xii)    within forty-five (45) days after the end of each fiscal quarters of Holdings, updated Exhibits A and B to the Security Agreement;

(xiii)    promptly following any request therefor, (A) such other information regarding the operations (including, without limitation, information in connection with monitoring of Collateral), changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of this Agreement, as the Administrative Agent or any Lender (through Administrative Agent) may reasonably request and (B) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation; and

(xiv)    promptly after any request therefor by the Administrative Agent or any Lender, copies of (A) any documents described in Section 101(k)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan and (B) any notices described in Section 101(l)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if the Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

(b)    Documents required to be delivered pursuant to Section 5.01(a)(i), (ii) or (xi) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which such materials are publicly available as posted on the Electronic Data Gathering, Analysis and Retrieval system (EDGAR); or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether made available by the Administrative Agent); provided that: (A) upon written request by the Administrative Agent (or any Lender through the Administrative Agent) to the Borrower, the Borrower shall deliver paper copies of such documents to the Administrative Agent (for further distribution to the Lenders) until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (B) the Borrower shall notify the Administrative Agent (by facsimile or through Electronic System) of the posting of any such documents and provide to the Administrative Agent through Electronic System electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such document to it and maintaining its copies of such documents.

(c)    Each of King and the Borrower represents and warrants that each of it and its Controlling and Controlled entities, in each case, if any (collectively with the Borrower, the "*Relevant Entities*"), either (i) other than with respect to the ABS Bonds, has no SEC registered or unregistered, publicly traded securities outstanding, or (ii) files its financial statements with the SEC and/or makes its financial statements available to potential holders of its securities, and, accordingly, the Borrower hereby (A) authorizes the Administrative Agent to make the financial statements to be provided under Sections 5.01(a)(i) and (ii) above, along with the Loan Documents, available to Public-Siders and (B) agrees that at the time such financial statements are provided hereunder, they shall already have been made available to holders of any such securities. The Borrower will not request that any other material be posted to Public-Siders without expressly representing and warranting to the Administrative Agent in writing that such

materials do not constitute material non-public information within the meaning of the federal securities laws or that the Relevant Entities have no outstanding SEC registered or unregistered, publicly traded securities. Notwithstanding anything herein to the contrary, in no event shall the Borrower request that the Administrative Agent make available to Public-Siders budgets or any certificates, reports or calculations with respect to the Borrower's compliance with the covenants contained herein or with respect to the Borrowing Base.

(d)     At all times, provide access to the global positioning satellite portal to the Administrative Agent and/or its agents for the purposes of tracking vehicles constituting Eligible Inventory.

Section 5.02    Notices of Material Events.

(a)     Each of the Borrower and King will furnish to the Administrative Agent and each Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(i)     within three (3) Business Days of any Responsible Officer of any Loan Party becoming aware thereof, the occurrence of any Default or Event of Default;

(ii)     within five (5) Business Days after receipt thereof, receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party or any Subsidiary of the Borrower that (A) seeks damages in excess of $2,000,000, (B) seeks injunctive relief, (C) is asserted or instituted against any Plan, its fiduciaries or its assets, (D) alleges criminal misconduct by any Loan Party or any Subsidiary of the Borrower, (E) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (F) asserts liability on the part of any Loan Party or any Subsidiary of the Borrower in excess of $2,000,000 in respect of any tax, fee, assessment, or other governmental charge, or (G) involves any material product recall that could reasonably be expected individually or in the aggregate to result in a Material Adverse Effect;

(iii)     concurrently with the delivery of the financial statements required to be delivered pursuant to Section 5.01(a)(i) or 5.01(a)(ii), as the case may be, notice of any material change in the accounting and/or financial reporting practices of the Loan Parties and their Subsidiaries for the period covered thereby;

(iv)     within five (5) Business Days of any Responsible Officer becoming aware thereof, the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and the Subsidiaries of the Borrower in an aggregate amount exceeding $1,500,000;

(v)     any Loan Party entering into a Swap Agreement or an amendment to a Swap Agreement, together with copies of all agreements evidencing such Swap Agreement or amendment;

(vi)     within five (5) Business Days after any Loan Party acquires knowledge thereof, any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

(vii)     any (A) issuance of Equity Interests or (B) incurrence of Material Indebtedness; and

(viii)     any change in the information provided in the Beneficial Ownership

Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such certification.

(b)    Each notice delivered under this <u>Section 5.02</u> shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03    <u>Existence.</u>  Each Loan Party will, and will cause each Subsidiary of the Borrower to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; <u>provided</u> that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under <u>Section 6.03</u>.

Section 5.04    <u>Payment of Obligations.</u>  Each Loan Party will, and will cause each Subsidiary of the Borrower to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or Subsidiary of the Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect; <u>provided</u>, however, that each Loan Party will, and will cause each Subsidiary of the Borrower to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

Section 5.05    <u>Maintenance of Properties.</u>  Each Loan Party will, and will cause each Subsidiary of the Borrower to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 5.06    <u>Books and Records; Inspection Rights; Field Audits.</u>

(a)    Each Loan Party will, and will cause each Subsidiary of the Borrower to, (i) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (ii) permit any representatives designated by the Administrative Agent (which may include representatives of any Lender) to visit during its regular business hours and with reasonable advance notice thereof and inspect the financial records and the property of such Loan Party or Subsidiary of the Borrower at reasonable times up to one (1) time per calendar year (but without frequency limit during the continuance of an Event of Default) and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent (which may include representatives of any Lender) to discuss the affairs, finances, accounts and condition of the Borrower with the officers and employees thereof and advisors therefor (including independent accountants); <u>provided</u> that the Administrative Agent shall give the Loan Parties and any such Subsidiary of the Borrower an opportunity for its respective representatives to participate in any such discussions (and such representatives of the Loan Parties and the Subsidiaries of the Borrower shall use commercially reasonable efforts to make themselves available for such purpose); <u>provided</u> <u>further</u> that so long as no Event of Default has occurred and is then continuing, the Borrower shall not bear the cost of more than one (1) such inspection per calendar year by the Administrative Agent (or its respective representatives), it being understand and agreed that so long as an Event of Default has occurred and is continuing, any such inspection by the Administrative Agent (or its respective representatives) shall be at the expense of the Loan Parties.

(b)    The Administrative Agent (or its designee) may conduct an audit of the Borrower's Inventory and processes related thereto consisting of a review at the Borrower's executive office (and any other location where certificates of title for vehicles that are part of the Collateral are stored) of randomly selected certificate of title files for no more than twenty percent (20%) of the collateral files and, on a reasonable basis, the verification of the location of Inventory through the Borrower's GPS-enabled Inventory control system for an unlimited number of vehicles that are part of the Collateral (such audit, a "*Headquarters Audit*").  The Administrative Agent may conduct such Headquarters Audits once per calendar month.  The Borrower shall reimburse the Administrative Agent for reasonable and documented charges and expenses in connection with such audits, in an amount not to exceed $10,000 in the aggregate for any fiscal year (or a proportionate amount for any partial year).  In addition to Headquarters Audits, in the event the Administrative Agent finds material discrepancies during the course of any Headquarters Audit, or if an Event of Default shall have occurred and be continuing, the Administrative Agent may conduct field audits in up to five (5) dealership or other locations selected by the Administrative Agent in its sole discretion per month.  Each Loan Party will, and will cause each Subsidiary of the Borrower to, cooperate with the Administrative Agent and its employees, agents, and third party audit firms, in the completion of such Headquarters Audits, with each such Headquarters Audit to be conducted in a manner reasonably satisfactory to the Administrative Agent.

Section 5.07    <u>Compliance with Laws and Material Contractual Obligations.</u>  Each Loan Party will, and will cause each Subsidiary of the Borrower to, (a) comply with each Requirement of Law applicable to it or its property (including without limitation Environmental Laws) and (b) perform in all material respects its obligations under material agreements to which it is a party, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Each Loan Party will maintain policies and procedures designed to promote and achieve compliance by such Loan Party, the Subsidiaries of the Borrower and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 5.08    <u>Use of Proceeds.</u>  The proceeds of the Loans will be used only (a) for working capital purposes (including the purchase of automobile inventory), (b) to make Capital Expenditures, (c) for general corporate purposes, and (d) to pay transaction fees, costs and expenses related to this Agreement, in each case with respect to <u>clauses (a)</u> through <u>(d)</u> not in violation of applicable laws or the terms of the Loan Documents.

Section 5.09    <u>[Reserved]</u>.

Section 5.10    <u>Insurance.</u>  Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards), and with such deductibles and standard exclusions, as are customarily carried under similar circumstances by such other Persons and all such insurance shall, subject to <u>Section 5.12</u> below, (a) provide for not less than 30 days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance, (b) name the Administrative Agent additional insured on behalf of the Secured Parties (in the case of liability insurance) or lender's loss payee (in the case of transit insurance and property insurance, in each case covering Collateral), as applicable, (c) if reasonably requested by the Administrative Agent, include a breach of warranty clause and (d) be reasonably satisfactory in all other respects to the Administrative Agent.

Section 5.11    <u>Casualty and Condemnation.</u>  The Borrower (a) will furnish to the Administrative Agent prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the

Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

Section 5.12    <u>Post-Closing Covenants</u>.

(a)    The Borrower shall use commercially reasonable efforts to deliver to the Administrative Agent, within sixty (60) days of the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion) a duly executed collateral access agreement from the lessor of the chief executive office location identified on Exhibit A to the Security Agreement.

(b)    Within thirty (30) days of the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion), the Borrower will deliver to the Administrative Agent endorsements to all insurance policies maintained by the Loan Parties (i) providing for not less than thirty (30) days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance and (ii) naming the Administrative Agent as an additional insured on behalf of the Secured Parties (in the case of liability insurance) or lender's loss payee (in the case of transit insurance and property insurance, in each case covering Collateral), as applicable.

Section 5.13    <u>Additional Guarantors; Further Assurances.</u>

(a)    Subject to applicable Requirement of Law, the Borrower will cause each of its Domestic Subsidiaries formed or acquired after the date of this Agreement to become a Loan Party by executing a Joinder Agreement.  In connection therewith, the Administrative Agent shall have received all documentation and other information regarding such newly formed or acquired Subsidiaries as may be required to comply with the applicable "know your customer" rules and regulations, including the USA Patriot Act.  Upon execution and delivery thereof, each such Person (i) shall automatically become a Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, in any property of such Loan Party which constitutes Collateral.  For purposes of clarity, no real property asset of any Loan Party shall be required to be pledged or mortgaged to secure the payment of the Secured Obligations.

(b)    Without limiting the foregoing, (i) upon the request of the Administrative Agent, the Borrower shall promptly deliver to the Administrative Agent all original certificates of title (the "*Certificates of Title*") and complete and accurate copies of all inventory records, and (ii) each Loan Party will, and will cause each Subsidiary of the Borrower to, execute and deliver, or cause to be executed and delivered, to the Administrative Agent such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements and other documents and such other actions or deliveries of the type required by <u>Section 4.01</u>, as applicable), which may be required by any Requirement of Law or which the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all in form and substance reasonably satisfactory to the Administrative Agent and all at the expense of the Loan Parties.  If the Administrative Agent receives Certificates of Title and other documents in accordance with this <u>Section 5.13(b)</u>, the Administrative Agent (or its designee or representative) shall do so as custodian for such Certificates of Title and other documents and shall maintain continuous custody (except as otherwise contemplated by this Agreement) of all such Certificates of Title and other documents at the office of the Administrative Agent (or its designee or representative) where it customarily maintains custody of similar documents and files in secure and fire resistant facilities. In performing its duties as

custodian, the Administrative Agent agrees to use the same standard of skill and attention that the Administrative Agent would exercise with respect to original certificates of title or other receivables that it services or holds for itself or others.  The Administrative Agent further agrees that any dispositions of the Certificates of Title by the Administrative Agent shall be in accordance with the terms of this Agreement or with written instructions furnished by the Borrower.

(c)       Upon request of any authorized officer of any Loan Party, the Administrative Agent shall release the applicable Certificate of Title and ship for delivery, or direct its agents or sub-custodians to release and ship for delivery, as the case may be, such Certificate of Title from time to time within three (3) Business Days receipt of a request for release specifying, among other things, the applicable Certificates of Title to be released and delivery instructions and other information as may be necessary to enable the Administrative Agent to release and ship such Certificates of Title.

ARTICLE 6
NEGATIVE COVENANTS

Until all of the Secured Obligations shall have been Paid in Full and the Commitments have expired or terminated, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lenders that:

Section 6.01       Indebtedness.  The Borrower will not, nor will it permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness, except:

(a)       the Secured Obligations;

(b)       Indebtedness existing on the date hereof and set forth in Schedule 6.01 and any extensions, renewals, refinancings and replacements of any such Indebtedness that does not increase the outstanding principal amount thereof (immediately prior to giving effect to such extension, renewal, refinancing or replacement) or shorten the maturity or weighted average life to maturity thereof or change the direct or contingent obligors with respect thereto (or add any additional direct or contingent obligor with respect thereto) and, if the Indebtedness being refinanced was subordinated to the Obligations, such Indebtedness continues to be subordinated;

(c)       Indebtedness of the Borrower to any of its Subsidiaries and of any Subsidiary of the Borrower to the Borrower or any other Subsidiary of the Borrower, provided that (i) Indebtedness of any Subsidiary that is not a Loan Party to the Borrower or any other Loan Party shall be subject to Section 6.04 and (ii) Indebtedness of the Borrower or any of its Subsidiaries that is a Loan Party to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Secured Obligations on terms reasonably satisfactory to the Administrative Agent;

(d)       Guarantees by the Borrower of Indebtedness of any Subsidiary of the Borrower and by any Subsidiary of the Borrower of Indebtedness of the Borrower or any other Subsidiary of the Borrower, provided that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01, (ii) Guarantees by the Borrower or any other Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04 and (iii) Guarantees permitted under this clause (d) shall be subordinated to the Secured Obligations on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(e)       to the extent consisting of Indebtedness, real property leases (but not, for purposes of clarity, capital leases) entered into in the ordinary course of business for which the lease or rent payment required with respect thereto does not include the repayment of (or interest with respect to) borrowed money

69

Indebtedness of the Borrower or any Subsidiary of the Borrower;

(f)     Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(g)     Indebtedness of any Loan Party in respect of performance bonds, bid bonds, dealer licensing bonds, appeal bonds, surety bonds, performance and completion guaranties and similar obligations or obligations in respect of letters of credit in lieu thereof, in each case provided in the ordinary course of business;

(h)     to the extent constituting Indebtedness, customary indemnification obligations, purchase price or similar adjustments in connection with Acquisitions and Dispositions permitted under this Agreement;

(i)     Indebtedness consisting *solely* of the financing of insurance premiums;

(j)     Indebtedness under the NextGear Credit Agreement in an aggregate amount outstanding at any time not to exceed $30,000,000, so long as (i) such Indebtedness is incurred solely for the purchase of vehicle Inventory, (ii) such Indebtedness is secured only by the Collateral (as defined in the NextGear Credit Agreement), (iii) such Indebtedness is at all times subject to the terms of the NextGear Intercreditor Agreement and (iv) loans under the NextGear Credit Agreement are repaid when the vehicles financed thereunder are either (x) transferred to the Borrower's leasing Affiliate and are leased to customers or (y) financed using proceeds of Loans under this Agreement;

(k)     Indebtedness of any Loan Party or any Subsidiary of the Borrower incurred under any unsecured corporate credit card or corporate charge cards for expenditures made in the ordinary course or purchasing car program entered into with any Lender so long as any required payments of interest, fees and/or principal under such Indebtedness are not past due;

(l)     other Indebtedness in an aggregate principal amount not exceeding $2,000,000 at any time outstanding;

(m)     Indebtedness owed to any bank in respect of any overdrafts and related liabilities incurred in the ordinary course of business and arising from treasury, depositary, and cash management services or in connection with any automated clearing house transfers of funds or arising from endorsements or negotiable instruments for collection;

(n)     all Indebtedness created or arising under any conditional sale or other title retention agreement for the sale of goods or lease with respect to property acquired or leased by Borrower (other than capital leases or purchase money Indebtedness), in each case, entered into in the ordinary course of business;

(o)     take-or-pay obligations contained in supply arrangements that arise in the ordinary course of business and not in connection with obtaining of financing; and

(p)     Capital Lease Obligations of the Borrower or Subsidiary of the Borrower; provided that such Indebtedness is permitted by Section 6.06.

Section 6.02     Liens.

(a)     The Borrower will not, nor will it permit any of its Subsidiaries to, create, incur,

assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

      (i)      Liens created pursuant to any Loan Document;

      (ii)      Permitted Encumbrances;

      (iii)      any Lien on any property or asset of the Borrower or any Subsidiary of the Borrower existing on the date hereof and set forth in Schedule 6.02; provided that (A) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary of the Borrower and (B) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

      (iv)      any Lien existing on any property or asset (other than Accounts and Inventory) prior to the acquisition thereof by the Borrower or any Subsidiary of the Borrower or existing on any property or asset (other than Accounts and Inventory) of any Person that becomes a Loan Party after the date hereof prior to the time such Person becomes a Loan Party; provided that (A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Loan Party, as the case may be, (B) such Lien shall not apply to any other property or assets of the Loan Party and (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Loan Party, as the case may be, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

      (v)      Liens of a collecting bank arising in the ordinary course of business under Section 4-210 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

      (vi)      Liens granted by a Subsidiary that is not a Loan Party in favor of the Borrower or another Loan Party in respect of Indebtedness owed by such Subsidiary;

      (vii)      Liens arising from precautionary UCC financing statements regarding operating leases;

      (viii)      Liens securing Indebtedness permitted under Section 6.01(k), so long as such Liens on are only with respect to the vehicles acquired using the proceeds of loans under the NextGear Credit Agreement, and such Liens are terminated and released at such time as such loans are repaid in accordance with terms of Section 5.15;

      (ix)      other Liens in addition to those permitted above, provided that the amount of the obligations secured thereby does not exceed $500,000; and

      (x)      Liens securing Indebtedness to the extent expressly permitted to be incurred under Section 6.01(j) (subject to the terms of the NextGear Intercreditor Agreement), Section 6.01(l) and Section 6.01(n).

      (b)      Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to Inventory of the Borrower or any of its Subsidiaries, other than those permitted under clauses (a) and (b) of the definition of Permitted Encumbrances and clause (a)(i) above.

Section 6.03      Fundamental Changes.

      (a)      The Borrower will not, nor will it permit any of its Subsidiaries to, merge into or

consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or otherwise Dispose of all or substantially all of its assets, or all or substantially all of the stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) any Subsidiary of the Borrower may merge into the Borrower in a transaction in which the Borrower is the surviving entity, (ii) any Loan Party (other than the Borrower) may merge into any other Loan Party in a transaction in which the surviving entity is a Loan Party, (iii) any Subsidiary that is not a Loan Party may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; provided that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04, (iv) any investment permitted by Section 6.04(c) may be structured as a merger, consolidation or amalgamation and (v) King may merge into or consolidate with any other party in connection with the creation of a Public Market provided that the surviving entity complies with Section 5.13.

(b)     The Borrower will not, nor will it permit any of its Subsidiaries to, consummate a Division as the Dividing Person, without the prior written consent of Administrative Agent.  Without limiting the foregoing, if any Loan Party that is a limited liability company consummates a Division (with or without the prior consent of Administrative Agent as required above), each Division Successor shall be required to comply with the obligations set forth in Section 5.13 and the other further assurances obligations set forth in the Loan Documents and become a Loan Party under this Agreement and the other Loan Documents.

(c)     The Borrower will not, nor will it permit any of its Subsidiaries to, engage in any business other than businesses of the type or substantially similar to the type conducted by the Borrower and its Subsidiaries on the date hereof and businesses reasonably related or reasonably complementary thereto.

(d)     No Loan Party will, nor will it permit any Subsidiary of the Borrower to change its fiscal year or any fiscal quarter from the basis in effect on the Closing Date.

(e)     Subject to Section 1.04 or except as required to comply with GAAP, no Loan Party will change the accounting basis upon which its financial statements are prepared.

(f)     No Loan Party will change the material tax filing elections it has made under the Code.

Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.  The Borrower will not, nor will it permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)     Permitted Investments;

(b)     (i) investments in existence on the date hereof consisting of Equity Interests of any Subsidiary of Holdings owned, directly or indirectly, by Holdings and (ii) investments in existence on the date hereof and described in Schedule 6.04;

(c)    investments by the Borrower and its Subsidiaries in Equity Interests in their respective Subsidiaries (other than such investments permitted by Section 6.04(b)(i)), provided that the aggregate amount of such investments by the Borrower and its Subsidiaries in Subsidiaries of the Borrower that are not Loan Parties (together with outstanding intercompany loans permitted under Section 6.04(d) and outstanding Guarantees permitted under Section 6.04(e)) shall not exceed $2,000,000 at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(d)    loans or advances made by the Borrower to any Subsidiary of the Borrower that is a Loan Party and made by any Subsidiary of the Borrower to the Borrower or any Subsidiary of the Borrower that is a Loan Party;

(e)    Guarantees constituting Indebtedness permitted by Section 6.01, provided that the aggregate principal amount of Indebtedness of Subsidiaries that are not Loan Parties that is Guaranteed by the Borrower or any Subsidiary of the Borrower (together with outstanding investments permitted under clause (ii) to the proviso to Section 6.04(c) and outstanding intercompany loans permitted under clause (ii) to the proviso to Section 6.04(d)) shall not exceed $2,000,000 at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(f)    loans or advances made by a Loan Party to its employees on an arms-length basis in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes up to a maximum of $20,000;

(g)    notes payable, or stock or other securities issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(h)    investments in the form of Swap Agreements permitted by Section 6.07;

(i)    investments of any Person existing at the time such Person becomes a Subsidiary of the Borrower or consolidates or merges with the Borrower or any Subsidiary (including in connection with a Permitted Acquisition), so long as such investments were not made in contemplation of such Person becoming a Subsidiary or of such merger;

(j)    investments received in connection with the disposition of assets permitted by Section 6.05;

(k)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "*Permitted Encumbrances*";

(l)    investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers, licensors, licensees and suppliers, in each case in the ordinary course of business;

(m)    extensions of trade credit in the ordinary course of business;

(n)    endorsement of items for collection or deposit in the ordinary course of business;

(o)    Permitted Acquisitions, including any purchase price adjustments or earn-out obligations in connection with Permitted Acquisitions; and

(p)    investments consisting of earnest money deposits required in connection with any

actual or intended Permitted Acquisition or investment not prohibited under this <u>Section 6.04</u> or consisting of earnest money deposits required in connection with any actual or intended acquisition of property not otherwise prohibited hereunder.

Section 6.05    <u>Asset Sales.</u>  The Borrower will not, nor will it permit any of its Subsidiaries to, Dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary (other than to the Borrower or another Subsidiary of the Borrower in compliance with <u>Section 6.04</u>), except:

(a)    Dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property or other property not necessary for operations, in each case, in the ordinary course of business;

(b)    Dispositions of assets to the Borrower or any Subsidiary, <u>provided</u> that any such Dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with <u>Section 6.09</u>;

(c)    Dispositions of Accounts (excluding sales or dispositions in a factoring arrangement) in connection with the compromise, settlement or collection thereof;

(d)    Dispositions of Permitted Investments and other investments permitted by <u>clauses (i)</u> and <u>(k)</u> of <u>Section 6.04</u>;

(e)    Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary of the Borrower;

(f)    Dispositions of assets (other than Equity Interests in a Subsidiary unless all Equity Interests in such Subsidiary are sold) that are not permitted by any other clause of this <u>Section 6.05</u>, <u>provided</u> that the aggregate fair market value of all assets disposed of in reliance upon this <u>clause (f)</u> shall not exceed $2,000,000 during any fiscal year of the Borrower; and

(g)    Dispositions of real property to the extent permitted under <u>Section 6.06</u>.

<u>provided</u> that all Dispositions permitted under this <u>Section 6.05</u> (other than those permitted by <u>clauses (b)</u>, <u>(d)</u> and <u>(e)</u> above) shall be made for fair value and for at least seventy-five percent (75%) cash consideration.

Section 6.06    <u>Sale and Leaseback Transactions.</u>  The Borrower will not, nor will it permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "*Sale and Leaseback Transaction*"); provided that, notwithstanding anything to the contrary in the foregoing, the Borrower and its Subsidiaries shall be permitted to enter into Sale and Leaseback Transactions with respect to real property, so long as the aggregate fair market value of real property sold in connection therewith does not exceed $30,000,000.

Section 6.07    <u>Swap Agreements.</u>  The Borrower will not, nor will it permit any of its Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any of its Subsidiaries has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the

74

Borrower or any of its Subsidiaries.

Section 6.08    Restricted Payments; Certain Payments of Indebtedness.

(a)    The Borrower will not, nor will it permit any of its Subsidiaries to, declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) the Borrower may declare and pay dividends with respect to its common stock payable solely in additional shares of its common stock, and, with respect to its preferred stock, payable solely in additional shares of such preferred stock or in shares of its common stock, (ii) Subsidiaries of the Borrower may declare and pay dividends ratably with respect to their Equity Interests, (iii) the Borrower may pay dividends or make distributions to its members in an aggregate amount not greater than the amount necessary for such members to pay their actual state and U.S. federal income tax liabilities in respect of income earned by the Borrower after deducting (to the extent permitted by applicable Law) any unused prior losses (to the extent such losses were incurred after the date hereof) and (iv) so long as no Event of Default has occurred and is continuing, each Loan Party may, directly or indirectly, declare or make any Restricted Payment or enter into any agreement to do any of the foregoing.

(b)    The Borrower will not, nor will it permit any of its Subsidiaries to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)    payment of Indebtedness created under the Loan Documents;

(ii)    payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01;

(iii)    refinancings of Indebtedness to the extent permitted by Section 6.01; and

(iv)    payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05.

Section 6.09    Transactions with Affiliates.  The Borrower will not, nor will it permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Loan Parties not involving any other Affiliate, (c) any investment permitted by Sections 6.04(c) or 6.04(d), (d) any Indebtedness permitted under Section 6.01(c), (e) any Restricted Payment permitted by Section 6.08, (f) loans or advances to employees permitted under Section 6.04(f), (g) the payment of reasonable fees to directors of the Borrower or any Subsidiary who are not employees of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business, (h) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors and (i) sales of vehicles and the associated leases to RAC Asset Holdings or a Subsidiary of RAC Asset Holdings in a manner and on terms consistent with past practices.

Section 6.10    <u>Restrictive Agreements.</u>    The Borrower will not, nor will it permit any of its Subsidiaries to, directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary of the Borrower to pay dividends or other distributions with respect to any Equity Interests, or the ability of any Subsidiary of the Borrower to make or repay loans or advances to the Borrower or any other Subsidiary of the Borrower or to Guarantee Indebtedness of the Borrower or any other Loan Party; <u>provided</u> that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on <u>Schedule 6.10</u> (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) <u>clause (a)</u> of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) <u>clause (a)</u> of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

Section 6.11    <u>Amendment of Material Documents.</u>    No Loan Party will, nor will it permit any Subsidiary of the Borrower to, amend, modify or waive any of its rights in a manner materially adverse to the Administrative Agent or any Lender under (a) any agreement relating to any Subordinated Indebtedness, (b) its Organization Documents, in each case to the extent any such amendment, modification or waiver would be adverse to the Lenders or (c) any agreement relating to any Material Indebtedness.

Section 6.12    <u>Financial Covenants.</u>

(a)    <u>Debt to Tangible Net Worth Ratio.</u>    The Loan Parties will not permit the Debt to Tangible Net Worth Ratio, determined on the last day of any fiscal quarter, commencing with the fiscal quarter ending June 30, 2021, to be greater than 6.00 to 1.00.

(b)    <u>Total Interest Coverage Ratio.</u>    The Loan Parties will not permit the Total Interest Coverage Ratio, determined on the last day of any fiscal quarter for the twelve-month period then ended, during any period set forth below, commencing with the fiscal quarter ending June 30, 2021, to be less than the ratio set forth below opposite such period:

| Period | Ratio |
|---|---|
| June 30, 2021 to June 29, 2022 | 1.50 to 1.00 |
| June 30, 2022 and thereafter | 1.75 to 1.00 |

(c)    <u>Days Inventory Outstanding Ratio.</u>    The Loan Parties will not permit the Days Inventory Outstanding Ratio, determined on the last day of any calendar month, commencing with the calendar month ending May 30, 2021, to be greater than 90.

Section 6.13    <u>Equity Cure Right.</u>    In the event the Loan Parties fail (or, but for the operation of this <u>Section 6.13</u>, would fail) to comply with the financial covenant set forth in <u>Section 6.12(a)</u> or <u>Section 6.12(b)</u> as of the last day of any fiscal quarter (a "*Financial Covenant Default*" and the applicable fiscal quarter, the "*Cure Quarter*"), any cash equity contribution to King by Holdings (funded with the proceeds of Equity Interests consisting of common stock issued by King to Holdings after the last day of such fiscal quarter and on or prior to the date that is ten (10) Business Days after the day on which financial statements are required to be delivered for the Cure Quarter pursuant to the terms of this Agreement (such

date, the "*Cure Deadline*")) will, at the irrevocable election of the Borrower and subject to the terms of the last sentence of this Section 6.13, be included in the calculation of (x) the Total Interest Coverage Ratio by adding such cash equity contribution to Net Income, or (y) the Debt to Tangible Net Worth Ratio by subtracting such cash equity contribution from Total Indebtedness, in the case of each of the foregoing clauses (x) and (y), solely for the purposes of determining compliance with such financial covenant (and not for any other purpose under any Loan Document) at the end of the Cure Quarter and any subsequent period of four consecutive fiscal quarters that includes the Cure Quarter (any such equity contribution so included in the calculation of the Total Interest Coverage Ratio or the Debt to Tangible Net Worth Ratio, a "*Specified Equity Contribution*"), provided that (a) no more than two (2) Specified Equity Contributions shall be made in any period of four (4) consecutive fiscal quarters, (b) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Loan Parties to be in compliance with the applicable financial covenant (or, if required for compliance with the financial covenants in both Section 6.12(a) and Section 6.12(b), the amount required to cause the Loan Parties to be in compliance with both such financial covenants) for the applicable measurement period, (c) notice of the Borrower's intent to make a Specified Equity Contribution (a "*Cure Notice*") shall be delivered no later than the day on which financial statements are required to be delivered for the Cure Quarter, (d) there shall be no more than four (4) Specified Equity Contributions made in the aggregate after the Closing Date and (e) all Specified Equity Contributions will be disregarded for all other purposes, including calculating basket levels, pricing, determining compliance with ratio-based or pro forma calculations or conditions and any other items governed by reference to Net Income, the Total Interest Coverage Ratio, the Debt to Tangible Net Worth Ratio or Section 6.12.  From the date of delivery of the applicable Cure Notice to the Administrative Agent until the earlier of (x) the applicable Cure Deadline and (y) the date on which the Borrower notifies the Administrative Agent in writing that it does not intend to provide the Specified Equity Contribution, the Administrative Agent shall not impose the default interest rate, accelerate the Obligations, terminate commitments hereunder or exercise any right or remedy against the Loan Parties or any Subsidiary or any of their respective properties otherwise available under any Loan Document during the continuance of a Default or an Event of Default, in each case, arising solely on the basis that the applicable Financial Covenant Default has occurred and is continuing; provided that notwithstanding anything to the contrary contained herein, in no event shall the Lenders have any obligation to fund any Loan during the period from and after the last day of the Cure Quarter with respect to which the Financial Covenant Default has occurred until the date such Financial Covenant Default is deemed cured pursuant to the last sentence of this Section 6.13.  Upon receipt by Borrower in cash of the appropriate amount of the specified Equity Contribution as provided above with respect to the Cure Quarter in exchange for Equity Interests of the Borrower consisting of common stock, if and to the extent that after giving effect to such Specified Equity Contribution the applicable Financial Covenant Default would no longer exist on a pro forma basis, the Loan Parties shall then be deemed to have been in compliance with the requirements of such financial covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Financial Covenant Default shall be deemed cured for all purposes of this Agreement.

Section 6.14    Use of Proceeds.  No Loan Party shall use the proceeds of any Borrowing of the Loans except pursuant to Section 5.08.  No Loan Party shall use, and each Loan Party shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (a) to refinance any commercial paper, (b) in any manner that causes or might cause such Borrowing or the application of such proceeds to violate any applicable Sanctions, Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System as in effect from time to time or any other regulation thereof or to violate the Exchange Act, (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, or (d) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country.

Section 6.15    <u>Accounting Changes.</u>  Other than as permitted pursuant to Section 1.04, no Loan Party will, nor will it permit any Subsidiary of the Borrower to, make or permit any material change in its accounting policies or reporting practices, except as may be required by GAAP.

Section 6.16    <u>Capital Expenditures.</u>  The Borrower will not, nor will it permit any of its Subsidiaries to, incur or make any Capital Expenditures in an aggregate amount to exceed $10,000,000 in any fiscal year of the Borrower.

Section 6.17    <u>Payments under the NextGear Credit Agreement.</u>  The Borrower will not, nor will it permit any of its Subsidiaries to, make any payment with respect to the Indebtedness under the NextGear Credit Agreement, except (a) required payments of interest and (b) so long as no Event of Default then exists or would arise therefrom, payments of principal, interest, fees and other amounts under the NextGear Credit Agreement.

ARTICLE 7
EVENTS OF DEFAULT

If any of the following events ("*Events of Default*") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise; or

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in <u>clause (a)</u> of this <u>Article 7</u>) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days; or

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary of the Borrower in, or in connection with, this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made; or

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 5.02(a)(i)</u>, <u>5.03</u> (with respect to a Loan Party's existence), <u>5.08</u> or <u>5.13</u> or in <u>Article 6</u>; or

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in <u>clause (a)</u>, <u>(b)</u> or <u>(d)</u>), and such failure shall continue unremedied for a period of (i) five (5) days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Administrative Agent (which notice will be given at the request of any Lender) if such breach relates to terms or provisions of <u>Section 5.01</u>, <u>5.02</u> (other than <u>Section 5.02(a)(i)</u>), <u>5.03</u> through <u>5.07</u>, <u>5.10</u>, or <u>5.11</u> of this Agreement or (ii) thirty (30) days after the earlier of any Responsible Officer of any Loan Party's knowledge of such breach or notice thereof from the Administrative Agent (which notice will be given at the request of the Required Lenders) if such breach relates to terms or provisions of any other Section of this Agreement; or

(f)    any Loan Party or any Subsidiary of the Borrower shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when

CHAR1\1782959v16

and as the same shall become due and payable (after giving effect to any applicable grace period under such Material Indebtedness); or

(g)        any event or condition occurs that (i) results in any Material Indebtedness of any Loan Party or any Subsidiary of the Borrower becoming due prior to its scheduled maturity and such event or condition is not otherwise waived or cured within any applicable cure periods, or (ii) enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity and such event or condition is not otherwise waived or cured within any applicable cure periods; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05; or

(h)        an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or Subsidiary of the Borrower or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Subsidiary of the Borrower or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or

(i)        any Loan Party or any Subsidiary of the Borrower shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article 7, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Subsidiary of the Borrower or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or

(j)        any Loan Party or any Subsidiary of the Borrower shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally, to pay its debts as they become due; or

(k)        one or more judgments for the payment of money in an aggregate amount in excess of $2,000,000 (not paid or to the extent not covered by either (i) independent third-party insurance as to which the insurer does not deny coverage or (ii) another creditworthy indemnitor that has been notified of such judgment and does not dispute its indemnification obligations in respect thereto) shall be rendered against any Loan Party, any Subsidiary of the Borrower or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any Subsidiary of the Borrower to enforce any such judgment or any Loan Party or any Subsidiary of the Borrower shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued; or

(l)        an ERISA Event shall have occurred that, in the opinion of the Required Lenders,

79

when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings, the Borrower and /or Subsidiaries of the Borrower in an aggregate amount exceeding $2,000,000; or

(m)    a Change in Control shall occur; or

(n)    the occurrence of any "default", as defined in any Loan Document (other than this Agreement), or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach has not been otherwise cured or waived and continues beyond any period of grace therein provided and such default shall continue unremedied for thirty (30) days; or

(o)    the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty, or any Guarantor shall deny that it has any further liability under the Loan Guaranty, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Section 10.08; or

(p)    except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason (other than solely as a result of the acts or omissions of the Administrative Agent or any Lender) fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien; or

(q)    any Collateral Document shall fail to remain in full force or effect (other than in accordance with its terms) or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(r)    any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms); or

(s)    on any date there are less than ninety-one (91) days remaining until the maturity date of the Warehouse Facility;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article 7), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments (including the Swingline Commitment), whereupon the Commitments shall terminate immediately and (ii) declare the Loans then outstanding to be due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any break funding payment) and other obligations of the Borrower accrued hereunder and under any other Loan Document, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in the case of any event with respect to the Borrower described in clause (h) or (i) of this Article 7, the Commitments (including the Swingline Commitment) shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any break funding payments) and other obligations of the Borrower accrued hereunder and under any other Loan Documents, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.  Upon the

occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders shall, increase the rate of interest applicable to the Loans and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE 8
THE ADMINISTRATIVE AGENT

Section 8.01    Authorization and Action.

(a)    Each Lender, on behalf of itself and any of its Affiliates that are Secured Parties, hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors and assigns to serve as the administrative agent and collateral agent under the Loan Documents and each Lender authorizes the Administrative Agent to take such actions as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent under such agreements and to exercise such powers as are reasonably incidental thereto.  In addition, to the extent required under the laws of any jurisdiction other than within the United States, each Lender hereby grants to the Administrative Agent any required powers of attorney to execute and enforce any Collateral Document governed by the laws of such jurisdiction on such Lender's behalf. Without limiting the foregoing, each Lender hereby authorizes the Administrative Agent to execute and deliver, and to perform its obligations under, each of the Loan Documents to which the Administrative Agent is a party, and to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents.

(b)    As to any matters not expressly provided for herein and in the other Loan Documents (including enforcement or collection), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, pursuant to the terms in the Loan Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Lender; provided, however, that the Administrative Agent shall not be required to take any action that (i) the Administrative Agent in good faith believes exposes it to liability unless the Administrative Agent receives an indemnification and is exculpated in a manner satisfactory to it from the Lenders with respect to such action or (ii) is contrary to this Agreement or any other Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the Administrative Agent may seek clarification or direction from the Required Lenders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided.  Except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Loan Party, any Subsidiary or any Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.  Nothing in this Agreement shall require the Administrative Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(c)    In performing its functions and duties hereunder and under the other Loan

Documents, the Administrative Agent is acting solely on behalf of the Lenders (except in limited circumstances expressly provided for herein relating to the maintenance of the Register), and its duties are entirely mechanical and administrative in nature.  Without limiting the generality of the foregoing:

(i)    the Administrative Agent does not assume and shall not be deemed to have assumed any obligation or duty or any other relationship as the agent, fiduciary or trustee of or for any Lender, any other Secured Party or holder of any other obligation other than as expressly set forth herein and in the other Loan Documents, regardless of whether a Default or an Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" (or any similar term) herein or in any other Loan Document with reference to the Administrative Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties); additionally, each Lender agrees that it will not assert any claim against the Administrative Agent based on an alleged breach of fiduciary duty by the Administrative Agent in connection with this Agreement and/or the transactions contemplated hereby;

(ii)    where the Administrative Agent is required or deemed to act as a trustee in respect of any Collateral over which a security interest has been created pursuant to a Loan Document expressed to be governed by the laws of any jurisdiction in the U.S., or is required or deemed to hold any Collateral "on trust" pursuant to the foregoing, the obligations and liabilities of the Administrative Agent to the Secured Parties in its capacity as trustee shall be excluded to the fullest extent permitted by applicable law; and

(iii)    nothing in this Agreement or any Loan Document shall require the Administrative Agent to account to any Lender for any sum or the profit element of any sum received by the Administrative Agent for its own account;

(d)    The Administrative Agent may perform any of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any of their respective duties and exercise their respective rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities pursuant to this Agreement.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

(e)    The Arranger shall not have obligations or duties whatsoever in such capacity under this Agreement or any other Loan Document and shall incur no liability hereunder or thereunder in such capacity, but all such persons shall have the benefit of the indemnities provided for hereunder.

(f)    In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file

CHAR1\1782959v16

such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.11, 2.12, 2.14, 2.15 and 9.03) allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03).  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

(g)    The provisions of this Article 8 are solely for the benefit of the Administrative Agent and the Lenders, and, except solely to the extent of the Borrower's rights to consent pursuant to and subject to the conditions set forth in this Article 8, none of the Borrower or any Subsidiary of the Borrower, or any of its Affiliates, shall have any rights as a third party beneficiary under any such provisions.  Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Secured Obligations provided under the Loan Documents, to have agreed to the provisions of this Article 8.

Section 8.02    Administrative Agent's Reliance, Indemnification, Etc.

(a)    Neither the Administrative Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by such party, the Administrative Agent or any of its Related Parties under or in connection with this Agreement or the other Loan Documents (A) with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or (B) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party to perform its obligations hereunder or thereunder.

(b)    The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan

83

Document, other than to confirm receipt of items (which on their face purport to be such items) expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent, or (vi) the creation, perfection or priority of Liens on the Collateral.

(c)     Without limiting the foregoing, the Administrative Agent (i) may treat the payee of any promissory note as its holder until such promissory note has been assigned in accordance with Section 9.04, (ii) may rely on the Register to the extent set forth in Section 9.04(b), (iii) may consult with legal counsel (including counsel to the Borrower), independent public accountants and other experts selected by it, and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts, (iv) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made by or on behalf of any Loan Party in connection with this Agreement or any other Loan Document, (v) in determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender sufficiently in advance of the making of such Loan and (vi) shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any notice, consent, certificate or other instrument or writing (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated by the proper party or parties (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

(d)     Neither the Administrative Agent nor any of its Related Parties shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions of this Agreement relating to Disqualified Lenders.  Without limiting the generality of the foregoing, the Administrative Agent shall not (i) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Lender or (ii) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Lender.

Section 8.03     Posting of Communications.

(a)     The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make any Communications available to the Lenders by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic system chosen by the Administrative Agent to be its electronic transmission system (the "*Approved Electronic Platform*").

(b)     Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution.  Each of the Lenders and the Borrower hereby approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.  The Borrower acknowledges and agrees that the DQ List shall be deemed suitable for posting and may be posted by the Administrative Agent on the

Approved Electronic Platform, including the portion of the Approved Electronic Platform that is designated for Public-Siders.

(c)     THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT, ANY ARRANGER OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "*APPLICABLE PARTIES*") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

(d)     Each Lender agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)     Each of the Lenders and the Borrower agrees that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally applicable document retention procedures and policies.

(f)     Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 8.04     The Administrative Agent Individually.     With respect to its Commitment and Loans (including the Swingline Commitment and Swingline Loans), the Person serving as the Administrative Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender. The terms "*Lenders*", "*Required Lenders*" and any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity as a Lender and/or as one of the Required Lenders, as applicable. The Person serving as the Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with, any Loan Party, any Subsidiary or any Affiliate of any of the foregoing as if such Person was not acting as the Administrative Agent and without any duty to account therefor to the Lenders.

Section 8.05     Successor Administrative Agent.

(a)       The Administrative Agent may resign at any time by giving thirty (30) days' prior written notice thereof to the Lenders and the Borrower, whether or not a successor Administrative Agent has been appointed.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent.  If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within thirty (30) days after the retiring Administrative Agent's giving of notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York or an Affiliate of any such bank.  In either case, such appointment shall be subject to the prior written approval of the Borrower (which approval may not be unreasonably withheld and shall not be required while an Event of Default has occurred and is continuing).  Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Administrative Agent.  Upon the acceptance of appointment as Administrative Agent by a successor Administrative Agent, the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents.  Prior to any retiring Administrative Agent's resignation hereunder as Administrative Agent, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents.

(b)       Notwithstanding clause (a) of this Section 8.05, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Collateral Document and Loan Document, and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this Section 8.05 (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Security Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided that (A) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall directly be given or made to each Lender.  Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article 8, Section 2.15(d) and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Section 8.06       Acknowledgements of Lenders.

(a)       Each Lender represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and that it has, independently and without reliance

upon the Administrative Agent, any Arranger, any other Lender or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Arranger, any other Lender or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)     Each Lender, by delivering its signature page to this Agreement on the Closing Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Closing Date or the effective date of any such Assignment and Assumption or any other Loan document pursuant to which it shall have become a Lender hereunder.

(c)     Each Lender hereby agrees that (i) it has requested a copy of each Report prepared by or on behalf of the Administrative Agent; (ii) the Administrative Agent (A) makes no representation or warranty, express or implied, as to the completeness or accuracy of any Report or any of the information contained therein or any inaccuracy or omission contained in or relating to a Report and (B) shall not be liable for any information contained in any Report; (iii) the Reports are not comprehensive audits or examinations, and that any Person performing any field examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel and that the Administrative Agent undertakes no obligation to update, correct or supplement the Reports; (iv) it will keep all Reports confidential and strictly for its internal use, not share the Report with any Loan Party or any other Person except as otherwise permitted pursuant to this Agreement; and (v) without limiting the generality of any other indemnification provision contained in this Agreement, (A) it will hold the Administrative Agent and any such other Person preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any extension of credit that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (B) it will pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorneys' fees) incurred by the Administrative Agent or any such other Person as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 8.07    Collateral Matters.

(a)     Except with respect to the exercise of setoff rights in accordance with Section 9.08 or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.  In its capacity, the Administrative Agent is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the UCC.  In the event that any Collateral is hereafter pledged by any Person as collateral security for the Secured Obligations, the

87

Administrative Agent is hereby authorized, and hereby granted a power of attorney, to execute and deliver on behalf of the Secured Parties any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Administrative Agent on behalf of the Secured Parties.

(b)        In furtherance of the foregoing and not in limitation thereof, no arrangements in respect of Banking Services the obligations under which constitute Secured Obligations and no Swap Agreement the obligations under which constitute Secured Obligations, will create (or be deemed to create) in favor of any Secured Party that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party under any Loan Document.  By accepting the benefits of the Collateral, each Secured Party that is a party to any such arrangement in respect of Banking Services or Swap Agreement, as applicable, shall be deemed to have appointed the Administrative Agent to serve as administrative agent and collateral agent under the Loan Documents and agreed to be bound by the Loan Documents as a Secured Party thereunder, subject to the limitations set forth in this clause (b).

(c)        The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(a)(ii).  The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

Section 8.08    Credit Bidding.    The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) the Administrative

Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason, such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

Section 8.09    Certain ERISA Matters.

(a)    Each Lender (i) represents and warrants, as of the date such Person became a Lender party hereto, to, and (ii) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(A)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Loans or the Commitments,

(B)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(C)    (I) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (II) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (III) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (IV) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(D)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (A) in the immediately preceding clause (a) is true

with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (D) in the immediately preceding clause (a), such Lender further (i) represents and warrants, as of the date such Person became a Lender party hereto, to, and (ii) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that none of the Administrative Agent, or the Arranger or any of their respective Affiliates is a fiduciary with respect to the Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

(c)     The Administrative Agent and the Arranger hereby informs the Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments, this Agreement and any other Loan Documents (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 8.10    Flood Laws.  Hancock Whitney has adopted internal policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and related legislation (the "*Flood Laws*").  Hancock Whitney, as administrative agent or collateral agent on a syndicated facility, will post on the applicable electronic platform (or otherwise distribute to each Lender in the syndicate) documents that it receives in connection with the Flood Laws.  However, Hancock Whitney reminds each Lender and Participant in the facility that, pursuant to the Flood Laws, each federally regulated Lender (whether acting as a Lender or Participant in the facility) is responsible for assuring its own compliance with the flood insurance requirements.

Section 8.11    Erroneous Payments.

(a)     Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender or from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "*Erroneous Payment*") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect

to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding <u>clause (a)</u>, each Lender hereby further agrees that if it receives an Erroneous Payment from the Administrative Agent (or any of its Affiliates) (i) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "*Erroneous Payment Notice*"), (ii) that was not preceded or accompanied by an Erroneous Payment Notice, or (iii) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one (1) Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)     The Borrower and each other Loan Party hereby agrees that (i) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (ii) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(d)     Each party's obligations under this <u>Section 8.11</u> shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

ARTICLE 9<br><u>MISCELLANEOUS</u>

Section 9.01     <u>Notices.</u>

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to clause (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(i)     if to any Loan Party, to it in care of the Borrower at:

RAC Dealership, LLC

6775 Lenox Center Ct., Ste 100
Memphis, TN 38115
Attention: Eric Harkness, Chief Financial Officer
Email: eric.harkness@americancarcenter.com

With a copy to:

RAC Dealership, LLC
6775 Lenox Center Ct., Ste 100
Memphis, TN 38115
Attention: John Moses, Executive Vice President and General Counsel
Email: john.moses@americancarcenter.com

(ii)    if to the Administrative Agent or the Swingline Lender, to Hancock Whitney Bank at:

Hancock Whitney Bank
701 Poydras Street, Suite 1600
New Orleans, Louisiana 70139
Attention: Matthew Chivleatto
Email: syndications@hancockwhitney.com

(iii)    if to any other Lender, to it at its address or fax number set forth in its Administrative Questionnaire.

All such notices and other communications (A) sent by hand or overnight courier service, or mailed by certified or registered mail shall be deemed to have been given when received, (B) sent by fax shall be deemed to have been given when sent, provided that if not given during normal business hours for the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (C) delivered through Electronic Systems or Approved Electronic Platforms, as applicable, to the extent provided in clause (b) below shall be effective as provided in such clause (b).

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems or Approved Electronic Platforms, as applicable, or pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article 2 or to compliance and no Default certificates delivered pursuant to Section 4.01(a)(iv) or Section 5.01(a)(iii) unless otherwise agreed by the Administrative Agent and the applicable Lender. Each of the Administrative Agent and the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by using Electronic Systems or Approved Electronic Platforms, as applicable, pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such

92

notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)    Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

Section 9.02    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    Subject to Section 2.04, Section 2.13(c) and (d) and Section 9.02(e) below, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, with the consent of the Required Lenders; provided that no such agreement shall (A) increase the Commitment of any Lender without the written consent of such Lender (including any such Lender that is a Defaulting Lender), (B) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon, or reduce or forgive any interest or fees payable hereunder, without the written consent of each Lender (including any such Lender that is a Defaulting Lender) affected thereby (except that any amendment or modification of the financial covenants in this Agreement (or defined terms used in the financial covenants in this Agreement) shall not constitute a reduction in the rate of interest or fees for purposes of this clause (B)), (C) postpone any scheduled date of payment of the principal amount of any Loan, or any date for the payment of any interest, fees or other Obligations payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment (including, without limitation, subject to Section 2.05), without the written consent of each Lender (including any such Lender that is a Defaulting Lender) affected thereby, (D) change Section 2.04 or Section 2.16(b) or (d) in a manner that would alter the ratable reduction of Commitments or the manner in which payments are shared, without the written consent of each Lender (other than any Defaulting Lender), (E) increase the advance rates set forth in the definition of Borrowing Base, add new categories of eligible assets or otherwise amend the definitions of Borrowing Base or Eligible Inventory, without the written consent of two (2) or more unaffiliated Lenders (other than any Defaulting Lender) having Revolving Exposure and Unfunded Commitments representing more than sixty-six and two-thirds percent (66.67%) of the sum of the Aggregate Revolving Exposure and Unfunded Commitments at such time, (F) change any of the provisions of this Section 9.02 or the definition of "*Required Lenders*" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (other than any Defaulting Lender) directly affected thereby, (G) release

all or substantially all of the Guarantors from their obligations under the Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents), without the written consent of each Lender (other than any Defaulting Lender), or (H) except as provided in <u>clause (c)</u> of this <u>Section 9.02</u> or in any Collateral Document, release all or substantially all of the Collateral without the written consent of each Lender (other than any Defaulting Lender); <u>provided</u> further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Swingline Lender hereunder without the prior written consent of the Administrative Agent or the Swingline Lender, as the case may be, (it being understood that any amendment to <u>Section 2.18</u> shall require the consent of the Administrative Agent and the Swingline Lender); <u>provided</u> further that no such agreement shall amend or modify the provisions of <u>Section 2.06</u> without the prior written consent of the Administrative Agent.  The Administrative Agent may also amend the <u>Commitment Schedule</u> to reflect assignments entered into pursuant to <u>Section 9.04</u>.

(c)      The Lenders hereby irrevocably authorize the Administrative Agent, at its option and in its sole discretion, to release any Liens granted to the Administrative Agent by the Loan Parties on any Collateral (i) upon the Payment in Full of all Secured Obligations, and the cash collateralization of all Unliquidated Obligations in a manner satisfactory to each affected Lender, (ii) constituting property being sold or disposed of if the Loan Party disposing of such property certifies to the Administrative Agent that the sale or disposition is made in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on any such certificate, without further inquiry), and to the extent that the property being sold or disposed of constitutes one hundred percent (100%) of the Equity Interests in a Subsidiary, the Administrative Agent is authorized to release any Loan Guaranty provided by such Subsidiary, (iii) constituting property leased to a Loan Party under a lease which has expired or been terminated in a transaction permitted under this Agreement, or (iv) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Administrative Agent and the Lenders pursuant to <u>Article 7</u>.  Except as provided in the preceding sentence, the Administrative Agent will not release any Liens on Collateral without the prior written authorization of the Required Lenders. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Any execution and delivery by the Administrative Agent of documents in connection with any such release shall be without recourse to or warranty by the Administrative Agent.

(d)      If, in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender affected thereby", the consent of the Required Lenders is obtained, but the consent of other necessary Lenders is not obtained (any such Lender whose consent is necessary but has not been obtained being referred to herein as a "*Non-Consenting Lender*"), then the Borrower may elect to replace a Non-Consenting Lender as a Lender party to this Agreement, <u>provided</u> that, concurrently with such replacement, (i) another bank or other entity which is reasonably satisfactory to the Borrower and the Administrative Agent shall agree, as of such date, to purchase for cash the Loans and other Obligations due to the Non-Consenting Lender pursuant to an Assignment and Assumption and to become a Lender for all purposes under this Agreement and to assume all obligations of the Non-Consenting Lender to be terminated as of such date and to comply with the requirements of <u>clause (b)</u> of <u>Section 9.04</u>, and (ii) the Borrower shall pay to such Non-Consenting Lender in same day funds on the day of such replacement all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by the Borrower hereunder to and including the date of termination, including without limitation payments due to such Non-Consenting Lender under <u>Sections 2.14</u> and <u>2.15</u>.

(e)      Notwithstanding anything to the contrary herein the Administrative Agent may, with the consent of the Borrower only, amend, modify or supplement this Agreement or any of the other Loan Documents to cure any ambiguity, omission, mistake, defect or inconsistency.

Section 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Loan Parties, jointly and severally, shall pay all (i) reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the syndication and distribution (including, without limitation, via the internet or through an Electronic System or Approved Electronic Platform) of the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) reasonable out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section 9.03, or in connection with the Loans made hereunder, including all such reasonable out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.  Expenses being reimbursed by the Loan Parties under this Section 9.03 include, without limiting the generality of the foregoing, reasonable fees, costs and expenses incurred in connection with:

(A)    appraisals and insurance reviews;

(B)    field examinations and the preparation of Reports based on the fees charged by a third party retained by the Administrative Agent or the internally allocated fees for each Person employed by the Administrative Agent with respect to each field examination;

(C)    background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Administrative Agent;

(D)    Taxes, fees and other charges for (I) lien and title searches and (II) filing financing statements and continuations, and other actions to perfect, protect, and continue the Administrative Agent's Liens;

(E)    sums paid or incurred to take any reasonable action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

(F)    forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

All of the foregoing fees, costs and expenses may be charged to the Borrower as Revolving Loans or to another deposit account, all as described in Section 2.16(c).

(b)    The Loan Parties, jointly and severally, shall indemnify the Administrative Agent, the Arranger, and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "*Indemnitee*") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary of the Borrower, or any Environmental Liability related in any way to a Loan Party or a Subsidiary of the

CHAR1\1782959v16

Borrower, (iv) the failure of a Loan Party to deliver to the Administrative Agent the required receipts or other required documentary evidence with respect to a payment made by such Loan Party for Taxes pursuant to <u>Section 2.15</u>, or (v) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or such Indemnitee's material breach of this or any other Loan Document.  This <u>Section 9.03(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)    Each Lender severally agrees to pay any amount required to be paid by any Loan Party under <u>clause (a)</u> or <u>(b)</u> of this <u>Section 9.03</u> to the Administrative Agent, the Swingline Lender and each Related Party of the foregoing Persons (each, an "*Agent Indemnitee*") (to the extent not reimbursed by the Loan Parties and without limiting the obligation of any Loan Party to do so), ratably according to their respective Applicable Percentage in effect on the date on which indemnification is sought under this <u>Section 9.03</u> (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Applicable Percentage immediately prior to such date), from and against any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent Indemnitee in its capacity as such; <u>provided</u> <u>further</u> that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct.  The agreements in this <u>Section 9.03</u> shall survive the termination of this Agreement and the Payment in Full of the Secured Obligations.

(d)    To the extent permitted by applicable law, (i) no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), or (ii) in no event shall any Loan Party, or any other party hereto (including any Indemnitee) have any liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof; <u>provided</u> that, nothing in this <u>clause (d)</u> shall relieve any Loan Party of any obligation it may have hereunder or under any other Loan Document to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)    All amounts due under this <u>Section 9.03</u> shall be payable promptly after written demand therefor.

Section 9.04    <u>Successors and Assigns.</u>

(a)        The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in clause (c) of this Section 9.04) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)        (i)        Subject to the conditions set forth in clause (b)(ii) below, any Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)        the Borrower, provided that, the Borrower shall be deemed to have consented to an assignment of all or a portion of the Revolving Loans and Commitments unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof, and provided further that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee; and

(B)        the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund; and

(C)        the Swingline Lender.

(ii)        Assignments shall be subject to the following additional conditions:

(A)        except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)        each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)        the parties to each assignment shall execute and deliver to the Administrative Agent (I) an Assignment and Assumption or (II) to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and the parties to the Assignment and Assumption are participants, together with a processing and recordation fee of $3,500; and

(D)        the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information

about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including federal and state securities laws.

(iii)     Subject to acceptance and recording thereof pursuant to clause (b)(iv) of this Section 9.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.15 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 9.04.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the U.S. a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of (A) a duly completed Assignment and Assumption executed by an assigning Lender and an assignee or (B) to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and the parties to the Assignment and Assumption are participants, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 9.04 and any written consent to such assignment required by clause (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.06, 2.07(d), 2.08(b), 2.16(e), 2.21 or 9.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause (b).

(c)     (i)     Any Lender may, without the consent of, or notice to, the Borrower, the Administrative Agent or the Swingline Lender, sell participations to one or more banks or other entities (a "*Participant*") other than an Ineligible Institution in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged; (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification

CHAR1\1782959v16

or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to <u>Section 9.02(b)</u> that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.14</u>, <u>2.15</u> and <u>2.16</u> (subject to the requirements and limitations therein, including the requirements under <u>Sections 2.15(f)</u> and <u>(g)</u> (it being understood that the documentation required under <u>Section 2.15(f)</u> shall be delivered to the participating Lender and the information and documentation required under <u>Section 2.15(g)</u> will be delivered to the Borrower and the Administrative Agent)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>clause (b)</u> of this <u>Section 9.04</u>; <u>provided</u> that such Participant (I) agrees to be subject to the provisions of <u>Sections 2.16</u> and <u>2.17</u> as if it were an assignee under <u>clause (b)</u> of this <u>Section 9.04</u>; and (II) shall not be entitled to receive any greater payment under <u>Sections 2.14</u> or <u>2.15</u> with respect to any participation than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(ii)      Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of <u>Section 2.17(b)</u> with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 9.08</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Section 2.16(d)</u> as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "<i>Participant Register</i>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this <u>Section 9.04</u> shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)      <u>Disqualified Lenders</u>. (i)      No assignment (or, to the extent the DQ List has been posted on the Approved Electronic Platform for all Lenders, participation) shall be made to any Person that was a Disqualified Lender as of the date (the "<i>Trade Date</i>") on which the applicable Lender entered into a binding agreement to sell and assign or participate all or a portion of its rights and obligations under this Agreement to such Person (unless the Borrower has consented to such assignment, in which case such Person will not be considered a Disqualified Lender for the purpose of such assignment or participation).  For the avoidance of doubt, with respect to any assignee or participant that becomes a Disqualified Lender after the applicable Trade Date (including as a result of the delivery of a notice pursuant to, and/or the expiration of the notice period referred to in, the definition of "Disqualified Lender"), such assignee shall not retroactively be considered a Disqualified Lender.  Any assignment in violation of this <u>Section 9.04(e)</u>

shall not be void, but the other provisions of this <u>Section 9.04(e)</u> shall apply.

    (ii)  If any assignment (or, to the extent the DQ List has been posted on the Approved Electronic Platform for all Lenders, participation) is made to any Disqualified Lender without the Borrower's prior consent in violation of <u>Section 9.04(e)(i)</u>, the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Lender and the Administrative Agent, (A) terminate any Revolving Commitment of such Disqualified Lender and repay all obligations of the Borrower owing to such Disqualified Lender in connection with such Revolving Commitment, and/or (B) require such Disqualified Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this <u>Section 9.04</u>), all of its interest, rights and obligations under this Agreement and the other Loan Documents to one or more Persons (other than an Ineligible Institution) that shall assume such obligations at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Lender paid to acquire such interests, rights and obligations, in each case <u>plus</u> accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and other the other Loan Documents; <u>provided</u> that (x) the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in <u>Section 9.04(b)(ii)(C)</u>, and (y) such assignment does not conflict with applicable law.

    (iii)  Notwithstanding anything to the contrary contained in this Agreement, Disqualified Lenders (A) will not (1) have the right to receive information, reports or other materials provided to Lenders by the Borrower, the Administrative Agent or any other Lender, (2) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (3) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders and (B) (1) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Lender will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Lenders consented to such matter, and (2) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to the Bankruptcy Code (or any similar laws in any other jurisdiction to which a Loan Party is subject) (a "*Plan of Reorganization*"), each Disqualified Lender party hereto hereby agrees (I) not to vote on such Plan of Reorganization, (II) if such Disqualified Lender does vote on such Plan of Reorganization notwithstanding the restriction in the foregoing <u>clause (1)</u>, such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar laws in any other jurisdictions to which a Loan Party is subject), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Plan of Reorganization in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other similar laws in any other jurisdictions to which a Loan Party is subject) and (III) not to contest any request by any party for a determination by the bankruptcy court (or other applicable court of competent jurisdiction) effectuating the foregoing <u>clause (II)</u>.

    (iv)  The Administrative Agent shall have the right, and the Borrower hereby expressly authorizes the Administrative Agent, to (A) post the list of Disqualified Lenders provided by the Borrower and any updates thereto from time to time (collectively, the "*DQ List*") on the Approved Electronic Platform, including that portion of the Approved Electronic Platform that is designated for Public-Siders or (B) provide the DQ List to each Lender requesting the same.

   Section 9.05  <u>Survival.</u> All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any

Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.14, 2.15 and 9.03 and Article 8 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

Section 9.06     Counterparts; Integration; Effectiveness; Electronic Execution.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution", "signed", "signature", "delivery", and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent.

Section 9.07     Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08     Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and other obligations at any time owing, by such Lender or any such Affiliate, to or for the credit or the account of any Loan Party against any and all of the Secured Obligations owing to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Loan Parties may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts

so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.18</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The applicable Lender or such Affiliate shall notify the Borrower and the Administrative Agent of such setoff or application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff or application under this <u>Section 9.08</u>.  The rights of each Lender and its Affiliates under this <u>Section 9.08</u> are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.

Section 9.09    <u>Governing Law; Jurisdiction; Consent to Service of Process.</u>

(a)    The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws of the State of New York.

(b)    Each of the Lenders and the Administrative Agent hereby irrevocably and unconditionally agrees that, notwithstanding the governing law provisions of any applicable Loan Document, any claims brought against the Administrative Agent by any Secured Party relating to this Agreement, any other Loan Document, the Collateral or the consummation or administration of the transactions contemplated hereby or thereby shall be construed in accordance with and governed by the law of the State of New York.

(c)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York state court sitting in New York, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Administrative Agent or any of its Related Parties may only) be heard and determined in such state court or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction *solely* to the extent required to enforce rights related to the Collateral (including, without limitation, in connection with foreclosure on the Collateral) or to enforce a judgment.

(d)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in <u>clause (b)</u> of this <u>Section 9.09</u>.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.01</u>.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

Section 9.11    Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    Confidentiality.

(a)    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and their respective directors, officers, employees, principals, managers, equityholders and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent requested by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners) having or purporting to have jurisdiction over the Administrative Agent, such Lender or such Affiliate, (iii) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 9.12, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement (it being understood that the DQ List may be disclosed to any assignee or Participant, or any prospective assignee or Participant, in reliance on this clause (vi)(A)) or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (vii) with the consent of the Borrower, (viii) on a confidential basis to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the credit facilities provided for herein or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of identification numbers with respect to the credit facilities provided for herein, or (ix) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section 9.12 or (B) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower. For the purposes of this Section 9.12, "*Information*" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower and other than information pertaining to this Agreement provided by arrangers to data service providers, including league table providers, that serve the lending industry. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

CHAR1\1782959v16

(b)    EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS <u>SECTION 9.12</u>) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE OTHER LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

Section 9.13    <u>Several Obligations; Nonreliance; Violation of Law.</u>  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder. Each Lender hereby represents that it is not relying on or looking to any margin stock (as defined in Regulation U of the Federal Reserve Board) for the repayment of the Borrowings provided for herein. Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrower in violation of any Requirement of Law.

Section 9.14    <u>USA PATRIOT Act.</u>  Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

Section 9.15    <u>Disclosure.</u>  Each Loan Party and each Lender hereby acknowledges and agrees that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with, any of the Loan Parties and their respective Affiliates.

Section 9.16    <u>Appointment for Perfection.</u>  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of the Administrative Agent and the Secured Parties, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession or control.  Should any Lender (other than the Administrative Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 9.17    <u>Interest Rate Limitation.</u>  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "*Charges*"), shall exceed the

maximum lawful rate (the "*Maximum Rate*") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this <u>Section 9.17</u> shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.18    <u>No Fiduciary Duty, etc.</u>

(a)    Each of the Loan Parties acknowledges and agrees that no Credit Party will have any obligations except those obligations expressly set forth herein and in the other Loan Documents and each Credit Party is acting solely in the capacity of an arm's length contractual counterparty to the Loan Parties with respect to the Loan Documents and the transactions contemplated herein and therein and not as a financial advisor or a fiduciary to, or an agent of, any of the Loan Parties or any other person. Each of the Loan Parties agrees that it will not assert any claim against any Credit Party based on an alleged breach of fiduciary duty by such Credit Party in connection with this Agreement and the transactions contemplated hereby. Additionally, each of the Loan Parties acknowledges and agrees that no Credit Party is advising any of the Loan Parties as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction. Each of the Loan Parties shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated herein or in the other Loan Documents, and the Credit Parties shall have no responsibility or liability to any of the Loan Parties with respect thereto.

(b)    Each of the Loan Parties further acknowledges and agrees that each Credit Party, together with its Affiliates, is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, any Credit Party may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, any of the Loan Parties and other companies with which any of the Loan Parties may have commercial or other relationships. With respect to any securities and/or financial instruments so held by any Credit Party or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

(c)    In addition, each of the Loan Parties acknowledges and agrees that each Credit Party and its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which the Loan Parties may have conflicting interests regarding the transactions described herein and otherwise. No Credit Party will use confidential information obtained from the Borrower by virtue of the transactions contemplated by the Loan Documents or its other relationships with the Borrower in connection with the performance by such Credit Party of services for other companies, and no Credit Party will furnish any such information to other companies. The Borrower also acknowledges that no Credit Party has any obligation to use in connection with the transactions contemplated by the Loan Documents, or to furnish to the Borrower, confidential information obtained from other companies.

Section 9.19    <u>Marketing Consent.</u>

The Borrower hereby authorizes Hancock Whitney and its affiliates (collectively, the "*Hancock Whitney Parties*"), at their respective sole expense, but without any prior approval by the Borrower, to publish such

tombstones and give such other publicity to this Agreement as each may from time to time determine in its sole discretion; provided, however, that to the extent that such marketing, press releases or other transactional announcements made after the Closing Date include material information other than (x) the names and logos of the Borrower and its subsidiaries, (y) the amount, type and closing date of the credit facilities provided hereunder and (z) the roles and any titles of the Arranger and/or Lenders in connection with such credit facilities, Hancock Whitney Bank or other Lender, as applicable, shall obtain prior written consent of the Borrower prior to the publication thereof.

Section 9.20    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 9.21    Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "*QFC Credit Support*" and each such QFC a "*Supported QFC*"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "*U.S. Special Resolution Regimes*") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "*Covered Party*") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of

the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

ARTICLE 10
LOAN GUARANTY

Section 10.01    Guaranty.  Each Guarantor (other than those that have delivered a separate Guarantee) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all reasonable costs and expenses including, without limitation, all court costs and reasonable attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent and the Lenders in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, the Borrower, any Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "*Guaranteed Obligations*"); provided, however, that the definition of "*Guaranteed Obligations*" shall not create any guarantee by any Guarantor of (or grant of security interest by any Guarantor to support, as applicable) any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of any Guarantor.  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

Section 10.02    Guaranty of Payment.  This Loan Guaranty is a guaranty of payment and not of collection.  Each Guarantor waives any right to require the Administrative Agent or any Lender to sue the Borrower, any Guarantor, any other guarantor of, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "*Obligated Party*"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

Section 10.03    No Discharge or Diminishment of Loan Guaranty.

(a)    Except as otherwise provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the Payment in Full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)	The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)	Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the Payment in Full of the Guaranteed Obligations).

Section 10.04	<u>Defenses Waived.</u>	To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower, any Guarantor or any other Obligated Party, other than the Payment in Full of the Guaranteed Obligations.  Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person.  Each Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  Upon the occurrence and during the continuance of an Event of Default, and subject to the terms and provisions of the Loan Documents, the Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Loan Guaranty, except to the extent the Guaranteed Obligations have been Paid in Full.  To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

Section 10.05	<u>Rights of Subrogation.</u>	No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to the Administrative Agent and the Lenders.

Section 10.06	<u>Reinstatement; Stay of Acceleration.</u>	If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded, or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Guarantor's obligations under this Loan Guaranty with respect to that payment shall be

reinstated at such time as though the payment had not been made and whether or not the Administrative Agent and the Lenders are in possession of this Loan Guaranty.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Administrative Agent.

Section 10.07    Information.    Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Loan Guaranty, and agrees that none of the Administrative Agent or any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

Section 10.08    Termination.    Each of the Lenders may continue to make loans or extend credit to the Borrower based on this Loan Guaranty until three (3) days after it receives written notice of termination from any Guarantor.  Notwithstanding receipt of any such notice, each Guarantor will continue to be liable to the Lenders for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations.  Nothing in this Section 10.08 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Administrative Agent or any Lender may have in respect of, any Default or Event of Default that shall exist under clause (o) of Article 7 hereof as a result of any such notice of termination.

Section 10.09    Taxes.    Each payment of the Guaranteed Obligations will be made by each Guarantor without withholding for any Taxes, unless such withholding is required by law.  If any Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by such Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section 10.09), the Administrative Agent or such Lender (as the case may be) receives the amount it would have received had no such withholding been made.

Section 10.10    Maximum Liability.    Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law.  In determining the limitations, if any, on the amount of any Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

Section 10.11    Contribution.

(a)    To the extent that any Guarantor shall make a payment under this Loan Guaranty (a "*Guarantor Payment*") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Guarantor if each Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Guarantor's "*Allocable Amount*" (as defined

109

below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment, the Payment in Full of the Guaranteed Obligations and the termination of this Agreement, such Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)　　As of any date of determination, the "*Allocable Amount*" of any Guarantor shall be equal to the excess of the fair saleable value of the property of such Guarantor over the total liabilities of such Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)　　This Section 10.11 is intended only to define the relative rights of the Guarantors, and nothing set forth in this Section 10.11 is intended to or shall impair the obligations of the Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)　　The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Guarantor or Guarantors to which such contribution and indemnification is owing.

(e)　　The rights of the indemnifying Guarantors against other Guarantors under this Section 10.11 shall be exercisable upon the Payment in Full of the Guaranteed Obligations and the termination of this Agreement.

Section 10.12　Liability Cumulative.  The liability of each Loan Party as a Guarantor under this Article 10 is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

Section 10.13　Keepwell.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guarantee in respect of a Swap Obligation (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 10.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.13 or otherwise under this Loan Guaranty voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this Section 10.13 shall remain in full force and effect until the termination of all Swap Obligations.  Each Qualified ECP Guarantor intends that this Section 10.13 constitute, and this Section 10.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the day and year first above written.

BORROWER:

RAC DEALERSHIP, LLC,
a Delaware limited liability company

By: _____

Name:  Eric Harkness
Title:   Chief Executive Officer

GUARANTORS:

RAC KING, LLC,
a Delaware limited liability company

By: _____

Name:  Eric Harkness
Title:   Chief Executive Officer

ADMINISTRATIVE AGENT:

HANCOCK WHITNEY BANK,
as Administrative Agent

By: _____

Name: _____

Title: _____

LENDERS:

HANCOCK WHITNEY BANK,
Individually and as Swingline Lender

By: _Jennifer Pelham_
Name: _Jennifer Pelham_
Title: _Senior Vice President_

SYNOVUS BANK

By: _____

Name:  Patrick O'Brien
Title:   Middle Market Banker

TRIUMPH BANK

By: _____

Name:  William C. Menkel

Title:   Executive Vice President

## <u>Schedule I</u>

**Commitment Schedule**

| Lender | Revolving Commitment | Applicable Percentage |
|---|---|---|
| Hancock Whitney Bank | $30,000,000.00 | 50.000000000% |
| Synovus Bank | $20,000,000.00 | 33.333333333% |
| Triumph Bank | $10,000,000.00 | 16.666666667% |
| **Total** | $60,000,000.00 | 100.000000000% |

| Swingline Lender | Swingline Commitment |
|---|---|
| Hancock Whitney Bank | $20,000,000.00 |
| **Total** | $20,000,000.00 |

**SCHEDULE 3.05**

A.    **Owned or Leased Real Property**

| No. | Loan Party Name | Location of Real Property | Leased/ Owned | Landlord Name and Notice Address |
|---|---|---|---|---|
| **Alabama** | | | | |
| 1. | RAC Dealership, LLC dba American Car Center | 9842 Parkway E., Birmingham, AL | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 2. | RAC Dealership, LLC dba American Car Center | 3078 S. Oates St., Dothan, AL | Leased | Raymond & Betty Dean<br><br>1991 County Rd. 49, Midland City, AL 36350 |
| 3. | RAC Dealership, LLC dba American Car Center | 1225 Florence Blvd., Florence, AL | Leased | 1225 Florence Blvd., LLC<br><br>Attn: Mike Kaphammer, 100 Bald Knob Rd., New Albany, IN 47150 |
| 4. | RAC Dealership, LLC dba American Car Center | 630 W. Meighan Blvd., Gadsden, AL | Leased | Grissom Family Properties, LLC<br><br>P.O. Box 308, Gadsden, AL 35902 |
| 5. | RAC Dealership, LLC dba American Car Center | 3777 University Dr. NW., Huntsville, AL | Leased | Brazelton Properties Inc.<br><br>P.O. Box 528, Huntsville, AL 35804 |
| 6. | RAC Dealership, LLC dba American Car Center | 2810 Government Blvd., Mobile, AL | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 7. | RAC Dealership, LLC | Tillman's Corner, 5447 U.S. Hwy. 90 W., Mobile, AL | Leased | Mobile (Tillmans Corner) LLC<br><br>Attn: Joel S. Langsfeld, President, 4200 Northside Pkwy., Bldg. 2, Ste. 200, Atlanta, GA 30327<br><br>With a copy to: Thompson Burton PLLC, Attn: William W. Burton, Esq., 1 Franklin Park, 6100 Tower Circle, Ste. 200, Franklin, TN 37067 |
| 8. | RAC Dealership, LLC | 190 Eastern Blvd. Montgomery, AL | Leased | Woodcock Properties, Inc.<br><br>Attn: W. Benjamin Johnson, 420 N. 20th St., Ste. 3400, Birmingham, AL 35203 |
| 9. | RAC Dealership, LLC dba American Car Center | 3296 Pelham Pkwy., Pelham, AL | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125; Email:Srunk@ar-global.com |
| 10. | RAC Dealership, LLC dba American Car Center | 405 Skyland Blvd. E. Tuscaloosa, AL | Leased | Lease and Rental Management LLC<br><br>Capital Real Estate, 705 27th Ave., Tuscaloosa, AL 35401 |

| **Arkansas** | | | | |
|---|---|---|---|---|
| 11. | RAC Dealership, LLC dba American Car Center | 3100 Towson Ave., Ft. Smith, AR | Leased | RAC Investment, LLC<br><br>6775 Lenox Center Ct., Ste. 100, Memphis, TN 38115 |
| 12. | RAC Dealership, LLC dba American Car Center | 3615 Stadium Blvd., Jonesboro, AR | Leased | John David Stump, Inc.<br><br>3460 Old Union Rd., Imboden, AR 72434 <u>Email</u>:john-stump@live.com |
| 13. | RAC Dealership, LLC dba American Car Center | 5039 Warden Rd., N. Little Rock, AR | Leased | Akshar 6, LLC<br><br>Attn: S. C. Vora, MD, 2402 Pathway, El Dorado, AR 71730<br><br>With a copy to: Melanie Gibson, Colliers International, P.O. Box 3546, Little Rock, AR 72203 Email:melanie.gibson@colliers.com |
| 14. | RAC Dealership, LLC dba American Car Center | 2009 N. Thompson St., Springdale, AR | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125; <u>Email</u>:Srunk@ar-global.com |
| **Florida** | | | | |
| 15. | RAC Dealership, LLC dba American Car Center | 2562 Colonial Blvd., Ft. Myers, FL | Leased | Rockledge Acquisitions, LLC<br><br>402-A High Point Dr., Cocoa, FL 32926 <u>Email</u>: summit@southeastpetro.com<br><br>With a copy to: Southeast Petro, Attn: Mindy Elfand, 402 High Point Dr., Cocoa, FL 32926 Email:mindy@southeastpetro.com |
| 16. | RAC Dealership, LLC dba American Car Center | 3432 N. Main St., Gainesville, FL | Leased | LG 3432 N Main Gainesville, LLC<br><br>c/o Leon Capital Group, Attn: Asset Management, 3500 Maple Ave., Ste. 1600, Dallas, TX 75219<br><br>With a copy to: LG 3432 N Main Gainesville, LLC c/o Leon Capital Group, Attn: Legal Department, 3500 Maple Ave., Ste. 1600, Dallas, TX 75219<br><br>And<br><br>Squire Patton Boggs (US) LLP, Attn: Stacy Krumin, Esq., 201 N. Franklin St., Ste. 2100, Tampa, FL 33602 |
| 17. | RAC Dealership, LLC dba American Car Center | 9590 Atlantic Blvd., Jacksonville, FL | Leased | MNR Properties Jacksonville, LLC<br><br>Attn: Aslam Rawoof, 311 Washington St. #9B, Jersey City, NJ 07302; <u>Email</u>: aslam.rawoof@gmail.com |
| 18. | RAC Dealership, LLC dba American Car Center | 7739 Blanding Blvd., Jacksonville, FL | Leased | Capital City Bank<br><br>Attn: Patricia Evans, 350 N. Temple Ave., Starke, FL 32091; <u>Email</u>: evans.patricia@ccbg.com, up4bidz@gmail.com |

| 19. | RAC Dealership, LLC dba American Car Center | 1831 Cassat Ave., Jacksonville, FL | Leased | East Coast Motors, Inc.<br><br>Victor Sirotkin, 1813 Forest Glen Way, St. Augustine, FL 32092 |
|-----|---------------------------------------------|-------------------------------------|--------|-----|
| 20. | RAC Dealership, LLC dba American Car Center | 920 W. Vine St., Kissimmee, FL | Leased | The O'Steen Company, LLP<br><br>Attn: Harold S. O'Steen, 759 N. Edgewood Ave., Jacksonville, FL 32254 |
| 21. | RAC Dealership, LLC dba American Car Center | 2725 U.S. Hwy. 98 N., Lakeland, FL | Leased | LG Lakeland 2725 US 98, LLC<br><br>c/o Leon Capital Group, Attn: Asset Management, 3500 Maple Ave., Ste. 1600, Dallas, TX 75219<br><br>With a copy to: LG Lakeland 2725 US 98, LLC, c/o Leon Capital Group, Attn: Legal Department, 3500 Maple Ave., Ste. 1600, Dallas, TX 75219<br><br>And:<br><br>Squire Patton Boggs (US) LLP, Attn: Stacy Krumin, Esq., 201 N. Franklin St., Ste. 2100, Tampa, FL 33602 |
| 22. | RAC Dealership, LLC dba American Car Center | 2300 U.S. Hwy. 17-92, Longwood, FL | Leased | Kesting Limited Partnership<br><br>Attn: Charles Kesting, 11330 Liberty Rd., Owings Mills, MD 2117 |
| 23. | RAC Dealership, LLC dba American Car Center | 430 N. Semoran Blvd., Orlando, FL | Leased | 430 Semoran, LLC<br><br>Attn: Wesley Wolk, 505 E. Jackson St., Ste. 308, Tampa, FL 33602 Email:weswolk@gmail.com |
| 24. | RAC Dealership, LLC dba American Car Center | 3920 W. Colonial Dr., Orlando, FL | Leased | Discovery Properties, LLC<br><br>Attn: Jim Kagiliery, 3132 St Johns Bluff Rd S., Jacksonville, FL 32246  (904)874-1540 Email:jzk@drive100.com |
| 25. | RAC Dealership, LLC dba American Car Center | 5831 Pensacola Blvd., Pensacola, FL | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 26. | RAC Dealership, LLC dba American Car Center | 720 N. State Rd. 7, Plantation, FL | Leased | 720 N State Rd 7 LLC<br><br>20533 Biscayne Blvd., Ste. 4531, Miami, FL 33180; Email: yyosifove@dproperties.us |
| 27. | RAC Dealership, LLC dba American Car Center | 8350 Park Blvd. N., Seminole, FL | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 28. | RAC Dealership, LLC dba American Car Center | 2394 W. Tennessee St., Tallahassee, FL | Leased | JP & JP2, LLC<br><br>4178 Apalachee Pkwy., Tallahassee, FL 32311 |

| 29. | RAC Dealership, LLC dba American Car Center | 9201 E. Adamo Dr., Tampa, FL | Leased | The Radiant Group LLC<br><br>Attn: Real Estate, 120 E. 9th Ave., Tampa, FL 33605 |
|---|---|---|---|---|
| 30. | RAC Dealership, LLC | 10013 & 10015 N. Florida Ave., Tampa, FL | Leased | 10013 N. Florida Avenue, LLC<br><br>c/o Paul Blanco, 3800 Florin Rd., Sacramento, CA 95823 Email: paulblanco@live.com<br><br>With a copy to: Michael P. Garcia, Esq., Beyers Costin Simon, PC, 200 4th St., Ste. 400, Santa Rosa, CA 95401 Email:mgarcia@beyerscostin.com |
| **Georgia** | | | | |
| 31. | RAC Dealership, LLC dba American Car Center | 4750 Atlanta Hwy., Athens, GA | Leased | 4750 Atlanta Hwy, LLC<br><br>Attn: Derek Griffin, 3131 Piedmont Rd., Ste. 202, Atlanta, GA 30305 Email:dgriffin@allied-cp.com |
| 32. | RAC Dealership, LLC dba American Car Center | 1801 Gordon Hwy., Augusta, GA | Leased | Discovery Properties II, LLC<br><br>Attn: Jim Kagiliery, 3132 St Johns Bluff Rd S., Jacksonville, FL 32246  (904)874-1540 Email:jzk@drive100.com |
| 33. | RAC Dealership, LLC dba American Car Center | 4474 Buford Hwy., Chamblee, GA | Leased | Pope Retail Properties, LLC<br><br>Attn: G. Richard Pope, P.O. Box 48347, Atlanta, GA 30362; Email: dpope@fivestaronline.net<br><br>With a copy to: Grant Sharp, Five Star Automotive Group, 3109 Clairmont Rd. NE, Ste. A, Atlanta, GA 30329; Email: gsharp@fivestaronline.net |
| 34. | RAC Dealership, LLC dba American Car Center | 1426 Veterans Pkwy., Columbus, GA | Leased | J & P Commercial Property Holdings, LLC<br><br> c/o W.C. Bradley Co., Real Estate Dept., 1017 Front Ave., Columbus, GA 31901 |
| 35. | RAC Dealership, LLC | 1798 Iris Dr. SW, Conyers, GA | Leased | TD Iris, LLC<br><br>Attn: Derek Griffin, 3131 Piedmont Rd, Ste. 202, Atlanta, GA 30305 Email:dgriffin@allied-cp.com |
| 36. | RAC Dealership, LLC dba American Car Center | 366 W. Pike St., Lawrenceville, GA | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125; Email:Srunk@ar-global.com |
| 37. | RAC Dealership, LLC dba American Car Center | 621 Thornton Rd., Lithia Springs, GA | Leased | D&D Holdings and Investments, LLC<br><br>Faizal Dhalla, 3271 Rays Creek Dr., Acworth, GA 30101 Email:faizal.dhalla@gmail.com<br><br>And:<br><br>Irving Duncan, 4025 Southdown Ln., Kennesaw, GA 30152 Email:irvingduncan@gmail.com |

| 38. | RAC Dealership, LLC dba American Car Center | 2110 Eisenhower Pkwy., Macon, GA | Leased | DG Oak Ridge, LLC<br><br>Attn: Derek Griffin, 3131 Piedmont Rd., Ste. 202, Atlanta, GA 30305 Email:dgriffin@allied-cp.com |
|---|---|---|---|---|
| 39. | RAC Dealership, LLC dba American Car Center | 1800 Cobb Pkwy. SE, Marietta, GA | Leased | RAC Land, LLC<br><br>Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 40. | RAC Dealership, LLC dba American Car Center | 7335 Hwy. 85, Riverdale, GA | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 41. | RAC Dealership, LLC dba American Car Center | 2237 E. Victory Dr., Savannah, GA | Leased | Overdrive Systems II, Inc.<br><br>Discovery Properties, LLC, Attn: Jim Kagiliery, 3132 St Johns Bluff Rd S., Jacksonville, FL 32246  (904)874-1540 Email:jzk@drive100.com |
| 42. | RAC Dealership, LLC dba American Car Center | 6108 Memorial Dr., Stone Mountain, GA | Leased | Toraj Zolghadr<br><br>805 Links View Dr., Sugar Hill, GA 30518 Email:toraj_zolghard@yahoo.com or toraj_zolghadr@yahoo.com |
| **Kentucky** | | | | |
| 43. | RAC Dealership, LLC dba American Car Center | 1171 E. New Circle Rd., Lexington, KY | Leased | S. F. Dawahare Estate Limited Partnership<br><br>Attn: Mark Dawahare, 1801 Alexandria Dr., Ste. 112, Lexington, KY 40504 |
| 44. | RAC Dealership, LLC dba American Car Center | 6724 Dixie Hwy., Louisville, KY | Leased | Ulrich-McIntyre Limited Family Partnership<br><br>Attn: Joe Ulrich, 12406 St. Clair Drive, Louisville, KY 40243 • Attorney Contact: Pamela U. Foree, 1122 Bates Lane, Smithfield, KY 40068, (502) 592-9476, (866) 422-0266 Email:pforeeattorney@gmail.com |
| 45. | RAC Dealership, LLC dba American Car Center | 6770 Dixie Hwy., Louisville, KY | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125; Email:Srunk@ar-global.com |
| **Missouri** | | | | |
| 46. | RAC Dealership, LLC dba American Car Center | 10660 Page Ave. & 10649 Liberty Ave., St. Louis, MO | Leased | Page Avenue Properties, LLC<br><br>105 Frontenac Forest, St. Louis, MO 63131 |
| **Mississippi** | | | | |
| 47. | RAC Dealership, LLC dba American Car Center | 11370 Hwy. 49N, Gulfport, MS | Leased | Rachel Investors LLC<br><br>PMG Leasing, LLC, Attn: Jane Steiner, 1055 St. Charles Ave., Ste. 701, New Orleans, LA 70130 |

| 48. | RAC Dealership, LLC dba American Car Center | 6103 N. I-55 Frontage Rd., Jackson, MS | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 49. | RAC Dealership, LLC dba American Car Center | 1195 S. Gloster St., Tupelo, MS | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| **North Carolina** | | | | |
| 50. | RAC Dealership, LLC dba American Car Center | 4517 E. Independence Blvd., Charlotte, NC | Leased | Oxford Homes, LLC<br><br>Landlord, c/o Oxford Homes, LLC, 2132 Foxcroft Woods Ln., Charlotte, NC 28211 |
| 51. | RAC Dealership, LLC dba American Car Center | 5416 N. Tryon St., Charlotte, NC | Leased | Ann Hampton<br><br>1530 Queens Rd. #204, Charlotte, NC 28207 Email:suehampton@yahoo.com |
| 52. | RAC Dealership, LLC dba American Car Center | 3305 Raeford Rd., Fayetteville, NC | Leased | Dax's Deals, Inc.<br><br>Dax Yarborough, 3618 Sycamore Dairy Rd., Fayetteville, NC 28303 |
| **South Carolina** | | | | |
| 53. | RAC Dealership, LLC dba American Car Center | 6409 Two Notch Rd., Columbia, SC | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 54. | RAC Dealership, LLC dba American Car Center | 13712 E. Wade Hampton Blvd., Greer, SC | Leased | Wade Hampton in Greer, LLC<br><br>960 Brockman Rd., Greer, SC 29651 |
| 55. | RAC Dealership, LLC dba American Car Center | 6258 Rivers Ave., N. Charleston, SC | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 56. | RAC Dealership, LLC dba American Car Center | 1640 Airport Blvd., W. Columbia, SC | Leased | RVM Rentals, LLC & Edward F. Larocque<br><br>c/o Julian Wilson, 1111 Laurel St., Columbia, SC 29201 Email:julian.wilson@wilsonkibler.com<br><br>With a copy to: Brett D. Budlong, Graybill, Lansche & Vinzani, LLC, 225 Seven Farms Dr., Ste. 207, Charleston, SC 29492 Email:bbudlong@glvlawfirm.com |
| Tennessee | | | | |
| 57. | RAC Dealership, LLC dba American Car Center | 5707 Lee Hwy., Chattanooga, TN | Leased | Chattanooga Metropolitan Airport Authority<br><br>1001 Airport Rd., Ste. 14, Chattanooga, TN 37421 Attn: Terry Hart, 423-855-2292, Email:thart@chattairport.com |

| 58. | RAC Dealership, LLC dba American Car Center | 1640 Wilma Rudolph Blvd., Clarksville, TN | Leased | H.A.R.E., LLC<br><br>Larry W. Houchins, H.A.R.E., LLC, 700 E. Ladd Rd., Goldsby, OK 73093<br><br>With a copy to: J. Michael Nordin, McAfee & Taft A Professional Corporation, 10th Floor, Two Leadership Square, 211 N. Robinson Ave., Oklahoma City, OK 73102 |
| 59. | RAC Dealership, LLC dba American Car Center | 1561 N. Germantown Pkwy., Cordova, TN | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 60. | RAC Dealership, LLC dba American Car Center | 1030 Hwy. 45 Bypass, Jackson, TN | Leased | Cox-McCarver Partnership<br><br>Attn: Flint Cox or Martha Shopher, P.O. Box 12486, Jackson, TN 38308 |
| 61. | RAC Dealership, LLC dba American Car Center | 231 Papermill Place Way, Knoxville, TN | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 62. | RAC Dealership, LLC dba American Car Center | 1425 Gallatin Pike, N. Madison, TN | Leased | RAC Land, LLC<br><br>Attn: Stacey Runk, VP Client Relations, AR Global; 212-415-6561; 347-931-1125 Email:Srunk@ar-global.com |
| 63. | RAC Dealership, LLC dba American Car Center | 1956 Covington Pike, Memphis, TN | Leased | UAG Memphis II, Inc.<br><br>c/o United Auto Group, Inc., Attn: R. Whitfield Ramonat, 2555 Telegraph Rd., Bloomfield Hills, MI 48302<br><br>With a copy to: Penske Automotive Group, Attn: General Counsel, 2555 Telegraph Rd., Bloomfield Hills, MI 48302 |
| 64. | RAC Dealership, LLC dba American Car Center | 3311 Elvis Presley Blvd., Memphis, TN | Leased | Shiva Properties, LLC<br><br>Pete Patel, 901-337-2336, Email:anjudesoto@gmail.com |
| 65. | RAC King, LLC | 6775 Lenox Center Ct., Memphis, TN | Leased | Lenox Park Memphis Realty LP<br><br>c/o Group RMC Corporation, Attn: Alexander Massa, One World Trade Center, Ste. 83G, New York, NY 10038<br><br>With a copy to: Vinson & Elkins LLP, Attn: Sander Ash, Esq., 666 5th Ave., 26th Floor, New York, NY 10103 |
| 66. | RAC Dealership, LLC dba American Car Center | 2660 S. Mendenhall, Memphis, TN | Leased | Lunati Ticer Partnership<br><br>7170 Stout Rd., Germantown, TN 38138 |
| 67. | American Car Center, LLC | 6400 Winchester Rd., Memphis, TN | Leased | Acee Company<br><br>Attn: Curtis Goldtrap, P.O. Box 10656, Ft. Smith, AR 72917 |
| 68. | RAC Dealership, LLC dba American Car Center | 2204 N.W. Broad St., Murfreesboro, TN | Leased | Brenda Rigsby<br><br>P.O. Box 246, Dunlap, TN 37327 |

| | | | | |
|---|---|---|---|---|
| 69. | RAC Dealership, LLC dba American Car Center | 1635 Bell Rd., Nashville, TN | Leased | Richland South LLC<br><br>Attn: Hoss Mousavi, 2525 21st Ave., Ste. 200, Nashville, TN 37212 |
| 70. | RAC Dealership, LLC dba American Car Center | 5501 Charlotte Pike Ave., Nashville, TN | Leased | Carney Charlotte Pike, LLC<br><br>Attn: Martin S. Carney, 4500 Bowling Blvd., Ste. 250, Louisville, KY 40207 |
| 71. | RAC Dealership, LLC dba American Car Center | 609 Thompson Lane, Nashville, TN | Leased | JRB Properties, LLC<br><br>3 Webster Ln., Nashville, TN 37205 |

**B.**     **Intellectual Property**

Trademarks

- "American Car Center, The King of Credit" Federal Trademark Registration, Serial Number 85672056, Registration Number 4308290, registered as of March 23, 2016.

CHAR1\1812637v2

## SCHEDULE 3.12

### Material Agreements

Master Services Agreement between CDK Global, LLC and American Car Center dated April 19, 2016

Global Master Services Agreement between ADP LLC and American Car Center dated February 21, 2019

CalAmp Commercial Equipment Purchase Agreement between CalAmp DataCom, Inc. and American Car Center, LLC dated October 16, 2009

PASSTIME Service Agreement between Gordon*Howard Associates Inc. and AF Title Co. dated August 4, 2020

Letter of Agreement between AutoZone and RAC Dealership, LLC dated July 18, 2018, as amended by Amendment #1 to Letter Agreement between AutoZone and RAC Dealership, LLC dated July 19, 2019

Auto Master Hosted Services Agreement Standard Terms and Conditions (Finance Company) between Auto Master Systems, Inc. and American Car Center

License & Service Agreement between AutoUpLink Technologies, Inc. and American Car Center dated November 21, 2016

Master Services Agreement between Rapid7 LLC and RAC King, LLC dated June 28, 2019 and the accompanying Product Order Form dated June 27, 2019

Rapid7 Insight Platform Terms of Service between Rapid7 LLC and RAC King, LLC dated June 28, 2019

National Consignment Agreement between Manheim Remarketing, Inc. and American Financial dated September 6, 2019

Letter Agreement for Certain Customer Incentives between Manheim Remarketing, Inc. and American Car Center dated November 14, 2019

Advertising Agency Agreement between The Automotive Advertising Agency L.L.C. and American Car Center dated June 16, 2016, as amended by Commission and Fee Concessions dated August 11, 2017

Customer/End User License Agreement between Stella GPS, LLC and RAC Dealership, LLC dated October 21, 2016

Master Agreement between Fiserv Solutions, LLC and RAC King, LLC dated November 30, 2017, as amended by Amendment to Agreement dated April 13, 2020

Agreement between Digital Technology, Inc. and RAC King, LLC dated March 1, 2017, as amended by Service & Maintenance Addendum Information to Electronic Media dated March 1, 2017; Service & Maintenance Addendum Information to Electronic Media dated October 1, 2018; and Addendum to Original Service & Maintenance Addendum (SMA) – Information to Electronic Media Agreement dated October 9, 2018

Service Agreement between DealerFire/Neleven, LLC and American Car Center dated May 16, 2014

**Schedule 3.15**

**Capitalization and Subsidiaries**

| Subsidiary | Owner | Ownership Percentage |
|---|---|---|
| RAC King, LLC, a Delaware limited liability company | RAC INVESTMENT HOLDINGS, LLC | 100% |
| RAC DEALERSHIP, LLC, a Delaware limited liability company | RAC KING, LLC | 100% |

CHAR1\1812637v2

## SCHEDULE 6.01

### Existing Indebtedness

Master Lease dated as of March 10, 2020, between RAC Land, LLC, a Delaware limited liability company and Borrower.

## SCHEDULE 6.02

**Existing Liens**

None.

## SCHEDULE 6.04

**Existing Investments**

None.

CHAR1\1812637v2

## SCHEDULE 6.10

### Existing Restrictions

None.

EXHIBIT A
FORM OF ASSIGNMENT AND ASSUMPTION

**ASSIGNMENT AND ASSUMPTION**

  This Assignment and Assumption (this "*Assignment and Assumption*") is dated as of the Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "*Assignor*") and [Insert name of Assignee] (the "*Assignee*").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

  For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and other rights of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "*Assigned Interest*").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

| 1. | Assignor: | [●] |
|----|-----------|-----|
| 2. | Assignee: | [●] [and is an Affiliate/Approved Fund of [identify Lender][1] |
| 3. | Borrower: | RAC Dealership, LLC |
| 4. | Administrative Agent: | Hancock Whitney Bank, as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | Credit Agreement dated as of June 29, 2021 among Borrower, the other Loan Parties party thereto, the Lenders party thereto, and Hancock Whitney Bank, as Administrative Agent |

---

[1] Select as applicable.

CHAR1\1789530v12

6.        Assigned Interest:

| Aggregate Amount of Revolving Commitment/Revolving Loans for all Lenders | Amount of Revolving Commitment/Revolving Loans Assigned | Percentage Assigned of Revolving Commitment/Revolving Loans[2] |
|---|---|---|
| $ | $ | % |
| $ | $ | % |
| $ | $ | % |

Effective Date: [●] [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their respective Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including federal and state securities laws.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

---

[2] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR:**

[NAME OF ASSIGNOR]


By: _____
Name: _____
Title: _____

**ASSIGNEE:**

[NAME OF ASSIGNEE]


By: _____
Name: _____
Title: _____

[Consented to and]³ Accepted:

HANCOCK WHITNEY BANK,
as Administrative Agent


By:     _____
Name:  _____
Title:   _____

Consented to:

HANCOCK WHITNEY BANK,
as Swingline Lender


By:     _____
Name:  _____
Title:   _____

[Consented to:]⁴

RAC DEALERSHIP, LLC


By:     _____
Name:  _____
Title:   _____

---

³ To be added only if the consent of the Administrative Agent, is required by the terms of the Credit Agreement.
⁴ To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

Exhibit A-4

ANNEX 1 to
ASSIGNMENT AND ASSUMPTION

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any Subsidiary or Affiliate or any other Person obligated in respect of any Loan Document, (iv) any requirements under applicable law for the Assignee to become a Lender under the Credit Agreement or any other Loan Document or to charge interest at the rate set forth therein from time to time or (v) the performance or observance by the Loan Parties or any Affiliate, or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement and under applicable law that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent, Arranger, the Assignor or any other Lender or any of their respective Related Parties, (v) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee, [and] (vi) it is not a Disqualified Lender [and [(vii) it is not an Affiliated Lender]]; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, Arranger, the Assignor or any other Lender or any of their respective Related Parties, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will be bound by the provisions of the Credit Agreement and the other Loan Documents and will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.  The Assignor and the Assignee shall make all appropriate adjustments (if any) in payments by the Administrative Agent for periods accrued prior to the Effective Date or with respect to the making of this assignment directly between themselves.

3.        <u>General Provisions.</u>  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Acceptance and adoption of the terms of this Assignment and Assumption by the Assignee and the Assignor by Electronic Signature (as defined in the Credit Agreement) or delivery of an executed counterpart of a signature page of this Assignment and Assumption by any Approved Electronic Platform (as defined in the Credit Agreement) shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

CHAR1\1789530v12

EXHIBIT B-1
FORM OF BORROWING REQUEST

**BORROWING REQUEST**

Hancock Whitney Bank
701 Poydras Street, Suite 1600
New Orleans, Louisiana 70139
Attention: Matthew Chivleatto
Email: syndications@hancockwhitney.com

Date: [●]

Ladies and Gentlemen:

This Borrowing Request is furnished pursuant to Section 2.03 of that certain Credit Agreement dated as of June 29, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "*Agreement*") among RAC Dealership, LLC (the "*Borrower*"), the other Loan Parties party thereto, the Lenders party thereto and Hancock Whitney Bank ("*Hancock Whitney*"), as the Administrative Agent. Unless otherwise defined herein, capitalized terms used in this Borrowing Request have the meanings ascribed thereto in the Agreement. The Borrower represents that, as of this date, the conditions precedent set forth in Section 4.02(a) of the Agreement are satisfied.

The Borrower hereby notifies Hancock Whitney of its request for the following Borrowing:

      1.      Type of Borrowing: [Revolving Loan] / [Swingline Loan]

      2.      Aggregate Amount of the Borrowing[5] $[●]

      3.      Borrowing Date of the Borrowing (must be a Business Day): [●]

      4.      The Borrowing shall be a ___ ABR Borrowing or ___ Eurodollar Borrowing[6]

      [*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

---

[5] Each Eurodollar Revolving Borrowing shall be in an aggregate amount that is an integral multiple of $250,000 and not less than $1,000,000. ABR Revolving Borrowings may be in any amount. Each Swingline Loan shall be in an amount that is an integral multiple of $10,000 and not less than $50,000.
[6] If no election is made, then the requested Borrowing shall be an ABR Borrowing. Swingline Borrowings shall bear interest at the rate per annum indicated in that certain letter agreement dated as of the Closing Date by and between the Borrower and the Administrative Agent.

IN WITNESS WHEREOF, the Borrower has caused this Borrowing Request to be duly executed and delivered by its below duly authorized Responsible Officer as of the day and year first written above.

RAC DEALERSHIP, LLC

By: _____

Name: _____

Title: _____

EXHIBIT B-2
FORM OF INTEREST ELECTION REQUEST

**INTEREST ELECTION REQUEST**

Hancock Whitney Bank
701 Poydras Street, Suite 1600
New Orleans, Louisiana 70139
Attention:  Matthew Chivleatto
Email:  syndications@hancockwhitney.com

Date: [●]

Ladies and Gentlemen:

This Interest Election Request is furnished pursuant to Section 2.07(c) of that certain Credit Agreement dated as of June 29, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "*Agreement*") among RAC Dealership, LLC (the "*Borrower*"), the other Loan Parties party thereto, the Lenders party thereto and Hancock Whitney Bank ("*Hancock Whitney*"), as the Administrative Agent. Unless otherwise defined herein, capitalized terms used in this Interest Election Request have the meanings ascribed thereto in the Agreement.

The Borrower is hereby requesting to convert or continue certain Borrowings as follows:

       1.      Borrowing to which this Interest Election Request applies: [●]

       2.      Date of conversion/continuation (must be a Business Day): [●]

       3.      Amount of Borrowings being converted/continued: $[●]

       4.      Nature of conversion/continuation:

      ☐     a.      Conversion of ABR Borrowings to Eurodollar Borrowings
      ☐     b.      Conversion of Eurodollar Borrowings to ABR Borrowings
      ☐     c.      Continuation of Eurodollar Borrowings as such

       5.      The undersigned Responsible Officer of Borrower certifies that, both before and after giving effect to the request above, no Default or Event of Default has occurred and is continuing under the Agreement.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the Borrower has caused this Interest Election Request to be duly executed and delivered by its below duly authorized Responsible Officer as of the day and year first written above.

RAC DEALERSHIP, LLC

By: _____
Name: _____
Title: _____

<u>EXHIBIT C-1</u>

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Credit Agreement dated as of June 29, 2021 (as amended, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among RAC Dealership, LLC, as Borrower, the other Loan Parties party thereto, the Lenders party thereto, and Hancock Whitney Bank, as Administrative Agent.

Pursuant to the provisions of Section 2.15 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any promissory note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By: _____
Name: _____
Title: _____

Date:    [●]

Exhibit C-1-1

CHAR1\1789530v12

EXHIBIT C-2

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Credit Agreement dated as of June 29, 2021 (as amended, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among RAC Dealership, LLC, as Borrower, the other Loan Parties party thereto, the Lenders party thereto, and Hancock Whitney Bank, as Administrative Agent.

Pursuant to the provisions of Section 2.15 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By: _____
Name: _____
Title: _____

Date:    [●]

Exhibit C-2-1

CHAR1\1789530v12

<u>EXHIBIT C-3</u>

[FORM OF]

### U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Credit Agreement dated as of June 29, 2021 (as amended, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among RAC Dealership, LLC, as Borrower, the other Loan Parties party thereto, the Lenders party thereto, and Hancock Whitney Bank, as Administrative Agent.

Pursuant to the provisions of Section 2.15 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by a withholding statement together with an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By: _____
Name: _____
Title: _____

Date: [●]

Exhibit C-3-1

CHAR1\1789530v12

EXHIBIT C-4

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Credit Agreement dated as of June 29, 2021 (as amended, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among RAC Dealership, LLC, as Borrower, the other Loan Parties party thereto, the Lenders party thereto, and Hancock Whitney Bank, as Administrative Agent.

Pursuant to the provisions of Section 2.15 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any promissory note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any promissory note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by a withholding statement together with an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By: _____
Name: _____
Title: _____

Date:    [●]

Exhibit C-4-1

EXHIBIT D
FORM OF COMPLIANCE CERTIFICATE

**COMPLIANCE CERTIFICATE**

To:     The Lenders party to the
        Credit Agreement described below

This Compliance Certificate (this "*Certificate*"), for the period ended [●], is furnished pursuant to that certain Credit Agreement dated as of June 29, 2021 (as amended, modified, renewed or extended from time to time, the "*Agreement*") among RAC Dealership, LLC (the "*Borrower*"), the other Loan Parties party thereto, the Lenders party thereto and Hancock Whitney Bank, as Administrative Agent.  Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings ascribed thereto in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.      I am the [●][7] of the Borrower and I am authorized to deliver this Certificate on behalf of the Loan Parties;

2.      I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the compliance of the Loan Parties with the Agreement during the accounting period covered by the attached financial statements (the "*Relevant Period*");

[3.      The attached internally-prepared schedules setting forth the financial results of King and its Subsidiaries are fairly stated in all material respects when considered in relation to the consolidated financial statements of Holdings and its Subsidiaries.][8]

[3.      (i) The attached financial statements of Holdings for the Relevant Period present fairly in all material respects the financial condition and results of operations of Holdings and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; and (ii) the attached internally-prepared schedules setting forth the financial results of King and its Subsidiaries are fairly stated in all material respects when considered in relation to the consolidated financial statements of Holdings and its Subsidiaries][9]

4.      Except as set forth in paragraph [10][10]; no Default or Event of Default exists on this date.

5.      Except as set forth in paragraph [10][11] there has been no change in GAAP or the application thereof since the date of the audited financial statements referred to in Section 3.04 of the Agreement.  [*If any change in GAAP has occurred, please specify the effect of such change on the financial statements accompanying this certificate*].

6.      Except as set forth below, no Loan Party has changed (a) its name, (b) its chief executive office, (c) its principal place of business, (d) the type of entity it is or (e) its state of incorporation or

---

[7] To be a Financial Officer of the Borrower.
[8] Include this paragraph in the case of a Certificate attaching annual financial statements delivered under clause (a)(i) of Section 5.01 of the Agreement.
[9] Include this paragraph in the case of a Certificate attaching quarterly financial statements delivered under clause (a)(ii) of Section 5.01 of the Agreement.
[10] Update as necessary.
[11] Update as necessary.

organization without having given the Administrative Agent the notice required by Section 4.9 of the Security Agreement;

7.      The representations and warranties of the Loan Parties set forth in the Loan Documents are true and correct in all material respects as of the date hereof, except (a) to the extent that any such representation or warranty specifically refers to an earlier date, in which case it is true and correct in all material respects only as of such earlier date, and (b) that any representation or warranty which is subject to any materiality qualifier is true and correct in all respects;

8.      <u>Schedule I</u> attached hereto sets forth financial data and computations evidencing the Borrower's compliance with Section 6.12 of the Agreement, all of which data and computations are true, complete and correct; and

9.      <u>Schedule II</u> hereto sets forth the computations necessary to determine the Applicable Rate commencing on the Business Day this Certificate is delivered.

10.      Described below are the exceptions, if any, referred to in paragraph 4 and paragraph 5 hereof by listing, in detail, the (i) nature of the Default or Event of Default, the period during which it has existed and the action which the Borrower has taken, is taking, or proposes to take with respect to each such Default or Event of Default or (ii) change in GAAP or the application thereof and the effect of such change on the attached financial statements:

[Insert Description]

11.      [Schedule III attached hereto sets forth updated Exhibits A and B to the Security Agreement][Exhibits A and B to the Security Agreement previously delivered to the Administrative Agent remain true and correct as of the date hereof].[12]

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

---

[12] Choose applicable option.

The foregoing certifications, together with the computations set forth in Schedule I and Schedule II hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this [●] day of [●], [●].

RAC DEALERSHIP, LLC


By:      _____
Name:  _____
Title:   _____

CHAR1\1789530v12

<u>Schedule I to Compliance Certificate</u>

Compliance as of [●] (the "*Compliance Test Date*") with Provisions of Section 6.12 of the Agreement

[Schedule I must include detailed calculation tables for all components of the financial covenant calculations.  Sample calculation tables are set forth below.]

6.12    <u>Financial Covenants.</u>

(a)    <u>Debt to Tangible Net Worth Ratio.</u>

(i)    Total Indebtedness of King and its Subsidiaries on consolidated basis in accordance with GAAP on the Compliance Test Date; provided that "Total Indebtedness" shall include, with respect to obligations under any letter of credit agreement, banker's acceptance agreement or similar agreement, such Indebtedness of King and its Subsidiaries only to the extent of any amount that has been drawn under such agreement and not reimbursed:    $_____

(ii)    Subordinated Indebtedness of King and its Subsidiaries on consolidated basis in accordance with GAAP on the Compliance Test Date:    $_____

(iii)    Tangible Net Worth of King and its Subsidiaries on consolidated basis in accordance with GAAP on the Compliance Test Date

(A)    common stock    $_____

(B)    preferred stock    $_____

(C)    capital surplus    $_____

(D)    retained earnings    $_____

(E)    Indebtedness specifically subordinated to the Secured Obligations as evidenced by a properly executed subordination agreement in form and substance satisfactory to the Administrative Agent    $_____

(F)    all treasury stock    $_____

(G)    all Intangible Assets    $_____

(H)    Tangible Net Worth ([sum of (a)(iii)(A) through (a)(iii)(E)] minus [sum of (a)(iii)(F) and (a)(iii)(G)])    $_____

(iv) Debt to Tangible Net Worth Ratio as of the Compliance Test Date ([(a)(i) minus (a)(ii)] divided by (a)(iii)(H))                    _____

Compliance as of the Compliance Test Date shown above:     [__] Yes     [__] No

(b)     <u>Total Interest Coverage Ratio.</u>

(i) Net Income for the twelve-month period ended on the Compliance Test Date (such period, the "*Subject Period*")                    $_____

(ii) Interest Expense for the Subject Period                    $_____

(iii) income taxes of King and its Subsidiaries for the Subject Period                    $_____

(iv) depreciation expense of King and its Subsidiaries for the Subject Period                    $_____

(v) amortization expense of King and its Subsidiaries for the Subject Period                    $_____

(vi) non-cash charges and expenses, in each case, approved by the Administrative Agent in its reasonable discretion for the Subject Period

(vii) extraordinary or non-recurring expenses approved by the Administrative Agent in its Permitted Discretion for the Subject Period

(viii) extraordinary gains for the Subject Period                    $_____

(ix) Interest Expense paid in cash for the Subject Period                    $_____

(viii) Total Interest Coverage Ratio for the Subject Period ([(sum of (b)(i) through (b)(vii)) minus (b)(viii)] divided by (b)(ix))                    _____

Compliance as of the Compliance Test Date shown above:     [__] Yes     [__] No

(c)     <u>Days Inventory Outstanding Ratio.</u>

(i) for the calendar month ended [_____] (such month, the "*First Subject Month*")

(A) average Inventory balance per day for the First Subject Month                    $_____

(B) Sales Per Day for the First Subject Month

(1)    the aggregate amount of the cost of goods sold for the Borrower and its Subsidiaries during the First Subject Month    $_____

(2)    the applicable number of days for the First Subject Month    _____

(3)    Sales Per Day for the First Subject Month ((c)(i)(B)(1) divided by (c)(i)(B)(2))    $_____

(C)    Days Inventory Outstanding Ratio for the First Subject Month ((c)(i)(A) divided by (c)(i)(B)(3))    _____

(ii) for the calendar month ended [_____] (such month, the "*Second Subject Month*")

(A)    average Inventory balance per day for the Second Subject Month    $_____

(B)    Sales Per Day for the Second Subject Month

(1)    the aggregate amount of the cost of goods sold for the Borrower and its Subsidiaries during the Second Subject Month    $_____

(2)    the applicable number of days for the Second Subject Month    _____

(3)    Sales Per Day for the Second Subject Month ((c)(ii)(B)(1) divided by (c)(ii)(B)(2))    $_____

(C)    Days Inventory Outstanding Ratio for the Second Subject Month ((c)(ii)(A) divided by (c)(ii)(B)(3))    _____

(iii) for the calendar month ended on the Compliance Test Date (such month, the "*Third Subject Month*")

(A)    average Inventory balance per day for the Third Subject Month    $_____

(B)    Sales Per Day for the Third Subject Month

(1)    the aggregate amount of the cost of goods sold for the Borrower and its Subsidiaries during the Third Subject Month    $_____

CHAR1\1789530v12

(2)        the applicable number of days for the Third Subject Month       _____

(3)        Sales Per Day for the Third Subject Month ((c)(iii)(B)(1) divided by (c)(iii)(B)(2))       $_____

(C)    Days Inventory Outstanding Ratio for the Third Subject Month ((c)(iii)(A) divided by (c)(iii)(B)(3))       _____

Compliance as of the Compliance Test Date shown above:    [__] Yes    [__] No

<u>Schedule II to Compliance Certificate</u>

Borrower's Applicable Rate Calculation

Debt to Tangible Net Worth Ratio as of the Compliance Test Date
(clause (a)(iv) of Schedule I to Compliance Certificate)                    _____

Applicable Rate Category (as set for the table in definition of
"Applicable Rate" in the Agreement)                                         _____

[Schedule III to Compliance Certificate

Updated Exhibits A and B to the Security Agreement]

EXHIBIT E
FORM OF JOINDER AGREEMENT

**JOINDER AGREEMENT**

This JOINDER AGREEMENT (this "*Agreement*"), dated as of [●], is entered into between [●], a [●] (the "*New Subsidiary*"), and HANCOCK WHITNEY BANK, in its capacity as administrative agent (the "*Administrative Agent*") under that certain Credit Agreement dated as of June 29, 2021 (as the same may be amended, modified, extended or restated from time to time, the "*Credit Agreement*") among RAC Dealership, LLC (the "*Borrower*"), the other Loan Parties party thereto, the Lenders party thereto and the Administrative Agent.  All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

The New Subsidiary and the Administrative Agent, for the benefit of the Secured Parties, hereby agree as follows:

1.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Credit Agreement and a Guarantor for all purposes of the Credit Agreement and shall have all of the obligations of a Loan Party and a Guarantor thereunder as if it had executed the Credit Agreement.  The New Subsidiary hereby delivers to the Administrative Agent all necessary supplements to the Schedules to the Credit Agreement attached hereto as <u>Annex A</u>. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Credit Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Article 3 of the Credit Agreement, (b) all of the covenants set forth in Articles 5 and 6 of the Credit Agreement and (c) all of the guaranty obligations set forth in Article 10 of the Credit Agreement.  Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Section 10.10 and 10.13 of the Credit Agreement, hereby guarantees, jointly and severally with the other Guarantors, to the Administrative Agent and the Lenders, as provided in Article 10 of the Credit Agreement, the prompt payment and performance of the Guaranteed Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Guaranteed Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

2.      If required, the New Subsidiary is, simultaneously with the execution of this Agreement, executing and delivering such Collateral Documents (and such other documents and instruments) as requested by the Administrative Agent in accordance with the Credit Agreement.

3.      The address of the New Subsidiary for purposes of Section 9.01 of the Credit Agreement is as follows:

[Insert Address]

4.      The New Subsidiary hereby waives acceptance by the Administrative Agent and the Lenders of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

CHAR1\1789530v12

5.       This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

6.       THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[*Remainder of Page Intentionally Left Blank; Signatures Follow*]

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and the Administrative Agent, for the benefit of the Secured Parties, has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By: _____
Name: _____
Title: _____

Acknowledged and accepted:

HANCOCK WHITNEY BANK,
as Administrative Agent

By: _____
Name: _____
Title: _____

Annex A to Joinder Agreement

EXHIBIT F
FORM OF BORROWING BASE CERTIFICATE

Date Submitted: _____
Inventory Report Date:_____
Latest Financial Quarter End:_____

| | |
|---|---|
| 1. Total Inventory: | $0.00 |
| 2. Ineligible Inventory: | |

(a) (i) Not owned by the Borrower; (ii) purchase price thereof has not funded as evidenced by a cleared check, wire confirmation or other evidence of payment to the seller thereof; (iii) the Borrower does not have the right to subject it to a security interest in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties; or (iv) not subject to a first priority perfected security interest in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Encumbrances

$0.00

(b) (i) Not at auction awaiting shipment to the Borrower; (ii) not located on, or in transit to, one of the owned or leased premises of the Borrower, such locations are within the United States and are acceptable to the Administrative Agent; and (iii) not in the possession of any sales manager or sales regional manager in the ordinary course of business and consistent with the Borrower's policies applicable thereto $0.00

(c) If held for sale or lease or furnishing under contracts of service, not (except as the Administrative Agent may otherwise consent in writing) used and lawfully suitable for sale or lease

$0.00

(d) Inventory with respect to which any covenant, representation or warranty contained in the Credit Agreement or in the Security Agreement has been breached or is not true $0.00

(e) Not valued at the cost of each item of Inventory $0.00

(f) Located on a Borrower lot for more than one hundred eighty (180) days $0.00

(g) Previously leased by the Borrower to a customer and returned by a customer, except in connection with (i) customer contract unwinds in the ordinary course of business or (ii) repossessions conducted by an Affiliate of the Borrower in the ordinary course of business in which the re-purchase of the repossessed vehicle by the Borrower from the Affiliate complies with the Borrower's arms-length, commercially reasonably repossession re-purchase procedure

$0.00

(h) Does not contain global positioning satellite monitors subject to access by the Administrative Agent $0.00

| | |
|---|---|
| **4. Total Ineligible Inventory** | **$0.00** |
| **5. Total Eligible Inventory** | **$0.00** |
| **6. Reasonable Reconditioning Expenses** | **$0.00** |
| **7. Borrowing Base** | **$0.00** |

Pursuant to, and in accordance with, the terms and provisions of that certain Credit Agreement dated as of June [●], 2021 (as it may be amended or modified from time to time, the "Agreement") among RAC Dealership, LLC (the "Borrower"), the other Loan Parties party thereto, the Lenders party thereto and Hancock Whitney Bank, as Administrative Agent, the Borrower is executing and delivering to the Administrative Agent this Borrowing Base Report accompanied by supporting data attached hereto as Exhibit A (collectively referred to as the "Report"). The Borrower represents and warrants to the Administrative Agent that this Report is true and correct, and is based on information contained in Borrower's own financial accounting records. The Borrower, by the execution of this Report, hereby ratifies, confirms and affirms all of the terms, conditions and provisions of the Agreement, and certifies on this [●] day of [●],[●], that the Borrower is in compliance with the Agreement. Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Agreement.

RAC DEALERSHIP, LLC

By:_____
Name:_____
Title:_____

**EXHIBIT D-2**

**FORBEARANCE AGREEMENT AND FIRST AMENDMENT TO CREDIT AGREEMENT**

This FORBEARANCE AGREEMENT AND FIRST AMENDMENT TO CREDIT AGREEMENT (this "Agreement"), dated as of September 27, 2022, is entered into by and among RAC DEALERSHIP, LLC, a Delaware limited liability company (the "Borrower"), the other Loan Parties party hereto, the Lenders party hereto and HANCOCK WHITNEY BANK, in its capacity as Administrative Agent (the "Administrative Agent"). All capitalized terms used herein shall have the meanings ascribed to such terms in the Credit Agreement referred to below.

RECITALS

A.     The Borrower, RAC King, LLC ("King") and certain Subsidiaries of the Borrower from time to time party thereto as Guarantors (collectively, the "Guarantors" and, together with the Borrower, the "Loan Parties"), the Lenders and the Administrative Agent are parties to that certain Credit Agreement dated as of June 29, 2021 (as amended, modified, extended or renewed to date, the "Credit Agreement").

B.     Events of Default have occurred and are continuing under (i) Section 7(e) of the Credit Agreement as a result of the Borrower's failure to timely deliver a Borrowing Base Certificate for the month ending July 31, 2022; (ii) Section 7(a) of the Credit Agreement as a result of the Borrower's failure to make a mandatory prepayment required under Section 2.10(d) of the Credit Agreement in respect of the Borrowing Base as of July 31, 2022, August 31, 2022 and September 13, 2022; (iii) Section 7(d) of the Credit Agreement as a result of the Borrower's failure to comply with Section 6.12(c) of the Credit Agreement (Days Inventory Outstanding Ratio) as of May 31, 2022, June 30, 2022, July 31, 2022 and August 31, 2022; (iv) Section 7(d) of the Credit Agreement as a result of the Borrower's failure to comply with Section 6.12(b) of the Credit Agreement (Total Interest Coverage Ratio) as of the applicable period ending June 30, 2022; (v) Section 7(e) of the Credit Agreement as a result of the Borrower's failure to deliver the compliance certificate required to be delivered pursuant to Section 5.01(a)(iii) of the Credit Agreement with the quarterly financial statements delivered for the period ending June 30, 2022; (vi) Section 7(d) of the Credit Agreement as a result of the Borrower's sales of vehicles and associated leases to RAC Asset Holdings in a manner not in the ordinary course of business and/or not consistent with past practices; (vii) Section 7(d) of the Credit Agreement as a result of certain payments under the NextGear Credit Agreement; (viii) Section 7(e) of the Credit Agreement as a result of the Borrower's failure to pay rent for the month of September 2022 on certain leased properties; (ix) Section 7(c) of the Credit Agreement as a result of failure to provide disclosures under Article III of the aforementioned Events of Default and (x) Section 7(d) of the Credit Agreement as a result of the Borrower's failure to timely provide notice of the aforementioned Events of Default or related events or any Material Adverse Effect arising from such Events of Default (collectively, the "Existing Events of Default"). In addition to the Existing Events of Default, the Borrower anticipates that additional Events of Default may arise under Section 7(a) of the Credit Agreement as a result of the Borrower's failure to make a mandatory prepayment required under Section 2.10(d) of the Credit Agreement based on the additional Borrowing Base Certificates to be delivered during the Forbearance Period, failure to pay rent for the month of October 2022 on certain leased properties, and the failure to give notice of such specified Events of Default (collectively, the "Anticipated Event of Default" and, together with the Existing Events of Default, the "Acknowledged Events of Default").

C.     The Borrower has requested that the Administrative Agent and the Lenders agree to (i) forbear from exercising their rights and remedies arising under the Loan Documents and applicable laws as a result of the Acknowledged Events of Default during the Forbearance Period (as defined below) and (ii) make certain modifications to the Credit Agreement.

D.    The Administrative Agent and the Lenders have agreed to do so, but only pursuant to the terms and conditions set forth herein.

AGREEMENT

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Estoppel, Acknowledgement and Reaffirmation</u>.    Each of the Loan Parties hereby acknowledges and agrees that the Acknowledged Events of Default have occurred and have not previously been waived by the Administrative Agent and the Lenders, nor are the Acknowledged Events of Default being waived by the Administrative Agent and the Lenders pursuant to this Agreement. Each of the Loan Parties hereby acknowledges and agrees that, as of September 27, 2022, (a) the outstanding principal balance of the Revolving Loans is not less than $27,342,454.05 and (b) the outstanding principal balance of the Swingline Loans is not less than $0.00, each of which constitutes a valid and subsisting obligation of the Borrower to the Lenders that is not subject to any credits, offsets, defenses, claims, counterclaims or adjustments of any kind. Each of the Loan Parties hereby acknowledges and reaffirms its Obligations under, and the Liens granted under, the Loan Documents and agrees that this Agreement shall in no manner impair or otherwise adversely affect such Obligations or Liens, except as explicitly set forth herein.

2.    <u>Forbearance</u>.

(a)    *Forbearance*.    Subject to the terms and conditions set forth herein, the Administrative Agent and the Lenders hereby agree that, during the Forbearance Period (as defined below), the Administrative Agent and the Lenders shall forbear from exercising any and all rights or remedies available to them under the Loan Documents or under applicable laws, other than the right to charge interest at the applicable default rate pursuant to Section 2.10(d) of the Credit Agreement, as a result of the Acknowledged Events of Default but only to the extent that such rights or remedies arise exclusively as a result of the existence or continuation of the Acknowledged Events of Default; <u>provided</u>, <u>however</u>, that (i) the Administrative Agent and the Lenders shall be free to exercise any or all of their rights and remedies arising on account of the Acknowledged Events of Default at any time upon or after the occurrence of a Forbearance Termination Event (as defined below), and (ii) the Acknowledged Events of Default shall continue to exist and apply for all purposes and provisions under the Credit Agreement and the other Loan Documents, including those provisions, conditions, requirements, rights, and obligations that are dependent upon the absence of any Default or Event of Default (including, without limitation, Section 6.08 of the Credit Agreement). For the avoidance of doubt, the Loan Parties shall not request, and the Lenders shall have no obligation to make, Revolving Loans or Swingline Loans during the Forbearance Period.

(b)    *Forbearance Period*.    Nothing set forth herein or contemplated hereby is intended to constitute an agreement by the Administrative Agent and the Lenders to forbear from exercising any of the rights or remedies available to them under the Loan Documents or under applicable laws (all of which rights and remedies are hereby expressly reserved by the Administrative Agent and the Lenders) upon or after the occurrence of a Forbearance Termination Event. As used herein, a "<u>Forbearance Termination Event</u>" shall mean the occurrence of any of the following: (a) any breach of this Agreement by the Borrower, (b) any Default or Event of Default under any Loan Document other than the Acknowledged Events of Default, (c) the failure of the Borrower to make a mandatory prepayment required under Section

2.10(d) of the Credit Agreement if such required prepayment is *in excess of* the prepayment required based on the Borrowing Base Certificate calculated as of September 13, 2022, (d) 5:00 p.m. Eastern time on October 15, 2022, (e) any draw request under the NextGear Credit Agreement being denied or NextGear Capital, Inc. (or any other lender thereunder) exercising any right or remedy (other than a waiver or forbearance) in connection with any pending defaults under the NextGear Credit Agreement, or (f) the Administrative Agent, the Collateral Agent or any lender under the Warehouse Facility exercising any right or remedy (other than a waiver or forbearance) in connection with any pending defaults.  The period from the date hereof to the date that a Forbearance Termination Event occurs shall be referred to as the "Forbearance Period".

3.    Negative Pledge.  The Loan Parties (a) represent and warrant that, as of the Effective Date, there are no Liens currently in existence on any real property or personal property (including for avoidance of doubt any Equity Interests in any Subsidiaries, Accounts, Securities, Investment Property, financial assets, securities accounts, notes, Documents, Instruments, certificates of deposit, items, Chattel Paper, electronic Chattel Paper, tangible Chattel Paper, Letter-of-Credit Rights, Payment Intangibles and other property (each such capitalized term, if not otherwise defined in the Credit Agreement, having the definition set forth in the UCC) of RAC Investment Holdings, LLC ("RAC IH") or any direct or indirect Subsidiary of RAC IH (other than the Borrower), other than (i) Liens contemplated by the terms of the transaction agreements entered into by any such Subsidiary in connection with the issuance by AF Title Co. of beneficial interests in pools of collateral securing (1) outstanding term securitization transactions sponsored by RAC King or (2) obligations due to the secured parties in the Warehouse Facility, (ii) Liens contemplated by (y) that certain Loan and Security Agreement, dated as of September 8, 2022, by and between RAC IH and RAC Investor, LLC, and (z) that certain Loan and Security Agreement, dated as of September 8, 2022, by and among RAC Asset Holdings, LLC, RAC IH and RAC Servicer, LLC (the financing described in clause (a)(ii)(y) and (z) herein, the "Secured Bridge Financing") (any such real or personal property described in, and not otherwise excepted from, the terms of this clause (a), collectively, the "Other Property") and (iii) Liens by RAC IH in respect of real property in Fort Smith, Arkansas (which is subject to a mortgage) and Madison, Tennessee (which such property is referred to as Gallatin Pike and is in contract for sale and subject to a negative pledge), (b) covenant not to assign or transfer any Other Property or grant a Lien on any Other Property, or permit any direct or indirect Subsidiary to assign or transfer any Other Property or grant a Lien on any Other Property except to (i) the Administrative Agent as Collateral for the Obligations, (ii) the allocation, from time to time, of lease buyout contracts to the 2022-A SUBI securing the loans described in clause (a)(ii)(z) above, and (iii) the Warehouse Facility in connection with one or more borrowing requests contemplated by the terms of that certain Limited Waiver, dated September 26, 2022, and (c) agree that it shall constitute a Forbearance Termination Event if any of AF Title Co., RAC Depositor, LLC, ACC WH Trust 2019-A, ACC Trust 2019-2, ACC Trust 2021-1 or ACC Trust 2022-1 shall issue any additional residual trust certificates ("Residual Interests"), grant a Lien on any existing Residual Interests, or otherwise grant a Lien on any Other Property of such entities not currently in existence other than as described in the foregoing clause (b).

4.    Restricted Payments.  From and after the Effective Date, King shall not declare or make, or agree to declare or make, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

5.    Forbearance Period Covenants.

(a)    *Perfection Certificate*.  On or before September 30, 2022, the Loan Parties shall complete and deliver to the Administrative Agent (x) a perfection certificate for the Loan Parties in form reasonably acceptable to the Administrative Agent and (y) an additional disclosure of all Liens encumbering any assets of RAC IH and any direct or indirect Subsidiaries of RAC IH (including, without limitation, the Loan Parties and Subsidiaries of RAC Asset Holdings, LLC).

3

(b)     *CS Eligibility Assessment*.  On or before September 30, 2022, the Loan Parties shall deliver a summary of (i) an updated assessment of eligibility requirements and advance rate parameters for the placement of vehicles and associated leases under the proposed restructured Warehouse Facility (the "CS Eligibility Assessment") and (ii) documentation reflecting all material terms contemplated by the restructured Warehouse Facility and applicable redlines showing changes to the existing Warehouse Facility.

(c)     *Borrowing Base*.  The Loan Parties shall deliver a Borrowing Base Certificate on the Wednesday of each week as of the end of the calendar week most recently ended.

(d)     *Access to Loan Parties' Financial Advisor*.  During the Forbearance Period, the Loan Parties shall provide (i) reasonable access to the Loan Parties' financial advisor (Berkeley Research Group, LLC), including a weekly update call, (ii) monthly thirteen-week cash flow forecasts in the form previously provided on or about September 18, 2022, with weekly variance reports, and (iii) monthly financial statements on or before the 15th day after each month in the form of those provided on a quarterly basis pursuant to the Credit Agreement ("Monthly Financials"), in each case with respect to clauses (ii) and (iii) prepared by such financial advisor and approved by the Borrower during the Forbearance Period.

(e)     *Restrictions on Transfers*.  During the Forbearance Period, notwithstanding anything in the Credit Agreement to the contrary, the Loan Parties shall be prohibited from transferring any vehicle and any associated lease to (x) RAC Asset Holdings or any Affiliate of any Loan Party or (y) any third party, except to the extent the Loan Parties make a paydown, not less than the amount of the advance ascribed to such vehicle (inclusive of cost plus reconditioning expenses) in the Borrowing Base Certificate most recently delivered, of the outstanding Obligations in connection therewith on Friday for transfers occurring the immediately prior Monday, Tuesday, Wednesday and Thursday, and Monday for transfers occurring the immediately prior Friday and Saturday.

(f)     *Residual Interest Valuation*.  On or before September 30, 2022, the Loan Parties shall engage an advisory firm reasonably acceptable to the Administrative Agent (it being understood that Berkeley Research Group, LLC is acceptable) to conduct a valuation of the Residual Interests with respect to ACC Trust 2019-2, ACC Trust 2021-1 and ACC Trust 2022-1, and shall deliver such valuation to the Administrative Agent, the Lenders and the Agent Advisor (as defined herein) promptly upon receipt.

(g)     *Secretary's Certificate*.  By 12:00 p.m. Eastern time on September 29, 2022, the Loan Parties shall deliver to the Administrative Agent such certificates of resolutions or other action, incumbency certificates and/or other certificates of a Responsible Officer of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with the transactions contemplated hereby and the other Loan Documents to which such Loan Party is a party.

6.     Field Audits.  The Administrative Agent hereby expressly reserves its rights under Section 5.06(b) of the Credit Agreement to conduct Headquarters Audits and other field audits.  The Loan Parties shall, and shall cause each Subsidiary of the Borrower to, cooperate with the Administrative Agent and its employees, agents, and third party audit firms in the completion of any such audit. Notwithstanding anything in Section 5.06(b) of the Credit Agreement to the contrary, (i) there shall be no limitations on the number of dealerships or other locations subject to such audits and (ii) the Borrower

shall reimburse the Administrative Agent on demand for its reasonable and documented out-of-pocket expenses incurred in connection with any such audit.

7.     Certificates of Title.  The Administrative Agent hereby expressly reserves its rights under Section 5.13 of the Credit Agreement to require the Borrower to deliver all Certificates of Title to the Administrative Agent or a third party custodian or process agent and take such other further actions as may be requested in connection with such Certificates of Title.

8.     Amendments to Credit Agreement.  Section 6.17 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

Section 6.17     Payments under the NextGear Credit Agreement.  The Borrower will not, nor will it permit any of its Subsidiaries to, make any payment with respect to the Indebtedness under the NextGear Credit Agreement, except payments of principal, interest, and fees under the NextGear Credit Agreement as and when due (and not on an accelerated basis).

9.     Forbearance Fee.  In consideration of the written consent of the Lenders, the Borrower hereby agrees to pay to the Administrative Agent a forbearance fee (the "Forbearance Fee") in an amount equal to 0.10% of the aggregate Commitments, to be divided pro rata among the Lenders that execute and return to the Administrative Agent a signature page to this Agreement by no later than 12:00 p.m. Eastern time on the Effective Date.  The Forbearance Fee shall be fully earned, non-refundable, due and payable on the Effective Date.

10.     Agent Financial Advisor.  The Administrative Agent may in its discretion elect to retain, or with the consent of the Administrative Agent a Lender may elect to retain, a financial advisor (the "Agent Advisor") that is not affiliated with any of the Lenders or any of the lenders under the Warehouse Facility to assist it in evaluating the (i) the value of any Other Property that may be available as additional collateral for the Obligations, including without limitation the value of any Residual Interests, (ii) the financial and operating performance of the Loan Parties and their respective Subsidiaries, and (iii) the go-forward business plan for the Loan Parties and their respective Subsidiaries.  The Loan Parties shall (and shall cause their respective Affiliates to) fully cooperate with any such Agent Advisor, provide reasonable access to their respective officers and employees, and the Loan Party's financial advisor.  The fees and expenses of such Agent Advisor (even if retained by a Lender as contemplated above) shall constitute reimbursable expenses under Section 9.03 of the Credit Agreement and the Loan Parties shall reimburse the Administrative Agent for the Agent Advisor's reasonable and documented fees and expenses on demand (including the delivery of a retainer in connection therewith), provided that the Administrative Agent and the Lenders shall not seek reimbursement for any such fees and expenses incurred during the Forbearance Period in excess of an aggregate amount of $150,000 (the "Agent Advisor Cap").

11.     Payment of Fees and Expenses.  Without limiting the Obligations of the Borrower under the Loan Documents, on the Effective Date and upon demand therefor, the Borrower shall reimburse the Administrative Agent and the Lenders for any and all reasonable and documented out-of-pocket costs and expenses related to this Agreement, the Credit Agreement, the other Loan Documents and the various transactions and agreements contemplated hereby (including reasonable legal fees of separate counsel to the Administrative Agent and the Lenders and, subject to Section 10 hereof, of the Agent Advisor (if any)).  For the avoidance of doubt, the Agent Advisor Cap shall only apply to the fees and expenses of the Agent Advisor, and not to the fees and expenses of separate counsel to the Administrative Agent and the Lenders.

12.    Effectiveness.    This Agreement shall become effective as of the date hereof (the "Effective Date") when, and only when, each of the following conditions shall have been satisfied or waived, in the sole discretion of the Administrative Agent:

(a)    the negotiation, execution and delivery to the Administrative Agent of this Agreement duly executed by the Borrower, the Guarantor, the Administrative Agent and the Lenders;

(b)    the Administrative Agent's receipt of the Forbearance Fee;

(c)    the Administrative Agent's receipt of a copy of the Limited Waiver dated September 26, 2022 in respect of the Warehouse Facility and, if not previously delivered, a copy of the prior waiver agreements in respect of the Warehouse Facility;

(d)    the Administrative Agent's receipt of an updated cash flow forecast for the Borrower for the then-following thirteen-week period, prepared in good faith by the Borrower upon assumptions believed by the Borrower to be reasonable under the circumstances, together with all underlying assumptions and any additional information as may be reasonably requested by the Administrative Agent in connection therewith;

(e)    the Administrative Agent's receipt of information indicating the status of all intercompany payables and receivables;

(f)    the Administrative Agent's receipt of copies of all documentation evidencing the so-called "Investor Loan" of approximately $10,000,000 made to a parent entity of King (and the investment of the proceeds thereof into the Loan Parties) and the Secured Bridge Financing;

(g)    the Administrative Agent's and Lenders' receipt of reimbursement from the Loan Parties for all reasonable and documented fees and out-of-pocket costs (including, without limitation, reasonable fees and costs of outside counsel to the Administrative Agent, the Lenders and any Agent Advisor (if any)) incurred in connection with this Agreement, the Credit Agreement, the other Loan Documents and the various transactions and agreements contemplated hereby through the Effective Date, and invoiced at least one day prior to the Effective Date; and

(h)    the Administrative Agent's receipt of the Monthly Financials for the months of July and August 2022; and

(i)    the Administrative Agent's receipt of payments (consistent with the requirements of Section 4(e) hereof), with respect to all vehicles transferred from and after September 13, 2022 and up to and including Saturday, September 24, 2022.

13.    Ratification.    Except as specifically modified herein, the terms of the Loan Documents shall remain in full force and effect.  The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of the Administrative Agent or the Lenders under the Loan Documents, or constitute a waiver or amendment of any provision of the Loan Documents.  The Borrower acknowledges that the breach in any material respect of any provision or representation by the Borrower under this Agreement shall constitute an Event of Default under the Credit Agreement and a Forbearance Termination Event under this Agreement, irrespective of any otherwise applicable grace period.  This Agreement shall constitute a Loan Document.

14.    <u>Representations and Warranties</u>.  Each of the Loan Parties represents and warrants to the Administrative Agent and the Lenders as follows:

(a)    Other than the Acknowledged Events of Default, no Default or Event of Default exists under the Loan Documents on and as of the Effective Date.

(b)    After giving effect to this Agreement, the representations and warranties of the Loan Parties set forth in Article 3 of the Credit Agreement and in each other Loan Document, or which are contained in any document furnished in connection therewith (other than the representations and warranties set forth in Section 3.07 of the Credit Agreement (solely as it relates to the Acknowledged Events of Default)), are true and correct on and as of the date hereof with the same effect as if made on and as of the date hereof, except to the extent such representations and warranties specifically refer to an earlier date, in which case they are true and correct as of such earlier date.

(c)    It has the full power and authority to enter, execute and deliver this Agreement and perform its obligations hereunder, under the Credit Agreement and under each of the Loan Documents.  The execution, delivery and performance by it of this Agreement, and the performance by it under the Loan Documents, are within its powers and have been authorized by all necessary corporate, limited liability or partnership action.

(d)    This Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligations, enforceable in accordance with its terms, except as such enforceability may be subject to (i) bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

(e)    No consent, approval, authorization or order of, or filing, registration or qualification with, any court or governmental authority or third party is required in connection with the execution, delivery or performance by it of this Agreement.

15.    <u>Release</u>.  In consideration of the agreements of the Administrative Agent and the Lenders set forth in this Agreement, each of the Loan Parties hereby releases and forever discharges the Administrative Agent, the Lenders, and each of the their predecessors, successors, assigns, officers, managers, directors, employees, agents, attorneys, representatives, affiliates and other Related Parties (hereinafter all of the above collectively referred to as the "<u>Lender Group</u>"), from any and all claims, counterclaims, demands, damages, debts, suits, liabilities, actions and causes of action of any nature whatsoever, in each case to the extent arising in connection with the Loan Documents or any of the negotiations, activities, events or circumstances arising out of or related to the Loan Documents through the date of this Agreement, whether arising at law or in equity, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which any of the Loan Parties may have or claim to have against any of the Lender Group.

16.    <u>No Third Party Beneficiaries</u>.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns.  No other Person shall have or be entitled to assert rights or benefits under this Agreement, other than any non-party member of the Lender Group with respect to <u>Section 15</u> and <u>Section 19</u> hereof (which Persons are intended to be third party beneficiaries of this Agreement).

CHAR2\2707234v10

17.    <u>**ENTIRE AGREEMENT**</u>.    **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS CONSTITUTE THE ENTIRE CONTRACT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDE ANY AND ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, RELATING TO THE SUBJECT MATTER HEREOF.**

18.    <u>Counterparts</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (e.g. "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Agreement.

19.    <u>No Actions, Claims, Etc</u>.  As of the date hereof, each of the Loan Parties hereby acknowledges and confirms that it has no knowledge of any actions, causes of action, claims, demands, damages and liabilities of whatever kind or nature, in law or in equity, of any of the Loan Parties against any member of the Lender Group arising from any action by such Persons, or failure of such Persons to act under the Loan Documents on or prior to the date hereof.

20.    <u>Consent to Jurisdiction; Governing Law; Service of Process; Waiver of Jury Trial</u>.  The jurisdiction, governing law, service of process and waiver of jury trial provisions set forth in the Loan Documents are hereby incorporated by reference, mutatis mutandis.

21.    <u>Further Assurances</u>.  Each of the parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments as may reasonably be requested to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

22.    <u>Information Sharing</u>.  The Administrative Agent and the Lenders hereby agree that this Agreement, the Credit Agreement, any other Loan Document may be disclosed to the administrative agent, the lenders and other secured parties under the Warehouse Agreement and investors or prospective investors in any Loan Party (and any direct or indirect parent or subsidiaries thereof).

[Signature Pages Follow]

8

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:
                RAC DEALERSHIP, LLC,
                a Delaware limited liability company

                BY: _____
                NAME: NOAH HOGAN
                TITLE: President & CEO


GUARANTOR:
                RAC KING, LLC,
                a Delaware limited liability company

                BY: _____
                NAME: NOAH HOGAN
                TITLE: President & CEO

ADMINISTRATIVE AGENT:      HANCOCK WHITNEY BANK,
as Administrative Agent

BY: _Jennifer Pelham_
NAME: _Jennifer Pelham_
TITLE: _Senior Vice President_

LENDERS:      HANCOCK WHITNEY BANK,
individually and as Swingline Lender

BY: _Jennifer Pelham_
NAME: _Jennifer Pelham_
TITLE: _Senior Vice President_

SYNOVUS BANK

BY: _____
NAME: _____
TITLE: _____

SIMMONS BANK

BY: _____
NAME: _____
TITLE: _____

FORBEARANCE AGREEMENT AND FIRST AMENDMENT TO CREDIT AGREEMENT
RAC DEALERSHIP, LLC

ADMINISTRATIVE AGENT:      HANCOCK WHITNEY BANK,
as Administrative Agent

BY: _____
NAME: _____
TITLE: _____

LENDERS:      HANCOCK WHITNEY BANK,
individually and as Swingline Lender

BY: _____
NAME: _____
TITLE: _____

SYNOVUS BANK

BY: _____
NAME: PATRICK OBRIEN
TITLE: MIDDLE MARKET BANKER

SIMMONS BANK

BY: _____
NAME: _____
TITLE: _____

ADMINISTRATIVE AGENT:

HANCOCK WHITNEY BANK,
as Administrative Agent

BY: _____
NAME: _____
TITLE: _____

LENDERS:

HANCOCK WHITNEY BANK,
individually and as Swingline Lender

BY: _____
NAME: _____
TITLE: _____

SYNOVUS BANK

BY: _____
NAME: _____
TITLE: _____

SIMMONS BANK

BY: _____
NAME: Stephen Midrach
TITLE: SVP

# **EXHIBIT D-3**

CONFIDENTIAL                                                                    *Executed Copy*

## SECOND AMENDMENT TO CREDIT AGREEMENT AND WAIVER

This SECOND AMENDMENT TO CREDIT AGREEMENT AND WAIVER (this "*Amendment*"), dated as of October 5, 2022 (the "*Second Amendment Effective Date*"), is entered into by and among RAC DEALERSHIP, LLC, a Delaware limited liability company (the "*Borrower*"), RAC KING, LLC, a Delaware limited liability company ("*King*"), the other Guarantors (here and hereafter as defined in the Credit Agreement (here and hereafter as defined below)) (including, without limitation, the Second Amendment Guarantors (here and hereafter as defined in Section 7(b) below)), the Lenders (here and hereafter as defined in the Credit Agreement), and HANCOCK WHITNEY BANK ("*Hancock*"), as Administrative Agent and Swingline Lender (each, here and hereafter as defined in the Credit Agreement).

R E C I T A L S

WHEREAS, the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and the Administrative Agent are parties to that certain Credit Agreement, dated as of June 29, 2021 (as modified by that certain Waiver Agreement, dated as of February 17, 2022, as further modified and amended by that certain Forbearance Agreement and First Amendment to Credit Agreement, dated as of September 27, 2022 (the "*Forbearance Agreement*"), and as further amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, the "*Credit Agreement*");

WHEREAS, the Borrower has requested that the Lenders convert, on the Second Amendment Effective Date, an amount equal to $16,000,000 in aggregate principal of Revolving Loans outstanding on the Second Amendment Effective Date to a term loan (the "*Overadvance Term Loan*");

WHEREAS, the Borrower has requested that the Lenders make certain modifications to the terms of the Credit Agreement as described in Section 5(a) below, certain modifications to the Schedules to the Credit Agreement as described in Section 5(b) below, and certain modifications to the Exhibits to the Credit Agreement as described in Section 5(c) below;

WHEREAS, the Borrower has advised the Administrative Agent and the Lenders that those certain Events of Default constituting Acknowledged Events of Default (as such term is defined in the Forbearance Agreement) (such Events of Default, collectively, the "*Specified Events of Default*", and each of them individually, a "*Specified Event of Default*") have occurred and are continuing, and the Borrower has requested that the Lenders waive the Specified Events of Default; and

WHEREAS, on the terms, and subject to the conditions, set forth in this Amendment: (i) the Lenders have agreed to (A) convert an amount equal to $16,000,000 in aggregate principal of Revolving Loans outstanding on the Second Amendment Effective Date to the Overadvance Term Loan, and (B) consent to the modifications to the terms and provisions of the Credit Agreement (including to the Schedules and Exhibits thereto) as set forth in this Amendment, and (ii) the Lenders (by act of the Required Lenders) have agreed to waive the Specified Events of Default.

NOW, THEREFORE, in consideration of the agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the parties hereto hereby agrees as follows:

CHAR1\1940131v9

A G R E E M E N T

1.    <u>Introductory Paragraph and Recitals; Definitions</u>. The above introductory paragraph and recitals (including any terms defined therein) of this Amendment are incorporated herein by reference as if fully set forth in the body of this Amendment. Capitalized terms used in this Amendment but not otherwise defined herein shall have the respective meanings provided for such terms in the Credit Agreement (as amended by this Amendment or as in effect immediately prior to the effectiveness of this Amendment, as the context may require).

2.    <u>Estoppel</u>. Each of the Loan Parties hereby acknowledges and agrees that, as of the Second Amendment Effective Date (immediately *prior* to giving effect to this Amendment), (a) the outstanding principal balance of the Revolving Loans is *not less than* $27,342,454.05, and (b) the outstanding principal balance of the Swingline Loans is *not less than* $0.00, each of which constitutes a valid and subsisting obligation of the Borrower to the Lenders that is *not* subject to any credits, offsets, defenses, claims, counterclaims or adjustments of any kind.

3.    <u>Voluntary Reduction in Aggregate Revolving Commitments</u>. Effective upon the effectiveness of this Amendment, the Borrower hereby makes a voluntary reduction in the aggregate Revolving Commitments of the Lenders in accordance with Section 2.08 (*Termination and Reduction of Commitments*; *Increase in Revolving Commitments*) of the Credit Agreement in the amount of Forty-Five Million Dollars ($45,000,000), such that, as of the Second Amendment Effective Date (immediately *after* giving effect to this Amendment), the aggregate amount of the Revolving Commitments of the Lenders, taken together, shall be Fifteen Million Dollars ($15,000,000). Such reduction of the aggregate Revolving Commitments of the Lenders shall be applied to the Revolving Commitment of each Lender according to its Applicable Percentage. The Lenders hereby waive compliance by the Borrower with the notice and minimum amount requirements set forth in Section 2.08 (*Termination and Reduction of Commitments*; *Increase in Revolving Commitments*) of the Credit Agreement with respect to such reduction in the aggregate Revolving Commitments of the Lenders.

4.    <u>Establishment of Overadvance Term Loan</u>.

(a)    Subject to the terms and conditions set forth in this Amendment and in the Credit Agreement (as amended by this Amendment), each of the Lenders hereby shall be deemed to have made its respective portion of the Overadvance Term Loan to the Borrower, in Dollars, in a single advance on the Second Amendment Effective Date, with the aggregate amount of each Lender's respective commitment to the Overadvance Term Loan being the respective amount set forth in the applicable column opposite such Lender's name (designated as such Lender's "*Overadvance Term Loan Commitment*") in the table set forth on Schedule I (*Commitment Schedule*) to the Credit Agreement, as such Schedule is in effect immediately *after* giving effect to this Amendment (collectively, the "<u>*Overadvance Term Loan Commitments*</u>"; and for each Lender, such Lender's "<u>*Overadvance Term Loan Commitment*</u>"). As of the Second Amendment Effective Date (immediately *after* giving effect to this Amendment), the aggregate amount of all of the Lenders' Overadvance Term Loan Commitments is Sixteen Million Dollars ($16,000,000).

(b)    The execution and delivery of this Amendment by the Borrower, and the satisfaction of all conditions precedent set forth in <u>Section 7</u>, shall be deemed to constitute the Borrower's request to borrow the Overadvance Term Loan, on the Second Amendment Effective Date as a conversion of principal of Revolving Loans outstanding on the Second Amendment Effective Date.

5.    <u>Amendments to Credit Agreement</u>. In accordance with Section 9.02 (*Waivers*; *Amendments*) of the Credit Agreement, the Credit Agreement is hereby amended in the following respects:

(a)      _Terms of Credit Agreement_. The terms of the Credit Agreement (but _not_ the Exhibits and/or Schedules thereto) are hereby amended and replaced in their entirety to read as set forth in the copy of the entire body of the Credit Agreement attached hereto as Annex I.

(b)      _Schedule to Credit Agreement_. Schedule I (_Commitment Schedule_) to the Credit Agreement is hereby amended and replaced in its entirety with the Schedule attached hereto as Annex II.

(c)      _Exhibits to Credit Agreement_. Exhibit A (_Form of Assignment and Assumption_), Exhibit B-1 (_Form of Borrowing Request_) and Exhibit B-2 (_Form of Interest Election Request_) to the Credit Agreement are each hereby amended and replaced in their entirety with the applicable Exhibit attached hereto as Annex III.

6.      _Waiver of Specified Events of Default_. The Lenders, by act of the Required Lenders, hereby waive, in accordance with Section 9.02 (_Waivers_; _Amendments_) of the Credit Agreement, each of the Specified Events of Default; provided, that, the foregoing waiver shall _not_, and shall _not_ be deemed to, modify, limit, reduce or otherwise affect the obligations of the Loan Parties to comply with each and every obligation, covenant, duty and agreement contained in the Credit Agreement and each other Loan Document (in each case, as such Loan Document may be amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, including pursuant to this Amendment). The waiver provided in this Section 6 is a limited, one-time waiver and shall _not_ be, or be construed or otherwise deemed to be, a waiver of, or in any way obligate the Lenders (by act of the Required Lenders or otherwise) to waive, any Default or Event of Default under the Credit Agreement or any other Loan Document (other than the Specified Events of Default) that may have occurred prior to the Second Amendment Effective Date or may occur on or after the Second Amendment Effective Date.

7.      _Effectiveness; Conditions Precedent_. This Amendment shall become effective as of the Second Amendment Effective Date upon the satisfaction of each of the following conditions precedent:

(a)      _Amendment; Additional Collateral_. Receipt by the Administrative Agent of a counterpart of: (i) this Amendment duly executed by the Borrower, King, each of the Second Amendment Guarantors, each of the Lenders, and the Administrative Agent, (ii) that certain Security and Pledge Agreement, dated as of the Second Amendment Effective Date, duly executed by the Borrower and the Administrative Agent, (iii) that certain Pledge Agreement, dated as of the Second Amendment Effective Date, duly executed by (A) King, (B) RAC Asset Holdings, LLC, a Delaware limited liability company ("_RAC Asset Holdings_"), (C) RAC Intermediate Holdings, LLC, a Delaware limited liability company ("_RAC Intermediate_"), (D) RAC Servicer, LLC, a Delaware limited liability company ("_RAC Servicer_"), and (E) the Administrative Agent, and (iv) that certain Security Agreement, dated as of the Second Amendment Effective Date, duly executed by RAC Asset Holdings, RAC Servicer and the Administrative Agent (the agreements referred to in the foregoing clauses (a)(ii) through (a)(iv), collectively, the "_Additional Security Agreements_", and each individually, an "_Additional Security Agreement_").

(b)      _Joinder of Second Amendment Guarantors_. Receipt by the Administrative Agent of a duly executed copy of a Joinder Agreement (in form and substance reasonably acceptable to the Administrative Agent) and such other documentation reasonably requested for such purpose by the Administrative Agent in order to confirm, in each case to the Administrative Agent's reasonable satisfaction, that each of the following Persons shall have, on or prior to the Second Amendment Effective Date, joined the Credit Agreement as a "_Guarantor_" and a "_Loan Party_", in each case of the foregoing, in accordance with the terms of Section 5.13 (_Additional Guarantors_; _Further Assurances_) of the Credit Agreement, (i) RAC Asset Holdings, (ii) RAC Intermediate, (iii) RAC Servicer, and (iv) RAC Investment Holdings, LLC, a Delaware limited liability company ("_RAC Investment Holdings_"; and RAC Investment Holdings together with RAC Servicer, RAC Intermediate and RAC Asset Holdings, collectively, the "_Second Amendment Guarantors_", and each individually, a "_Second Amendment Guarantor_").

3

(c)   Warehouse Facility. Receipt by the Administrative Agent of a fully executed and fully compiled copy of the definitive documentation evidencing a restructured Warehouse Facility, in form and substance acceptable to the Administrative Agent.

(d)   Perfection Certificate. Receipt by the Administrative Agent of (i) a perfection certificate for the Loan Parties in form and scope reasonably acceptable to the Administrative Agent, and (ii) disclosure of all Liens encumbering any assets of RAC Investment Holdings and any direct or indirect Subsidiaries of RAC Investment Holdings (including, without limitation, the Loan Parties and Subsidiaries of RAC Asset Holdings).

(e)   CS Eligibility Assessment. Receipt by the Administrative Agent of a summary of an updated assessment of eligibility requirements and advance rate parameters for the placement of vehicles and associated leases under the proposed restructured Warehouse Facility described in the foregoing clause (c).

(f)   Interest / Fees and Expenses. Receipt by the Administrative Agent of all fees, costs, expenses, charges, disbursements and other amounts due and payable by any of the Loan Parties to any of the Administrative Agent, the Swingline Lender, and/or the Lenders on or prior to the Second Amendment Effective Date, including, without limitation, (i) payment of accrued interest, as of the Second Amendment Effective Date, on Revolving Loans outstanding as of the Second Amendment Effective Date that are to be converted into the Overadvance Term Loan on the Second Amendment Effective Date as described herein, and (ii) reimbursement or payment of all out-of-pocket expenses of the Administrative Agent and its Affiliates (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent) and the Lenders (including, without limitation, all fees, charges and disbursements of separate counsel to the Lenders) required to be reimbursed or paid by any of the Loan Parties hereunder, under any other Loan Document, and/or under any other agreement with the Administrative Agent or any of its Affiliates.

8.   Post-Effectiveness Obligations. To the extent *not* received by the Administrative Agent as of the Second Amendment Effective Date:

(a)   Organization Documents; Resolutions and Certificates. By *no later than* the date that is three (3) Business Days after the Second Amendment Effective Date (or by such later date as the Administrative Agent may agree in its sole discretion), receipt by the Administrative Agent of a duly executed certificate of a Responsible Officer of each Loan Party: (i) certifying that there has been no change to the Organization Documents of such Loan Party since the Closing Date (except as may be detailed in such certificate, and, in the event of any such change(s), such certificate shall attach a copy of such changed Organization Document(s) that is certified, as of a recent date, by the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation or formation (as the case may be)); (ii) attaching and certifying a copy of resolutions (or unanimous written consents) of the board of directors or managers (or equivalent governing body) of such Loan Party, authorizing (A) the timely execution and delivery of this Amendment, the transactions contemplated hereby, and the performance by such Loan Party of its obligations hereunder and under the Credit Agreement (as amended by this Amendment) and other Loan Documents, (B) the reduction in the aggregate Revolving Commitments of the Lenders on the Second Amendment Effective Date as described herein, (C) the conversion of certain outstanding Revolving Loans into the Overadvance Term Loan on the Second Amendment Effective Date as described herein, and (D) the granting of the Liens contemplated hereby; (iii) if the Administrative Agent has *not* already received an executed, original incumbency certificate (in form and substance reasonably satisfactory to the Administrative Agent) with respect to each Responsible Officer of a Loan Party signing this Amendment and/or any other document, agreement, letter, certificate and/or instrument executed, or required to be executed, in connection herewith (including, without limitation, the certificate(s) described in this clause (a)), an executed incumbency certificate with respect to each such Responsible Officer; and (iv) copies of certificates of good standing, existence, or the like for each Loan Party, certified, as of a recent date, by the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation or formation (as the case may be).

(b)   Subordination Agreements. By *no later than* the date that is three (3) Business Days after the Second Amendment Effective Date (or by such later date as the Administrative Agent may agree in its sole

CHAR1\1940131v9

discretion), receipt by the Administrative Agent of a counterpart, duly executed by each of the parties thereto, of (i) the Holdings Subordination Agreement, and (ii) the RAC Investor Subordination Agreement (each, as defined in the Credit Agreement as in effect on the Second Amendment Effective Date after giving effect to this Amendment).

(c)    Opinions of Counsel. By *no later than* the date that is five (5) Business Days after the Second Amendment Effective Date (or by such later date as the Administrative Agent may agree in its sole discretion), receipt by the Administrative Agent of favorable written opinions of counsel to the Loan Parties, addressed to the Administrative Agent and the Lenders, regarding, among other matters, the binding effect and enforceability of this Amendment and of the Credit Agreement (as amended by this Amendment) and otherwise in form and substance satisfactory to the Administrative Agent and the Lenders.

(d)    Financing Statements. By *no later than* the date that is three (3) Business Days after the Second Amendment Effective Date (or by such later date as the Administrative Agent may agree in its sole discretion), receipt by the Administrative Agent of UCC financing statements (including any amendments thereto), duly authorized by the Loan Parties for filing by the Administrative Agent, with respect to each appropriate jurisdiction as is necessary or advisable, in the Administrative Agent's reasonable discretion, to perfect the Administrative Agent's security interest in the Collateral (to the extent that such security interest is *not*, for any reason, perfected with respect to any of the Collateral immediately *prior* to such date).

(e)    Insurance Endorsements. By *no later than* the date that is thirty (30) calendar days after the Second Amendment Effective Date (or by such later date as the Administrative Agent may agree in its sole discretion), receipt by the Administrative Agent of endorsements to all insurance policies maintained by the Loan Parties (i) providing for *not less than* thirty (30) days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance, and (ii) naming the Administrative Agent as an additional insured on behalf of the Secured Parties (in the case of liability insurance) or lender's loss payee (in the case of transit insurance and property insurance, in each case covering Collateral), as applicable.

(f)    Trust Certificates. By *no later than* the date that is five (5) Business Days after the Second Amendment Effective Date (or by such later date as the Administrative Agent may agree in its sole discretion), receipt by the Administrative Agent of original copies of: (i) that certain Asset-Backed Certificate issued to, and registered in the name of, RAC Asset Holdings pursuant to the terms of that certain Amended and Restated Trust Agreement, dated as of November 21, 2019, between RAC Depositor, LLC, as depositor, and Wilmington Trust, National Association, as owner trustee; (ii) that certain Asset-Backed Certificate issued to, and registered in the name of, RAC Asset Holdings pursuant to the terms of that certain Amended and Restated Trust Agreement, dated as of June 23, 2021, between RAC Depositor, LLC, as depositor, and Wilmington Trust, National Association, as owner trustee; and (iii) that certain Asset-Backed Certificate issued to, and registered in the name of, RAC Asset Holdings pursuant to the terms of that certain Trust Agreement, dated as of February 9, 2022, between RAC Depositor, LLC, as depositor, and Wilmington Trust, National Association, as owner trustee.

9.    Representations and Warranties. Each Loan Party hereby represents and warrants to the Administrative Agent and each of the Lenders as follows:

(a)    Bring-Down of Representations and Warranties; No Default or Event of Default. Immediately *after* giving effect to each of (A) the execution and delivery of this Amendment on the Second Amendment Effective Date, (B) the reduction in the aggregate Revolving Commitments of the Lenders on the Second Amendment Effective Date as described herein, (C) the conversion of certain outstanding Revolving Loans into the Overadvance Term Loan on the Second Amendment Effective Date as described herein, and (D) the granting of the Liens contemplated hereby:

(i)    no Default or Event of Default exists; and

(ii)      all representations and warranties of each Loan Party set forth in the Loan Documents (including, without limitation, the representations and warranties of each Loan Party set forth in Article 3 (*Representations and Warranties*) of the Credit Agreement) are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties are true and correct in all respects), except to the extent that such representations and warranties specifically relate to an *earlier* date, in which case, such representations and warranties are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties are true and correct in all respects) as of such earlier date.

(b)      <u>Authorization</u>. The execution and delivery by such Loan Party and by each other Loan Party of this Amendment, and the performance by such Loan Party and by each other Loan Party of its respective obligations hereunder and under the Credit Agreement (as amended by this Amendment), in each case of the foregoing, is within such Loan Party's organizational powers. Such Loan Party and each other Loan Party has taken all necessary organizational, and if required, shareholder, partner or member (as the case may be) action to duly authorize each of (i) the execution and delivery of this Amendment on the Second Amendment Effective Date and the performance by such Loan Party of its respective obligations hereunder and under the Credit Agreement (as amended by this Amendment), including the entry into each document and agreement contemplated hereby, (ii) the reduction in the aggregate Revolving Commitments of the Lenders on the Second Amendment Effective Date as described herein, (iii) the conversion of certain outstanding Revolving Loans into the Overadvance Term Loan on the Second Amendment Effective Date as described herein, (iv) the granting of the pledges contemplated hereby, (v) the entry into the Joinder Agreement (in form and substance reasonably acceptable to the Administrative Agent) and such other documentation reasonably requested for such purpose by the Administrative Agent in order to confirm, in each case to the Administrative Agent's reasonable satisfaction, that each of the Second Amendment Guarantors have, on or prior to the Second Amendment Effective Date, joined the Credit Agreement as a "*Guarantor*" and the applicable Additional Security Agreement(s) as an "*Obligor*" or a "*Grantor*" (as applicable, in each case, as such term is defined therein), (vi) the granting of the Liens contemplated hereby, and (vii) all other agreements, duties, and obligations contemplated hereby.

(c)      <u>Validity; Enforceability</u>. This Amendment has been duly executed and delivered by such Loan Party and by each other Loan Party, and constitutes a legal, valid and binding obligation of such Loan Party and of each other Loan Party, enforceable against such Loan Party and each other Loan Party in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar applicable laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(d)      <u>Required Consents and Approvals</u>. The Loan Parties have received all consents (including, without limitation, any necessary governmental consents, as applicable), approvals, authorizations, registrations, filings and orders required or advisable to be made or obtained (as the case may be) under any applicable law, under the Organization Documents of any Loan Party, or pursuant to any contractual obligation of any Loan Party, in each case of the foregoing, in connection with any of the execution, delivery, validity and enforceability of this Amendment and/or the performance by each Loan Party of any of its respective obligations hereunder and/or under the Credit Agreement (as amended by this Amendment), or in connection with any Borrowings(s) to occur on the Second Amendment Effective Date and/or any of the other transactions contemplated hereby, and such consents, approvals, authorizations, registrations, filings and orders are currently in full force and effect and all applicable waiting periods have expired, and no investigation or inquiry by any Governmental Authority regarding any of the Commitments (including, without limitation, the Overadvance Term

Loan Commitments), this Amendment, or any of the other transactions contemplated hereby, is ongoing.

10.    <u>Reaffirmation</u>. Each Loan Party: (a) (i) acknowledges and consents to all of the terms and conditions of this Amendment, (ii) affirms all of its respective obligations under each of the Loan Documents (as amended by this Amendment, to the extent amended), except for those obligation(s) compliance with which is expressly waived by the Lenders (by act of the Required Lenders) pursuant to this Amendment, and (iii) agrees that this Amendment, and all documents, agreements, letters, certificates and/or instruments executed in connection with this Amendment, do *not* operate to reduce or discharge any Loan Party's obligations under any of the Loan Documents (except to the extent that any such obligation(s) are expressly modified pursuant to this Amendment); and (b) (i) affirms that each of the Liens granted in, or pursuant to, the Loan Documents is valid and subsisting, and (ii) agrees that this Amendment, and all documents, agreements, certificates and/or instruments executed in connection with this Amendment, do *not*, in any manner, impair, or otherwise adversely affect, any of the Liens granted in, or pursuant to, any of the Loan Documents.

11.    <u>Waiver Fee</u>. In consideration of the willingness of the Lenders to enter into this Amendment, the Loan Parties shall be obligated to, and the Loan Parties hereby agree to, pay to the Administrative Agent, for the ratable benefit of the Lenders, a waiver fee (the "*Waiver Fee*") in an amount equal to $155,000. The Waiver Fee shall be fully earned and non-refundable upon the effectiveness of this Amendment on the Second Amendment Effective Date, but payment thereof may be deferred and made in twelve (12) monthly installments on the last Business Day of each calendar month commencing October 31, 2022.

12.    <u>Release</u>. In consideration of the agreements of the Administrative Agent and the Lenders set forth in this Amendment, each of the Loan Parties hereby releases and forever discharges the Administrative Agent, the Lenders, and each of their respective predecessors, successors, assigns, officers, managers, directors, employees, agents, attorneys, representatives, affiliates and other Related Parties (hereinafter all of the above collectively referred to as the "*Lender Group*"), from any and all claims, counterclaims, demands, damages, debts, suits, liabilities, actions and causes of action of any nature whatsoever, in each case of the foregoing, to the extent arising in connection with this Amendment, the Credit Agreement, the other Loan Documents or any of the negotiations, activities, transactions, events or circumstances arising out of or related to the Loan Documents through the Second Amendment Effective Date, whether arising at law or in equity, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which any of the Loan Parties may have or claim to have against any of the Lender Group.

13.    <u>No Actions, Claims</u>. As of the Second Amendment Effective Date, each Loan Party hereby represents, acknowledges and confirms that such Person has no knowledge of any actions, causes of action, claims, demands, damages and liabilities of whatever kind or nature, in law or in equity, against any member of the Lender Group arising from any action by any member of the Lender Group, or the failure of any member of the Lender Group to act, in any way in connection with this Amendment, the Credit Agreement or the other Loan Documents on or prior to the Second Amendment Effective Date.

14.    <u>Miscellaneous</u>.

(a)    <u>Loan Document; Reference of Terms</u>. This Amendment is hereby deemed to be, and shall be, a Loan Document, and all references to a "*Loan Document*" or the "*Loan Documents*" in the Credit Agreement, in any other Loan Document, or in any other document, agreement, letter, certificate and/or instrument executed and delivered pursuant to the terms thereof, whether executed on, prior to or after the Second Amendment Effective Date (including, without limitation, all such references in the representations and warranties of the Loan Parties set forth in the Credit Agreement and the other Loan Documents), shall be deemed to include, and shall include, this Amendment. All references to "*Agreement*" in the Credit Agreement, and all references to the "*Credit Agreement*" in any other Loan Document or in any other document, agreement, letter, certificate and/or instrument executed and delivered pursuant to the terms thereof, whether executed on, prior to or after the

CHAR1\1940131v9

Second Amendment Effective Date (including, without limitation, all such references in the representations and warranties of the Loan Parties set forth in the Credit Agreement and the other Loan Documents), are hereby amended so that any reference to "*Agreement*" or the "*Credit Agreement*" therein, as the case may be, shall be, and be deemed to be, a reference to the Credit Agreement as amended by this Amendment.

(b)     <u>Full Force and Effect</u>. Except as expressly modified and amended by this Amendment, all of the terms, provisions and conditions of the Loan Documents (including in any Schedules and/or Exhibits thereto) shall remain in full force and effect according to their terms.

(c)     <u>Counterparts; Delivery</u>. This Amendment may be executed by one (1) or more of the parties to this Amendment on any number of separate counterparts, and all of said counterparts shall, taken together, be deemed to constitute one (1) and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment, by facsimile transmission or any other electronic imaging means (including in ".pdf" format), shall be as effective as delivery of a manually executed counterpart of this Amendment.

(d)     <u>Fees and Expenses</u>. To the extent *not* previously paid in connection with the Forbearance Agreement, the Loan Parties shall reimburse the Administrative Agent and the Lenders for any and all reasonable and documented out-of-pocket costs and expenses related to this Amendment, the Credit Agreement, the other Loan Documents and the various transactions and agreements contemplated hereby (including reasonable legal fees of separate counsel to the Administrative Agent and the Lenders and, subject to Section 10 of the Forbearance Agreement, of the Agent Advisor (as defined in the Forbearance Agreement)).

(e)     <u>Governing Law</u>. THIS AMENDMENT AND ANY CLAIMS, CONTROVERSIES, DISPUTES AND/OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF, OR RELATING TO THIS AMENDMENT AND/OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, THE ESTABLISHMENT AND INCURRENCE OF THE OVERADVANCE TERM LOAN ON THE SECOND AMENDMENT EFFECTIVE DATE AS DESCRIBED HEREIN) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(f)     <u>No Third-Party Beneficiaries</u>. This Amendment and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns. No other Person (other than any member of the Lender Group who is *not* a party to this Amendment with respect to the provisions of <u>Section 12</u> and <u>Section 13</u> hereof, which Persons are intended to be third party beneficiaries of this Amendment) shall have or be entitled to assert rights or benefits under this Amendment.

[*Remainder of Page Intentionally Left Blank*; *Signature Pages Follow*]

IN WITNESS WHEREOF, each of the parties hereto have caused a counterpart of this Amendment to be duly executed and delivered by its below duly authorized officer as of the Second Amendment Effective Date.

BORROWER:

**RAC DEALERSHIP, LLC,**
a Delaware limited liability company

By: _____
Name:   Noah Hogan
Title:    Chief Executive Officer

GUARANTORS:

**RAC KING, LLC,**
a Delaware limited liability company

By: _____
Name:   Noah Hogan
Title:    Chief Executive Officer

**RAC ASSET HOLDINGS, LLC,**
a Delaware limited liability company

By: _____
Name:   Noah Hogan
Title:    Chief Executive Officer

**RAC INTERMEDIATE HOLDINGS, LLC,**
a Delaware limited liability company

By: _____
Name:   Noah Hogan
Title:    Chief Executive Officer

**RAC INVESTMENT HOLDINGS, LLC,**
a Delaware limited liability company

By: _____
Name:   Noah Hogan
Title:    Chief Executive Officer

[*Signature Pages Continue*]

**RAC SERVICER, LLC**,
a Delaware limited liability company

By: _____

Name:  Noah Hogan

Title:    Chief Executive Officer

[*Signature Pages Continue*]

ADMINISTRATIVE AGENT:            **HANCOCK WHITNEY BANK,**
                                 as Administrative Agent

By: _____

Name: Jennifer Pelham

Title: Senior Vice President

[*Signature Pages Continue*]

LENDERS:

**HANCOCK WHITNEY BANK,**
as Swingline Lender and a Lender

By: _Jennifer Pelham_
Name: Jennifer Pelham
Title: Senior Vice President

*[Signature Pages Continue]*

**SYNOVUS BANK,**
as a Lender

By: _____

Name:  Patrick O'Brien
Title:    Middle Market Banker

[*Signature Pages Continue*]

**SIMMONS BANK** (as successor by merger to Triumph Bank), as a Lender

By: _____

Name:  Stephen Miracle

Title:    Sr. Vice President

*[Signature Pages End]*

**BODY OF CREDIT AGREEMENT**

See attached.

[*Remainder of Page Intentionally Left Blank*]

---

**CREDIT AGREEMENT**

dated as of June 29, 2021

by and among

RAC DEALERSHIP, LLC,
as the Borrower,

the Guarantors from time to time party hereto,

the Lenders from time to time party hereto,

and

HANCOCK WHITNEY BANK,
as the Administrative Agent

---

HANCOCK WHITNEY BANK,
as Sole Bookrunner and Sole Lead Arranger

Cover Page to Credit Agreement (RAC Dealership, LLC)

# TABLE OF CONTENTS

*Page*

Article 1 — Definitions .................................................................................................... 6
   Section 1.01    Defined Terms. ................................................................................ 6
   Section 1.02    Classification of Loans and Borrowings. ...................................... 37
   Section 1.03    Terms Generally. ........................................................................... 37
   Section 1.04    Accounting Terms; GAAP; Rounding. ......................................... 38
   Section 1.05    Interest Rate Disclosure; Cashless Rollovers. .............................. 39
   Section 1.06    Pro Forma Adjustments for Acquisitions and Dispositions. ........ 39
   Section 1.07    Status of Obligations. ................................................................... 40
   Section 1.08    Limited Condition Acquisitions ................................................... 40
   Section 1.12    ....................................................................................................... 40
Article 2 — The Credits .................................................................................................. 41
   Section 2.01    Commitments. ............................................................................... 41
   Section 2.02    Loans and Borrowings. ................................................................. 41
   Section 2.03    Requests for Borrowings. .............................................................. 42
   Section 2.04    [*Reserved*]. ..................................................................................... 42
   Section 2.05    [*Reserved*]. ..................................................................................... 42
   Section 2.06    Funding of Borrowings. ................................................................ 42
   Section 2.07    Interest Elections. ......................................................................... 43
   Section 2.08    Termination and Reduction of Commitments; Increase in Revolving Commitments.43
   Section 2.09    Repayment of Loans; Evidence of Debt. ...................................... 44
   Section 2.10    Prepayment of Loans. ................................................................... 45
   Section 2.11    Fees. .............................................................................................. 46
   Section 2.12    Interest. ......................................................................................... 47
   Section 2.13    Benchmark Replacement; Illegality; Funding Indemnity. ........... 47
   Section 2.14    Increased Costs. ............................................................................ 50
   Section 2.15    Withholding of Taxes; Gross-Up. ................................................. 51
   Section 2.16    Payments Generally; Allocation of Proceeds; Sharing of Setoffs. ... 54
   Section 2.17    Mitigation Obligations; Replacement of Lenders. ....................... 56
   Section 2.18    Defaulting Lenders. ...................................................................... 56
   Section 2.19    Returned Payments. ...................................................................... 58
   Section 2.20    Banking Services and Swap Agreements. ..................................... 58
   Section 2.21    Swingline Loans. .......................................................................... 58
Article 3 — Representations and Warranties .................................................................. 59

Section 3.01    Organization; Powers. ...................................................................................... 60

Section 3.02    Authorization; Enforceability. ........................................................................... 60

Section 3.03    Governmental Approvals; No Conflicts. .............................................................. 60

Section 3.04    Financial Condition; No Material Adverse Effect. ............................................. 60

Section 3.05    Properties. .......................................................................................................... 60

Section 3.06    Litigation and Environmental Matters. .............................................................. 61

Section 3.07    Compliance with Laws and Agreements; No Default. ....................................... 61

Section 3.08    Investment Company Status. ............................................................................. 61

Section 3.09    Taxes. ................................................................................................................. 61

Section 3.10    ERISA. ............................................................................................................... 61

Section 3.11    Disclosure. ......................................................................................................... 62

Section 3.12    Material Agreements. ........................................................................................ 62

Section 3.13    Solvency. ............................................................................................................ 62

Section 3.14    Insurance. ........................................................................................................... 62

Section 3.15    Capitalization and Subsidiaries. ........................................................................ 62

Section 3.16    Security Interest in Collateral. ........................................................................... 63

Section 3.17    Employment Matters. ......................................................................................... 63

Section 3.18    Margin Regulations. .......................................................................................... 63

Section 3.19    Use of Proceeds. ................................................................................................ 63

Section 3.20    No Burdensome Restrictions. ............................................................................ 63

Section 3.21    Anti-Corruption Laws and Sanctions. ............................................................... 63

Section 3.22    Affected Financial Institutions. ......................................................................... 64

Section 3.23    Plan Assets; Prohibited Transactions. ............................................................... 64

Section 3.24    Casualty. ............................................................................................................ 64

Article 4 — Conditions ............................................................................................................ 64

Section 4.01    Closing Date. ...................................................................................................... 64

Section 4.02    Each Credit Event. ............................................................................................. 66

Article 5 — Affirmative Covenants ......................................................................................... 67

Section 5.01    Financial Statements; Borrowing Base and Other Information. ........................ 67

Section 5.02    Notices of Material Events. ................................................................................ 70

Section 5.03    Existence. ........................................................................................................... 71

Section 5.04    Payment of Obligations. .................................................................................... 71

Section 5.05    Maintenance of Properties. ................................................................................ 71

Section 5.06    Books and Records; Inspection Rights; Field Audits. ....................................... 71

Section 5.07    Compliance with Laws and Material Contractual Obligations. ......................... 72

Section 5.08    Use of Proceeds. ................................................................................................ 72

Section 5.09    [*Reserved*]. ........................................................................................................ 72

Section 5.10    Insurance. ............................................................................................................ 72

Section 5.11    Casualty and Condemnation. ................................................................................ 72

Section 5.12    Post-Closing Covenants. ...................................................................................... 73

Section 5.13    Additional Guarantors; Further Assurances. ........................................................ 73

Article 6 — Negative Covenants ................................................................................................ 74

Section 6.01    Indebtedness. ........................................................................................................ 74

Section 6.02    Liens. .................................................................................................................... 76

Section 6.03    Fundamental Changes. .......................................................................................... 77

Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions. ............................ 78

Section 6.05    Asset Sales. .......................................................................................................... 79

Section 6.06    Sale and Leaseback Transactions; Certain Transfers. ......................................... 80

Section 6.07    Swap Agreements. ................................................................................................ 80

Section 6.08    Restricted Payments; Certain Payments of Indebtedness. .................................. 80

Section 6.09    Transactions with Affiliates. ................................................................................ 81

Section 6.10    Restrictive Agreements. ....................................................................................... 81

Section 6.11    Amendment of Material Documents. .................................................................... 82

Section 6.12    Financial Covenants. ............................................................................................ 82

Section 6.13    Equity Cure Right. ................................................................................................ 82

Section 6.14    Use of Proceeds. ................................................................................................... 83

Section 6.15    Accounting Changes. ............................................................................................ 83

Section 6.16    Capital Expenditures. ........................................................................................... 83

Section 6.17    Payments under the NextGear Credit Agreement. ............................................... 83

Article 7 — Events of Default .................................................................................................... 83

Article 8 — The Administrative Agent. ...................................................................................... 86

Section 8.01    Authorization and Action. .................................................................................... 86

Section 8.02    Administrative Agent's Reliance, Indemnification, Etc. ..................................... 88

Section 8.03    Posting of Communications. ................................................................................ 89

Section 8.04    The Administrative Agent Individually. ............................................................... 90

Section 8.05    Successor Administrative Agent. .......................................................................... 90

Section 8.06    Acknowledgements of Lenders. ........................................................................... 91

Section 8.07    Collateral Matters. ................................................................................................ 92

Section 8.08    Credit Bidding. ..................................................................................................... 93

Section 8.09    Certain ERISA Matters. ....................................................................................... 94

Section 8.10    Flood Laws. .......................................................................................................... 95

Section 8.11    Erroneous Payments. ............................................................................................ 95

Article 9 — Miscellaneous ................................................................................................ 96

Section 9.01    Notices. ............................................................................................... 96

Section 9.02    Waivers; Amendments. ....................................................................... 97

Section 9.03    Expenses; Indemnity; Damage Waiver. .............................................. 99

Section 9.04    Successors and Assigns. .................................................................... 101

Section 9.05    Survival. ............................................................................................ 104

Section 9.06    Counterparts; Integration; Effectiveness; Electronic Execution. ............. 105

Section 9.07    Severability. ...................................................................................... 105

Section 9.08    Right of Setoff. .................................................................................. 105

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process. .................. 106

Section 9.10    WAIVER OF JURY TRIAL. ............................................................... 106

Section 9.11    Headings. ........................................................................................... 106

Section 9.12    Confidentiality. ................................................................................. 107

Section 9.13    Several Obligations; Nonreliance; Violation of Law. ................................ 108

Section 9.14    USA PATRIOT Act. .......................................................................... 108

Section 9.15    Disclosure. ........................................................................................ 108

Section 9.16    Appointment for Perfection. ............................................................. 108

Section 9.17    Interest Rate Limitation. ................................................................... 108

Section 9.18    No Fiduciary Duty, etc. ..................................................................... 108

Section 9.19    Marketing Consent. ........................................................................... 109

Section 9.20    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. ........ 109

Section 9.21    Acknowledgement Regarding Any Supported QFCs. ............................. 110

Article 10 — Loan Guaranty ............................................................................................ 110

Section 10.01    Guaranty. ......................................................................................... 110

Section 10.02    Guaranty of Payment. ..................................................................... 110

Section 10.03    No Discharge or Diminishment of Loan Guaranty. ............................... 111

Section 10.04    Defenses Waived. ............................................................................. 111

Section 10.05    Rights of Subrogation. ..................................................................... 112

Section 10.06    Reinstatement; Stay of Acceleration. .................................................. 112

Section 10.07    Information. ...................................................................................... 112

Section 10.08    Termination. ..................................................................................... 112

Section 10.09    Taxes. ............................................................................................... 112

Section 10.10    Maximum Liability. .......................................................................... 112

Section 10.11    Contribution. .................................................................................... 112

Section 10.12    Liability Cumulative. ....................................................................... 113

Section 10.13    Keepwell. ......................................................................................... 113

iv

SCHEDULES:

|  |  |  |
|---|---|---|
| Schedule I | – | Commitment Schedule |
| Schedule 3.05 | – | Properties, Etc. |
| Schedule 3.12 | – | Material Agreements |
| Schedule 3.15 | – | Capitalization and Subsidiaries |
| Schedule 6.01 | – | Existing Indebtedness |
| Schedule 6.02 | – | Existing Liens |
| Schedule 6.04 | – | Existing Investments |
| Schedule 6.10 | – | Existing Restrictions |

EXHIBITS:

|  |  |  |
|---|---|---|
| Exhibit A | – | [*Form of*] Assignment and Assumption |
| Exhibit B-1 | – | [*Form of*] Borrowing Request |
| Exhibit B-2 | – | [*Form of*] Interest Election Request |
| Exhibit C-1 | – | [*Form of*] U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit C-2 | – | [*Form of*] U.S. Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit C-3 | – | [*Form of*] U.S. Tax Compliance Certificate (For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit C-4 | – | [*Form of*] U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit D | – | [*Form of*] Compliance Certificate |
| Exhibit E | – | [*Form of*] Joinder Agreement |
| Exhibit F | – | [*Form of*] Borrowing Base Certificate |

[*Remainder of Page Intentionally Left Blank*]

This CREDIT AGREEMENT, dated as of June 29, 2021 (as it may be amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, this "*Agreement*"), by and among RAC DEALERSHIP, LLC, a Delaware limited liability company, as the Borrower, the Guarantors from time to time party hereto, the Lenders from time to time party hereto, and HANCOCK WHITNEY BANK, as Administrative Agent.

R E C I T A L S

WHEREAS, the Borrower has requested that the Lenders: (i) establish, on the Closing Date, a Sixty Million Dollar ($60,000,000) revolving credit facility in favor of the Borrower, which revolving credit facility was reduced, on the Second Amendment Effective Date pursuant to the Second Amendment, to Fifteen Million Dollars ($15,000,000); and (ii) on the Second Amendment Effective Date, convert Sixteen Million Dollars ($16,000,000) of the aggregate principal amount of Revolving Loans then outstanding to a new term loan; and

WHEREAS, in each case on the terms, and subject to the conditions, provided herein, the Lenders are willing severally to establish the requested revolving credit facility (as reduced on the Second Amendment Effective Date pursuant to the Second Amendment) and to convert the requested portion of principal of Revolving Loans outstanding on the Second Amendment Effective Date to a new term loan.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the parties to this Agreement hereby agrees as follows:

ARTICLE 1
DEFINITIONS

Section 1.01    Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"*ABR Borrowing*" means a Borrowing, the Loans in respect of which bear interest at a rate determined by reference to the Alternate Base Rate (including, for the avoidance of doubt, pursuant to clause (c) of the definition of "*Alternate Base Rate*" below).

"*ABR Loan*" means a Loan bearing interest at a rate determined by reference to the Alternate Base Rate (including, for the avoidance of doubt, pursuant to clause (c) of the definition of "*Alternate Base Rate*" below).

"*ABS Bonds*" means any asset-backed notes or other securities issued by RAC Asset Holdings or any subsidiary of RAC Asset Holdings.

"*Account*" has the meaning assigned to such term in the Borrower Security Agreement.

"*Account Debtor*" means any Person obligated on an Account.

"*Acquisition*" means any transaction, or any series of related transactions, consummated on or after the Closing Date, by which any Loan Party: (a) acquires any going business or all, or substantially all, of the assets of any Person, whether through purchase of assets, merger or otherwise; or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) *at least* a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

Credit Agreement (RAC Dealership, LLC)

"*Adjusted Daily Simple SOFR*" means, as of any date of determination, with respect to any calculations relating to any Loan bearing interest at a rate determined by reference to Daily Simple SOFR, the *sum of* (a) the rate per annum equal to Daily Simple SOFR determined as of such date, *plus* (b) the SOFR Adjustment; provided, that, if, at any time, Adjusted Daily Simple SOFR is *less than* the Floor, then Adjusted Daily Simple SOFR shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Adjusted Term SOFR*" means, as of any date of determination, with respect to any calculations relating to a SOFR Loan for any applicable Interest Period or a SOFR Borrowing for any selected Interest Period and/or the determination of the Alternate Base Rate in accordance with clause (c) of such definition below, the *sum of*: (a) the rate per annum equal to Term SOFR for such Interest Period determined as of such date; *plus* (b) the SOFR Adjustment; provided, that, if, at any time, Adjusted Term SOFR is *less than* the Floor, then Adjusted Term SOFR shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Administrative Agent*" means Hancock Whitney Bank, in its capacity as administrative agent for the Lenders hereunder.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affected Financial Institution*" means: (a) any EEA Financial Institution; or (b) any UK Financial Institution.

"*Affiliate*" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"*Affiliated Guarantors*" means, collectively: (a) King; and (b) each of the Second Amendment Guarantors.

"*Agent Indemnitee*" has the meaning assigned to it in Section 9.03(c).

"*Aggregate Revolving Exposure*" means, at any time, the aggregate Revolving Exposure of all the Lenders at such time (with the Swingline Exposure of each Lender calculated assuming that all of the Lenders have funded their participations in all Swingline Loans outstanding at such time).

"*Alternate Base Rate*" or "*ABR*" means, for any day, a rate per annum equal to the *highest* of: (a) the Prime Rate in effect on such day; (b) the Federal Funds Effective Rate in effect on such day *plus* one half of one percent (0.50%); (c) Adjusted Term SOFR for a forward-looking one (1) month term in effect on such date *plus* one percent (1.00%); and (d) the Floor. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate and/or Adjusted Term SOFR shall be effective from, and including, the effective date of such change in the Prime Rate, the Federal Funds Effective Rate and/or Adjusted Term SOFR, respectively. If the Alternate Base Rate is being used as an alternate rate of interest by operation of Section 2.13, then the Alternate Base Rate shall be the *greater of* the rates described in the foregoing clauses (a), (b) and (d) and (for the avoidance of doubt) shall be determined without reference to the foregoing clause (c).

"*Anti-Corruption Laws*" means all laws, rules, and regulations of any jurisdiction applicable to any Loan Party or any of their Subsidiaries from time to time concerning or relating to bribery or corruption.

"*Applicable Parties*" has the meaning assigned to it in Section 8.03(c).

"*Applicable Percentage*" means, at any time with respect to any Class of Commitments of any Lender, a percentage equal to a fraction, the *numerator* of which is such Lender's Commitment of the applicable Class at such time, and the *denominator* of which is the aggregate Commitments of the applicable Class of all Lenders at such time (provided, that, if the Commitments of the applicable Class have terminated or expired at such time,

then the Applicable Percentages shall be determined based upon such Lender's share of the Aggregate Revolving Exposure or such Lender's respective portion of outstanding Loans of the applicable Class (as the case may be) at such time); provided, that, in accordance with Section 2.18, so long as any Lender shall be a Defaulting Lender, such Defaulting Lender's Commitments, Revolving Exposure and respective portion of outstanding Loans of the applicable Class (as the case may be) shall be disregarded in the calculations above.

"*Applicable Rate*" means, for any day, with respect to (A) the Overadvance Term Loan, (I) at any time from, and including, the Second Amendment Effective Date to, but *excluding*, July 1, 2023, nine percent (9.0%) per annum, (II) at any time from, and including, July 1, 2023 through, but *excluding*, January 1, 2024, eleven percent (11.0%) per annum, and (III) at any time from and after, and including, January 1, 2024, thirteen percent (13.0%) per annum, and (B) any Revolving Loan (other than any Swingline Loan) or the Commitment Fees payable hereunder, as the case may be, the applicable rate per annum set forth in the table below under the caption "*ABR Spread – Revolving Loans*" (applicable to Revolving Loans that are outstanding as ABR Loans), "*SOFR Spread – Revolving Loans*" (applicable to Revolving Loans that are outstanding as SOFR Loans), or "*Commitment Fee Rate*", as the case may be:

| ABR Spread – Revolving Loans | SOFR Spread – Revolving Loans | Commitment Fee Rate |
|---|---|---|
| 3.50% | 4.50% | 0.25% |

"*Approved Electronic Platform*" has the meaning assigned to it in Section 8.03(a).

"*Approved Fund*" means, for the purposes of Section 9.04(b), any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Arranger*" means Hancock Whitney, in its capacity as sole bookrunner and sole lead arranger hereunder.

"*Assignment and Assumption*" means an assignment and assumption agreement entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form (including electronic records generated by the use of an electronic platform) approved by the Administrative Agent.

"*Availability*" means, at any time, an amount equal to (a) the *lesser of* (i) the aggregate Revolving Commitments, and (ii) the Borrowing Base, *minus* (b) the Aggregate Revolving Exposure (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Applicable Percentage of all outstanding Borrowings).

"*Availability Period*" means the period, from and including, the Closing Date to, but *excluding*, the *earlier* of the Revolving Credit Maturity Date and the date of termination of the Revolving Commitments.

"*Available Tenor*" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is, or may be, used for determining the length of any interest period (including any Interest Period) pursuant to this Agreement, and (b) if such Benchmark is *not* a term rate, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is, or may be, used for determining any frequency of the making of payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case of the foregoing clauses (a) and (b), as of such date of determination, but *excluding*, in any event and for the avoidance of doubt, any tenor for such Benchmark that is removed as of such date of determination from the definition of "*Interest Period*" below in accordance with Section 2.13(e).

8

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"*Banking Services*" means each and any of the following bank services provided to any Loan Party by any Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards); (b) stored value cards; (c) merchant processing services; and (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, any direct debit scheme or arrangement, overdrafts and interstate depository network services and cash pooling services).

"*Banking Services Obligations*" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy", as now or hereafter in effect, or any successor thereto, as hereafter amended.

"*Bankruptcy Event*" means, with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof; provided, that, a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"*Benchmark*" means, as of the Second Amendment Effective Date, the SOFR Reference Rate; provided, that, if a Benchmark Transition Event has occurred with respect to the SOFR Reference Rate or the then-current Benchmark, then "*Benchmark*" shall thereafter mean the applicable Benchmark Replacement, to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.13(b).

"*Benchmark Replacement*" means, with respect to any Benchmark Transition Event, the first (1st) alternative set forth in the alphabetic order immediately below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

> (a)    the *sum of*: (i) Daily Simple SOFR; *plus* (ii) the related Benchmark Replacement Adjustment; or

> (b)    the *sum of*: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower, giving due consideration to (A) any selection or recommendation of a replacement benchmark rate, or the mechanism for determining such a replacement rate, by the Relevant

CHAR1\1940128v8

Governmental Body, and (B) any evolving, or then-prevailing, market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities; and (ii) the related Benchmark Replacement Adjustment;

provided, that, notwithstanding anything to the contrary in the foregoing or elsewhere in this Agreement or any other Loan Document, if, at any time, the Benchmark Replacement (as determined pursuant to the foregoing clauses (a) or (b), as applicable) would be *less than* the Floor, then the Benchmark Replacement shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Benchmark Replacement Adjustment*" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or equal to zero), that has been selected by the Administrative Agent and the Borrower, giving due consideration to: (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body; or (b) any evolving, or then-prevailing, market convention for determining a spread adjustment, or a method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"*Benchmark Replacement Date*" means a date and time determined by the Administrative Agent, which date shall be *no later than* the *earliest* to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of the occurrence of any event(s) described in clauses (a) or (b) of the definition of "*Benchmark Transition Event*" below, the *later* to occur of: (i) the date of the public statement or publication of information, as applicable, referred to in such clause (a) or (b), as applicable; and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of the occurrence of any event(s) described in clause (c) of the definition of "*Benchmark Transition Event*" below, the first (1st) date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that, such non-representativeness shall be determined by reference to the most recent statement or publication referred to in such clause (c), notwithstanding that any Available Tenor of such Benchmark (or such component thereof) may continue to be provided as of such date.

For the avoidance of doubt, in any such case of occurrence of the foregoing clauses (a) or (b) of this definition of "*Benchmark Replacement Date*" with respect to any Benchmark, the Benchmark Replacement Date will be deemed to have occurred upon the occurrence of the applicable event(s) set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Transition Event*" means, with respect to the then-current Benchmark, the occurrence of one (1) or more of the following events:

(a)    a public statement or publication of information by, or on behalf of, the administrator of such Benchmark (or the published component used in the calculation thereof), in either case, announcing that such administrator has ceased, or will cease, to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, no successor administrator has been identified that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the FRBNY, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component thereof), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component thereof), or a court or other Person with similar insolvency or resolution authority over the administrator for such Benchmark (or such component thereof), in any such case, which states that the administrator of such Benchmark (or such component thereof) has ceased, or will cease, to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, no successor administrator has been identified that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are *not*, or, as of a specified future date, will *not* be, representative.

For the avoidance of doubt, a "*Benchmark Transition Event*" shall be deemed to have occurred, with respect to any Benchmark, if a public statement or publication of information as described above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Unavailability Period*" means the period (if any): (a) *beginning* at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with Section 2.13; and (b) *ending* at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with Section 2.13.

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" means 31 C.F.R. § 1010.230.

"*Benefit Plan*" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"*BHC Act Affiliate*" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"*Borrower*" means RAC Dealership, LLC, a Delaware limited liability company.

"*Borrower Security Agreement*" means that certain Security and Pledge Agreement (including any and all supplements thereto), dated as of the Second Amendment Effective Date, by and between the Borrower and the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties (as amended, restated, amended and restated, supplemented, replaced, and/or otherwise modified in writing from time to time). For purposes of clarity, Holdings is *not* required to be or to become a "*Grantor*" or an "*Obligor*" (as applicable) under the Borrower Security Agreement.

"*Borrowing*" means, as the context may require, a borrowing consisting of: (a) Loans of the same Class and (if Revolving Loans) Type, made, converted or continued on the same date, and, in the case of SOFR Loans, as to which a single Interest Period is in effect; or (b) a Swingline Loan.

"*Borrowing Base*" means, at any time, one hundred percent (100%) of the Borrower's Eligible Inventory, valued at cost, as evidenced by auction or other seller receipts, invoices, bills of sales or other supporting documentation, in each case, reasonably acceptable to the Administrative Agent (but, for avoidance of doubt, *excluding* reconditioning expenses).

"*Borrowing Base Certificate*" means a certificate, signed and certified as accurate and complete by a Financial Officer, in substantially the form of Exhibit F or another form which is acceptable to the Administrative Agent in its sole discretion.

"*Borrowing Request*" means a request by the Borrower for a Revolving Borrowing in accordance with Section 2.03, which shall be substantially in the form of Exhibit B-1 hereto or any other form approved by the Administrative Agent.

"*Burdensome Restrictions*" means any consensual encumbrance or restriction of the type described in clauses (a) or (b) of Section 6.10.

"*Business Day*" means any day, other than: (a) a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized, or required by applicable law, to close; and (b) if such day relates to a determination of, or a calculation involving, SOFR, the SOFR Reference Rate and/or any SOFR-Based Rate (or any notice with respect to any of the foregoing), any day on which any of SIFMA, the New York Stock Exchange and/or the FRBNY is *not* open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"*Capital Expenditures*" means, without duplication, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Borrower and the Subsidiaries of the Borrower prepared in accordance with GAAP.

"*Capital Lease Obligations*" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP (subject, in any event, to Section 1.04), and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP (subject, in any event, to Section 1.04).

"*Change in Control*" means: (a) at any time *prior* to the creation of a Public Market, York Capital Management, together with its controlled funds and controlled Affiliates, shall cease to own and control, directly or indirectly, free and clear of all Liens or other encumbrances, *more than* fifty percent (50%) of the outstanding voting Equity Interests in any Affiliated Guarantor, in each case on a fully diluted basis; (b) at any time *after* the creation of a Public Market, any "person" or "group" (in each case, within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date) other than York Capital Management or B. Michael Shivers Jr. shall, directly or indirectly, acquire *more than* thirty-five percent (35%) of the outstanding voting equity Interests in any Affiliated Guarantor or any direct or indirect parent of any Affiliated Guarantor, as determined on a fully diluted basis; (c) King shall cease to own, free and clear of all Liens or other encumbrances, one hundred percent (100%) of the outstanding voting Equity Interests in the Borrower on a fully diluted basis; or (d) the Borrower shall cease to own, free and clear of all Liens or other encumbrances, one hundred percent (100%) of the outstanding voting Equity Interests in each of its Subsidiaries (if any) on a fully diluted basis.

"*Change in Law*" means the occurrence after the date of this Agreement (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement) of any of the following, (a) the adoption of or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) compliance by any Lender (or, for purposes of Section 2.14(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (ii) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "*Change in Law*", regardless of the date enacted, adopted, issued or implemented.

"*Charges*" has the meaning assigned to such term in Section 9.17.

"*Class*", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, Swingline Loans or the Overadvance Term Loan, and, when used in reference to any Commitment, refers to whether such Commitment is a Revolving Commitment, a Swingline Commitment or an Overadvance Term Loan Commitment.

"*Closing Date*" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"*Code*" means the Internal Revenue Code of 1986.

"*Collateral*" means any and all Collateral (collectively, as defined in each and all of the Security Agreements).

"*Collateral Documents*" means, collectively, each Security Agreement and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the Administrative Agent.

"*Commitment*" means, as to each Lender, a Revolving Commitment, a Swingline Commitment or an Overadvance Term Loan Commitment, and/or any combination of the foregoing (as the context shall permit or require).

"*Commitment Fee*" has the meaning assigned to it in Section 2.11(a).

"*Commitment Schedule*" means the Schedule attached hereto identified as such (as amended, restated, amended and restated, and/or otherwise modified in writing from time to time, including, without limitation, pursuant to the Second Amendment).

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"*Communications*" means, collectively, any notice, demand, communication, information, document or other material provided by, or on behalf of, any Loan Party pursuant to any Loan Document or the transactions

CHAR1\1940128v8

contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Agreement, including through an Approved Electronic Platform.

"*Competitor*" means any competitor of any Loan Party or any Subsidiary that is in the used car sales and/or leasing business or the subprime auto finance business (whether through sale financing or lease financing) and is designated as such in writing from time to time by the Borrower to the Administrative Agent.

"*Compliance Certificate*" means a certificate of a Financial Officer in substantially the form of Exhibit D.

"*Conforming Changes*" means, with respect to (a) the use and/or administration of, and/or any conventions associated with, SOFR, the SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), or (b) the use, administration, adoption and/or implementation of, and/or any conventions associated with, any Benchmark Replacement, in each case of the foregoing clauses (a) and (b), any technical, administrative and/or operational change(s) (including, without limitation, any such change(s) to the definition of "*Alternate Base Rate*" above, the definition of "*Business Day*" above, the definition of "*Interest Period*" below (or any similar or analogous definition, or the addition of an applicable concept of "interest period"), the definition of "*U.S. Government Securities Business Day*" below, the timing and frequency of determining rates and making payments of interest, the timing of delivery of any Borrowing Requests (or other requests for borrowing of Loans), the timing of delivery of any notices of optional reduction or termination of any Commitment(s), the timing of delivery of any notices of optional prepayment of Loans (or other notices of prepayment of Loans), the timing of delivery of any Interest Election Requests (or other notices of the continuation or conversion of Loans), the applicability and length of lookback periods, the applicability of Section 2.13(h), and any other technical, administrative and/or operational matters) that the Administrative Agent determines, in its discretion, may be appropriate to reflect the adoption and/or implementation of any such rate and/or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines, in its discretion, that (i) the adoption and/or implementation of, or of any portion of, such market practice is *not* administratively feasible for the Administrative Agent, or (ii) no market practice for the administration of any such rate exists, then, in each case of the foregoing clauses (i) and (ii), permit the use and administration thereof by the Administrative Agent in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"*Connection Income Taxes*" means Other Connection Taxes that are imposed on, or measured by, net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Contingent Release Collateral*" means, collectively, (a) the RAC Asset Holdings Collateral (as such term is defined in the Residuals Security Agreement) consisting of, or relating to or derived from, (i) the 2019-2 Trust Certificate (as such term is defined in the Residuals Security Agreement), (ii) the 2021-1 Trust Certificate (as such term is defined in the Residuals Security Agreement), and/or (iii) the 2022-1 Trust Certificate (as such term is defined in the Residuals Security Agreement) but for avoidance of doubt specifically including the 2019-A WH Trust Certificate (as such term is defined in the Residuals Security Agreement), and (b) the Collateral (as such term is defined in the Equity Pledge Agreement).

"*Contingent Release Collateral Release Date*" means the earliest date on which (a) all of the Obligations in respect of the Overadvance Term Loan shall have been Paid in Full, and (b) the Supplemental Payment Amount shall have been paid to the Supplemental Payment Account.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Covered Entity*" means any of the following:

(a)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R.§ 47.3(b); or

(c)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R.§ 382.2(b).

"*Covered Party*" has the meaning assigned to it in Section 9.21.

"*Credit Party*" means the Administrative Agent, the Swingline Lender, or any other Lender.

"*Cure Notice*" has the meaning assigned to it in Section 6.13.

"*Daily Simple SOFR*" means, for any date of determination, SOFR, with the conventions for such rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for such rate selected or recommended by the Relevant Governmental Body for determining "*Daily Simple SOFR*" for business loans; *provided*, *that*, if the Administrative Agent decides that any such convention is *not* administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"*Days Inventory Outstanding Ratio*" means, at the end of any calendar month, (a) the *sum of* the number of days since each unit of Inventory owned by the Borrower at the end of such calendar month was initially located on a Borrower lot, *divided by* (b) the number of units of Inventory owned by the Borrower as of the end of such calendar month.

"*Debt to Tangible Net Worth Ratio*" means, on any date, the ratio of (a) Total Indebtedness *less* Subordinated Indebtedness of King and its Subsidiaries on a consolidated basis in accordance with GAAP (subject, in any event, to Section 1.04) on such date, to (b) Tangible Net Worth on such date.

"*Default*" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"*Default Right*" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"*Defaulting Lender*" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Swingline Loans, or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Loans and participations in then outstanding Swingline Loans under this Agreement, provided, that, such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such

Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) has become the subject of (i) a Bankruptcy Event, or (ii) a Bail-In Action.

"*Designated Limited Condition Acquisition*" has the meaning assigned to it in Section 1.08(a).

"*Disposition*" or "*Dispose*" means the sale, transfer, exclusive license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by any Person (including any sale and leaseback transaction and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Disqualified Lender*" means, on any date, (a) any financial institution, institutional lender or investment fund identified by name by the Borrower as a "*Disqualified Lender*" by written notice delivered to the Administrative Agent prior to the Closing Date, (b) any Competitor that is separately identified by its legal name by the Borrower as a "*Disqualified Lender*" by written notice delivered to the Administrative Agent, and (c) any Affiliate of any Person identified by the Borrower pursuant to clause (a) or (b) that, in each case, is either (i) identified by its legal name by the Borrower as a "*Disqualified Lender*" by written notice delivered to the Administrative Agent, or (ii) clearly identifiable (solely on the basis that such Person's name has the name of the applicable financial institution, institutional lender or Competitor in such Person's legal name) as an Affiliate of such Person; provided, that, (x) any designation contemplated in the foregoing clauses (b) and (c) designating any such Person as a Disqualified Lender shall become effective two (2) Business Days after the date that such written designation is delivered to the Administrative Agent, (y) any Person that is a Lender and subsequently becomes a Disqualified Lender (but was not a Disqualified Lender on the Closing Date or at the time it became a Lender, as applicable) shall be deemed to not be a Disqualified Lender hereunder, and (z) "*Disqualified Lender*" shall exclude any Person that the Borrower has designated as no longer being a "*Disqualified Lender*" by written notice delivered to the Administrative Agent from time to time.

"*Dividing Person*" has the meaning assigned to it in the definition of "*Division*".

"*Division*" means the division of the assets, liabilities and/or obligations of a Person (the "*Dividing Person*") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"*Division Successor*" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"*Document*" has the meaning assigned to such term in the Borrower Security Agreement.

"*Dollars*" or "*$*" refers to lawful money of the U.S.

"*Domestic Subsidiary*" means any Subsidiary of the Borrower that is organized under the laws of any political subdivision of the United States.

"*DQ List*" has the meaning assigned to such term in Section 9.04(e)(iv).

"*ECP*" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

CHAR1\1940128v8

"*EEA Financial Institution*" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Electronic Signature*" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"*Electronic System*" means any electronic system, including e-mail, e-fax, web portal access for the Borrower and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent and any of its Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"*Eligible Inventory*" means, at any time, the Inventory of the Borrower which is acceptable to the Administrative Agent in its Permitted Discretion determined in good faith for lending purposes. Without limiting the Administrative Agent's discretion provided herein, the Administrative Agent shall, in general, consider Inventory to be Eligible Inventory if it meets, and so long as it continues to meet, the following requirements:

(a)     (i) it is owned by the Borrower, (ii) the purchase price thereof has funded as evidenced by a cleared check, wire confirmation or other evidence of payment to the seller thereof, (iii) the Borrower has the right to subject it to a security interest in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, and (iv) it is subject to a first priority perfected security interest in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Encumbrances;

(b)     (i) it is at auction awaiting shipment to the Borrower; (ii) it is located on, or in transit to, one of the owned or leased premises of the Borrower, such locations are within the United States and are acceptable to the Administrative Agent; or (iii) in the possession of any sales manager or sales regional manager in the ordinary course of business and consistent with the Borrower's policies applicable thereto;

(c)     if held for sale or lease or furnishing under contracts of service, it is (except as the Administrative Agent may otherwise consent in writing) used and lawfully suitable for sale or lease;

(d)     it is *not* Inventory with respect to which any covenant, representation or warranty contained in this Agreement or in any applicable Security Agreement has been breached or is *not* true;

(e)     it is valued at the cost of each item of Inventory;

(f)     it has *not* been located on a Borrower lot for *more than* two hundred forty (240) days;

(g)     it has *not* been previously leased by the Borrower to a customer and returned by a customer, except in connection with (i) customer contract unwinds in the ordinary course of business, or (ii) repossessions conducted by an Affiliate of the Borrower in the ordinary course of business in which

the re-purchase of the repossessed vehicle by the Borrower from the Affiliate complies with the Borrower's arms-length, commercially reasonably repossession re-purchase procedure; and

> (h)    it contains global positioning satellite monitors subject to access by the Administrative Agent.

In the event that Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, the Borrower shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate.

"*Environmental Laws*" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (a) the environment, (b) preservation or reclamation of natural resources, (c) the management, Release or threatened Release of any Hazardous Material, or (d) health and safety matters.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment, or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equipment*" has the meaning assigned to such term in the Borrower Security Agreement.

"*Equity Interests*" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing, but *excluding* any debt securities convertible into any of the foregoing.

"*Equity Pledge Agreement*" means that certain Pledge Agreement (including any and all supplements thereto), dated as of the Second Amendment Effective Date, by and among King, Intermediate Holdings, RAC Servicer, RAC Asset Holdings, and the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties (as amended, restated, amended and restated, supplemented, replaced, and/or otherwise modified in writing from time to time). For purposes of clarity, Holdings is *not* required to be or to become a "*Grantor*" or an "*Obligor*" (as applicable) under the Equity Pledge Agreement.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the

incurrence by the Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of the Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, in critical status or in reorganization, within the meaning of Title IV of ERISA.

"*Erroneous Payment*" has the meaning assigned to such term in Section 8.11(a).

"*Erroneous Payment Notice*" has the meaning assigned to such term in Section 8.11(b).

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Event of Default*" has the meaning assigned to such term in Article 7.

"*Exchange Act*" means the Securities Exchange Act of 1934.

"*Excluded Swap Obligation*" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP at the time the Guarantee of such Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing *more than* one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.17(b)), or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.15(f), and (d) any withholding Taxes imposed under FATCA.

"*FATCA*" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"*Federal Funds Effective Rate*" means, for any day, the *greater of*: (a) the rate calculated by the FRBNY based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the FRBNY shall set forth on its public website from time to time) and published on the next succeeding Business Day by the FRBNY as the Federal funds effective rate; and (b) zero percent (0%).

"*Federal Reserve Board*" means the Board of Governors of the Federal Reserve System of the United States of America (or any successor).

"*Financial Officer*" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"*Flood Laws*" has the meaning assigned to such term in Section 8.10.

"*Floor*" means a rate of interest equal to zero percent (0.0%) per annum.

"*Foreign Lender*" means a Lender that is *not* a U.S. Person.

"*FRBNY*" means the Federal Reserve Bank of New York (or any successor).

"*Funding Account*" has the meaning assigned to such term in Section 4.01(a)(viii).

"*GAAP*" means generally accepted accounting principles in the United States (subject, in any event, to Section 1.04).

"*Governmental Authority*" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Guarantee*" of or by any Person (the "*guarantor*") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that, the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"*Guaranteed Obligations*" has the meaning assigned to such term in Section 10.01.

"*Guarantors*" means, collectively, (a) each of the Affiliated Guarantors, (b) each other Person that joins this Agreement as a Guarantor pursuant to Section 5.13, (c) with respect to Banking Services Obligations (determined before giving effect to Section 10.10) under the Loan Guaranty hereunder, the Borrower, and (d) the successors and permitted assigns of each of the foregoing.

"*Hancock Whitney*" means Hancock Whitney Bank, a Mississippi state chartered bank, in its individual capacity, and its successors.

"*Hazardous Materials*" means: (a) any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302 and amendments thereto); and (c) any substance, material, or waste that is petroleum, petroleum-related, or a

petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide, or any other agricultural chemical.

"*Headquarters Audit*" has the meaning assigned to such term in Section 5.06(b).

"*Holdings*" means RAC Investment Holdings, LLC, a Delaware limited liability company.

"*Holdings Subordination Agreement*" means that certain Subordination Agreement, dated as of the Second Amendment Effective Date, by and among the RAC Investor, LLC, a Delaware limited liability company, Michael Shivers, an individual, American Financial, Inc., a Tennessee corporation, Holdings, the other Affiliated Guarantors and the Administrative Agent  (as such agreement may be amended, restated, amended and restated, supplemented, replaced, and/or otherwise modified in writing from time to time).

"*Indebtedness*" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) [*reserved*], (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations (contingent or otherwise) under any letter of credit agreement, banker's acceptance agreement or similar agreement, (j) [*reserved*], (k) obligations under any earn-out arising out of purchase and sale contracts with respect to which the amount due has been ascertained (as determined by the Borrower in good faith) and is due and payable, (l) any other Off-Balance Sheet Liability, and (m) obligations, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all Swap Agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document, and (b) to the extent not otherwise described in the foregoing clause (a), Other Taxes.

"*Indemnitee*" has the meaning assigned to such term in Section 9.03(b).

"*Ineligible Institution*" means, for the purposes of Section 9.04(b), a (a) natural person, (b) a Defaulting Lender or its Parent, (c) holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof, provided, that, with respect to this clause (c), such holding company, investment vehicle or trust shall *not* constitute an Ineligible Institution if it (i) has *not* been established for the primary purpose of acquiring any Loans or Commitments, (ii) is managed by a professional advisor, who is not such natural person or a relative thereof, having significant experience in the business of making or purchasing commercial loans, and (iii) has assets *greater than* $25,000,000 and a significant part of its activities consist of making or purchasing commercial loans and similar extensions of credit in the ordinary course of its business, (d) a Loan Party or a Subsidiary or other Affiliate of a Loan Party, or (e) subject to Section 9.04(e), a Disqualified Lender.

"*Information*" has the meaning assigned to such term in Section 9.12.

"_Intangible Assets_" means the aggregate amount of: (a) all assets classified as intangible assets under GAAP (subject, in any event, to Section 1.04), including, without limitation, goodwill, trademarks, patents, copyrights, service marks, brand names, organization expenses, franchises, licenses, trade names, brand names, mailing lists, catalogs, excess of cost over book value of assets acquired, and bond discount and underwriting expenses; and (b) loans or advances to, investments in, or receivables from (i) any Affiliate or shareholder of Holdings or the Borrower, or (ii) any Person if such loan, advance, investment or receivable is outside the Borrower's ordinary course of business.

"_Interest Election Request_" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07, which shall be substantially in the form of Exhibit B-2 hereto or any other form approved by the Administrative Agent.

"_Interest Payment Date_" means, with respect to (a) the Overadvance Term Loan, the last day of each calendar month and the Overadvance Term Loan Maturity Date, (b) any Swingline Loan, the day that such Loan is required to be repaid and the Revolving Credit Maturity Date, (c) any ABR Loan, the last day of each calendar month and the Revolving Credit Maturity Date, and (d) any SOFR Loan, the last day of each Interest Period applicable thereto and the Revolving Credit Maturity Date.

"_Interest Period_" means, with respect to any SOFR Revolving Borrowing and/or any SOFR Revolving Loan, a period of one (1) month (subject to availability) (a) initially, commencing on the date of the applicable Borrowing or the effective date of the applicable conversion or continuation of outstanding Loans (as the case may be), and (b) thereafter, commencing on the day on which the immediately preceding Interest Period expires, provided, that:

      (i)    if any Interest Period would otherwise end on a day that is _not_ a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such Business Day falls in another calendar month, in which case, such Interest Period shall end on the immediately preceding Business Day;

      (ii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of such calendar month;

      (iii)    no Interest Period with respect to any Revolving Loans, to the extent outstanding as SOFR Loans, shall extend beyond the Revolving Credit Maturity Date; and

      (iv)    notwithstanding anything to the contrary in the foregoing of this definition of "_Interest Period_" or elsewhere in this Agreement or any other Loan Document, no tenor that has been removed from this definition of "_Interest Period_" by operation of Section 2.13(e) shall be available for specification by the Borrower in any Borrowing Request and/or any Interest Election Request, as applicable.

"_Intermediate Holdings_" means RAC Intermediate Holdings, LLC, a Delaware limited liability company.

"_Inventory_" has the meaning assigned to such term in the Borrower Security Agreement.

"_IRS_" means the United States Internal Revenue Service.

"_Joinder Agreement_" means a Joinder Agreement in substantially the form of Exhibit E.

"_King_" means RAC King, LLC, a Delaware limited liability company.

"_Lenders_" means the Persons listed on the Commitment Schedule and any other Person that shall have become a Lender hereunder pursuant to an Assignment and Assumption or otherwise, other than any such Person

that ceases to be a Lender hereunder pursuant to an Assignment and Assumption or otherwise. Unless the context otherwise requires, the term "*Lenders*" includes the Swingline Lender.

"*Lien*" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset, and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"*Limited Condition Acquisition*" means any Acquisition by any Loan Party (other than any Affiliated Guarantor) permitted pursuant to the Loan Documents whose consummation is *not* conditioned on the availability of, or on obtaining, third party financing and which has been designated as a Limited Condition Acquisition by the Borrower in writing to the Administrative Agent; provided, that, upon the *earlier* to occur of (i) the date on which the applicable Limited Condition Acquisition Agreement is terminated or otherwise expires without the consummation of such Acquisition, and (ii) the date that is 120 days following the entering into of the applicable Limited Condition Acquisition Agreement (or such later date as the Administrative Agent may agree in writing in its reasonable discretion), such Acquisition shall no longer constitute a Limited Condition Acquisition for any purpose hereunder.

"*Limited Condition Acquisition Agreement*" means the definitive agreement with respect to any Limited Condition Acquisition.

"*Limited Condition Acquisition Test Date*" means, with respect to any Limited Condition Acquisition Agreement, the date on which such Limited Condition Acquisition Agreement is entered into.

"*Loan Documents*" means, collectively, this Agreement, each promissory note issued pursuant to this Agreement, the NextGear Intercreditor Agreement, the RAC Investor Subordination Agreement, the Holdings Subordination Agreement, each Collateral Document, each Compliance Certificate, the Loan Guaranty, and each other agreement, instrument, document and certificate executed and delivered to, or in favor of, the Administrative Agent or any Lender and *including* each other pledge, power of attorney, consent, assignment, contract, notice, and each other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Administrative Agent or any Lender in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"*Loan Guaranty*" means Article 10 of this Agreement.

"*Loan Parties*" means, collectively, the Borrower, each of the Affiliated Guarantors, each of the other Guarantors (including the Borrower's Domestic Subsidiaries, if any), and any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement and their respective successors and assigns, and the term "*Loan Party*" means any one of them or all of them individually, as the context may require.

"*Loans*" means the loans and advances made by the Lenders pursuant to this Agreement, including Swingline Loans.

"*Margin Stock*" means margin stock within the meaning of Regulation T, Regulation U and Regulation X, as applicable.

"*Material Adverse Effect*" means a material adverse effect on (a) the financial condition, operations, business or properties of the Borrower or any of the other Loan Parties, taken as a whole, (b) the ability of any of the Loan Parties, taken as a whole, to perform their respective obligations under this Agreement or any of the

other Loan Documents to which they are party, or (c) the legality, validity or enforceability of this Agreement or any other Loan Documents or the rights and remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"*Material Agreements*" has the meaning assigned to such term in <u>Section 3.12</u>.

"*Material Indebtedness*" means (a) indebtedness under the NextGear Credit Agreement, and (b) other Indebtedness (other than the Loans), or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties and/or Subsidiaries of the Borrower in an aggregate principal amount *exceeding* $7,500,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of any Loan Party and/or any Subsidiary of the Borrower in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that any such Loan Party and/or Subsidiary of the Borrower would be required to pay if such Swap Agreement were terminated at such time.

"*Maximum Rate*" has the meaning assigned to such term in <u>Section 9.17</u>.

"*Moody's*" means Moody's Investors Service, Inc.

"*Multiemployer Plan*" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"*Net Proceeds*" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but *excluding* any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, *minus* (b) the *sum of* (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"*NextGear Credit Agreement*" means that certain Demand Promissory Note and Loan and Security Agreement, dated as of November 14, 2017, by and between NextGear Capital, Inc. and the Borrower.

"*NextGear Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of the Closing Date, by and among NextGear Capital, Inc., the Administrative Agent, on behalf of the Secured Parties, and the Borrower.

"*Non-Consenting Lender*" has the meaning assigned to such term in <u>Section 9.02(d)</u>.

"*Obligated Party*" has the meaning assigned to such term in <u>Section 10.02</u>.

"*Obligations*" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Loan Parties to any of the Lenders, the Administrative Agent or any indemnified party, individually or collectively, existing on the Closing Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation

CHAR1\1940128v8

of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or other instruments at any time evidencing any thereof.

"*Off-Balance Sheet Liability*" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does *not* constitute a liability on the balance sheet of such Person (other than operating leases).

"*Organization Documents*" means, with respect to any Person, any charter, articles or certificate of incorporation, articles or certificate of organization, registration or formation, certificate of partnership or limited partnership, bylaws, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other applicable documents relating to such Person's formation, organization or entity governance matters (including any shareholders' or equityholders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan, or any Loan Document).

"*Other Taxes*" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

"*Overadvance Term Loan*" has the meaning assigned to it in Section 2.01(b).

"*Overadvance Term Loan Commitment*" means, with respect to each Lender, the obligation of such Lender to convert its respective portion of Sixteen Million Dollars ($16,000,000) of the outstanding principal amount of the Revolving Loans on the Second Amendment Effective Date to the Overadvance Term Loan in accordance with Section 2.01(b) and such Lender's "*Overadvance Term Loan Commitment*" as provided on the Commitment Schedule. On the Second Amendment Effective Date, after giving effect to the Second Amendment, the aggregate amount of the Overadvance Term Loan Commitments is Sixteen Million Dollars ($16,000,000).

"*Overadvance Term Loan Maturity Date*" means, with respect to the Overadvance Term Loan, the *earlier* to occur of: (a) March 30, 2024 (if the same is a Business Day, or if *not*, then the immediately next succeeding Business Day); and (b) the date on which the aggregate outstanding principal amount of the Overadvance Term Loan has been declared, or automatically has become, due and payable pursuant to Article 7 (whether by acceleration or otherwise).

"*Paid in Full*" or "*Payment in Full*" means, (a) the indefeasible payment in full in cash of all outstanding Loans, together with accrued and unpaid interest thereon, (b) the indefeasible payment in full in cash of the accrued and unpaid fees, if any, (c) the indefeasible payment in full in cash of all reimbursable expenses and other Secured Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement), together with accrued and unpaid interest thereon, (d) the termination of all Commitments, and (e) the termination of the Swap Agreement

Obligations and the Banking Services Obligations or entering into other arrangements satisfactory to the Secured Parties counterparties thereto.

"*Parent*" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

"*Participant*" has the meaning assigned to such term in Section 9.04(c)(i).

"*Participant Register*" has the meaning assigned to such term in Section 9.04(c)(ii).

"*Payment Office*" means the office of the Administrative Agent located at Hancock Whitney Loan Syndications, Attn: Matthew Chivleatto, 701 Poydras Street, Suite 1600, New Orleans, LA 70139, or such other location as to which the Administrative Agent shall have given written notice to the Borrower and the other Lenders.

"*PBGC*" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"*Periodic SOFR Determination Date*" shall have the meaning set forth in the definition of "*Term SOFR*" below.

"*Permitted Acquisition*" means an Acquisition by any Loan Party (other than any Affiliated Guarantor) of all of the outstanding Equity Interests of Persons (other than director's qualifying shares) or of other assets constituting an ongoing business, provided, that, in each case, the following conditions are satisfied:

(a)     the applicable Loan Party that is the acquirer shall comply with the requirements of Section 5.13 within the applicable time periods specified therein;

(b)     after giving effect to such Acquisition, the Loan Parties shall be in compliance with the requirements of Section 6.03(c);

(c)     (A) with respect to the Acquisition of any Person, such Person is organized under the laws of the United States of America or any state thereof or the District of Columbia, or (B) with respect to an Acquisition of all or substantially all of the assets of a Person, or of any division, business unit or product line of a Person, substantially all of the assets, division, business unit or product line are located in the United States;

(d)     no Default or Event of Default shall have occurred and be continuing both immediately before and immediately after giving effect to such Acquisition and any transactions consummated in connection therewith (including, without limitation, the incurrence of any related Indebtedness and the use of proceeds thereof) on a pro forma basis; provided, that, in the case of a Designated Limited Condition Acquisition, the requirements of this clause (d) shall be satisfied if (i) no Default or Event of Default shall have occurred and be continuing on the date on which the applicable Limited Condition Acquisition Agreement is executed and delivered by the parties thereto, and (ii) both immediately before and immediately after giving effect to the consummation such Acquisition and any transactions consummated in connection therewith (including, without limitation, the incurrence of any related Indebtedness and the use of proceeds thereof) on a pro forma basis, no Event of Default pursuant to clause (a), (b), (h), (i) or (j) of Article 7 shall have occurred and be continuing;

(e)     immediately prior thereto, and after giving pro forma effect thereto, the representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects

26

on and as of such earlier date; provided, that, (i) to the extent any such representation or warranty is already qualified by materiality or Material Adverse Effect, such representation or warranty shall be true and correct in all respects, and (ii) for purposes of this clause (e), the representations and warranties contained in Section 3.04 shall be deemed to refer to the most recent statements pursuant to Section 5.01(a)(i) and Section 5.01(a)(ii); provided, further, that, in the case of a Designated Limited Condition Acquisition, (x) such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) only as of the Limited Condition Acquisition Test Date, and (y) the only representations and warranties required to be true and correct at the time of the consummation of such Limited Condition Acquisition are (1) the Specified Representations, and (2) such representations and warranties regarding the target of such Limited Condition Acquisition and its Subsidiaries made by or with respect to such target and its Subsidiaries as are material to the interests of the Administrative Agent and the Lenders, but only to the extent that the applicable Loan Party has the right to terminate its obligations under such Limited Condition Acquisition Agreement or to *not* consummate such Limited Condition Acquisition pursuant to such Limited Condition Acquisition Agreement as a result of the failure of such representations and warranties to be true and correct;

(f)      subject, in the case of a Designated Limited Condition Acquisition, to Section 1.08, upon giving effect to such Acquisition and any transactions consummated in connection therewith (including, without limitation, the incurrence of any Indebtedness and the use of proceeds thereof) on a pro forma basis, the Loan Parties would be in compliance with each of the financial covenants set forth in Section 6.12, recomputed as of the end of the most recent period of four (4) fiscal quarter for which financial statements and the related Compliance Certificate have been delivered pursuant to Section 5.01;

(g)      such Acquisition shall not be an Unfriendly Acquisition;

(h)      if the Total Consideration paid in connection with such Acquisition is in *excess* of $10,000,000, the Borrower shall have delivered to the Administrative Agent, *at least* five (5) Business Days prior to the date of consummation of such Acquisition (or such shorter period as the Administrative Agent may agree in its sole discretion), each of the following: (i) then-available drafts of the definitive agreement relating to such Acquisition, with a final version of such agreement to be delivered prior to the date of consummation of such Acquisition (or at such other time as the Administrative Agent may agree in its sole discretion); (ii) such prepared and available historical financial statements of the target of such Acquisition and its Subsidiaries for the most recent trailing four (4) fiscal quarter period for which any such financial statements are available; and (iii) such additional business and financial information and material acquisition documents relating to such Acquisition or the target of such Acquisition and its Subsidiaries as the Administrative Agent shall reasonably request to the extent available to the Borrower.

"*Permitted Discretion*" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"*Permitted Encumbrances*" means:

(a)      Liens imposed by law for Taxes that are *not* yet due or are being contested in compliance with Section 5.04;

(b)      carriers', warehousemen's, landlords', sub-landlords', mechanics', materialmen's, repairmen's, construction contractors and other like Liens imposed by law, arising in the ordinary course of business and securing obligations;

(c)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

CHAR1\1940128v8

(d)        deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)        judgment Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article 7;

(f)        easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do *not* secure any monetary obligations and do *not* materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of any Loan Party or any Subsidiary of the Borrower;

(g)        statutory Liens on deposit accounts maintained with, or other property in the custody of, a depositary bank pursuant to its general business terms and in the ordinary course of business, provided, that, such Liens do *not* secure any Indebtedness;

(h)        Liens consisting of pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations to (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Loan Party, provided, that, in each case, such obligation is *not* for borrowed money;

(i)        Liens that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers of Borrower in the ordinary course of business;

(j)        Liens on tangible property in favor of landlords securing obligations of any Loan Party under leases; provided, that, such Liens do *not* extend to or cover any tangible property other than tangible property located at such locations and other locations leased by the same landlord;

(k)        automobile dealer bonds posted in the ordinary course of business; and

(l)        Liens securing Indebtedness permitted under, and incurred in reliance on, Section 6.01(q), provided, that, such Liens are, at all times, subject to the RAC Investor Subordination Agreement or otherwise subordinated on terms acceptable to the Administrative Agent in its sole discretion.

"*Permitted Investments*" means:

(a)        direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b)        investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)        investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any state thereof which has a combined capital and surplus and undivided profits of *not less than* $500,000,000;

(d)        fully collateralized repurchase agreements with a term of *not more than* thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)        money market funds that (i) comply with the criteria set forth in Securities and Exchange

Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's, and (iii) have portfolio assets of *at least* $5,000,000,000; and

(f)    mutual funds investing *solely* in any one or more of the Permitted Investments described in the foregoing <u>clauses (a)</u> through (<u>e</u>).

"<u>*Person*</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>*Plan*</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>*Plan Asset Regulations*</u>" means 29 CFR § 2510.3-101 *et seq.*, as modified by Section 3(42) of ERISA, as amended from time to time.

"<u>*Prime Rate*</u>" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"<u>*Projections*</u>" has the meaning assigned to such term in <u>Section 5.01(a)(v)</u>.

"<u>*PTE*</u>" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>*Public Market*</u>" shall exist if (a) a Public Offering has been consummated, (b) any amount of Equity Interests in any Affiliated Guarantor, or in any direct or indirect parent of any Affiliated Guarantor, has been distributed by means of an effective registration statement under the Securities Act of 1933, or (c) any business combination shall be consummated which results in the Borrower being owned, in whole or in part, directly or indirectly, by an entity the Equity Interests of which are listed on a national securities exchange or which are eligible for trading in a national securities market.

"<u>*Public Offering*</u>" means a public offering of the Equity Interests in any Affiliated Guarantor, or in any direct or indirect parent of any Affiliated Guarantor, pursuant to an effective registration statement under the Securities Act of 1933.

"<u>*Public-Sider*</u>" means a Lender whose representatives may trade in securities of the Borrower or its Controlling person or any of its Subsidiaries while in possession of the financial statements provided by the Borrower under the terms of this Agreement.

"<u>*QFC*</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"<u>*QFC Credit Support*</u>" has the meaning assigned to it in <u>Section 9.21</u>.

"<u>*Qualified ECP Guarantor*</u>" means, in respect of any Swap Obligation, each Loan Party that has total assets *exceeding* $10,000,000 at the time the relevant Loan Guaranty or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other person as constitutes an

CHAR1\1940128v8

"eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"*RAC Asset Holdings*" means RAC Asset Holdings, LLC, a Delaware limited liability company.

"*RAC Investor Subordination Agreement*" means that certain Subordination and Intercreditor Agreement, dated as of the Second Amendment Effective Date, by and among RAC Investor, LLC, a Delaware limited liability company, Holdings, the other Affiliated Guarantors and the Administrative Agent (as such agreement may be amended, restated, amended and restated, supplemented, replaced, and/or otherwise modified in writing from time to time).

"*RAC Servicer*" means RAC Servicer, LLC, a Delaware limited liability company.

"*Real Property*" means all real property that was, is now or may hereafter be owned, occupied or otherwise controlled by any Loan Party pursuant to any contract of sale, lease or other conveyance of any legal interest in any real property to any Loan Party.

"*Real Property Lease*" means any rented or leasehold interest in any Real Property pursuant to the terms of the applicable rental or lease agreement.

"*Recipient*" means, as applicable, (a) the Administrative Agent, and (b) any Lender, or any combination thereof (as the context requires).

"*Register*" has the meaning assigned to such term in Section 9.04(b)(iv).

"*Regulation D*" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"*Regulation T*" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"*Regulation U*" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"*Regulation X*" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"*Related Parties*" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"*Release*" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of any substance into the environment.

"*Relevant Governmental Body*" means the Federal Reserve Board and/or the FRBNY, or a committee officially endorsed or convened by the Federal Reserve Board and/or the FRBNY or, in each case, any successor thereto.

"*Report*" means reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's assets from information furnished by, or on behalf of, the Borrower, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent.

"*Required Lenders*" means, subject to Section 2.18, at any time, two (2) or more unaffiliated Lenders having Revolving Exposure (provided, that, as to any Lender, clause (a) of the definition of "*Swingline Exposure*" shall only be applicable in calculating a Lender's Revolving Exposure to the extent such Lender shall have funded its respective participations in the outstanding Swingline Loans) and Unfunded Commitments representing more than sixty-six and two thirds percent (66.67%) of the *sum of* the Aggregate Revolving Exposure and Unfunded Commitments at such time; provided, that, as long as there are two (2) or fewer unaffiliated Lenders, Required Lenders shall mean all such Lenders.

"*Requirement of Law*" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person, and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Residuals*" means the Collateral (as such term is defined in the Residuals Security Agreement).

"*Residuals Security Agreement*" means that certain Security Agreement (including any and all supplements thereto), dated as of the Second Amendment Effective Date, by and between RAC Asset Holdings, RAC Servicer and the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties (as amended, restated, amended and restated, supplemented, replaced, and/or otherwise modified in writing from time to time). For purposes of clarity, Holdings is *not* required to be or to become an "*Obligor*" under the Residuals Security Agreement.

"*Resolution Authority*" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" means the president, Financial Officer or other executive officer of the Borrower.

"*Restricted Payment*" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests and any other payment to Sponsor.

"*Revolving Commitment*" means, with respect to each Lender, the amount set forth on the Commitment Schedule opposite such Lender's name as such Lender's "*Revolving Commitment*", or in the Assignment and Assumption or other documentation or record (as such term is defined in Section 9-102(a)(70) of the New York Uniform Commercial Code) as provided in Section 9.04(b)(ii)(C), pursuant to which such Lender shall have assumed its Revolving Commitment, as applicable, as such Revolving Commitment may be reduced or increased from time to time pursuant to (a) the Second Amendment, and (b) assignments by or to such Lender pursuant to Section 9.04; provided, that, at no time shall the Revolving Exposure of any Lender *exceed* its Revolving Commitment. The initial aggregate amount of the Revolving Commitments of the Lenders on the Closing Date was Sixty Million Dollars ($60,000,000), and the aggregate amount of the Revolving Commitments of the Lenders on the Second Amendment Effective Date, after giving effect to the reduction in the aggregate amount of the Revolving Commitments of the Lenders on the Second Amendment Effective Date pursuant to the Second Amendment, is Fifteen Million Dollars ($15,000,000).

"*Revolving Credit Maturity Date*" means: (a) September 30, 2023 (if the same is a Business Day, or if *not*, then the immediately next succeeding Business Day); or (b) any *earlier* date on which the Revolving Commitments are reduced to zero (0) or otherwise terminated pursuant to the terms hereof.

"*Revolving Exposure*" means, with respect to any Lender, at any time, the *sum of* the aggregate outstanding principal amount of such Lender's Revolving Loans and Swingline Exposure at such time.

"*Revolving Lender*" means, as of any date of determination, a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"*Revolving Loan*" means a Loan made by a Lender (other than the Swingline Lender) to the Borrower under its Revolving Commitment, which may be a ABR Loan or a SOFR Loan.

"*S&P*" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"*Sale and Leaseback Transaction*" has the meaning assigned to such term in Section 6.06.

"*Sanctioned Country*" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"*Sanctioned Person*" means, at any time: (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority; (b) any Person operating, organized or resident in a Sanctioned Country; (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b); or (d) any Person otherwise the subject of any Sanctions.

"*Sanctions*" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by: (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State; or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"*Scheduled Borrowing Base Reporting Date*" has the meaning assigned to it in Section 5.01(a)(vi).

"*SEC*" means the Securities and Exchange Commission of the U.S.

"*Second Amendment*" means that certain Second Amendment to Credit Agreement and Waiver, dated as of the Second Amendment Effective Date, by and among the Borrower, each of the Affiliated Guarantors, the Lenders and the Administrative Agent.

"*Second Amendment Effective Date*" means October 5, 2022.

"*Second Amendment Guarantors*" means, collectively: (a) Holdings; (b) Intermediate Holdings; (c) RAC Servicer; and (d) RAC Asset Holdings.

"*Secured Obligations*" means all Obligations, together with all (a) Banking Services Obligations, and (b) Swap Agreement Obligations owing to one or more Lenders or their respective Affiliates; provided, that, the definition of "*Secured Obligations*" shall *not* create any guarantee by any Guarantor of (or grant of security interest by any Guarantor to support, as applicable) any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of any Guarantor.

"*Secured Parties*" means (a) the Lenders, (b) the Administrative Agent, (c) each provider of Banking Services, to the extent the Banking Services Obligations in respect thereof constitute Secured Obligations, (d) each counterparty to any Swap Agreement, to the extent the obligations thereunder constitute Secured Obligations, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (f) the successors and assigns of each of the foregoing.

"*Security Agreements*" means, collectively: (a) the Borrower Security Agreement; (b) the Vehicle Security Agreement; (c) the Equity Pledge Agreement; (d) the Residuals Security Agreement; and (e) any other pledge or security agreement entered into after the Second Amendment Effective Date by any Loan Party (whether as required by this Agreement or any other Loan Document or otherwise) or any other Person, for the benefit of the Administrative Agent and the other Secured Parties (in any such case, as such other pledge or security agreement may be amended, restated, amended and restated, supplemented, replaced, and/or otherwise modified in writing from time to time).

"*SIFMA*" means the Securities Industry and Financial Markets Association (or any successor thereto).

"*SOFR*" means a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"*SOFR Adjustment*" means a percentage equal to 0.10000% (10.000 basis points) per annum.

"*SOFR Administrator*" means the FRBNY (or any successor administrator of the secured overnight financing rate).

"*SOFR-Based Rate*" means each of Adjusted Term SOFR for any Interest Period and Term SOFR for any Interest Period.

"*SOFR Borrowing*" means a Revolving Borrowing, the Revolving Loans in respect of which bear interest at a rate determined by reference to Adjusted Term SOFR for any available Interest Period, other than pursuant to clause (c) of the definition of "*Alternate Base Rate*" above.

"*SOFR Loan*" means a Revolving Loan bearing interest at a rate determined by reference to Adjusted Term SOFR for any available Interest Period, other than pursuant to clause (c) of the definition of "*Alternate Base Rate*" above.

"*SOFR Reference Rate*" means the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR for an applicable tenor.

"*Specified Equity Contribution*" has the meaning assigned to it in Section 6.13.

"*Specified Representations*" means the representations and warranties made pursuant to Section 3.01(a), Section 3.01(b), Section 3.02, Section 3.03(a), Section 3.03(b), Section 3.03(c)(i), Section 3.08, Section 3.13, Section 3.16, Section 3.18, Section 3.19, and Section 3.21.

"*Specified Restricted Insider Debt*" means, collectively, (a) the Indebtedness subject to the Holdings Subordination Agreement, and (b) the Indebtedness subject to the RAC Investor Subordination Agreement.

"*Sponsor*" means York Capital Management Global Advisors, LLC, together with its controlled funds and controlled Affiliates.

"*Statements*" has the meaning assigned to such term in Section 2.16(f).

"*Subordinated Indebtedness*" of a Person means any Indebtedness of such Person, the payment of which is subordinated to payment of the Secured Obligations to the written satisfaction of the Administrative Agent in its Permitted Discretion.

"*subsidiary*" means, with respect to any Person (the "*parent*") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in

accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity: (a) of which securities or other ownership interests representing *more than* fifty percent (50%) of the equity or *more than* fifty percent (50%) of the ordinary voting power or, in the case of a partnership, *more than* fifty percent (50%) of the general partnership interests are, as of such date, owned, controlled or held; or (b) that is, as of such date, otherwise Controlled, by the parent and/or one or more subsidiaries of the parent.

"*Subsidiary*" means, with respect to any Person, any direct or indirect subsidiary of such Person; provided, that, unless otherwise specified, "*Subsidiary*" means any direct or indirect subsidiary of a Loan Party.

"*Supplemental Payment Account*" means a blocked account subject to the Administrative Agent's control, as additional Collateral for the Obligations.

"*Supplemental Payment Amount*" means $1,000,000.

"*Supplemental Payment*" means one or more payments delivered to the Administrative Agent to be held in the Supplemental Payment Account.

"*Supported QFC*" has the meaning assigned to it in Section 9.21.

"*Swap Agreement*" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided, that, no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower shall be a Swap Agreement.

"*Swap Agreement Obligations*" means any and all obligations of the Loan Parties and any of their respective Subsidiaries, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under: (a) any Swap Agreement permitted hereunder with a Lender or an Affiliate of a Lender; and (b) any cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction permitted hereunder with a Lender or an Affiliate of a Lender.

"*Swap Obligation*" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"*Swingline Commitment*" means: (a) at any time after the Closing Date but *prior* to the Second Amendment Effective Date, Twenty Million Dollars ($20,000,000); and (b) at any time on or after the Second Amendment Effective Date, Zero Dollars ($0.00).

"*Swingline Exposure*" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time. The Swingline Exposure of any Revolving Lender at any time shall be the *sum of*: (a) its Applicable Percentage of the total Swingline Exposure at such time other than with respect to any Swingline Loans made by such Revolving Lender in its capacity as the Swingline Lender; and (b) the principal amount of all Swingline Loans made by such Revolving Lender in its capacity as the Swingline Lender outstanding at such time (less the amount of participations funded by the other Lenders in such Swingline Loans).

"*Swingline Lender*" means Hancock Whitney, in its capacity as lender of Swingline Loans hereunder. Any consent required of the Administrative Agent shall be deemed to be required of the Swingline Lender and any consent given by Hancock Whitney in its capacity as Administrative Agent shall be deemed given by Hancock Whitney in its capacity as Swingline Lender as well.

34

"*Swingline Loan*" means a Loan made pursuant to Section 2.21.

"*Tangible Net Worth*" means, with respect to King and its Subsidiaries on a consolidated basis in accordance with GAAP (subject, in any event, to Section 1.04), (a) the *sum of* (i) common stock, (ii) preferred stock, (iii) capital surplus, (iv) retained earnings, and (v) Indebtedness specifically subordinated to the Secured Obligations as evidenced by a properly executed subordination agreement in form and substance satisfactory to the Administrative Agent, *less* (b) the *sum of* (i) all treasury stock, and (ii) all Intangible Assets.

"*Taxes*" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Term Lender*" means, as of any date of determination, a Lender with an Overadvance Term Loan Commitment or, if the Overadvance Term Loan Commitments have terminated or expired, a Lender holding a portion of the outstanding principal amount of the Overadvance Term Loan.

"*Term SOFR*" means, as of any date of determination, for any calculations with respect to a SOFR Loan and/or a SOFR Borrowing and/or any determination of the Alternate Base Rate pursuant to clause (c) of the definition of "*Alternate Base Rate*" above, the rate per annum equal to the SOFR Reference Rate for a forward-looking tenor comparable to the then applicable or selected (as applicable) Interest Period for such SOFR Loan or SOFR Borrowing (or for a forward-looking one (1) month tenor, in the case of any determination of the Alternate Base Rate pursuant to clause (c) of the definition of "*Alternate Base Rate*" above), determined as of the date (such date, a "*Periodic SOFR Determination Date*") that is two (2) U.S. Government Securities Business Days *prior* to the first (1st) day of such Interest Period, as such rate is published by the Term SOFR Administrator on such Periodic SOFR Determination Date; provided, that, if, as of 5:00 p.m., Eastern Time, on any Periodic SOFR Determination Date, (i) the SOFR Reference Rate for the applicable tenor has *not* been published by the Term SOFR Administrator, and (ii) a Benchmark Replacement Date with respect to the SOFR Reference Rate has *not* occurred, then "*Term SOFR*" shall instead mean the SOFR Reference Rate for such applicable tenor as published by the Term SOFR Administrator on the first (1st) preceding U.S. Government Securities Business Day for which the SOFR Reference Rate for such applicable tenor was published by the Term SOFR Administrator, so long as such first (1st) preceding U.S. Government Securities Business Day is *not more than* three (3) U.S. Government Securities Business Days prior to such Periodic SOFR Determination Date. Any change(s) in Term SOFR for any Interest Period due to any change(s) in the SOFR Reference Rate for a comparable tenor shall be effective from, and including, the effective date of any such change(s) in the SOFR Reference Rate, without further notice to any Loan Party or Subsidiary, any other party to this Agreement or any other Loan Document, or any other Person.

"*Term SOFR Administrator*" means the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"*Total Consideration*" means, with respect to any Acquisition, as at the date of entering into any agreement therefor, the sum of the following (without duplication): (a) the amount of any cash and fair market value of other property given by any Loan Party or any Subsidiary of the Borrower as consideration in connection with such Acquisition; (b) the amount of any Indebtedness incurred, assumed or acquired by any Loan Party or any Subsidiary of the Borrower in connection with such Acquisition; and (c) all additional purchase price amounts in the form of earnouts and other contingent obligations that (i) are payable in cash, and (ii) should be recorded on the consolidated financial statements of Holdings and its Subsidiaries in accordance with GAAP in connection with such Acquisition.

"*Total Indebtedness*" means, at any date, the aggregate principal amount of all Indebtedness determined for King and its Subsidiaries on a consolidated basis in accordance with GAAP (subject, in any event, to Section 1.04) at such date; provided, that, "*Total Indebtedness*" shall include, with respect to Indebtedness contemplated

in <u>clause (i)</u> of the definition thereof, such Indebtedness of King and its Subsidiaries only to the extent of any amount that has been drawn under such agreement and *not* reimbursed.

"*Transactions*" means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions and the use of the proceeds thereof.

"*Type*", when used in reference to a Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR for any Interest Period (other than pursuant to clause (c) of the definition of "*Alternate Base Rate*" above) or the Alternate Base Rate (including, for the avoidance of doubt, pursuant to clause (c) of the definition of "*Alternate Base Rate*" above).

"*UCC*" means the Uniform Commercial Code as in effect from time to time in the State of New York or in any other state, the laws of which are required to be applied in connection with the issue of perfection of security interests.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Unadjusted Benchmark Replacement*" means the applicable Benchmark Replacement without giving effect to the Benchmark Replacement Adjustment.

"*Unfriendly Acquisition*" means any acquisition that has *not*, upon the earlier to occur of (a) the time of the first public announcement of an offer relating thereto, and (b) the execution of the definitive documentation therefor, been duly approved by the board of directors (or other legally recognized governing body) of the Person to be acquired.

"*Unfunded Commitment*" means, with respect to each Lender, the Revolving Commitment of such Lender *less* its Revolving Exposure; provided, that, as to any Lender, <u>clause (a)</u> of the definition of "*Swingline Exposure*" shall only be applicable in calculating a Lender's Revolving Exposure to the extent such Lender shall have funded its respective participations in the outstanding Swingline Loans.

"*Unliquidated Obligations*" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is: (a) an obligation to reimburse a bank for drawings *not* yet made under a letter of credit issued by it; (b) any other obligation (including any guarantee) that is contingent in nature at such time; or (c) an obligation to provide collateral to secure any of the foregoing types of obligations.

"*U.S.*" means the United States of America.

"*U.S. Government Securities Business Day*" means any day, other than: (a) a Saturday or a Sunday; or (b) any day on which SIFMA recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

"*U.S. Person*" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"*U.S. Special Resolution Regime*" has the meaning assigned to it in <u>Section 9.21</u>.

36

"*U.S. Tax Compliance Certificate*" has the meaning assigned to such term in Section 2.15(f)(ii)(B)(III).

"*USA PATRIOT Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"*Vehicle Security Agreement*" means that certain Security Agreement (including any and all supplements thereto), dated as of the Closing Date, by and between the Borrower and the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties (as amended, restated, amended and restated, supplemented, replaced, and/or otherwise modified in writing from time to time). For purposes of clarity, Holdings is *not* required to be or to become a "*Grantor*" or an "*Obligor*" (as applicable) under the Vehicle Security Agreement.

"*Warehouse Facility*" means that certain Loan and Security Agreement, dated as of August 16, 2019, by and among ACC WH Trust 2019-A, a Delaware statutory trust, as the borrower, RAC Servicer, as servicer, RAC Asset Holdings, as residual holder, the lenders and group agents from time to time party thereto, Wells Fargo bank, N.A., as collateral agent, and Credit Suisse AG, New York Branch, as administrative agent (as amended by that certain First Amendment to Loan and Security Agreement, dated as of October 18, 2019, as further amended by that certain Second Amended to Loan and Security Agreement, dated as of November 20, 2019, as further amended by that certain Third Amendment to Loan and Security Agreement, dated as of December 11, 2020, and as further amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time).

"*Withdrawal Liability*" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withholding Agent*" means the Borrower and the Administrative Agent.

"*Write-Down and Conversion Powers*" means: (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule; and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution, or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it, or to suspend any obligation in respect of that liability, or any of the powers under that Bail-In Legislation that are related or ancillary to any of those powers.

Section 1.02    Classification of Loans and Borrowings. For purposes of this Agreement and the other Loan Documents, Loans may be classified and referred to by Class (*e.g.*, a "*Revolving Loan*" or the "*Overadvance Term Loan*") and, if Revolving Loans, by Type (*e.g.*, a "*SOFR Loan*" or an "*ABR Loan*") or by Class and Type (*e.g.*, a "*Revolving SOFR Loan*"). Borrowings also may be classified and referred to by Class (*e.g.*, a "*Revolving Borrowing*") and, if Revolving Borrowings, by Type (*e.g.*, a "*SOFR Borrowing*" or an "*ABR Borrowing*") or by Class and Type (*e.g.*, a "*Revolving SOFR Borrowing*").

Section 1.03    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*", "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*". The word "*law*" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "*will*" shall be construed to have the same meaning and effect as the word "*shall*". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document

herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "*herein*", "*hereof*" and "*hereunder*", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "*at any time*" or "*for any period*" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "*asset*" and "*property*" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

      Section 1.04     Accounting Terms; GAAP; Rounding.

      (a)     Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, that, if, at any time, any change in GAAP would affect the computation of any financial ratio, financial covenant or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request in writing, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided, further, that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein, and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios (including all financial covenants) referred to herein shall be made (i) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Holdings, the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

      (b)     Notwithstanding anything to the contrary in this Agreement or any other Loan Document, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, all liability amounts shall be determined *excluding* any liability relating to any operating lease, all asset amounts shall be determined *excluding* any right-of-use assets relating to any operating lease, all amortization amounts shall be determined *excluding* any amortization of a right-of-use asset relating to any operating lease, and all interest amounts shall be determined *excluding* any deemed interest comprising a portion of fixed rent payable under any operating lease, in each case of the foregoing of this clause (b), to the extent that such liability, asset, amortization or interest pertains to an operating lease under which the covenantor or a member of its consolidated group is the lessee and would *not* have been accounted for as such under GAAP as in effect on December 31, 2015. For the avoidance of doubt, all references to "*GAAP*" in this Agreement and the other Loan Documents shall be to GAAP without giving effect to the adoption of FASB ASC 842.

      (c)     Any financial ratios required to be maintained by any Loan Party pursuant to this Agreement shall

be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

(d)　　Notwithstanding anything to the contrary in this Agreement or any other Loans Documents, any calculation of "extraordinary gains" and/or "extraordinary losses" shall, in each case for all purposes of this Agreement and the other Loan Documents, be determined by reference to GAAP as in effect immediately prior to giving effect to FASB's Accounting Standards Update No. 2015–01.

Section 1.05　　Interest Rate Disclosure; Cashless Rollovers.

(a)　　The Administrative Agent does *not* warrant or accept responsibility for, and shall *not* have any liability whatsoever with respect to: (a) the continuation, administration, submission and/or calculation of, or any other matter related to, any of the Alternate Base Rate, the SOFR Reference Rate and/or any SOFR-Based Rate for any Interest Period, or any component definition used or referred to in, or any rate(s) used or referred to in, the definitions of any of the foregoing in Section 1.01, or for any alternative, successor or replacement rate thereto (including, without limitation, any Benchmark Replacement), including whether the composition and/or characteristics of any such actual or proposed alternative, successor or replacement rate (including, without limitation, any Benchmark Replacement) is or will be similar to, or produces or will produce the same or substantially equivalent value or economic equivalence of, or has or will have the same or a comparable volume or liquidity as, any of the Alternate Base Rate, the SOFR Reference Rate, any SOFR-Based Rate for any Interest Period and/or any other Benchmark prior to its discontinuance or unavailability; or (b) the effect, implementation and/or composition of any Conforming Changes. The Administrative Agent, together with its affiliates and other related entities, may engage in transactions that affect the calculation of any of the Alternate Base Rate, the SOFR Reference Rate, any SOFR-Based Rate for any Interest Period, any alternative, successor or replacement rate of any of the foregoing (including, without limitation, any Benchmark Replacement), and/or any relevant adjustments to any of the foregoing, in any such case of the foregoing, in a manner adverse to the Borrower and the other Loan Parties. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any of the Alternate Base Rate, the SOFR Reference Rate, any SOFR-Based Rate for any Interest Period, and/or any other Benchmark, in each case of the foregoing, pursuant to the terms of this Agreement, and the Administrative Agent shall have no liability whatsoever to the Borrower, any other Loan Party, any Subsidiary, any Lender and/or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental and/or consequential damages, costs, losses and/or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or any component thereof) provided by any such information source or service.

(b)　　Notwithstanding anything to the contrary in this Agreement or any other Loan Document, to the extent that any Lender agrees to extend the maturity date of, or replaces, renews and/or refinances any of, its then-existing Loans pursuant to any loans incurred under a new credit facility (including, without limitation, the conversion of outstanding Revolving Loans on the Second Amendment Effective Date to the Overadvance Term Loan as described in this Agreement and the Second Amendment), in each case of the foregoing, to the extent that such extension, replacement, renewal and/or refinancing is effected by means of a "cashless roll" by such Lender, then such extension, replacement, renewal and/or refinancing shall be deemed to comply with any requirement(s) under this Agreement or any other Loan Document that any related payment(s) to be made in effectuating such extension, replacement, renewal and/or refinancing be made "in Dollars", "in immediately available funds", "in cash" or any other similar requirement.

Section 1.06　　Pro Forma Adjustments for Acquisitions and Dispositions. To the extent that the Borrower or any Subsidiary of King makes any acquisition permitted pursuant to Section 6.04 or disposition of assets outside the ordinary course of business permitted by Section 6.05 during the period of four (4) fiscal quarters of the Borrower most recently ended, the Debt to Tangible Net Worth Ratio shall be calculated after giving pro forma effect thereto (including pro forma adjustments arising out of events which are directly attributable to the acquisition or the disposition of assets, are factually supportable and are expected to have a continuing impact, in

each case as determined on a basis consistent with Article 11 of Regulation S-X of the Securities Act of 1933, as amended, as interpreted by the SEC, and as certified by a Financial Officer), as if such acquisition or such disposition (and any related incurrence, repayment or assumption of Indebtedness) had occurred in the first day of such four-quarter period.

Section 1.07    Status of Obligations. In the event that the Borrower or any other Loan Party shall at any time issue or have outstanding any Subordinated Indebtedness, the Borrower shall take, or cause such other Loan Party to take, all such actions as shall be necessary to cause the Secured Obligations to constitute senior indebtedness (however denominated) in respect of such Subordinated Indebtedness and to enable the Administrative Agent and the Lenders to have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness. Without limiting the foregoing, the Secured Obligations are hereby designated as "senior indebtedness" and as "designated senior indebtedness" and words of similar import under and in respect of any indenture or other agreement or instrument under which such Subordinated Indebtedness is outstanding and are further given all such other designations as shall be required under the terms of any such Subordinated Indebtedness in order that the Lenders may have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness.

Section 1.08    Limited Condition Acquisitions.

(a)    Notwithstanding anything to the contrary herein (except with respect to the incurrence of Indebtedness under the Revolving Commitments), for purposes of (i) determining compliance with any financial covenant set forth in Section 6.12, in each case, on a pro forma basis, (ii) determining capacity under any basket set forth herein with respect to the making of any Permitted Acquisition or any other Acquisition permitted hereunder, or (iii) determining compliance with any representation and warranty, or with any Default or Event of Default test or condition with respect to the making of any Permitted Acquisition or any other Acquisition permitted hereunder, in each case of the foregoing clauses (i), (ii) and (iii), in connection with a Limited Condition Acquisition, then, at the Borrower's election by written notice to the Administrative Agent on or prior to the Limited Condition Acquisition Test Date (any Limited Condition Acquisition so designated, a "Designated Limited Condition Acquisition"), the date of determination of whether such action is permitted hereunder (including, in the case of determining compliance with the financial covenants of Section 6.12, the reference date for determining the most recent period of four (4) consecutive fiscal quarters for which financial statements have been provided pursuant to Section 5.01) shall be deemed to be the applicable Limited Condition Acquisition Test Date; and if, after giving effect to such Limited Condition Acquisition and any other transactions to be entered into in connection therewith (including, without limitation, the incurrence of any related Indebtedness and the use of proceeds thereof) on a pro forma basis, the Borrower could have taken such action on the relevant Limited Condition Acquisition Test Date in compliance with such applicable financial covenant, basket, representation and warranty, or Default or Event of Default test or condition, in each such case of the foregoing, such financial covenant, basket, representation and warranty, or Default or Event of Default test or condition, as the case may be, shall be deemed to have been complied with.

(b)    For the avoidance of doubt, if the Borrower has designated any Acquisition as a Limited Condition Acquisition in accordance with the terms of the foregoing clause (a) and any applicable financial covenant, basket, representation and warranty, or Default or Event of Default test or condition, as the case may be, for which compliance was determined or tested as of the applicable Limited Condition Acquisition Test Date, would thereafter have failed to have been satisfied as a result of fluctuations in any such financial covenant or basket, or changes in compliance with such representation and warranty or such Default or Event of Default test or condition, in each case of the foregoing, as of, or prior to, the date of consummation of the applicable Limited Condition Acquisition, then such financial covenant, basket, representation and warranty, and Default or Event of Default test or condition shall *not* be deemed to have failed to have been satisfied as a result of such fluctuations or changes. If the Borrower has designated any Acquisition as a Limited Condition Acquisition in accordance with the terms of the foregoing clause (a), then, in connection with any subsequent calculation of any ratio (other than the testing of actual compliance with any of the financial covenants set forth in Section 6.12 and the

40

determination of the Debt to Tangible Net Worth Ratio for purposes of calculating the Applicable Rate pursuant to clause (B) of the definition thereof) or basket on, or following, the applicable Limited Condition Acquisition Test Date, and prior to the *earlier* of (A) the date on which such Limited Condition Acquisition is consummated, and (B) the date on which such Acquisition ceases to constitute a Limited Condition Acquisition pursuant to the definition thereof, then any such ratio or basket: (i) shall be calculated on a pro forma basis, assuming that such Limited Condition Acquisition, and any other transactions consummated in connection therewith (including, without limitation, any incurrence of related Indebtedness and the use of proceeds thereof) have been consummated; and (ii) on a standalone basis, without giving effect to such Limited Condition Acquisition and any other transactions consummated in connection therewith (including, without limitation, any incurrence of related Indebtedness and the use of proceeds thereof).

ARTICLE 2
THE CREDITS

Section 2.01    Commitments.

(a)    Revolving Commitments. Subject to the terms and conditions set forth herein, each Revolving Lender severally (and not jointly) agrees to make Revolving Loans in Dollars to the Borrower from time to time during the Availability Period in an aggregate principal amount that will *not* result (after giving effect to any application of proceeds of such Borrowing pursuant to the proviso to Section 2.09(a)) in (a) such Lender's Revolving Exposure *exceeding* such Lender's Revolving Commitment, or (b) the Aggregate Revolving Exposure *exceeding* the *lesser of* (i) the aggregate Revolving Commitments, and (ii) the Borrowing Base. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.

(b)    Overadvance Term Loan Commitments. Subject to the terms and conditions set forth herein, each Term Lender severally (and not jointly) agrees to convert its respective portion of Sixteen Million Dollars ($16,000,000) of outstanding principal of Revolving Loans outstanding on the Second Amendment Effective Date to a single term loan (the "*Overadvance Term Loan*"), which shall be deemed to have been borrowed by the Borrower in full in a single advance on the Second Amendment Effective Date, in an original respective principal amount (as of the Second Amendment Effective Date) equal to the Overadvance Term Loan Commitment of such Lender (as set forth on the Commitment Schedule as such Lender's "*Overadvance Term Loan Commitment*"). The Overadvance Term Loan may *not* be reborrowed.

Section 2.02    Loans and Borrowings.

(a)    Each Loan (other than a Swingline Loan) shall be made as part of a Borrowing consisting of Loans of the same Class and (if Revolving Loans) Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it shall *not* relieve any other Lender of its obligations hereunder; provided, that, the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required. Any Swingline Loan shall be made in accordance with the procedures set forth in Section 2.21.

(b)    Subject to Section 2.13, each Revolving Borrowing shall be comprised entirely of ABR Loans or SOFR Loans, as the Borrower may request in accordance herewith. Each Swingline Loan shall bear interest at the rate per annum indicated in that certain letter agreement, dated as of the Closing Date, by and between the Borrower and the Administrative Agent. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan (and, in the case of an Affiliate, the provisions of Section 2.13, Section 2.14 and Section 2.15 shall apply to such Affiliate to the same extent as to such Lender); provided, that, any exercise of such option shall *not* affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

41

(c)      Each SOFR Borrowing shall be in an aggregate amount that is an integral multiple of $250,000 and *not less than* $1,000,000. ABR Borrowings may be in any amount; provided, that, each Swingline Loan shall be in an amount that is an integral multiple of $10,000 and *not less than* $50,000. Borrowings of *more than* one Type may be outstanding at the same time; provided, that, there shall *not*, at any time, be *more than* a total of ten (10) SOFR Borrowings outstanding.

Section 2.03      Requests for Borrowings. To request a Revolving Borrowing, the Borrower shall notify the Administrative Agent of such request either in writing (delivered by hand or fax) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, (a) in the case of a SOFR Borrowing, by *not later than* 10:00 a.m., Eastern time, three (3) Business Days before the date of the proposed Borrowing, (b) in the case of an ABR Borrowing, by *not later than* 12:00 p.m. (noon), Eastern time, on the date of the proposed Revolving Borrowing, and (c) in the case of a Swingline Loan, at such times as required pursuant to Section 2.21. Each such Borrowing Request shall be irrevocable. Each such Borrowing Request shall specify the following information in compliance with Section 2.01(a):

(i)      whether such Revolving Borrowing is a Borrowing of Revolving Loans or Swingline Loans;

(ii)      the aggregate amount of the requested Revolving Borrowing, and a breakdown of the separate wires comprising such Borrowing;

(iii)      the date of such Revolving Borrowing, which shall be a Business Day;

(iv)      whether such Revolving Borrowing is to be an ABR Borrowing or a SOFR Borrowing and, if a SOFR Borrowing, the applicable Interest Period therefor.

If no election as to the Type of a requested Revolving Borrowing is specified, then the requested Revolving Borrowing shall be an ABR Borrowing. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Revolving Loan to be made as part of the requested Borrowing.

Section 2.04      [*Reserved*].

Section 2.05      [*Reserved*].

Section 2.06      Funding of Borrowings.

(a)      Each Lender shall make each Loan to be made by such Lender hereunder on the proposed date thereof *solely* by wire transfer of immediately available funds by 2:00 p.m., Eastern time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders in an amount equal to such Lender's Applicable Percentage; provided, that, Swingline Loans shall be made as provided in Section 2.21. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the funds so received in the aforesaid account of the Administrative Agent to the Funding Account(s).

(b)      Unless the Administrative Agent shall have received notice from a Lender *prior to* the proposed date of any Borrowing that such Lender will *not* make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with clause (a) of this Section 2.06 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has *not* in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower each severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from, and including, the date such amount is made available to the Borrower to, but *excluding*, the

42

date of payment to the Administrative Agent, at (i) in the case of such Lender, the *greater of* the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing; provided, that, any interest received from the Borrower by the Administrative Agent during the period beginning when Administrative Agent funded the Borrowing until such Lender pays such amount shall be *solely* for the account of the Administrative Agent.

Section 2.07     Interest Elections.

(a)     Each Revolving Borrowing initially shall be of the Type specified in the applicable Borrowing Request. Thereafter, the Borrower may elect to convert such Revolving Borrowing to a different Type or to continue such Revolving Borrowing as provided in this Section 2.07. The Borrower may elect different options with respect to different portions of the affected Revolving Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Revolving Borrowing, and the Loans comprising each such portion shall be considered a separate Revolving Borrowing. This Section 2.07 shall *not* apply to any Borrowing of Swingline Loans, which may *not* be converted or continued.

(b)     To make an election pursuant to this Section 2.07, the Borrower shall notify the Administrative Agent of such election either in writing (delivered by hand or fax) by delivering an Interest Election Request signed by a Responsible Officer of the Borrower or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Revolving Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such Interest Election Request shall be irrevocable.

(c)     Each Interest Election Request (including requests submitted through Electronic System) shall specify the following information in compliance with Section 2.02:

(i)     the Revolving Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Revolving Borrowing (in which case, the information to be specified pursuant to clauses (ii) and (iii) below shall be specified for each resulting Revolving Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

(iii)     whether each resulting Revolving Borrowing is to be an ABR Borrowing or a SOFR Borrowing.

(d)     If, on the expiration of any Interest Period in respect of any SOFR Borrowing, the Borrower shall have failed to deliver an Interest Election request, then the Borrower shall be deemed to have elected to continue such Borrowing as a SOFR Borrowing of the same Interest Period; provided, that, no Borrowing may be converted into, or continued as, a SOFR Borrowing if a Default or an Event of Default exists, unless the Administrative Agent and each of the Lenders shall have otherwise consented in writing. No conversion of any SOFR Loan shall be permitted, except on the last day of the Interest Period in respect thereof.

(e)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Revolving Borrowing.

Section 2.08     Termination and Reduction of Commitments; Increase in Revolving Commitments.

(a)     Unless previously terminated, all the Revolving Commitments shall terminate on the Revolving Credit Maturity Date. Unless previously terminated, all the Overadvance Term Loan Commitments shall terminate

on the Second Amendment Effective Date upon the conversion of Sixteen Million Dollars ($16,000,000) of principal of then outstanding Revolving Loans to the Overadvance Term Loan as described in this Agreement and the Second Amendment.

(b)     The Borrower may, at any time, terminate the Revolving Commitments upon the Payment in Full of the Secured Obligations.

(c)     The Borrower may from time to time reduce the Revolving Commitments in part; provided, that, (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $5,000,000 and *not less than* $10,000,000, and (ii) the Borrower shall *not* terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.10, the Aggregate Revolving Exposure would *exceed* the *lesser of* (x) the aggregate Revolving Commitments, and (y) the Borrowing Base.

(d)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under clause (b) or (c) of this Section 2.08 *at least* three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable; provided, that, a notice of termination of the Revolving Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is *not* satisfied. Any termination or reduction of the Revolving Commitments shall be permanent. Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Revolving Commitments.

Section 2.09     Repayment of Loans; Evidence of Debt.

(a)     The Borrower hereby unconditionally promises to pay: (i) to (A) the Administrative Agent, for the account of each Revolving Lender, the then unpaid principal amount of each Revolving Loan on the Revolving Credit Maturity Date, and (B) the Swingline Lender the then unpaid principal amount of each Swingline Loan on the *earlier* of the Revolving Credit Maturity Date and the fifth (5th) Business Day after such Swingline Loan is made, provided, that, on each date that a Revolving Loan is made, the Borrower shall repay all Swingline Loans then outstanding and the proceeds of any such Revolving Loan shall be applied by the Administrative Agent to repay any Swingline Loans outstanding; and (ii) to the Administrative Agent, for the account of each Term Lender, the then unpaid principal amount of the Overadvance Term Loan of such Lender in equal monthly installments, in an aggregate principal amount of Two-Hundred Thousand Dollars ($200,000) for all Term Lenders, on the last day of each calendar month, commencing with the calendar month ending January 31, 2023 (and on such other date(s), and in such other amount(s), as may be required from time to time pursuant to this Agreement); provided, that, to the extent *not* previously paid, the aggregate unpaid principal balance of the Overadvance Term Loan shall be due and payable on the Overadvance Term Loan Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder and the Type thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to clauses (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided, that, the

44

failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall *not* in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to <u>Section 9.04</u>) be represented by one or more promissory notes in such form.

Section 2.10    <u>Prepayment of Loans</u>.

(a)    The Borrower shall have the right, at any time and from time to time, to prepay any Borrowing in whole or in part, subject to prior notice in accordance with <u>clause (f)</u> of this <u>Section 2.10</u>.

(b)    In the event and on such occasion that the Aggregate Revolving Exposure *exceeds* the aggregate Revolving Commitments, the Borrower immediately shall prepay the Revolving Loans and/or the Swingline Loans to the extent of such excess.

(c)    The Borrower shall make the following prepayments on the Loans:

(i)    In the event and on each occasion that any Net Proceeds are received by, or on behalf of, the Borrower or any Subsidiary of the Borrower from the incurrence by the Borrower or any Subsidiary of the Borrower of any Indebtedness other than Indebtedness permitted under <u>Section 6.01</u>, the Borrower shall, immediately after such Net Proceeds are received by the Borrower or any Subsidiary of the Borrower, prepay the Obligations as set forth in <u>Section 2.10(e)</u> below in an aggregate amount equal to one hundred percent (100%) of such Net Proceeds;

(ii)    Upon the occurrence of any Disposition of that certain real property located at 1425 Gallatin Pike N., Madison, Tennessee by Holdings, the Borrower shall promptly (but in no event later than three (3) Business Days) after the related Net Proceeds are received by any Loan Party or Subsidiary thereof, prepay the Obligations as set forth in <u>Section 2.10(e)</u> below in an amount equal to fifty percent (50%) of the Net Proceeds of such Disposition, up to the *sum of* the aggregate then outstanding balance of the Overadvance Term Loan *plus* the then-current amount of accrued interest on the Overadvance Term Loan;

(iii)    In the event and on each occasion that any Net Proceeds are received by, or on behalf of, the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor from the incurrence by any Loan Party or any Subsidiary thereof, on or after the Second Amendment Effective Date, of any term loan Indebtedness (other than (x) Indebtedness under this Agreement, and (y) Indebtedness permitted under, and incurred in reliance on, <u>Section 6.01(q)</u>) that is secured, in whole or in part, by any of the Residuals, the Borrower shall, immediately after such Net Proceeds are received by the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor and, in any event, concurrently with any related release of Liens by the Administrative Agent, prepay the Obligations as set forth in <u>Section 2.10(e)</u> below in an aggregate amount equal to one hundred percent (100%) of such Net Proceeds, up to the *sum of* the aggregate then outstanding balance of the Overadvance Term Loan *plus* the then-current amount of accrued interest on the Overadvance Term Loan;

(iv)    In the event and on each occasion that any Net Proceeds are received by, or on behalf of, the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor from the Disposition of any of the Residuals by any Loan Party or Subsidiary thereof, the Borrower shall, immediately after such Net Proceeds are received by the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor and, in any event, concurrently with any related release of Liens by the Administrative Agent, prepay the Obligations as set forth in <u>Section 2.10(e)</u> below in an aggregate amount equal to one hundred percent

(100%) of such Net Proceeds, up to the *sum of* the aggregate then outstanding balance of the Overadvance Term Loan *plus* the then-current amount of accrued interest on the Overadvance Term Loan; and

(v)    In the event and on each occasion that any Net Proceeds are received by, or on behalf of, the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor from contractual distributions in respect of any of the Residuals in the ordinary course of business, the Borrower shall, promptly (but in no event later than one (1) Business Day) after such Net Proceeds are received by the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor, prepay the Obligations as set forth in Section 2.10(e) below in an aggregate amount equal to fifty percent (50%) of such Net Proceeds, up to the *sum of* the aggregate then outstanding balance of the Overadvance Term Loan *plus* the then-current amount of accrued interest on the Overadvance Term Loan.

(d)    Upon the Borrower's delivery of a Borrowing Base Certificate by the Scheduled Borrowing Base Reporting Date pursuant to Section 5.1(a)(vi), in the event and on such occasion that the Aggregate Revolving Exposure *exceeds* the Borrowing Base, the Borrower shall (within one (1) Business Day) prepay the Revolving Loans and/or the Swingline Loans to the extent of such excess.

(e)    Any prepayments made by the Borrower pursuant to the foregoing clause (c) shall, in each case, be applied, *first*, to accrued interest in respect of the Overadvance Term Loan, *second*, the outstanding principal balance of the Overadvance Term Loan, and applied to the remaining scheduled principal installments thereof (including the principal installment thereof due and payable on the Overadvance Term Loan Maturity Date) in *inverse* order of maturity, and *third*, to the Supplemental Payment Account as a Supplemental Payment (up to, together with any other Supplemental Payments in the aggregate, the Supplemental Payment Amount).

(f)    The Borrower shall notify the Administrative Agent (and, in the case of prepayment of a Swingline Loan, the Swingline Lender) by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, of any prepayment under this Section 2.10: (i) in the case of prepayment of a SOFR Borrowing, by *not later than* 10:00 a.m., Eastern time, three (3) Business Days before the date of prepayment, (ii) in the case of prepayment of an ABR Borrowing, by *not later than* 10:00 a.m., Eastern time, one (1) Business Day before the date of prepayment, or (iii) in the case of prepayment of a Swingline Loan, by *not later than* 11:00 a.m. Eastern time, on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid; provided, that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitments as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Revolving Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing pursuant to the foregoing clause (a) shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.12.

Section 2.11    Fees.

(a)    The Borrower agrees to pay to the Administrative Agent a commitment fee (the "*Commitment Fee*") for the account of each Revolving Lender, which shall accrue at the Applicable Rate on the daily amount of the undrawn portion of the Revolving Commitment of such Lender during the period from, and including, the Closing Date to, but *excluding*, the date on which the Lenders' Revolving Commitments terminate, it being understood that the Swingline Exposure of a Lender shall be *excluded* from the drawn portion of the Revolving Commitment of such Lender for purposes of calculating the Commitment Fees. Accrued Commitment Fees shall be payable in arrears on the last day of each calendar month of each year and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the Closing Date. All Commitment Fees shall be computed on the basis of a year of three hundred sixty (360) days and shall be payable for the actual

46

number of days elapsed (including the first day, but *excluding* the last day).

(b)       The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(c)       All fees payable hereunder shall be paid on the dates due, in Dollars in immediately available funds, to the Administrative Agent for distribution, in the case of Commitment Fees, to the Lenders entitled thereto. Fees paid shall *not* be refundable under any circumstances.

Section 2.12       Interest.

(a)       The Revolving Loans comprising: (i) each ABR Revolving Borrowing shall bear interest at the Alternate Base Rate *plus* the Applicable Rate; and (ii) each SOFR Borrowing shall bear interest at Adjusted Term SOFR *plus* the Applicable Rate.

(b)       The Overadvance Term Loan shall bear interest at the Applicable Rate.

(c)       Each Swingline Loan shall bear interest at the rate per annum indicated in that certain letter agreement, dated as of the Closing Date, by and between the Borrower and the Administrative Agent.

(d)       Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, automatically in the case of any Event of Default under clause (a), (b), (h), (i), or (j) of Article 7 and otherwise at the election of the Required Lenders, by notice to the Borrower (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of Section 9.02 requiring the consent of "each Lender affected thereby" for reductions in interest rates), declare that: (i) all Loans shall bear interest at two percent (2%) *plus* the rate otherwise applicable to such Loans as provided in the preceding clauses of this Section 2.12; or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at two percent (2%) *plus* the rate applicable to such fee or other obligation as provided hereunder.

(e)       Accrued interest on each Loan (for ABR Loans and the Overadvance Term Loan, accrued through the last day of the prior calendar month and, for SOFR Loans, accrued through the last day of the last-ended Interest Period for such Loan) shall be payable in arrears on each Interest Payment Date for such Loan; provided, that, (i) interest accrued pursuant to clause (d) of this Section 2.12 shall be payable on demand, and (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan *prior* to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(f)       All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days and shall be payable for the actual number of days elapsed (including the first day, but *excluding* the last day). The Alternate Base Rate or Adjusted Term SOFR for the applicable Interest Period (as the case may be) shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.13       Benchmark Replacement; Illegality; Funding Indemnity.

(a)       Inability to Determine SOFR. Subject to clauses (b) through (f) below, if, at any time (prior to the commencement of any affected Interest Period) for any SOFR Borrowing:

(i)       the Administrative Agent shall have determined (which determination shall be conclusive and binding absent manifest error) that any SOFR-Based Rate for any affected Interest Period cannot be determined pursuant to the applicable definition thereof in Section 1.01; or

(ii)       the Administrative Agent shall have received notice from the Required Lenders that any SOFR-Based Rate for any affected Interest Period will *not* adequately and fairly reflect the cost to such

Lender(s) of making, funding and/or maintaining their (or its, as the case may be) SOFR Loans for any affected Interest Period;

then, the Administrative Agent shall give notice thereof to the Borrower and to the Lenders through Electronic System as provided in Section 9.01 as soon as practicable thereafter. Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans for any affected Interest Period and/or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans and/or the affected Interest Periods, as applicable) until the Administrative Agent shall have revoked such notice. Upon receipt of such notice: (A) the Borrower may revoke any pending request for a Borrowing of, conversion to, and/or continuation of any SOFR Loans (to the extent of the affected SOFR Loans and/or the affected Interest Periods, as applicable), or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or a conversion to (as applicable) ABR Loans in the amount specified therein; and (B) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans (at the end of the applicable Interest Period, in the case of any outstanding affected SOFR Loans). Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to clause (h) below. Subject to clauses (b) through (f) below, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that any SOFR-Based Rate for any affected Interest Period cannot be determined pursuant to the applicable definition thereof in Section 1.01 on any given day, then applicable interest rate for ABR Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "*Alternate Base Rate*" in Section 1.01, until the Administrative Agent shall have revoked such determination.

(b)    Benchmark Replacement.

(i)    Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, if a Benchmark Transition Event, together with its related Benchmark Replacement Date, have occurred *prior* to any setting of the then-current Benchmark, then: (i) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "*Benchmark Replacement*" in Section 1.01 for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes of this Agreement and each other Loan Document in respect of such Benchmark setting and any subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document; and (ii) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "*Benchmark Replacement*" in Section 1.01 for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes of this Agreement and each other Loan Document in respect of any Benchmark setting at or after 5:00 p.m., Eastern time, on the date that is five (5) Business Days after the date on which notice of such Benchmark Replacement is first provided to the Lenders, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent shall *not* have received, by the date that is five (5) Business Days after the date on which notice of such Benchmark Replacement is first provided to the Lenders, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders at such time. If the Benchmark Replacement is Adjusted Daily Simple SOFR, then all interest payments will be payable on a monthly basis.

(ii)    Notwithstanding anything to the contrary herein or in any other Loan Document, no master agreement and/or any other agreement evidencing Swap Obligations shall be deemed to be a "*Loan Document*" for purposes of this Section 2.13.

(c)    Conforming Changes. In connection with the use, administration, adoption and/or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time, and, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action(s) and/or consent(s) of any Loan Party, any other party to this Agreement or any other Loan Document and/or any other

48

Person.

(d)      Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of: (i) the implementation of any Benchmark Replacement; and (ii) the effectiveness of any Conforming Changes implemented in connection with the use, administration, adoption and/or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of: (A) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (e) below; and (B) the commencement of any Benchmark Unavailability Period. Any determination, decision, or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.13, including, without limitation, any determination with respect to a tenor, rate or adjustment, or of the occurrence or non-occurrence of an event, circumstance or date, and any decision to take, or refrain from taking, any action or any selection, will be conclusive and binding absent manifest error, and may be made in its or their, as applicable, sole discretion, and, in any event, without consent from any Loan Party, any other party to this Agreement or any other Loan Document or any other Person, except, in each case, as expressly required pursuant to this Section 2.13.

(e)      Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement): (i) if the then-current Benchmark is a term rate (including the SOFR Reference Rate for any applicable tenor) and either (A) any tenor for such Benchmark is *not* displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion, or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is *not* or will *not* be representative, then, in any such case of the foregoing clauses (e)(i)(A) or (e)(i)(B), the Administrative Agent may modify the definition of "*Interest Period*" in Section 1.01 (or any similar or analogous definition) for any Benchmark settings at or after such time in order to remove such unavailable or non-representative tenor; and (ii) if a tenor that was removed pursuant to the foregoing clause (e)(i) either (A) is subsequently displayed on a screen or information service for a Benchmark (including, without limitation, a Benchmark Replacement), or (B) is *not*, or is no longer, subject to an announcement that it is *not* or will *not* be representative for a Benchmark (including, without limitation, a Benchmark Replacement), then, in any such case of the foregoing clauses (e)(ii)(A) or (e)(ii)(B), the Administrative Agent may modify the definition of "*Interest Period*" in Section 1.01 (or any similar or analogous definition) for all Benchmark settings at or after such time in order to reinstate such previously removed tenor.

(f)      Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, a conversion to, or a continuation of SOFR Loans to be made, converted or continued, as the case may be, during any Benchmark Unavailability Period, and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of, or a conversion to, ABR Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is *not* an Available Tenor, the component of the Alternate Base Rate that is based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, shall *not* be used in any determination of the Alternate Base Rate for purposes of this Agreement or the other Loan Documents.

(g)      Illegality. If any Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, fund or continue any SOFR Borrowing or to determine or charge interest rates based upon SOFR, the SOFR Reference Rate and/or any SOFR-Based Rate for any Interest Period, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make, maintain, fund or continue SOFR Loans or to convert ABR Borrowings to SOFR Borrowings will be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower will, upon demand from such Lender (with a copy to the Administrative Agent), either prepay or convert all SOFR Borrowings of such Lender to ABR Borrowings (i) on

the last day of the then current Interest Period applicable to such SOFR Borrowings, if such Lender may lawfully continue to maintain such SOFR Borrowings to such date, and (ii) immediately, if such Lender shall determine that it may *not* lawfully continue to maintain such SOFR Borrowings to such date (and, in each instance, the Alternate Base Rate shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the component thereof described in clause (c) of the definition of "*Alternate Base Rate*" in Section 1.01). Upon any such prepayment or conversion, the Borrower will also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to clause (h) below.

(h)     Funding Indemnity. In the event of (a) the payment of any principal of a SOFR Loan other than on the last day of the Interest Period applicable thereto (including, without limitation, as a result of an Event of Default), (b) the conversion or continuation of a SOFR Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure by the Borrower to borrow, prepay, convert or continue any SOFR Loan on the date specified in any applicable notice (regardless of whether such notice is withdrawn or revoked), then, in any such event, the Borrower shall compensate each Lender, promptly and, in any event, within five (5) Business Days after written demand therefor from such Lender, for any loss, cost or expense attributable to such event. In the case of a SOFR Loan, such loss, cost or expense shall be deemed to include an amount determined by such Lender to be the *excess*, if any, of: (i) the amount of interest that would have accrued on the principal amount of such SOFR Loan if such event had *not* occurred, at Adjusted Term SOFR for the then current Interest Period for such SOFR Loan (or, in the case of a failure to borrow, convert or continue, for the requested Interest Period for the applicable SOFR Borrowing) for the period from, and including, the date of such event to, and including, the last day of such Interest Period; over (ii) the amount of interest that would accrue on the principal amount of such SOFR Loan for the same period, if Adjusted Term SOFR for such Interest Period were set on the date on which such SOFR Loan was prepaid or converted, or the date on which the Borrower failed to borrow, convert or continue such SOFR Loan, as the case may be. A certificate as to any additional amount payable under this clause (h) submitted to the Borrower by any Lender (with a copy to the Administrative Agent) shall be conclusive, absent manifest error.

Section 2.14     Increased Costs.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender; or

(ii)     impose on any Lender, or on the secured overnight or other applicable interbank lending market generally, any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender; or

(iii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of "*Excluded Taxes*", and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's

holding company, if any, as a consequence of this Agreement, the Commitments of or the Loans made by, or participations in Swingline Loans held by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in clause (a) or (b) of this Section 2.14 shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.14 shall *not* constitute a waiver of such Lender's right to demand such compensation; provided, that, (i) the Borrower shall *not* be required to compensate a Lender pursuant to this Section 2.14 for any increased costs or reductions incurred *more than* 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor, and (ii) if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.15     Withholding of Taxes; Gross-Up.

(a)     Payments Free of Taxes. Any and all payments by, or on account of, any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15), the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Evidence of Payment. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent,

51

within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has *not* already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c) relating to the maintenance of a Participant Register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to setoff and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this clause (e).

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in clauses (f)(ii)(A), (f)(ii)(ii)(B) and (f)(ii)(ii)(D) below) shall *not* be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), an executed copy of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party (1) with respect to payments of interest under any Loan Document, an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty, and (2) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal

52

withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    an executed copy of IRS Form W-8ECI;

(III)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (1) a certificate substantially in the form of Exhibit C-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "*U.S. Tax Compliance Certificate*"), and (2) an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(IV)    to the extent a Foreign Lender is not the beneficial owner, an executed copy of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-2 or Exhibit C-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided, that, if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "*FATCA*" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)    Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good

faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (g) (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (g) the payment of which would place the indemnified party in a *less* favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (g) shall *not* be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Survival. Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)    Defined Terms. For purposes of this Section 2.15 the term "*applicable law*" includes FATCA.

Section 2.16    Payments Generally; Allocation of Proceeds; Sharing of Setoffs.

(a)    The Borrower shall make each payment or prepayment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under Section 2.14 or Section 2.15, or otherwise) prior to 2:00 p.m., Eastern time, on the date when due or the date fixed for any prepayment hereunder, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices, except payments to be made directly to the Swingline Lender as expressly provided herein, at the Payment Office, except that payments pursuant to Section 2.14, Section 2.15 and Section 9.03 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)    (i)    All payments and any proceeds of Collateral received by the Administrative Agent (A) *not* constituting either (I) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower), or (II) a mandatory prepayment (which shall be applied in accordance with Section 2.10), or (B) after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders so direct, shall be applied ratably, *first*, to pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent or Swingline Lender from the Borrower (other than in connection with Banking Services Obligations or Swap Agreement Obligations), *second*, to pay any fees, indemnities, or expense reimbursements then due to the Lenders from the Borrower (other than in connection with Banking Services Obligations or Swap Agreement Obligations), *third*, to pay interest then due and payable on the Loans ratably, *fourth*, to prepay principal on the Loans and to pay any amounts owing in respect of Swap Agreement Obligations and Banking Services Obligations up to, and including, the amount most recently provided to the Administrative Agent pursuant to Section 2.20, ratably, and *fifth*, to the payment of any

54

other Secured Obligation due to the Administrative Agent or any Lender from the Borrower or any other Loan Party. The Administrative Agent and the Lenders shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Secured Obligations.

(ii)    Notwithstanding the foregoing, Secured Obligations arising under Banking Services Obligations or Swap Agreement Obligations shall be *excluded* from the application described above and paid in *clause fifth* if the Administrative Agent has *not* received written notice thereof, together with such supporting documentation as the Administrative Agent may have reasonably requested from the applicable provider of such Banking Services or Swap Agreements.

(c)    At the election of the Administrative Agent, all payments of principal, interest, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 9.03), and other sums payable under the Loan Documents, may be paid from the proceeds of Borrowings made hereunder, whether made following a request by the Borrower pursuant to Section 2.03 or a deemed request as provided in this Section 2.16. The Borrower hereby irrevocably authorizes the Administrative Agent to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents and agrees that all such amounts charged shall constitute Loans (including, for purposes of clarity, Swingline Loans), and that all such Borrowings shall be deemed to have been requested pursuant to Section 2.03.

(d)    If, except as otherwise expressly provided herein, any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a *greater* proportion of the aggregate amount of its Loans and participations in Swingline Loans and accrued interest thereon than the proportion received by any other similarly situated Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in Swingline Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders ratably in accordance with the aggregate amount of principal of, and accrued interest on, their respective Loans and participations in Swingline Loans; provided, that, (i) if any such participations are purchased and all, or any portion, of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this clause (d) shall *not* be construed to apply to any payment made by the Borrower pursuant to, and in accordance with the express terms of, this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in Swingline Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this clause (d) shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(e)    Unless the Administrative Agent shall have received, prior to any date on which any payment is due to the Administrative Agent for the account of the Lenders pursuant to the terms hereof or any other Loan Document (including any date that is fixed for prepayment by notice from the Borrower to the Administrative Agent pursuant to Section 2.10(e)), notice from the Borrower that the Borrower will *not* make such payment or prepayment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has *not* in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from, and including, the date such amount is distributed to it to, but *excluding*, the date of payment to the Administrative Agent, at the *greater of* the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)    The Administrative Agent shall provide the Borrower with monthly account statements or

invoices with respect to any of the Secured Obligations (the "*Statements*"), <u>provided</u>, <u>that</u>, any failure on the part of the Administrative Agent to provide such monthly account statements or invoices shall *not* relieve the Borrower of its payment obligations as set forth herein. If the Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall *not* be in default of payment with respect to the billing period indicated on such Statement; <u>provided</u>, <u>that</u>, acceptance by the Administrative Agent, on behalf of the Lenders, of any payment that is *less than* the total amount actually due at that time (including but not limited to any past due amounts) shall *not* constitute a waiver of the Administrative Agent's or the Lenders' right to receive payment in full at another time.

Section 2.17    <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)    If any Lender requests compensation under <u>Section 2.14</u>, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.15</u>, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 2.14</u> or <u>Section 2.15</u>, as the case may be, in the future, and (ii) would *not* subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under <u>Section 2.14</u>, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.15</u>, or if any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 9.04</u>), all its interests, rights (other than its existing rights to payments pursuant to <u>Section 2.14</u> or <u>Section 2.15</u>) and obligations under this Agreement and other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u>, <u>that</u>, (i) the Borrower shall have received the prior written consent of the Administrative Agent (and in circumstances where its consent would be required under <u>Section 9.04</u>, the Swingline Lender), which consent shall *not* unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and funded participations in Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), and (iii) in the case of any such assignment resulting from a claim for compensation under <u>Section 2.14</u> or payments required to be made pursuant to <u>Section 2.15</u>, such assignment will result in a reduction in such compensation or payments. A Lender shall *not* be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that (x) an assignment required pursuant to this <u>clause (b)</u> may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and such parties are participants), and (y) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to and be bound by the terms thereof; <u>provided</u>, <u>that</u>, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender, <u>provided</u>, <u>that</u>, any such documents shall be without recourse to or warranty by the parties thereto.

Section 2.18    <u>Defaulting Lenders</u>.

(a)    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(i)       fees shall cease to accrue on the unfunded portion of the Revolving Commitment of such Defaulting Lender pursuant to Section 2.11(a);

(ii)       any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 2.16(b) or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows, *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, *second*, to the payment on a *pro rata* basis of any amounts owing by such Defaulting Lender to the Swingline Lender hereunder, *third*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, *fourth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement, *fifth*, to the payment of any amounts owing to the Lenders or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender or Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document, *sixth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document, and *seventh*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, that, if (A) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (B) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied *solely* to pay the Loans of all non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans and unfunded and funded participations in the Borrower's obligations corresponding to such Defaulting Lender's Swingline Exposure is held by the Lenders *pro rata* in accordance with the Commitments without giving effect to clause (iv) below. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.18 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto;

(iii)       such Defaulting Lender shall *not* have the right to vote on any issue on which voting is required (other than to the extent expressly provided in Section 9.02(b)) and the Commitment and Revolving Exposure of such Defaulting Lender shall *not* be included in determining whether the Required Lenders have taken or may take any action hereunder or under any other Loan Document; provided, that, except as otherwise provided in Section 9.02, this clause (iii) shall *not* apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender directly affected thereby; and

(iv)       if any Swingline Exposure exists at the time such Lender becomes a Defaulting Lender, then:

(A)       all or any part of the Swingline Exposure of such Defaulting Lender (other than the portion of such Swingline Exposure referred to in clause (b) of the definition of such term) shall be reallocated among the non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent that such reallocation does *not*, as to any non-Defaulting Lender, cause such non-Defaulting Lender's Revolving Exposure to *exceed* its Revolving Commitment; and

(B)       if the reallocation described in clause (A) above cannot, or can only partially, be

effected, the Borrower shall within one (1) Business Day following notice by the Administrative Agent prepay such Swingline Exposure and (after giving effect to any partial reallocation pursuant to clause (A) above).

(v)    so long as such Lender is a Defaulting Lender, the Swingline Lender shall *not* be required to fund any Swingline Loan, unless it is satisfied that the related exposure will be one hundred percent (100%) covered by the Commitments of the non-Defaulting Lenders, and Swingline Exposure related to any such newly made Swingline Loan shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.18(a)(iv)(A) (and such Defaulting Lender shall *not* participate therein).

(b)    If (i) a Bankruptcy Event or a Bail-In Action with respect to the Parent of any Lender shall occur following the date hereof and for so long as such event shall continue, or (ii) the Swingline Lender or has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, the Swingline Lender shall *not* be required to fund any Swingline Loan, unless the Swingline Lender shall have entered into arrangements with the Borrower or such Lender, satisfactory to the Swingline Lender to defease any risk to it in respect of such Lender hereunder.

(c)    In the event that each of the Administrative Agent, the Borrower and the Swingline Lender agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Commitment and on the date of such readjustment such Lender shall purchase at par such of the Loans of the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage.

Section 2.19    Returned Payments. If, after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Administrative Agent or any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had *not* been received by the Administrative Agent or such Lender. The provisions of this Section 2.19 shall be and remain effective notwithstanding any contrary action which may have been taken by the Administrative Agent or any Lender in reliance upon such payment or application of proceeds. The provisions of this Section 2.19 shall survive the termination of this Agreement.

Section 2.20    Banking Services and Swap Agreements. Each Lender or Affiliate thereof providing Banking Services for, or having Swap Agreements with, any Loan Party or any Subsidiary or Affiliate of a Loan Party shall deliver to the Administrative Agent, promptly after entering into such Banking Services or Swap Agreements, written notice setting forth the aggregate amount of all Banking Services Obligations and Swap Agreement Obligations of such Loan Party or Subsidiary or Affiliate thereof to such Lender or Affiliate (whether matured or unmatured, absolute or contingent). In furtherance of that requirement, each such Lender or Affiliate thereof shall furnish the Administrative Agent, from time to time after a significant change therein or upon a request therefor, a summary of the amounts due or to become due in respect of such Banking Services Obligations and Swap Agreement Obligations. The most recent information provided to the Administrative Agent shall be used in determining which tier of the waterfall, contained in Section 2.16(b), such Banking Services Obligations and/or Swap Agreement Obligations will be placed.

Section 2.21    Swingline Loans.

(a)    Subject to the terms and conditions set forth herein, from time to time during the Availability Period, the Swingline Lender agrees to make Swingline Loans to the Borrower, in an aggregate principal amount at any time outstanding that will *not* result in (i) the aggregate principal amount of outstanding Swingline Loans

*exceeding* the Swingline Lender's Swingline Commitment, (ii) the Swingline Lender's Revolving Exposure *exceeding* its Revolving Commitment, or (iii) the Aggregate Revolving Exposure *exceeding* the *lesser of* (A) the aggregate Revolving Commitments, or (B) the Borrowing Base; provided, that, the Swingline Lender shall *not* be required to make a Swingline Loan to refinance an outstanding Swingline Loan. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Swingline Loans. To request a Swingline Loan, the Borrower shall notify the Administrative Agent of such request by fax or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, by *not later than* 12:00 p.m. (noon), Eastern time, on the day of a proposed Swingline Loan. Each such notice shall be in a form approved by the Administrative Agent, shall be irrevocable and shall specify the requested date (which shall be a Business Day) and amount of the requested Swingline Loan. The Administrative Agent will promptly advise the Swingline Lender of any such notice received from the Borrower. The Swingline Lender shall make each Swingline Loan available to the Borrower by means of a credit to the Funding Account(s) by 2:00 p.m., Eastern time, on the requested date of such Swingline Loan.

(b)     The Swingline Lender may by written notice given to the Administrative Agent require the Revolving Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which the Revolving Lenders will participate. Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Revolving Lender, specifying in such notice such Lender's Applicable Percentage of such Swingline Loan or Loans. Each Revolving Lender hereby absolutely and unconditionally agrees, promptly upon receipt of such notice from the Administrative Agent (and in any event, if such notice is received by 11:00 a.m., Eastern time, on a Business Day *no later than* 4:00 p.m., Eastern time on such Business Day and if received after 11:00 a.m., Eastern time, "on a Business Day" shall mean *no later than* 9:00 a.m. Eastern time on the immediately succeeding Business Day), to pay to the Administrative Agent, for the account of the Swingline Lender, such Lender's Applicable Percentage of such Swingline Loan or Loans. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall *not* be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Revolving Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Revolving Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Revolving Lenders. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph, and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and *not* to the Swingline Lender. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear; provided, that, any such payment so remitted shall be repaid to the Swingline Lender or to the Administrative Agent, as applicable, if and to the extent such payment is required to be refunded to the Borrower for any reason. The purchase of participations in a Swingline Loan pursuant to this paragraph shall *not* relieve the Borrower of any default in the payment thereof.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lenders on each date set forth in Section 4.01 and Section 4.02 and each other date set forth herein or in any other Loan Document as a date on which representations and warranties are required to be made or are deemed to be made pursuant to the express terms hereof or thereof that (and where applicable, agrees):

59

Section 3.01    <u>Organization; Powers</u>. Each Loan Party and each Subsidiary of the Borrower (a) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted, and (c) except where the failure to do so, individually or in the aggregate, could *not* reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02    <u>Authorization; Enforceability</u>. The Transactions and related Guarantee of the Guaranteed Obligations are within each applicable Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational actions and, if required, actions by equity holders. Each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    <u>Governmental Approvals; No Conflicts</u>. The Transactions (a) do *not* require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will *not* violate any Requirement of Law applicable to any Loan Party or any Subsidiary of the Borrower, (c) will *not* violate or result in a default under (i) any Organization Document of any Loan Party, or (ii) any material contract or agreement binding upon any Loan Party or any Subsidiary of the Borrower or the assets of any Loan Party or any Subsidiary of the Borrower, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary of the Borrower, except individually or in the aggregate in the case of the preceding <u>clauses (b)</u> and (<u>c</u>)(<u>ii</u>) where it would *not* reasonably be expected to result in a Material Adverse Effect, and (d) will *not* result in the creation or imposition of, or other requirement to create, any Lien on any asset of any Loan Party or any Subsidiary of the Borrower, except Liens created pursuant to the Loan Documents.

Section 3.04    <u>Financial Condition; No Material Adverse Effect</u>.

(a)    Holdings has heretofore furnished to the Lenders (i) audited consolidated financial statements of Holdings and its Subsidiaries for the fiscal year ended December 31, 2020 and fiscal year ended December 31, 2019, in each case, together with internally-prepared schedules thereto setting forth the consolidated balance sheet and related statements of operations and cash flows of King and its Subsidiaries as of the end and for such fiscal years, and (ii) the internally-prepared consolidated financial statements of Holdings and its consolidated Subsidiaries on a consolidated basis for the fiscal quarter ended December 31, 2020, together with internally-prepared schedules thereto setting forth the consolidated balance sheet and related statement of operations of King and its Subsidiaries as of the end and for such fiscal quarter. Such financial statements present fairly, in all material respects, the financial position and results of operations of Holdings and its consolidated Subsidiaries (or King and its consolidated Subsidiaries, as applicable) as of such dates and for such periods in accordance with GAAP in all material respects, subject to normal year end audit adjustments and the absence of footnotes in the case of the statements referred to in <u>clause (ii)</u> above.

(b)    No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since August 31, 2022.

Section 3.05    <u>Properties</u>.

(a)    As of the date of this Agreement, <u>Schedule 3.05</u> sets forth the address of each parcel of real property that is owned or leased by any Loan Party. To the knowledge of the Loan Parties, except to the extent constituting a Specified Event of Default (as such term is defined in the Second Amendment), no default by any party to any such lease or sublease exists. Each of the Loan Parties and each Subsidiary of the Borrower has good and marketable title to, or valid leasehold interests in, all of its real and personal property (other than intellectual

property, which is subject to <u>clause (b)</u> below) material to its business, in each case except for irregularities or deficiencies in title that individually or in the aggregate do *not* materially interfere with its ability to conduct its business as currently conducted or to utilize such assets for their intended purpose, free of all Liens other than those permitted by Section 6.02.

(b)     Each Loan Party and each Subsidiary of the Borrower owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on <u>Schedule 3.05</u>, and, to the knowledge of each applicable Loan Party and each applicable Subsidiary of the Borrower, the use thereof by each Loan Party and each Subsidiary of the Borrower does *not* infringe in any material respect upon the rights of any other Person except individually or in the aggregate where it would *not* reasonably be expected to result in a Material Adverse Effect, and the rights thereto of each Loan Party and each Subsidiary of the Borrower are *not* subject to any licensing agreement or similar arrangement.

Section 3.06    <u>Litigation and Environmental Matters</u>.

(a)     There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any Subsidiary of the Borrower (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) that involve any Loan Document or the Transactions.

(b)     (i) No Loan Party or any Subsidiary of the Borrower has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability, and (ii) except with respect to any other matters that, individually or in the aggregate, could *not* reasonably be expected to result in a Material Adverse Effect, no Loan Party or any Subsidiary of the Borrower (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (B) has become subject to any Environmental Liability, or (C) knows of any basis for any Environmental Liability.

Section 3.07    <u>Compliance with Laws and Agreements; No Default</u>. Except where the failure to do so, individually or in the aggregate, could *not* reasonably be expected to result in a Material Adverse Effect, each Loan Party and each Subsidiary of the Borrower is in compliance with: (a) all Requirement of Law applicable to it or its property; and (b) except to the extent constituting a Specified Event of Default (as such term is defined in the Second Amendment), all material contracts or agreements binding upon it or its property. No Default has occurred and is continuing.

Section 3.08    <u>Investment Company Status</u>. No Loan Party or any Subsidiary of the Borrower is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 3.09    <u>Taxes</u>. Each Loan Party and each Subsidiary of the Borrower has timely filed or caused to be filed (in each case after giving effect to all extensions) all federal and other material Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary of the Borrower, as applicable, has set aside on its books adequate reserves. No tax liens other than those constituting Permitted Encumbrances have been filed, and no claims are being asserted with respect to any Taxes of a Loan Party or Subsidiary of the Borrower.

Section 3.10    <u>ERISA</u>. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did *not*, as of the date of the most recent financial statements reflecting such amounts, *exceed*

61

the fair market value of the assets of such Plan by an amount that could reasonably be expected to result in a Material Adverse Effect.

Section 3.11    Disclosure.

(a)    The Loan Parties have disclosed to the Lenders all material contracts and agreements and corporate or other restrictions to which any Loan Party or any Subsidiary of the Borrower is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No written information, reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, *not* misleading in any material respect; provided, that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

(b)    As of the Closing Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

Section 3.12    Material Agreements. No Loan Party or any Subsidiary of the Borrower is, except to the extent constituting a Specified Event of Default (as such term is defined in the Second Amendment), in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any contract or agreement to which it is a party (such agreements, "*Material Agreements*") except with respect to any default that, individually or in the aggregate, could *not* reasonably be expected to result in a Material Adverse Effect.

Section 3.13    Solvency.

(a)    (i) The fair value of the assets of the Loan Parties, at a fair valuation and on a consolidated basis, will *exceed* their debts and liabilities, subordinated, contingent or otherwise; (ii) the present fair saleable value of the property of the Loan Parties on a consolidated basis will be *greater than* the amount that will be required to pay the probable liability of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Loan Parties on a consolidated basis will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) the Loan Parties on a consolidated basis will *not* have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are conducted on the Second Amendment Effective Date and are proposed to be conducted after the Second Amendment Effective Date.

(b)    The Loan Parties do *not* intend to, and the Loan Parties do *not* believe that they will, on a consolidated basis, incur debts beyond their ability, on a consolidated basis, to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by them and the timing of the amounts of cash to be payable on or in respect of their Indebtedness.

Section 3.14    Insurance. The properties of the Loan Parties are insured with financially sound and reputable insurance companies *not* Affiliates of the Loan Parties, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and standard exclusions and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties operate.

Section 3.15    Capitalization and Subsidiaries. Schedule 3.15 sets forth (a) a correct and complete list

62

of the name and relationship to King of the Borrower and each Subsidiary of the Borrower, (b) a true and complete listing of each class of each of King's authorized Equity Interests, of which all of such issued Equity Interests are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 3.15, and (c) the type of entity of King, the Borrower and each Subsidiary of the Borrower. All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable.

Section 3.16    Security Interest in Collateral. Each Collateral Document delivered pursuant to Article 4 and Section 5.13 will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder under applicable Requirements of Law (to the extent required hereunder and thereunder), and (i) when appropriate filings or recordings are made in the appropriate offices as may be required under applicable Requirements of Law (to the extent required hereunder and thereunder), and (ii) upon the taking of possession, control or other action by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession, control or other action (which possession, control or other action shall be given to the Administrative Agent or taken by the Administrative Agent to the extent required by any Collateral Document), the Liens in favor of the Administrative Agent will constitute first priority fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case under applicable Requirements of Law (to the extent required hereunder and thereunder), subject to no Liens other than the applicable Permitted Encumbrances.

Section 3.17    Employment Matters. As of the Closing Date, there are no strikes, lockouts or slowdowns against any Loan Party or any Subsidiary of the Borrower pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties and the Subsidiaries of the Borrower have *not* been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters in any manner which could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect. All payments due from any Loan Party or any Subsidiary of the Borrower, or for which any claim may be made against any Loan Party or any Subsidiary of the Borrower, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary of the Borrower, except where the failure to do so could *not* reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

Section 3.18    Margin Regulations. No Loan Party is engaged and will *not* engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing hereunder will be used to buy or carry any Margin Stock. Following the application of the proceeds of each Borrowing, *not more than* twenty-five percent (25%) of the value of the assets (either of any Loan Party only or of the Loan Parties and their Subsidiaries on a consolidated basis) will be Margin Stock.

Section 3.19    Use of Proceeds. The proceeds of the Loans have been used and will be used, whether directly or indirectly as set forth in Section 5.08.

Section 3.20    No Burdensome Restrictions. No Loan Party is subject to any Burdensome Restrictions except Burdensome Restrictions permitted under Section 6.10.

Section 3.21    Anti-Corruption Laws and Sanctions. Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and directors and, to the knowledge of such Loan Party, its employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that could reasonably be expected to result in any Loan Party being designated as a Sanctioned Person. None of (a) any Loan Party, any Subsidiary, any of their

63

respective directors or officers or, to the knowledge of any such Loan Party or Subsidiary, employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing, use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

Section 3.22    <u>Affected Financial Institutions</u>. No Loan Party is an Affected Financial Institution.

Section 3.23    <u>Plan Assets; Prohibited Transactions</u>. None of the Loan Parties or any Subsidiary of the Borrower is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery nor performance of the transactions contemplated under this Agreement, including the making of any Loan hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

Section 3.24    <u>Casualty</u>. Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God (with the exception of impacts of the COVID-19 pandemic on the business operations and/or financial condition of the Loan Parties to the extent that such impacts (i) occurred prior to the Closing Date, and (ii) were disclosed in writing to the Administrative Agent prior to the Closing Date) or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

ARTICLE 4
CONDITIONS

Section 4.01    <u>Closing Date</u>.

(a)    The obligations of the Lenders to make Loans hereunder shall *not* become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 9.02</u>):

(i)    <u>Credit Agreement and Loan Documents; Opinions of Counsel</u>. The Administrative Agent (or its counsel) shall have received (A) from each party hereto either (I) a counterpart of this Agreement signed on behalf of such party or (II) written evidence satisfactory to the Administrative Agent (which may include fax or other electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (B) duly executed copies of the Loan Documents and such other certificates, documents, instruments and agreements as the Administrative Agent shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including any promissory notes requested by a Lender pursuant to <u>Section 2.09</u> payable to the order of each such requesting Lender and a written opinion of the Loan Parties' counsel, addressed to the Administrative Agent and the Lenders, all in form and substance satisfactory to the Administrative Agent.

(ii)    <u>Financial Statements</u>. The Lenders shall have received (A) audited consolidated financial statements of Holdings and its Subsidiaries for the fiscal year ended December 31, 2020 and fiscal year ended December 31, 2019, in each case, together with internally-prepared schedules thereto setting forth the consolidated balance sheet and related statements of operations of King and its Subsidiaries as of the end and for such fiscal years, and (B) the internally-prepared consolidated financial statements of Holdings and its consolidated Subsidiaries on a consolidated basis for the fiscal quarter ended March 31, 2021, together with internally-prepared schedules thereto setting forth the consolidated balance sheet and related statement of operations of King and its Subsidiaries as of the end and for such fiscal quarter, and such financial statements shall not, in the reasonable judgment of the Administrative Agent, reflect any material adverse change in the consolidated financial condition of Holdings and its Subsidiaries as

64

reflected in the audited, consolidated financial statements described in <u>clause (A)</u> of this <u>clause (ii)</u>.

(iii)    <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Administrative Agent shall have received (A) a certificate of each Loan Party, dated the Closing Date and executed by its secretary or assistant secretary, which shall (I) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (II) identify by name and title and bear the signatures of the officers of such Loan Party authorized to sign the Loan Documents to which it is a party and, in the case of the Borrower, its Financial Officers, and (III) contain appropriate attachments, including the charter, articles or certificate of organization or incorporation of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, management or partnership agreement, or other organizational or governing documents, and (B) a good standing certificate for each Loan Party from its jurisdiction of organization.

(iv)    <u>No Default Certificate</u>. The Administrative Agent shall have received a certificate, signed by the a Financial Officer of the Borrower, dated as of the Closing Date (A) stating that no Default has occurred and is continuing, and (B) stating that the representations and warranties contained in the Loan Documents are true and correct in all material respects as of such date (other than any representation or warranty which is subject to any materiality qualifier, in which case, such representation or warranty shall be true and correct in all respects).

(v)    <u>Fees</u>. The Lenders and the Administrative Agent shall have received all reasonable fees and expenses required to be paid or reimbursed in accordance with <u>Section 9.03</u> and that certain Fee Letter dated February 26, 2021 between Hancock Whitney and the Borrower for which invoices have been presented two (2) Business Days prior to the Closing Date.

(vi)    <u>Lien Searches</u>. The Administrative Agent shall have received the results of a recent lien search in the jurisdiction of organization of each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for liens permitted by <u>Section 6.02</u> or discharged on or prior to the Closing Date pursuant to a pay-off letter or other documentation satisfactory to the Administrative Agent.

(vii)    <u>Notice of Termination</u>. The Administrative Agent shall have received a notice of termination with respect to that certain Loan Agreement dated December 6, 2019 between Borrower, Hancock Whitney Bank and each of the other parties thereto from time to time.

(viii)    <u>Funding Account; Borrowing Request; Funds Disbursement Agreement</u>. The Administrative Agent shall have received (A) a notice setting forth the deposit account of the Borrower maintained at Hancock Whitney (the "<u>*Funding Account*</u>") to which the Administrative Agent is authorized by the Borrower to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement, (B) a duly executed Borrowing Request and (C) a duly executed funds disbursement agreement.

(ix)    <u>Solvency</u>. The Administrative Agent shall have received a solvency certificate signed by a Financial Officer dated the Closing Date in form and substance reasonably satisfactory to the Administrative Agent.

(x)    <u>Borrowing Base Certificate</u>. The Administrative Agent shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of the end of the Business Day immediately preceding the Closing Date.

(xi)    <u>Filings, Registrations and Recordings</u>. Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably

requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(xii)    Insurance. The Administrative Agent shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Administrative Agent and otherwise in compliance with the terms of Sections 5.10 and 5.12 of this Agreement and Section 4.12 of the Vehicle Security Agreement.

(xiii)    Field Audit. The Administrative Agent shall have received a field audit of the Collateral in such scope as the Administrative Agent reasonably requires, from an auditor reasonably approved by the Administrative Agent, and in form and substance reasonably satisfactory to the Administrative Agent.

(xiv)    Required Consents and Approvals. The Loan Parties shall have received all consents (including necessary governmental consents), approvals, authorizations, registrations and filings and orders required or advisable to be made or obtained under any applicable Requirements of Law of, or with respect to, any Loan Party, or by any contractual obligation of any Loan Party, in connection with the execution, delivery, performance, validity and enforceability of the Loan Documents or any of the transactions contemplated thereby, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect and all applicable waiting periods shall have expired, and no investigation or inquiry by any Governmental Authority regarding the Loan Documents or any other transaction being financed with the proceeds thereof shall be ongoing.

(xv)    Legal Due Diligence. The Administrative Agent and its counsel shall have completed all legal (including tax implications) and regulatory due diligence, including but not limited to compliance with all applicable requirements of Regulations U, T, and X of the Board of Governors of the Federal Reserve System, the results of which shall be satisfactory to Administrative Agent in its sole discretion.

(xvi)    USA PATRIOT Act, Etc. (A) The Administrative Agent shall have received, (I) *at least* five (5) days prior to the Closing Date, all documentation and other information regarding the Borrower requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to the extent requested in writing of the Borrower *at least* ten (10) days prior to the Closing Date, and (II) a properly completed and signed IRS Form W-8 or W-9, as applicable, for each Loan Party, and (B) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, *at least* five (5) days prior to the Closing Date, any Lender that has requested, in a written notice to the Borrower *at least* the (10) days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification (provided, that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (B) shall be deemed to be satisfied).

(xvii)    Other Documents. The Administrative Agent shall have received such other documents as the Administrative Agent, any Lender or their respective counsel may have reasonably requested.

Section 4.02    Each Credit Event.

(a)    The obligation of each Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(i)    The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and

correct in all material respects only as of such specified date, and that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects).

(ii)    At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(iii)    The Administrative Agent shall have received the most recent Borrowing Base Certificate required pursuant to Section 5.01(a)(vi).

(iv)    With respect to any Borrowing to occur on or after the Second Amendment Effective Date, the conditions set forth in each of Section 8(a), Section 8(b), Section 8(c) and Section 8(d) of the Second Amendment shall have been satisfied.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in clauses (a)(i), (a)(ii) and (a)(iii) of this Section 4.02.

ARTICLE 5
AFFIRMATIVE COVENANTS

Until all of the Secured Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lenders that:

Section 5.01    Financial Statements; Borrowing Base and Other Information.

(a)    The Borrower will furnish to the Administrative Agent and each Lender, including their Public-Siders:

(i)    within (x) one hundred fifty (150) calendar days after the end of the fiscal year of Holdings ending December 31, 2022, and (y) one hundred twenty (120) calendar days after the end of each fiscal year of Holdings ending thereafter, its audited consolidated and consolidating balance sheet and related statements of operations and cash flows as of the end of and for such year, together with internally-prepared schedules to such consolidated financial statements setting forth the consolidated and consolidating balance sheet and related statements of operations and cash flows of King and its Subsidiaries as of the end of and for such year, setting forth, in each case in comparative form, the figures for the previous fiscal year, and, with respect to (A) such consolidated and consolidating financial statements of Holdings and its Subsidiaries, reported on by independent public accountants of recognized national standing (without a "going concern" or like qualification, commentary or exception, and without any qualification or exception as to the scope of such audit) to the effect that (I) such consolidated financial statements of Holdings and its Subsidiaries present fairly, in all material respects, the financial condition and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, and (II) such consolidating financial statements of Holdings and its Subsidiaries are fairly stated, in all material respects, when considered in relation to the consolidated financial statements of Holdings and its Subsidiaries, and accompanied by any management letter prepared by said accountants, and (B) the internally-prepared schedules setting forth the financial results of King and its Subsidiaries, all certified by a Financial Officer to the effect that such financial statements are fairly stated, in all material respects, when considered in relation to the consolidated and consolidating financial statements of Holdings and its Subsidiaries;

(ii)    within forty-five (45) days after the end of each of the first three fiscal quarters of Holdings, its consolidated balance sheet and related statement of operations as of the end of and for such fiscal quarter and the then elapsed portion of such fiscal year, together with internally-prepared schedules

to such consolidated financial statements setting forth the consolidated balance sheet and related statement of operations of King and its Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of such fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, (i) with respect to the consolidated financial statements of Holdings and its Subsidiaries, all certified by a Financial Officer as presenting fairly in all material respects the financial condition and results of operations of Holdings and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) with respect to the internally-prepared schedules setting forth the financial results of King and its Subsidiaries, all certified by a Financial Officer to the effect that such financial statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of Holdings and its Subsidiaries;

(iii)    concurrently with any delivery of financial statements under <u>clause (i)</u> or (<u>ii</u>) above, a Compliance Certificate;

(iv)    such other information as the Administrative Agent reasonably requires in connection with monitoring the Collateral, at the times and in the manner reasonably requested by the Administrative Agent;

(v)    as soon as available, but in any event no later than March 31st of each calendar year, a copy of the plan and forecast (including a projected consolidated balance sheet and income statement) of Holdings and its Subsidiaries for the then-current fiscal year (the "*Projections*") in form reasonably satisfactory to the Administrative Agent;

(vi)    on Wednesday of each calendar week (such date, the "*Scheduled Borrowing Base Reporting Date*") and at such other times as may be necessary to re-determine Availability hereunder or as may be reasonably requested by the Administrative Agent, as of the last calendar day of the immediately preceding calendar week, a Borrowing Base Certificate and supporting information in connection therewith (including, in any event, an update as to the inventory of cars purchased, cars leased, cars transferred by the Borrower to RAC Asset Holdings and cars (and corresponding leases) transferred by RAC Asset Holdings to the Warehouse Facility, in each case of the foregoing, during such calendar week, and a certification of the corresponding payments made in respect thereof as required pursuant to <u>Section 6.06(b)</u>), together with any additional reports with respect to the Borrowing Base as the Administrative Agent may reasonably request;

(vii)    as soon as available but in any event within twenty (20) days of the end of each calendar month, a calculation of the Days Inventory Outstanding Ratio for such month, certified by a Financial Officer;

(viii)    so long as the NextGear Credit Agreement has *not* been terminated, upon request by the Administrative Agent, a current Inventory listing (if any Revolving Loans are outstanding at any point during the week);

(ix)    as soon as available, but in any event within twenty (20) of the end of each calendar month, a current Inventory listing (if any Revolving Loans are outstanding at any point during the month);

(x)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Loan Party or any Subsidiary of the Borrower with the SEC, or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities exchange, or distributed by the Borrower to its shareholders generally, as the case may be;

(xi)    promptly after receipt thereof by the Borrower or any Subsidiary of the Borrower, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by the SEC or such other agency regarding financial or other operational results of the Borrower or any Subsidiary thereof;

(xii)    within forty-five (45) days after the end of each fiscal quarters of Holdings, updated Exhibits A and B to the Vehicle Security Agreement;

(xiii)    promptly following any request therefor, (A) such other information regarding the operations (including, without limitation, information in connection with monitoring of Collateral), changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of this Agreement, as the Administrative Agent or any Lender (through Administrative Agent) may reasonably request, and (B) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation;

(xiv)    promptly after any request therefor by the Administrative Agent or any Lender, copies of (A) any documents described in Section 101(k)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan, and (B) any notices described in Section 101(l)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that, if the Borrower or any ERISA Affiliate has *not* requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof;

(xv)    on or before the fifteenth (15th) day of each calendar month *prior* to the Contingent Release Collateral Release Date, a rolling thirteen-week forecast of cash flows as of the last day of the immediately preceding month in the form provided by the Borrower to the Administrative Agent on or about September 18, 2022, accompanied by a variance report comparing actual performance against the immediately preceding forecast of cash flows; and

(xvi)    on or before the fifteenth (15th) day following the end of each calendar month, monthly financial statements in the form of those provided pursuant to Section 5.01(a)(ii) hereof and otherwise reasonably acceptable to the Administrative Agent, together with the certifications contemplated by Section 5.01(a)(ii) hereof (in each case, with such changes as are reasonably necessary to reflect the delivery of monthly financials instead of quarterly).

(b)    Documents required to be delivered pursuant to Section 5.01(a)(i), Section 5.01(a)(ii) or Section 5.01(a)(xi) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which such materials are publicly available as posted on the Electronic Data Gathering, Analysis and Retrieval system (EDGAR), or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether made available by the Administrative Agent), provided, that: (A) upon written request by the Administrative Agent (or any Lender through the Administrative Agent) to the Borrower, the Borrower shall deliver paper copies of such documents to the Administrative Agent (for further distribution to the Lenders) until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender, and (B) the Borrower shall notify the Administrative Agent (by facsimile or through Electronic System) of the posting of any such documents and provide to the Administrative Agent through Electronic System electronic versions (*i.e.*, soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to

monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such document to it and maintaining its copies of such documents.

(c)    Each Affiliated Guarantor and the Borrower represent and warrant that each of it and its Controlling and Controlled entities, in each case, if any (collectively with the Borrower, the "*Relevant Entities*"), either (i) other than with respect to the ABS Bonds, has no SEC registered or unregistered, publicly traded securities outstanding, or (ii) files its financial statements with the SEC and/or makes its financial statements available to potential holders of its securities, and, accordingly, the Borrower hereby (A) authorizes the Administrative Agent to make the financial statements to be provided under the foregoing clauses (a)(i) and (a)(ii), along with the Loan Documents, available to Public-Siders, and (B) agrees that at the time such financial statements are provided hereunder, they shall already have been made available to holders of any such securities. The Borrower will *not* request that any other material be posted to Public-Siders without expressly representing and warranting to the Administrative Agent in writing that such materials do *not* constitute material non-public information within the meaning of the federal securities laws or that the Relevant Entities have no outstanding SEC registered or unregistered, publicly traded securities. Notwithstanding anything herein to the contrary, in no event shall the Borrower request that the Administrative Agent make available to Public-Siders budgets or any certificates, reports or calculations with respect to the Borrower's compliance with the covenants contained herein or with respect to the Borrowing Base.

(d)    At all times, provide access to the global positioning satellite portal to the Administrative Agent and/or its agents for the purposes of tracking vehicles constituting Eligible Inventory.

Section 5.02    Notices of Material Events.

(a)    Each of the Borrower and each Affiliated Guarantor will furnish to the Administrative Agent and each Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(i)    within three (3) Business Days of any Responsible Officer of any Loan Party becoming aware thereof, the occurrence of any Default or Event of Default;

(ii)    within five (5) Business Days after receipt thereof, receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party or any Subsidiary of the Borrower that (A) seeks damages in *excess* of $2,000,000, (B) seeks injunctive relief, (C) is asserted or instituted against any Plan, its fiduciaries or its assets, (D) alleges criminal misconduct by any Loan Party or any Subsidiary of the Borrower, (E) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (F) asserts liability on the part of any Loan Party or any Subsidiary of the Borrower in *excess* of $2,000,000 in respect of any tax, fee, assessment, or other governmental charge, or (G) involves any material product recall that could reasonably be expected individually or in the aggregate to result in a Material Adverse Effect;

(iii)    concurrently with the delivery of the financial statements required to be delivered pursuant to Section 5.01(a)(i) or Section 5.01(a)(ii), as the case may be, notice of any material change in the accounting and/or financial reporting practices of the Loan Parties and their Subsidiaries for the period covered thereby;

(iv)    within five (5) Business Days of any Responsible Officer becoming aware thereof, the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and the Subsidiaries of the Borrower in an aggregate amount *exceeding* $1,500,000;

(v)    any Loan Party entering into a Swap Agreement or an amendment to a Swap Agreement, together with copies of all agreements evidencing such Swap Agreement or amendment;

(vi)    within five (5) Business Days after any Loan Party acquires knowledge thereof, any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

(vii)    any (A) issuance of Equity Interests, or (B) incurrence of Material Indebtedness; and

(viii)    any change in the information provided in the Beneficial Ownership Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such certification.

(b)    Each notice delivered under this <u>Section 5.02</u> shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03    <u>Existence</u>. Each Loan Party will, and will cause each Subsidiary of the Borrower to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; <u>provided</u>, <u>that</u>, the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under <u>Section 6.03</u>.

Section 5.04    <u>Payment of Obligations</u>. Each Loan Party will, and will cause each Subsidiary of the Borrower to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or Subsidiary of the Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (c) the failure to make payment pending such contest could *not* reasonably be expected to result in a Material Adverse Effect; <u>provided</u>, <u>that</u>, each Loan Party will, and will cause each Subsidiary of the Borrower to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

Section 5.05    <u>Maintenance of Properties</u>. Each Loan Party will, and will cause each Subsidiary of the Borrower to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 5.06    <u>Books and Records; Inspection Rights; Field Audits</u>.

(a)    Each Loan Party will, and will cause each Subsidiary of the Borrower to, (i) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities, and (ii) permit any representatives designated by the Administrative Agent (which may include representatives of any Lender) to visit during its regular business hours and with reasonable advance notice thereof and inspect the financial records and the property of such Loan Party or Subsidiary of the Borrower at reasonable times up to one (1) time per calendar year (but without frequency limit during the continuance of an Event of Default) and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent (which may include representatives of any Lender) to discuss the affairs, finances, accounts and condition of the Borrower with the officers and employees thereof and advisors therefor (including independent accountants); <u>provided</u>, <u>that</u>, (A) the Administrative Agent shall give the Loan Parties and any such Subsidiary of the Borrower an opportunity for its respective representatives to participate in any such discussions (and such representatives of the Loan Parties and the Subsidiaries of the Borrower shall use commercially reasonable efforts to make themselves available for such purpose), and (B) so long as no Event of Default has occurred and is then continuing, the Borrower shall *not* bear the cost of *more than* one (1) such

inspection per calendar year by the Administrative Agent (or its respective representatives), it being understand and agreed that so long as an Event of Default has occurred and is continuing, any such inspection by the Administrative Agent (or its respective representatives) shall be at the expense of the Loan Parties.

(b)     The Administrative Agent (or its designee) may conduct an audit of the Borrower's Inventory and processes related thereto consisting of a review at the Borrower's executive office (and any other location where certificates of title for vehicles that are part of the Collateral are stored) of randomly selected certificate of title files for *no more than* twenty percent (20%) of the collateral files and, on a reasonable basis, the verification of the location of Inventory through the Borrower's GPS-enabled Inventory control system for an unlimited number of vehicles that are part of the Collateral (such audit, a "*Headquarters Audit*"). The Administrative Agent may conduct such Headquarters Audits once per calendar month. The Borrower shall reimburse the Administrative Agent for reasonable and documented charges and expenses in connection with such audits, in an amount *not to exceed* $10,000 in the aggregate for any fiscal year (or a proportionate amount for any partial year). In addition to Headquarters Audits, in the event the Administrative Agent finds material discrepancies during the course of any Headquarters Audit, or if an Event of Default shall have occurred and be continuing, the Administrative Agent may conduct field audits in up to five (5) dealership or other locations selected by the Administrative Agent in its sole discretion per month. Each Loan Party will, and will cause each Subsidiary of the Borrower to, cooperate with the Administrative Agent and its employees, agents, and third party audit firms, in the completion of such Headquarters Audits, with each such Headquarters Audit to be conducted in a manner reasonably satisfactory to the Administrative Agent.

Section 5.07     <u>Compliance with Laws and Material Contractual Obligations</u>. Each Loan Party will, and will cause each Subsidiary of the Borrower to, (a) comply with each Requirement of Law applicable to it or its property (including, without limitation, Environmental Laws), and (b) perform, in all material respects, its respective obligations under all Material Agreements to which it is a party, except, in each case, (i) where the failure to do so, individually or in the aggregate, could *not* reasonably be expected to result in a Material Adverse Effect, and/or (ii) to the extent constituting a Specified Event of Default (as such term is defined in the Second Amendment). Each Loan Party will maintain policies and procedures designed to promote and achieve compliance by such Loan Party, the Subsidiaries of the Borrower and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 5.08     <u>Use of Proceeds</u>. The proceeds of (a) the Revolving Loans will be used only (i) for working capital purposes (including the purchase of automobile inventory), (ii) to make Capital Expenditures, (iii) for general corporate purposes, and (iv) to pay transaction fees, costs and expenses related to this Agreement, and (b) the Overadvance Term Loan shall be deemed to have been applied, on the Second Amendment Effective Date, to refinance a portion of Revolving Loans then outstanding, in each case with respect to the foregoing <u>clauses (a)</u> and (<u>b</u>), *solely* to the extent *not* in violation of applicable laws or the terms of the Loan Documents.

Section 5.09     [*Reserved*].

Section 5.10     <u>Insurance</u>. Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards), and with such deductibles and standard exclusions, as are customarily carried under similar circumstances by such other Persons and all such insurance shall, subject to <u>Section 5.12</u> below, (a) provide for *not less than* 30 days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance, (b) name the Administrative Agent additional insured on behalf of the Secured Parties (in the case of liability insurance) or lender's loss payee (in the case of transit insurance and property insurance, in each case covering Collateral), as applicable, (c) if reasonably requested by the Administrative Agent, include a breach of warranty clause, and (d) be reasonably satisfactory in all other respects to the Administrative Agent.

Section 5.11     <u>Casualty and Condemnation</u>. The Borrower (a) will furnish to the Administrative Agent

72

prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding, and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

Section 5.12    Post-Closing Covenants.

(a)    The Borrower shall use commercially reasonable efforts to deliver to the Administrative Agent, within sixty (60) days of the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion) a duly executed collateral access agreement from the lessor of the chief executive office location identified on Exhibit A to the Vehicle Security Agreement.

(b)    Within thirty (30) days of the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion), the Borrower will deliver to the Administrative Agent endorsements to all insurance policies maintained by the Loan Parties (i) providing for *not less than* thirty (30) days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance, and (ii) naming the Administrative Agent as an additional insured on behalf of the Secured Parties (in the case of liability insurance) or lender's loss payee (in the case of transit insurance and property insurance, in each case covering Collateral), as applicable.

(c)    At all times after the Second Amendment Effective Date, cause the Net Proceeds received by the Borrower, any Subsidiary of the Borrower or any Affiliated Guarantor of any contractual distributions in respect of any of the Residuals in the ordinary course of business that are *not* applied to prepay the Obligations pursuant to Section 2.10(c)(v) to be retained by the Borrower, any Subsidiary of the Borrower and/or any Affiliated Guarantor and, in any such case, used for working capital and/or general corporate purposes of the Borrower, any Subsidiary of the Borrower and/or any Affiliated Guarantor in the ordinary course of business of the Borrower, the Subsidiaries of the Borrower and the Affiliated Guarantors.

Section 5.13    Additional Guarantors; Further Assurances.

(a)    Subject to applicable Requirement of Law, the Borrower will cause each of its Domestic Subsidiaries formed or acquired after the date of this Agreement to become a Loan Party by executing a Joinder Agreement. In connection therewith, the Administrative Agent shall have received all documentation and other information regarding such newly formed or acquired Subsidiaries as may be required to comply with the applicable "know your customer" rules and regulations, including the USA Patriot Act. Upon execution and delivery thereof, each such Person (i) shall automatically become a Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents, and (ii) will grant Liens to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, in any property of such Loan Party which constitutes Collateral. For purposes of clarity, no real property asset of any Loan Party shall be required to be pledged or mortgaged to secure the payment of the Secured Obligations.

(b)    Without limiting the foregoing, (i) upon the request of the Administrative Agent (which requests may or may *not* be made from time to time in the sole discretion of the Administrative Agent), the Borrower shall promptly deliver to the Administrative Agent all original certificates of title (the "*Certificates of Title*") and complete and accurate copies of all inventory records, and (ii) each Loan Party will, and will cause each Subsidiary of the Borrower to, execute and deliver, or cause to be executed and delivered, to the Administrative Agent such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all in form and substance reasonably satisfactory to the Administrative

Agent and all at the expense of the Loan Parties. If the Administrative Agent receives Certificates of Title and other documents in accordance with this clause (b), the Administrative Agent (or its designee or representative) shall do so as custodian for such Certificates of Title and other documents and shall maintain continuous custody (except as otherwise contemplated by this Agreement) of all such Certificates of Title and other documents at the office of the Administrative Agent (or its designee or representative) where it customarily maintains custody of similar documents and files in secure and fire resistant facilities. In performing its duties as custodian, the Administrative Agent agrees to use the same standard of skill and attention that the Administrative Agent would exercise with respect to original certificates of title or other receivables that it services or holds for itself or others. The Administrative Agent further agrees that any dispositions of the Certificates of Title by the Administrative Agent shall be in accordance with the terms of this Agreement or with written instructions furnished by the Borrower.

(c)     Upon request of any authorized officer of any Loan Party, the Administrative Agent shall release the applicable Certificate of Title and ship for delivery, or direct its agents or sub-custodians to release and ship for delivery, as the case may be, such Certificate of Title from time to time within three (3) Business Days receipt of a request for release specifying, among other things, the applicable Certificates of Title to be released and delivery instructions and other information as may be necessary to enable the Administrative Agent to release and ship such Certificates of Title.

(d)     At all times on and after the Second Amendment Effective Date, fully cooperate with the Administrative Agent to, as soon as practicable after the Second Amendment Effective Date but, in any event, within ninety (90) calendar days of the Second Amendment Effective Date (or by such later date as the Administrative Agent and the Lenders may agree in their sole discretion), engage, at the sole expense of the Borrower, a third-party servicer reasonably acceptable to the Administrative Agent (capable of accommodating daily collateral releases) to carry out the functions of receiving, maintaining custody and processing releases of Certificates of Title in connection with permitted Dispositions, and receiving and maintaining other related documents and records, all as contemplated by Section 5.13. For avoidance of doubt, pending the engagement of a third-party servicer as contemplated herein (and thereafter in the discretion of the Administrative Agent), the Administrative Agent reserves any and all rights described in this Section 5.13, including the right to take (or cause a designee or representative to take) custody of the Certificates of Title at the sole expense of the Borrower.

ARTICLE 6
NEGATIVE COVENANTS

Until all of the Secured Obligations shall have been Paid in Full and the Commitments have expired or terminated, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lenders that:

Section 6.01     Indebtedness. The Borrower will *not*, nor will it permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness, except:

(a)     the Secured Obligations;

(b)     Indebtedness existing on the date hereof and set forth in Schedule 6.01 and any extensions, renewals, refinancings and replacements of any such Indebtedness that does not increase the outstanding principal amount thereof (immediately *prior* to giving effect to such extension, renewal, refinancing or replacement) or shorten the maturity or weighted average life to maturity thereof or change the direct or contingent obligors with respect thereto (or add any additional direct or contingent obligor with respect thereto) and, if the Indebtedness being refinanced was subordinated to the Obligations, such Indebtedness continues to be subordinated;

(c)     unsecured Indebtedness of any Loan Party owing to any other Loan Party, and Indebtedness of any Subsidiary of the Borrower that is *not* a Loan Party owing to any Loan Party; provided, that, Indebtedness of

74

any Subsidiary of the Borrower that is *not* a Loan Party owing to any Loan Party shall be subject to <u>Section 6.04</u>;

(d)    Guarantees by the Borrower of Indebtedness of any Subsidiary of the Borrower and by any Subsidiary of the Borrower of Indebtedness of the Borrower or any other Subsidiary of the Borrower; <u>provided, that</u>, (i) the Indebtedness so Guaranteed is permitted by this <u>Section 6.01</u>, (ii) Guarantees by the Borrower or any other Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to <u>Section 6.04</u>, and (iii) Guarantees permitted under this <u>clause (d)</u> shall be subordinated to the Secured Obligations on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(e)    to the extent consisting of Indebtedness, Real Property Leases (but *not*, for purposes of clarity, capital leases) entered into in the ordinary course of business for which the lease or rent payment required with respect thereto does *not* include the repayment of (or interest with respect to) borrowed money Indebtedness of the Borrower or any Subsidiary of the Borrower;

(f)    Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(g)    Indebtedness of any Loan Party in respect of performance bonds, bid bonds, dealer licensing bonds, appeal bonds, surety bonds, performance and completion guaranties and similar obligations or obligations in respect of letters of credit in lieu thereof, in each case provided in the ordinary course of business;

(h)    to the extent constituting Indebtedness, customary indemnification obligations, purchase price or similar adjustments in connection with Acquisitions and Dispositions permitted under this Agreement;

(i)    Indebtedness consisting *solely* of the financing of insurance premiums;

(j)    Indebtedness under the NextGear Credit Agreement (or under any new floorplan facility established after the Second Amendment Effective Date and provided by a lender or group of lenders, and on terms, reasonably acceptable to the Administrative Agent that replaces or refinances, in full, all Indebtedness owing under the NextGear Credit Agreement) in an aggregate amount outstanding at any time *not to exceed* $30,000,000, so long as (i) such Indebtedness is incurred *solely* for the purchase of vehicle Inventory, (ii) such Indebtedness is secured *solely* by the Collateral (as defined in the NextGear Credit Agreement as in effect on the Second Amendment Effective Date), (iii) such Indebtedness is, at all times, subject to the terms of the NextGear Intercreditor Agreement (or a replacement intercreditor agreement in substantially the same form as the NextGear Intercreditor Agreement and otherwise acceptable to the Administrative Agent), and (iv) loans under the NextGear Credit Agreement (or such new floorplan facility established after the Second Amendment Effective Date) are repaid when the vehicles financed thereunder are either (x) transferred to the Borrower's leasing Affiliate and are leased to customers, or (y) financed using proceeds of Loans under this Agreement;

(k)    Indebtedness of any Loan Party or any Subsidiary of the Borrower incurred under any unsecured corporate credit card or corporate charge cards for expenditures made in the ordinary course or purchasing card program entered into with any Lender so long as any required payments of interest, fees and/or principal under such Indebtedness are *not* past due;

(l)    other unsecured Indebtedness in an aggregate principal amount *not exceeding* $2,000,000 at any time outstanding;

(m)    Indebtedness owed to any bank in respect of any overdrafts and related liabilities incurred in the ordinary course of business and arising from treasury, depositary, and cash management services or in connection with any automated clearing house transfers of funds or arising from endorsements or negotiable instruments for collection;

CHAR1\1940128v8

(n)       all Indebtedness created or arising under any conditional sale or other title retention agreement for the sale of goods or lease with respect to property acquired or leased by Borrower (other than capital leases or purchase money Indebtedness), in each case, entered into in the ordinary course of business;

(o)       take-or-pay obligations contained in supply arrangements that arise in the ordinary course of business and not in connection with obtaining of financing;

(p)       Capital Lease Obligations of the Borrower or Subsidiary of the Borrower; provided, that, such Indebtedness is permitted by Section 6.06; and

(q)       Subordinated Indebtedness of any Loan Party or any Subsidiary thereof incurred pursuant to the Junior Loan Documents (as such term is defined in the RAC Investor Subordination Agreement), provided, that, any such Indebtedness, and any Liens securing any such Indebtedness, is or are (as applicable) subject to the RAC Investor Subordination Agreement.

Section 6.02     Liens.

(a)       The Borrower will *not*, nor will it permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

(i)       Liens created pursuant to any Loan Document;

(ii)       Permitted Encumbrances;

(iii)       any Lien on any property or asset of the Borrower or any Subsidiary of the Borrower existing on the date hereof and set forth in Schedule 6.02; provided, that, (A) such Lien shall *not* apply to any other property or asset of the Borrower or any Subsidiary of the Borrower, and (B) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do *not* increase the outstanding principal amount thereof;

(iv)       any Lien existing on any property or asset (other than Accounts and Inventory) prior to the acquisition thereof by the Borrower or any Subsidiary of the Borrower or existing on any property or asset (other than Accounts and Inventory) of any Person that becomes a Loan Party after the date hereof prior to the time such Person becomes a Loan Party; provided, that, (A) such Lien is *not* created in contemplation of or in connection with such acquisition or such Person becoming a Loan Party, as the case may be, (B) such Lien shall *not* apply to any other property or assets of the Loan Party, and (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Loan Party, as the case may be, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(v)       Liens of a collecting bank arising in the ordinary course of business under Section 4-210 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(vi)       Liens granted by a Subsidiary that is *not* a Loan Party in favor of the Borrower or another Loan Party in respect of Indebtedness owed by such Subsidiary;

(vii)       Liens arising from precautionary UCC financing statements regarding operating leases;

(viii)       Liens securing Indebtedness permitted under, and incurred in reliance on, Section 6.01(j), so long as (A) such Liens encumber *solely* the vehicles acquired using the proceeds of loans under the NextGear Credit Agreement (or such new floorplan facility established after the Second Amendment Effective Date as described in Section 6.01(j)), and (B) such Liens are terminated and released at such

time as such loans are repaid in accordance with the terms of this Agreement and the NextGear Credit Agreement (or such new floorplan facility established after the Second Amendment Effective Date as described in Section 6.01(j));

(ix)    other Liens in addition to those permitted above, provided, that, the amount of the obligations secured thereby does *not exceed* $500,000; and

(x)    Liens securing Indebtedness to the extent expressly permitted to be incurred under Section 6.01(j) (subject to the terms of the NextGear Intercreditor Agreement), Section 6.01(l) and Section 6.01(n).

(b)    The Borrower will *not*, nor will it permit any of its Subsidiaries or any other Person to, create, incur, assume or permit to exist any Lien on any or all of the Equity Interests in: (i) AF Title Co., a Delaware statutory trust, except SUBI Certificates already (as of the Second Amendment Effective Date) issued and issued thereafter from time to time in connection with securitizations or other financings *not* prohibited by this Agreement or any other Loan Document; and/or (ii) RAC Depositor, LLC, a Delaware limited liability company.

(c)    Notwithstanding anything to the contrary in the foregoing of this Section 6.02, none of the Liens permitted pursuant to this Section 6.02 may, at any time, attach to Inventory of the Borrower or any of its Subsidiaries, other than those permitted under clauses (a) and (b) of the definition of Permitted Encumbrances and clause (a)(i) above.

Section 6.03    Fundamental Changes.

(a)    The Borrower will *not*, nor will it permit any of its Subsidiaries to, and prior to the repayment in full of the Overadvance Term Loan, the Second Amendment Guarantors will not, nor will any of them permit any Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or otherwise Dispose of all or substantially all of its assets, or all or substantially all of the stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) any Subsidiary of the Borrower may merge into the Borrower in a transaction in which the Borrower is the surviving entity, (ii) any Loan Party (other than the Borrower) may merge into any other Loan Party in a transaction in which the surviving entity is a Loan Party that is party to all of the Security Agreements to which the non-surviving Loan Party was a party, (iii) any Subsidiary that is *not* a Loan Party may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is *not* materially disadvantageous to the Lenders, provided, that, any such merger involving a Person that is *not* a wholly owned Subsidiary immediately prior to such merger shall *not* be permitted unless also permitted by Section 6.04, (iv) any investment permitted by Section 6.04(c) may be structured as a merger, consolidation or amalgamation, and (v) any Affiliated Guarantor may merge into, or consolidate with, any other party in connection with the creation of a Public Market, provided, that, the surviving entity complies with Section 5.13.

(b)    The Borrower will *not*, nor will it permit any of its Subsidiaries to, consummate a Division as the Dividing Person, without the prior written consent of Administrative Agent. Without limiting the foregoing, if any Loan Party that is a limited liability company consummates a Division (with or without the prior consent of Administrative Agent as required above), each Division Successor shall be required to comply with the obligations set forth in Section 5.13 and the other further assurances obligations set forth in the Loan Documents and become a Loan Party under this Agreement and the other Loan Documents.

(c)    The Borrower will *not*, nor will it permit any of its Subsidiaries to, engage in any business other than businesses of the type or substantially similar to the type conducted by the Borrower and its Subsidiaries on the date hereof and businesses reasonably related or reasonably complementary thereto.

(d)      No Loan Party will, nor will it permit any Subsidiary of the Borrower to change its fiscal year or any fiscal quarter from the basis in effect on the Closing Date.

(e)      Subject to Section 1.04 or except as required to comply with GAAP, no Loan Party will change the accounting basis upon which its financial statements are prepared.

(f)      No Loan Party will change the material tax filing elections it has made under the Code.

Section 6.04      Investments, Loans, Advances, Guarantees and Acquisitions. The Borrower will *not*, nor will it permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was *not* a Loan Party and a wholly owned Subsidiary prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)      Permitted Investments;

(b)      (i) investments in existence on the date hereof consisting of Equity Interests of any Subsidiary of Holdings owned, directly or indirectly, by Holdings; and (ii) investments in existence on the date hereof and described in Schedule 6.04;

(c)      investments by the Borrower and its Subsidiaries in Equity Interests in their respective Subsidiaries (other than such investments permitted by Section 6.04(b)(i)), provided, that, the aggregate amount of such investments by the Borrower and its Subsidiaries in Subsidiaries of the Borrower that are *not* Loan Parties (together with outstanding intercompany loans permitted under Section 6.04(d) and outstanding Guarantees permitted under Section 6.04(e)) shall *not exceed* $2,000,000 at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(d)      unsecured loans or advances made by any Loan Party or any Subsidiary thereof to any Loan Party;

(e)      Guarantees constituting Indebtedness permitted by Section 6.01, provided, that, the aggregate principal amount of Indebtedness of Subsidiaries that are *not* Loan Parties that is Guaranteed by the Borrower or any Subsidiary of the Borrower (together with outstanding investments permitted under clause (ii) to the proviso to Section 6.04(c) and outstanding intercompany loans permitted under clause (ii) to the proviso to Section 6.04(d)) shall *not exceed* $2,000,000 at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(f)      loans or advances made by a Loan Party to its employees on an arms-length basis in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes up to a *maximum* of $20,000;

(g)      notes payable, or stock or other securities issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(h)      investments in the form of Swap Agreements permitted by Section 6.07;

(i)      investments of any Person existing at the time such Person becomes a Subsidiary of the Borrower or consolidates or merges with the Borrower or any Subsidiary (including in connection with a Permitted Acquisition), so long as such investments were not made in contemplation of such Person becoming a Subsidiary or of such merger;

(j)　　investments received in connection with the disposition of assets permitted by Section 6.05;

(k)　　investments constituting deposits described in clauses (c) and (d) of the definition of the term "*Permitted Encumbrances*";

(l)　　investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers, licensors, licensees and suppliers, in each case in the ordinary course of business;

(m)　　extensions of trade credit in the ordinary course of business;

(n)　　endorsement of items for collection or deposit in the ordinary course of business;

(o)　　after the repayment in full of the Overadvance Term Loan, Permitted Acquisitions, including any purchase price adjustments or earn-out obligations in connection with Permitted Acquisitions; and

(p)　　investments consisting of earnest money deposits required in connection with any actual or intended Permitted Acquisition or investment not prohibited under this Section 6.04 or consisting of earnest money deposits required in connection with any actual or intended acquisition of property not otherwise prohibited hereunder.

Section 6.05　　Asset Sales. The Borrower will *not*, nor will it permit any of its Subsidiaries to, Dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary (other than to the Borrower or another Subsidiary of the Borrower in compliance with Section 6.04), except:

(a)　　Dispositions of (i) Inventory in the ordinary course of business, and (ii) used, obsolete, worn out or surplus Equipment or property or other property *not* necessary for operations, in each case, in the ordinary course of business;

(b)　　Dispositions of assets to the Borrower or any Subsidiary, provided, that, any such Dispositions involving a Subsidiary that is *not* a Loan Party shall be made in compliance with Section 6.09;

(c)　　Dispositions of Accounts (excluding sales or dispositions in a factoring arrangement) in connection with the compromise, settlement or collection thereof;

(d)　　Dispositions of Permitted Investments and other investments permitted by Section 6.04(i) and Section 6.04(k);

(e)　　Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary of the Borrower;

(f)　　Dispositions of assets (other than Equity Interests in a Subsidiary unless all Equity Interests in such Subsidiary are sold) that are *not* permitted by any other clause of this Section 6.05, provided, that, the aggregate fair market value of all assets disposed of in reliance upon this clause (f) shall *not exceed* $2,000,000 during any fiscal year of the Borrower; and

(g)　　Dispositions of real property to the extent permitted under Section 6.06.

provided, that, all Dispositions permitted under this Section 6.05 (other than those permitted by clauses (b), (d) and (e) above) shall be made for fair value and for *at least* seventy-five percent (75%) cash consideration.

CHAR1\1940128v8

Section 6.06     Sale and Leaseback Transactions; Certain Transfers.

(a)     The Borrower will *not*, nor will it permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "*Sale and Leaseback Transaction*"); provided, that, notwithstanding anything to the contrary in the foregoing, the Borrower and its Subsidiaries shall be permitted to enter into Sale and Leaseback Transactions with respect to real property, so long as the aggregate fair market value of real property sold in connection therewith does *not exceed* $30,000,000.

(b)     The Borrower shall *not* transfer, assign or sell any vehicle(s) and/or any associated lease(s) to (i) RAC Asset Holdings, (ii) any other Loan Party or Affiliate thereof, or (iii) any third party, in each case of the foregoing, except to the extent that the Borrower makes a prepayment of the outstanding Revolving Loans in an amount *not less than* the amount of the advance ascribed to such vehicle in the Borrowing Base Certificate most recently delivered to the Administrative Agent; provided, that, until a third-party servicer (or other agent of the Administrative Agent) capable of processing daily releases of Certificates of Title has been engaged consistent with Section 5.13(d), such payment shall be made on each Friday for transfers occurring the immediately prior Monday, Tuesday, Wednesday and Thursday, and each Monday for transfers occurring the immediately prior Friday and Saturday.

Section 6.07     Swap Agreements. The Borrower will *not*, nor will it permit any of its Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any of its Subsidiaries has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any of its Subsidiaries.

Section 6.08     Restricted Payments; Certain Payments of Indebtedness.

(a)     Neither the Borrower nor any Affiliated Guarantor will, nor will the Borrower nor any Affiliated Guarantor permit any of its respective Subsidiaries to, declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) the Borrower and the Affiliated Guarantors may declare and pay dividends with respect to their respective common stock payable *solely* in additional shares of their respective common stock, and, with respect to their respective preferred stock, payable *solely* in additional shares of such preferred stock or in shares of their respective common stock, (ii) Subsidiaries of Holdings may declare and pay dividends ratably with respect to their Equity Interests to any Loan Party or any other Subsidiary of a Loan Party directly owning such Equity Interests, and (iii) the Borrower and the Affiliated Guarantors may pay dividends or make distributions to their respective members in an aggregate amount *not greater than* the amount necessary for such members to pay their actual state and U.S. federal income tax liabilities in respect of income earned by the Loan Parties after deducting (to the extent permitted by applicable law) any unused prior losses (to the extent that such losses were incurred after the Second Amendment Effective Date).

(b)     Neither the Borrower nor any Affiliated Guarantor will, nor will the Borrower nor any Affiliated Guarantor permit any of its respective Subsidiaries to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of, or in respect of, principal of, or interest on, any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except, and in each case subject to any applicable subordination or intercreditor agreement:

(i)     payment of Indebtedness created under the Loan Documents;

(ii)        payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01;

(iii)       refinancings of Indebtedness to the extent permitted by Section 6.01;

(iv)       payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05;

(v)        regularly scheduled payments of principal and interest, and mandatory prepayments (but *not*, for purposes of clarity, optional or voluntary prepayments), in respect of Indebtedness of a Second Amendment Guarantor (other than, in any event and for the avoidance of doubt, any Specified Restricted Insider Debt) owing to any Person that is *not* (A) an Affiliate of any Loan Party or any Subsidiary thereof, or (B) a direct or indirect owner of any Equity Interests in any Loan Party or any Subsidiary thereof, in each case of the foregoing of this clause (b)(v), *solely* to the extent in accordance with the terms of any applicable subordination and/or intercreditor agreement(s) pertaining thereto; and

(vi)       (A) payments of interest in kind, and (B) payments in cash (whether in respect of accrued interest, principal or otherwise) *solely* (in the case of this clause (b)(vi)(B)) to the extent owing from a Loan Party or a Subsidiary thereof, on the one hand, to a Loan Party other than Holdings, on the other hand, in each case of the foregoing of this clause (b)(vi), in respect of any Specified Restricted Insider Debt, but *solely* to the extent in accordance with the terms of any applicable subordination and/or intercreditor agreement(s) pertaining thereto.

Section 6.09    Transactions with Affiliates. The Borrower will *not*, nor will it permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business, and (ii) are at prices and on terms and conditions *not less* favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) [*reserved*], (c) any investment permitted by Sections 6.04(c) or Section 6.04(d), (d) any Indebtedness permitted under Section 6.01(c), (e) any Restricted Payment permitted by Section 6.08, (f) loans or advances to employees permitted under Section 6.04(f), (g) the payment of reasonable fees to directors of the Borrower or any Subsidiary who are *not* employees of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business, (h) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors, and (i) subject to Section 6.06(b), sales of vehicles and the associated leases to RAC Asset Holdings or a Subsidiary of RAC Asset Holdings in a manner and on terms consistent with past practices.  For purposes of clarity, prior to the repayment in full of the Overadvance Term Loan but subject to clause (g) above, no management, consulting or similar fee may be paid to the Sponsor or its Affiliates.

Section 6.10    Restrictive Agreements. The Borrower will *not*, nor will it permit any of its Subsidiaries to, directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary of the Borrower to pay dividends or other distributions with respect to any Equity Interests, or the ability of any Subsidiary of the Borrower to make or repay loans or advances to the Borrower or any other Subsidiary of the Borrower or to Guarantee Indebtedness of the Borrower or any other Loan Party; provided, that, (i) the foregoing shall *not* apply to restrictions and conditions imposed by any Requirement of Law or by any Loan Document, (ii) the foregoing shall *not* apply to restrictions and conditions existing on the date hereof identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall *not* apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary

pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall *not* apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, and (v) clause (a) of the foregoing shall *not* apply to customary provisions in leases and other contracts restricting the assignment thereof.

Section 6.11    Amendment of Material Documents. No Loan Party will, nor will it permit any Subsidiary of the Borrower to, amend, modify or waive any of its rights in a manner materially adverse to the Administrative Agent or any Lender under (a) any agreement relating to any Subordinated Indebtedness, (b) its Organization Documents, in each case to the extent any such amendment, modification or waiver would be adverse to the Lenders, or (c) any agreement relating to any Material Indebtedness.

Section 6.12    Financial Covenants.

(a)    Debt to Tangible Net Worth Ratio. The Loan Parties will *not* permit the Debt to Tangible Net Worth Ratio, determined on the last day of any fiscal quarter, commencing with the fiscal quarter ending June 30, 2021, to be *greater than* 7.00 to 1.00.

(b)    Days Inventory Outstanding Ratio. The Loan Parties will *not* permit the Days Inventory Outstanding Ratio, determined on the last day of any calendar month, commencing with the calendar month ending May 30, 2021, to be *greater than* 150.

Section 6.13    Equity Cure Right. In the event the Loan Parties fail (or, but for the operation of this Section 6.13, would fail) to comply with the financial covenant set forth in Section 6.12(a) or Section 6.12(b) as of the last day of any fiscal quarter (a "*Financial Covenant Default*", and the applicable fiscal quarter, the "*Cure Quarter*"), any cash equity contribution to King by Holdings (funded with the proceeds of Equity Interests consisting of common stock issued by King to Holdings after the last day of such fiscal quarter and on or *prior* to the date that is ten (10) Business Days after the day on which financial statements are required to be delivered for the Cure Quarter pursuant to the terms of this Agreement (such date, the "*Cure Deadline*")) will, at the irrevocable election of the Borrower and subject to the terms of the last sentence of this Section 6.13, be included in the calculation of the Debt to Tangible Net Worth Ratio by *subtracting* such cash equity contribution from Total Indebtedness, in each case of the foregoing, *solely* for the purposes of determining compliance with such financial covenant (and *not* for any other purpose under any Loan Document) at the end of the Cure Quarter and any subsequent period of four consecutive fiscal quarters that includes the Cure Quarter (any such equity contribution so included in the calculation of the Debt to Tangible Net Worth Ratio, a "*Specified Equity Contribution*"), provided, that, (a) *no more than* two (2) Specified Equity Contributions shall be made in any period of four (4) consecutive fiscal quarters, (b) the amount of any Specified Equity Contribution shall be *no greater than* the amount required to cause the Loan Parties to be in compliance with the applicable financial covenant (or, if required for compliance with the financial covenants in both Section 6.12(a) and Section 6.12(b), the amount required to cause the Loan Parties to be in compliance with both such financial covenants) for the applicable measurement period, (c) notice of the Borrower's intent to make a Specified Equity Contribution (a "*Cure Notice*") shall be delivered *no later than* the day on which financial statements are required to be delivered for the Cure Quarter, (d) there shall be *no more than* four (4) Specified Equity Contributions made in the aggregate after the Closing Date, and (e) all Specified Equity Contributions will be disregarded for all other purposes, including calculating basket levels, pricing, determining compliance with ratio-based or pro forma calculations or conditions and any other items governed by reference to the Debt to Tangible Net Worth Ratio or Section 6.12. From the date of delivery of the applicable Cure Notice to the Administrative Agent until the *earlier* of (x) the applicable Cure Deadline, and (y) the date on which the Borrower notifies the Administrative Agent in writing that it does *not* intend to provide the Specified Equity Contribution, the Administrative Agent shall *not* impose the default interest rate, accelerate the Obligations, terminate commitments hereunder or exercise any right or remedy against the Loan Parties or any Subsidiary or any of their respective properties otherwise available under any Loan Document during the continuance of a Default or an Event of Default, in each case, arising *solely* on the basis that the applicable Financial Covenant Default has occurred and is continuing; provided, that, notwithstanding

82

anything to the contrary contained herein, in no event shall the Lenders have any obligation to fund any Loan during the period from and after the last day of the Cure Quarter with respect to which the Financial Covenant Default has occurred until the date such Financial Covenant Default is deemed cured pursuant to the last sentence of this Section 6.13. Upon receipt by Borrower in cash of the appropriate amount of the specified Equity Contribution as provided above with respect to the Cure Quarter in exchange for Equity Interests of the Borrower consisting of common stock, if and to the extent that after giving effect to such Specified Equity Contribution the applicable Financial Covenant Default would no longer exist on a pro forma basis, the Loan Parties shall then be deemed to have been in compliance with the requirements of such financial covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Financial Covenant Default shall be deemed cured for all purposes of this Agreement.

Section 6.14    Use of Proceeds. No Loan Party shall use the proceeds of any Borrowing of the Loans except pursuant to Section 5.08. No Loan Party shall use, and each Loan Party shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (a) to refinance any commercial paper, (b) in any manner that causes or might cause such Borrowing or the application of such proceeds to violate any applicable Sanctions, Regulation T, Regulation U or Regulation X as in effect from time to time or any other regulation thereof or to violate the Exchange Act, (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, or (d) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country.

Section 6.15    Accounting Changes. Other than as permitted pursuant to Section 1.04, no Loan Party will, nor will it permit any Subsidiary of the Borrower to, make or permit any material change in its accounting policies or reporting practices, except as may be required by GAAP.

Section 6.16    Capital Expenditures. The Borrower will *not*, nor will it permit any of its Subsidiaries to, incur or make any Capital Expenditures in an aggregate amount to *exceed* $10,000,000 in any fiscal year of the Borrower.

Section 6.17    Payments under the NextGear Credit Agreement. The Borrower will *not*, nor will it permit any of its Subsidiaries to, make any payment with respect to the Indebtedness under the NextGear Credit Agreement (or under such new floorplan facility established after the Second Amendment Effective Date as described in Section 6.01(j)), except for (x) payments of principal, interest and fees under the NextGear Credit Agreement (or such new floorplan facility established after the Second Amendment Effective Date as described in Section 6.01(j)) as and when due (and *not* on an accelerated basis), and (y) payments made in connection with the replacement of the NextGear Credit Agreement with a new floorplan financing facility established after the Second Amendment Effective Date in accordance with Section 6.01(j).

ARTICLE 7
EVENTS OF DEFAULT

If any of the following events ("*Events of Default*") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise; or

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article 7) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days; or

(c)     any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary of the Borrower in, or in connection with, this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made; or

(d)     any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a)(i), Section 5.03 (with respect to a Loan Party's existence), Section 5.08 or Section 5.13 or in Article 6; or

(e)     any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b) or (d)), and such failure shall continue unremedied for a period of (i) five (5) days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Administrative Agent (which notice will be given at the request of any Lender) if such breach relates to terms or provisions of Section 5.01, Section 5.02 (other than Section 5.02(a)(i)), Section 5.03, Section 5.04, Section 5.05, Section 5.06, Section 5.07, Section 5.10, or Section 5.11 of this Agreement, or (ii) thirty (30) days after the *earlier* of any Responsible Officer of any Loan Party's knowledge of such breach or notice thereof from the Administrative Agent (which notice will be given at the request of the Required Lenders) if such breach relates to terms or provisions of any other Section of this Agreement; or

(f)     any Loan Party or any Subsidiary of the Borrower shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period under such Material Indebtedness); or

(g)     any event or condition occurs that (i) results in any Material Indebtedness of any Loan Party or any Subsidiary of the Borrower becoming due prior to its scheduled maturity and such event or condition is not otherwise waived or cured within any applicable cure periods, or (ii) enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity and such event or condition is *not* otherwise waived or cured within any applicable cure periods; provided, that, this clause (g) shall *not* apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05; or

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or Subsidiary of the Borrower or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Subsidiary of the Borrower or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or

(i)     any Loan Party or any Subsidiary of the Borrower shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article 7, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Subsidiary of the Borrower

or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, or (vi) take any action for the purpose of effecting any of the foregoing; or

(j)    any Loan Party or any Subsidiary of the Borrower shall become unable, admit in writing its inability, or publicly declare its intention *not* to, or fail generally, to pay its debts as they become due; or

(k)    one or more judgments for the payment of money in an aggregate amount in *excess* of $2,000,000 (*not* paid or to the extent *not* covered by either (i) independent third-party insurance as to which the insurer does *not* deny coverage, or (ii) another creditworthy indemnitor that has been notified of such judgment and does *not* dispute its indemnification obligations in respect thereto) shall be rendered against any Loan Party, any Subsidiary of the Borrower or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall *not* be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any Subsidiary of the Borrower to enforce any such judgment or any Loan Party or any Subsidiary of the Borrower shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued; or

(l)    an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings, the Borrower and /or Subsidiaries of the Borrower in an aggregate amount *exceeding* $2,000,000; or

(m)    a Change in Control shall occur; or

(n)    the occurrence of any "default", as defined in any Loan Document (other than this Agreement), or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach has *not* been otherwise cured or waived and continues beyond any period of grace therein provided and such default shall continue unremedied for thirty (30) days; or

(o)    the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty, or any Guarantor shall deny that it has any further liability under the Loan Guaranty, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to <u>Section 10.08</u>; or

(p)    except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason (other than *solely* as a result of the acts or omissions of the Administrative Agent or any Lender) fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien; or

(q)    any Collateral Document shall fail to remain in full force or effect (other than in accordance with its terms) or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document; or

(r)    any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is *not* valid, binding and enforceable in accordance with its terms); or

85

(s)    on any date there are *less than* ninety-one (91) days remaining until the maturity date of the Warehouse Facility; or

(t)    at any time after the Second Amendment Effective Date, any Loan Party or Subsidiary thereof shall Dispose of any Collateral (as such term is defined in the Equity Pledge Agreement) or any Collateral (as such term is defined in the Residuals Security Agreement) owned by it, in any such case of the foregoing, in a sale to another Person, unless such Disposition (i) occurs on the Contingent Release Collateral Release Date, or (ii) is otherwise consented to by the Administrative Agent in writing;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article 7), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times, (i) terminate the Commitments (including the Swingline Commitment), whereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any break funding payment) and other obligations of the Borrower accrued hereunder and under any other Loan Document, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and, in the case of any event with respect to the Borrower described in clause (h) or (i) of this Article 7, the Commitments (including the Swingline Commitment) shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any break funding payments) and other obligations of the Borrower accrued hereunder and under any other Loan Documents, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders shall, increase the rate of interest applicable to the Loans and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the UCC.

## ARTICLE 8
## THE ADMINISTRATIVE AGENT

Section 8.01    Authorization and Action.

(a)    Each Lender, on behalf of itself and any of its Affiliates that are Secured Parties, hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors and assigns to serve as the administrative agent and collateral agent under the Loan Documents and each Lender authorizes the Administrative Agent to take such actions as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent under such agreements and to exercise such powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction other than within the United States, each Lender hereby grants to the Administrative Agent any required powers of attorney to execute and enforce any Collateral Document governed by the laws of such jurisdiction on such Lender's behalf. Without limiting the foregoing, each Lender hereby authorizes the Administrative Agent to execute and deliver, and to perform its obligations under, each of the Loan Documents to which the Administrative Agent is a party, and to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents.

(b)    As to any matters *not* expressly provided for herein and in the other Loan Documents (including enforcement or collection), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, pursuant to the terms in the Loan Documents), and, unless and until revoked in

writing, such instructions shall be binding upon each Lender; provided, that, the Administrative Agent shall not be required to take any action that (i) the Administrative Agent in good faith believes exposes it to liability unless the Administrative Agent receives an indemnification and is exculpated in a manner satisfactory to it from the Lenders with respect to such action, or (ii) is contrary to this Agreement or any other Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that, the Administrative Agent may seek clarification or direction from the Required Lenders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided. Except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Loan Party, any Subsidiary or any Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. Nothing in this Agreement shall require the Administrative Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(c)      In performing its functions and duties hereunder and under the other Loan Documents, the Administrative Agent is acting solely on behalf of the Lenders (except in limited circumstances expressly provided for herein relating to the maintenance of the Register), and its duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing:

(i)      the Administrative Agent does not assume and shall *not* be deemed to have assumed any obligation or duty or any other relationship as the agent, fiduciary or trustee of or for any Lender, any other Secured Party or holder of any other obligation other than as expressly set forth herein and in the other Loan Documents, regardless of whether a Default or an Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" (or any similar term) herein or in any other Loan Document with reference to the Administrative Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties); additionally, each Lender agrees that it will not assert any claim against the Administrative Agent based on an alleged breach of fiduciary duty by the Administrative Agent in connection with this Agreement and/or the transactions contemplated hereby;

(ii)      where the Administrative Agent is required or deemed to act as a trustee in respect of any Collateral over which a security interest has been created pursuant to a Loan Document expressed to be governed by the laws of any jurisdiction in the U.S., or is required or deemed to hold any Collateral "on trust" pursuant to the foregoing, the obligations and liabilities of the Administrative Agent to the Secured Parties in its capacity as trustee shall be excluded to the fullest extent permitted by applicable law; and

(iii)      nothing in this Agreement or any Loan Document shall require the Administrative Agent to account to any Lender for any sum or the profit element of any sum received by the Administrative Agent for its own account.

(d)      The Administrative Agent may perform any of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any of their respective duties and exercise their respective rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities pursuant to this Agreement. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the

Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

(e)     The Arranger shall not have obligations or duties whatsoever in such capacity under this Agreement or any other Loan Document and shall incur no liability hereunder or thereunder in such capacity, but all such persons shall have the benefit of the indemnities provided for hereunder.

(f)     In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Section 2.11, Section 2.12, Section 2.14, Section 2.15 and Section 9.03) allowed in such judicial proceeding; and

(ii)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03). Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

(g)     The provisions of this Article 8 are *solely* for the benefit of the Administrative Agent and the Lenders, and, except *solely* to the extent of the Borrower's rights to consent pursuant to and subject to the conditions set forth in this Article 8, none of the Borrower or any Subsidiary of the Borrower, or any of its Affiliates, shall have any rights as a third party beneficiary under any such provisions. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Secured Obligations provided under the Loan Documents, to have agreed to the provisions of this Article 8.

Section 8.02     Administrative Agent's Reliance, Indemnification, Etc.

(a)     Neither the Administrative Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by such party, the Administrative Agent or any of its Related Parties under or in connection with this Agreement or the other Loan Documents (A) with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents), or (B) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment), or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for

any failure of any Loan Party to perform its obligations hereunder or thereunder.

(b)    The Administrative Agent shall be deemed *not* to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall *not* be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items (which on their face purport to be such items) expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent, or (vi) the creation, perfection or priority of Liens on the Collateral.

(c)    Without limiting the foregoing, the Administrative Agent (i) may treat the payee of any promissory note as its holder until such promissory note has been assigned in accordance with Section 9.04, (ii) may rely on the Register to the extent set forth in Section 9.04(b), (iii) may consult with legal counsel (including counsel to the Borrower), independent public accountants and other experts selected by it, and shall *not* be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts, (iv) makes no warranty or representation to any Lender and shall *not* be responsible to any Lender for any statements, warranties or representations made by or on behalf of any Loan Party in connection with this Agreement or any other Loan Document, (v) in determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender sufficiently in advance of the making of such Loan, and (vi) shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any notice, consent, certificate or other instrument or writing (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated by the proper party or parties (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

(d)    Neither the Administrative Agent nor any of its Related Parties shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions of this Agreement relating to Disqualified Lenders. Without limiting the generality of the foregoing, the Administrative Agent shall *not*: (i) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Lender; or (ii) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Lender.

Section 8.03    Posting of Communications.

(a)    The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make any Communications available to the Lenders by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic system chosen by the Administrative Agent to be its electronic transmission system (the "*Approved Electronic Platform*").

(b)    Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Lender that

89

are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders and the Borrower hereby approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution. The Borrower acknowledges and agrees that the DQ List shall be deemed suitable for posting and may be posted by the Administrative Agent on the Approved Electronic Platform, including the portion of the Approved Electronic Platform that is designated for Public-Siders.

(c)    THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT, ANY ARRANGER OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "*APPLICABLE PARTIES*") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

(d)    Each Lender agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees: (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's email address to which the foregoing notice may be sent by electronic transmission; and (ii) that the foregoing notice may be sent to such email address.

(e)    Each of the Lenders and the Borrower agrees that the Administrative Agent may, but (except as may be required by applicable law) shall *not* be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally applicable document retention procedures and policies.

(f)    Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 8.04    The Administrative Agent Individually. With respect to its Commitment and Loans (including the Swingline Commitment and Swingline Loans), the Person serving as the Administrative Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender. The terms "*Lenders*", "*Required Lenders*" and any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity as a Lender and/or as one of the Required Lenders, as applicable. The Person serving as the Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with, any Loan Party, any Subsidiary or any Affiliate of any of the foregoing as if such Person was not acting as the Administrative Agent and without any duty to account therefor to the Lenders.

Section 8.05    Successor Administrative Agent.

(a)      The Administrative Agent may resign at any time by giving thirty (30) days' prior written notice thereof to the Lenders and the Borrower, whether or not a successor Administrative Agent has been appointed. Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within thirty (30) days after the retiring Administrative Agent's giving of notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York or an Affiliate of any such bank. In either case, such appointment shall be subject to the prior written approval of the Borrower (which approval may not be unreasonably withheld and shall not be required while an Event of Default has occurred and is continuing). Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Administrative Agent. Upon the acceptance of appointment as Administrative Agent by a successor Administrative Agent, the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. Prior to any retiring Administrative Agent's resignation hereunder as Administrative Agent, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents.

(b)      Notwithstanding anything to the contrary in the foregoing clause (a), in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, provided, that, *solely* for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Collateral Document and Loan Document, and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this Section 8.05 (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided, that, (A) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person, and (B) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall directly be given or made to each Lender. Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article 8, Section 2.15(d) and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Section 8.06      Acknowledgements of Lenders.

(a)      Each Lender represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and that it has, independently and without reliance upon the Administrative Agent, any Arranger, any other Lender or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Arranger, any other Lender or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain

material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or *not* taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)     Each Lender, by delivering its signature page to this Agreement on the Closing Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Closing Date or the effective date of any such Assignment and Assumption or any other Loan document pursuant to which it shall have become a Lender hereunder.

(c)     Each Lender hereby agrees that: (i) it has requested a copy of each Report prepared by or on behalf of the Administrative Agent; (ii) the Administrative Agent (A) makes no representation or warranty, express or implied, as to the completeness or accuracy of any Report or any of the information contained therein or any inaccuracy or omission contained in or relating to a Report, and (B) shall *not* be liable for any information contained in any Report; (iii) the Reports are *not* comprehensive audits or examinations, and that any Person performing any field examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel and that the Administrative Agent undertakes no obligation to update, correct or supplement the Reports; (iv) it will keep all Reports confidential and strictly for its internal use, not share the Report with any Loan Party or any other Person except as otherwise permitted pursuant to this Agreement; and (v) without limiting the generality of any other indemnification provision contained in this Agreement, (A) it will hold the Administrative Agent and any such other Person preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any extension of credit that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans, and (B) it will pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorneys' fees) incurred by the Administrative Agent or any such other Person as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 8.07    Collateral Matters.

(a)     Except with respect to the exercise of setoff rights in accordance with Section 9.08 or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised *solely* by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof. In its capacity, the Administrative Agent is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the UCC. In the event that any Collateral is hereafter pledged by any Person as collateral security for the Secured Obligations, the Administrative Agent is hereby authorized, and hereby granted a power of attorney, to execute and deliver on behalf of the Secured Parties any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Administrative Agent on behalf of the Secured Parties.

(b)     In furtherance of the foregoing and *not* in limitation thereof, no arrangements in respect of Banking Services the obligations under which constitute Secured Obligations and no Swap Agreement the obligations under which constitute Secured Obligations, will create (or be deemed to create) in favor of any Secured Party that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party under any Loan Document. By accepting the benefits of the Collateral, each Secured Party that is a party to any such arrangement in respect of Banking Services or Swap Agreement, as applicable, shall be deemed to have appointed the Administrative Agent to serve as administrative agent and

collateral agent under the Loan Documents and agreed to be bound by the Loan Documents as a Secured Party thereunder, subject to the limitations set forth in this clause (b).

(c)       The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(a)(ii). The Administrative Agent shall *not* be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

(d)       Upon (i) the Payment in Full of all Obligations in respect of the Overadvance Term Loan, and (ii) the making of Supplemental Payments, in the aggregate, to the Supplemental Payment Account in an amount *not less than* the Supplemental Payment Amount, the Administrative Agent agrees, and the Lenders irrevocably authorize the Administrative Agent, to release promptly the Liens in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, in (and *solely* to the extent relating to and encumbering) the Contingent Release Collateral.

Section 8.08       Credit Bidding. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided, that, any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason, such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the

need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

Section 8.09    Certain ERISA Matters.

(a)    Each Lender (i) represents and warrants, as of the date such Person became a Lender party hereto, to, and (ii) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that *at least* one of the following is and will be true:

(A)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Loans or the Commitments,

(B)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(C)    (I) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (II) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (III) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14, and (IV) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(D)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (A) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has *not* provided another representation, warranty and covenant as provided in the foregoing clause (a)(D), such Lender further (i) represents and warrants, as of the date such Person became a Lender party hereto, to, and (ii) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that none of the Administrative Agent, or the Arranger or any of their respective Affiliates is a fiduciary with respect to the Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

(c)    The Administrative Agent and the Arranger hereby informs the Lenders that each such Person is

not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments, this Agreement and any other Loan Documents, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender, or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 8.10    Flood Laws. Hancock Whitney has adopted internal policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and related legislation (the "*Flood Laws*"). Hancock Whitney, as administrative agent or collateral agent on a syndicated facility, will post on the applicable electronic platform (or otherwise distribute to each Lender in the syndicate) documents that it receives in connection with the Flood Laws. However, Hancock Whitney reminds each Lender and Participant in the facility that, pursuant to the Flood Laws, each federally regulated Lender (whether acting as a Lender or Participant in the facility) is responsible for assuring its own compliance with the flood insurance requirements.

Section 8.11    Erroneous Payments.

(a)    Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender or from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "*Erroneous Payment*") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the *greater of* the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding <u>clause (a)</u>, each Lender hereby further agrees that if it receives an Erroneous Payment from the Administrative Agent (or any of its Affiliates) (i) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "*Erroneous Payment Notice*"), (ii) that was *not* preceded or accompanied by an Erroneous Payment Notice, or (iii) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall *not* assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events,

95

within one (1) Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)      The Borrower and each other Loan Party hereby agrees that: (i) in the event an Erroneous Payment (or portion thereof) is *not* recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount; and (ii) an Erroneous Payment shall *not* pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(d)      Each party's obligations under this Section 8.11 shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

ARTICLE 9
MISCELLANEOUS

Section 9.01      Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to clause (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(i)      if to any Loan Party, to it in care of the Borrower at:

> RAC Dealership, LLC
> 6775 Lenox Center Ct., Ste 100
> Memphis, TN 38115
> Attention: Noah Hogan, Chief Executive Officer
> Email: noah.hogan@americancarecenter.com

> With a copy to:

> RAC Dealership, LLC
> 6775 Lenox Center Ct., Ste 100
> Memphis, TN 38115
> Attention: John McCann, Executive Vice President and General Counsel
> Email: john.mccann@americancarcenter.com

(ii)      if to the Administrative Agent or the Swingline Lender, to Hancock Whitney at:

> Hancock Whitney Bank
> 701 Poydras Street, Suite 1600
> New Orleans, Louisiana 70139
> Attention: Matthew Chivleatto
> Email: syndications@hancockwhitney.com

(iii)    if to any other Lender, to it at its address or fax number set forth in its Administrative Questionnaire.

All such notices and other communications (A) sent by hand or overnight courier service, or mailed by certified or registered mail shall be deemed to have been given when received, (B) sent by fax shall be deemed to have been given when sent, provided, that, if not given during normal business hours for the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (C) delivered through Electronic Systems or Approved Electronic Platforms, as applicable, to the extent provided in underline clause (b) below shall be effective as provided in such underline clause (b).

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems or Approved Electronic Platforms, as applicable, or pursuant to procedures approved by the Administrative Agent; provided, that, the foregoing shall *not* apply to notices pursuant to Article 2 or to compliance and no Default certificates delivered pursuant to Section 4.01(a)(iv) or Section 5.01(a)(iii) unless otherwise agreed by the Administrative Agent and the applicable Lender. Each of the Administrative Agent and the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by using Electronic Systems or Approved Electronic Platforms, as applicable, pursuant to procedures approved by it; provided, that, approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided, that, if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided, that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is *not* sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)    Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

Section 9.02    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    Subject to Section 2.13(c), Section 2.13(d) and Section 9.02(e) below, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders, or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, with the consent of the Required Lenders; provided, that, no such agreement shall (A) increase the Commitment of any

97

Lender without the written consent of such Lender (including any such Lender that is a Defaulting Lender), (B) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon, or reduce or forgive any interest or fees payable hereunder, without the written consent of each Lender (including any such Lender that is a Defaulting Lender) affected thereby (except that any amendment or modification of the financial covenants in this Agreement (or defined terms used in the financial covenants in this Agreement) shall not constitute a reduction in the rate of interest or fees for purposes of this <u>clause (B)</u>), (C) postpone any scheduled date of payment of the principal amount of any Loan, or any date for the payment of any interest, fees or other Obligations payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender (including any such Lender that is a Defaulting Lender) affected thereby, (D) change <u>Section 2.16(b)</u> or <u>Section 2.16(d)</u> in a manner that would alter the ratable reduction of Commitments or the manner in which payments are shared, without the written consent of each Lender (other than any Defaulting Lender), (E) increase the advance rates set forth in the definition of Borrowing Base, add new categories of eligible assets or otherwise amend the definitions of Borrowing Base or Eligible Inventory, without the written consent of two (2) or more unaffiliated Lenders (other than any Defaulting Lender) having Revolving Exposure and Unfunded Commitments representing more than sixty-six and two-thirds percent (66.67%) of the *sum of* the Aggregate Revolving Exposure and Unfunded Commitments at such time, (F) change any of the provisions of this <u>Section 9.02</u> or the definition of "*Required Lenders*" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (other than any Defaulting Lender) directly affected thereby, (G) release all or substantially all of the Guarantors from their obligations under the Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents), without the written consent of each Lender (other than any Defaulting Lender), or (H) except as provided in clause (c) of this <u>Section 9.02</u> or in any Collateral Document, release all or substantially all of the Collateral without the written consent of each Lender (other than any Defaulting Lender); <u>provided</u>, <u>further</u>, <u>that</u>, no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Swingline Lender hereunder without the prior written consent of the Administrative Agent or the Swingline Lender, as the case may be, (it being understood that any amendment to <u>Section 2.18</u> shall require the consent of the Administrative Agent and the Swingline Lender); <u>provided</u>, <u>further</u>, <u>that</u>, no such agreement shall amend or modify the provisions of <u>Section 2.06</u> without the prior written consent of the Administrative Agent. The Administrative Agent may also amend the <u>Commitment Schedule</u> to reflect assignments entered into pursuant to <u>Section 9.04</u>.

(c)     The Lenders hereby irrevocably authorize the Administrative Agent, at its option and in its sole discretion, to release any Liens granted to the Administrative Agent by the Loan Parties on any Collateral (i) upon the Payment in Full of all Secured Obligations, and the cash collateralization of all Unliquidated Obligations in a manner satisfactory to each affected Lender, (ii) constituting property being sold or disposed of if the Loan Party disposing of such property certifies to the Administrative Agent that the sale or disposition is made in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on any such certificate, without further inquiry), and to the extent that the property being sold or disposed of constitutes one hundred percent (100%) of the Equity Interests in a Subsidiary, the Administrative Agent is authorized to release any Loan Guaranty provided by such Subsidiary, (iii) constituting property leased to a Loan Party under a lease which has expired or been terminated in a transaction permitted under this Agreement, or (iv) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Administrative Agent and the Lenders pursuant to <u>Article 7</u>. Except as provided in the preceding sentence, the Administrative Agent will not release any Liens on Collateral without the prior written authorization of the Required Lenders. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral. Any execution and delivery by the Administrative Agent of documents in connection with any such release shall be without recourse to or warranty by the Administrative Agent.

(d)     If, in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender affected thereby", the consent of the Required Lenders is obtained, but the consent of

other necessary Lenders is not obtained (any such Lender whose consent is necessary but has not been obtained being referred to herein as a "*Non-Consenting Lender*"), then the Borrower may elect to replace a Non-Consenting Lender as a Lender party to this Agreement, provided, that, concurrently with such replacement, (i) another bank or other entity which is reasonably satisfactory to the Borrower and the Administrative Agent shall agree, as of such date, to purchase for cash the Loans and other Obligations due to the Non-Consenting Lender pursuant to an Assignment and Assumption and to become a Lender for all purposes under this Agreement and to assume all obligations of the Non-Consenting Lender to be terminated as of such date and to comply with the requirements of clause (b) of Section 9.04, and (ii) the Borrower shall pay to such Non-Consenting Lender in same day funds on the day of such replacement all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by the Borrower hereunder to and including the date of termination, including without limitation payments due to such Non-Consenting Lender under Section 2.14 and Section 2.15.

(e)    Notwithstanding anything to the contrary herein the Administrative Agent may, with the consent of the Borrower only, amend, modify or supplement this Agreement or any of the other Loan Documents to cure any ambiguity, omission, mistake, defect or inconsistency.

Section 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Loan Parties, jointly and severally, shall pay all (i) reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the syndication and distribution (including, without limitation, via the internet or through an Electronic System or Approved Electronic Platform) of the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) reasonable out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section 9.03, or in connection with the Loans made hereunder, including all such reasonable out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans. Expenses being reimbursed by the Loan Parties under this Section 9.03 include, without limiting the generality of the foregoing, reasonable fees, costs and expenses incurred in connection with:

(A)    appraisals and insurance reviews;

(B)    field examinations and the preparation of Reports based on the fees charged by a third party retained by the Administrative Agent or the internally allocated fees for each Person employed by the Administrative Agent with respect to each field examination;

(C)    background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Administrative Agent;

(D)    Taxes, fees and other charges for (I) lien and title searches, and (II) filing financing statements and continuations, and other actions to perfect, protect, and continue the Administrative Agent's Liens;

(E)    sums paid or incurred to take any reasonable action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

(F)    forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

All of the foregoing fees, costs and expenses may be charged to the Borrower as Revolving Loans or to

another deposit account, all as described in <u>Section 2.16(c)</u>.

(b)        The Loan Parties, jointly and severally, shall indemnify the Administrative Agent, the Arranger, and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "*Indemnitee*") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary of the Borrower, or any Environmental Liability related in any way to a Loan Party or a Subsidiary of the Borrower, (iv) the failure of a Loan Party to deliver to the Administrative Agent the required receipts or other required documentary evidence with respect to a payment made by such Loan Party for Taxes pursuant to <u>Section 2.15</u>, or (v) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; <u>provided</u>, <u>that</u>, such indemnity shall *not*, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or such Indemnitee's material breach of this or any other Loan Document. This <u>clause (b)</u> shall *not* apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)        Each Lender severally agrees to pay any amount required to be paid by any Loan Party under <u>clause (a)</u> or (<u>b</u>) of this <u>Section 9.03</u> to the Administrative Agent, the Swingline Lender and each Related Party of the foregoing Persons (each, an "*Agent Indemnitee*") (to the extent *not* reimbursed by the Loan Parties and without limiting the obligation of any Loan Party to do so), ratably according to their respective Applicable Percentage in effect on the date on which indemnification is sought under this <u>Section 9.03</u> (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Applicable Percentage immediately prior to such date), from and against any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to, or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; <u>provided</u>, <u>that</u>, (i) the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent Indemnitee in its capacity as such, and (ii) no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct. The agreements in this <u>Section 9.03</u> shall survive the termination of this Agreement and the Payment in Full of the Secured Obligations.

(d)        To the extent permitted by applicable law, (i) no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, (ii) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), or (iii) in no event shall any Loan Party, or any other party hereto (including any Indemnitee) have any liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof; <u>provided</u>, <u>that</u>, nothing in this <u>clause (d)</u> shall relieve any Loan Party of any obligation it may have hereunder or under any other Loan Document to indemnify an Indemnitee against special, indirect,

100

consequential or punitive damages asserted against such Indemnitee by a third party.

(e)    All amounts due under this <u>Section 9.03</u> shall be payable promptly after written demand therefor.

Section 9.04    <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that: (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void); and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this <u>Section 9.04</u>. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in <u>clause (c)</u> below) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in <u>clause (b)(ii)</u> below, any Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)    the Borrower, <u>provided</u>, <u>that</u>: (I) the Borrower shall be deemed to have consented to an assignment of all or a portion of the Revolving Loans and Commitments unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof, and (II) no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee; and

(B)    the Administrative Agent, <u>provided</u>, <u>that</u>, no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund; and

(C)    the Swingline Lender.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall *not* be *less than* $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consent; <u>provided</u>, <u>that</u>, no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent (I) an Assignment and Assumption, or (II) to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and the parties to the Assignment and Assumption are participants, together with a processing and recordation fee of $3,500; and

(D)      the assignee, if it shall *not* be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including federal and state securities laws.

(iii)      Subject to acceptance and recording thereof pursuant to clause (b)(iv) of this Section 9.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.14, Section 2.15 and Section 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 9.04.

(iv)      The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the U.S. a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)      Upon its receipt of (A) a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, or (B) to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and the parties to the Assignment and Assumption are participants, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this clause (b) and any written consent to such assignment required by this clause (b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided, that, if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.06, Section 2.07(d), Section 2.08(b), Section 2.16(e), Section 2.21 or Section 9.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause (b).

(c)      (i)      Any Lender may, without the consent of, or notice to, the Borrower, the Administrative Agent or the Swingline Lender, sell participations to one or more banks or other entities (a "*Participant*") other than an Ineligible Institution in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided, that, (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain *solely* responsible to the other parties hereto for the performance of such obligations, and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal *solely* and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve

any amendment, modification or waiver of any provision of this Agreement; provided, that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.14, Section 2.15 and Section 2.16 (subject to the requirements and limitations therein, including the requirements under Section 2.15(f) and Section 2.15(g) (it being understood that the documentation required under Section 2.15(f) shall be delivered to the participating Lender and the information and documentation required under Section 2.15(g) will be delivered to the Borrower and the Administrative Agent)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to this clause (b); provided, that, such Participant (I) agrees to be subject to the provisions of Section 2.16 and Section 2.17 as if it were an assignee under this clause (b); and (II) shall *not* be entitled to receive any greater payment under Section 2.14 or Section 2.15 with respect to any participation than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(ii)    Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.17(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided, that, such Participant agrees to be subject to Section 2.16(d) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "*Participant Register*"); provided, that, no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 9.04 shall *not* apply to any such pledge or assignment of a security interest; provided, that, no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    Disqualified Lenders. (i)    No assignment (or, to the extent the DQ List has been posted on the Approved Electronic Platform for all Lenders, participation) shall be made to any Person that was a Disqualified Lender as of the date (the "*Trade Date*") on which the applicable Lender entered into a binding agreement to sell and assign or participate all or a portion of its rights and obligations under this Agreement to such Person (unless the Borrower has consented to such assignment, in which case such Person will not be considered a Disqualified Lender for the purpose of such assignment or participation). For the avoidance of doubt, with respect to any assignee or participant that becomes a Disqualified Lender after the applicable Trade Date (including as a result of the delivery of a notice pursuant to, and/or the expiration of the notice period referred to in, the definition of "*Disqualified Lender*"), such assignee shall not retroactively be considered a Disqualified Lender. Any assignment in violation of this clause (e) shall *not* be void, but the other provisions of this clause (e) shall apply.

(ii)    If any assignment (or, to the extent the DQ List has been posted on the Approved

Electronic Platform for all Lenders, participation) is made to any Disqualified Lender without the Borrower's prior consent in violation of Section 9.04(e)(i), the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Lender and the Administrative Agent, (A) terminate any Revolving Commitment of such Disqualified Lender and repay all obligations of the Borrower owing to such Disqualified Lender in connection with such Revolving Commitment, and/or (B) require such Disqualified Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this Section 9.04), all of its interest, rights and obligations under this Agreement and the other Loan Documents to one or more Persons (other than an Ineligible Institution) that shall assume such obligations at the *lesser of* (x) the principal amount thereof, and (y) the amount that such Disqualified Lender paid to acquire such interests, rights and obligations, in each case, *plus* accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and other the other Loan Documents; provided, that, (x) the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 9.04(b)(ii)(C), and (y) such assignment does not conflict with applicable law.

(iii)     Notwithstanding anything to the contrary contained in this Agreement, Disqualified Lenders (A) will *not* (1) have the right to receive information, reports or other materials provided to Lenders by the Borrower, the Administrative Agent or any other Lender, (2) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (3) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders, and (B) (1) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Lender will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Lenders consented to such matter, and (2) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to the Bankruptcy Code (or any similar laws in any other jurisdiction to which a Loan Party is subject) (a "*Plan of Reorganization*"), each Disqualified Lender party hereto hereby agrees (I) *not* to vote on such Plan of Reorganization, (II) if such Disqualified Lender does vote on such Plan of Reorganization notwithstanding the restriction in the foregoing clause (1), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar laws in any other jurisdictions to which a Loan Party is subject), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Plan of Reorganization in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other similar laws in any other jurisdictions to which a Loan Party is subject), and (III) not to contest any request by any party for a determination by the bankruptcy court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (II).

(iv)     The Administrative Agent shall have the right, and the Borrower hereby expressly authorizes the Administrative Agent, to: (A) post the list of Disqualified Lenders provided by the Borrower and any updates thereto from time to time (collectively, the "*DQ List*") on the Approved Electronic Platform, including that portion of the Approved Electronic Platform that is designated for Public-Siders; or (B) provide the DQ List to each Lender requesting the same.

Section 9.05     Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Section 2.14, Section 2.15, Section 9.03 and Article 8 shall survive and remain in full force and effect regardless of the

consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

Section 9.06     Counterparts; Integration; Effectiveness; Electronic Execution.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "*execution*", "*signed*", "*signature*", "*delivery*", and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided, that, nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent.

Section 9.07     Severability. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08     Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and other obligations at any time owing, by such Lender or any such Affiliate, to or for the credit or the account of any Loan Party against any and all of the Secured Obligations owing to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Loan Parties may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness; provided, that, in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.18 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender or such Affiliate shall notify the Borrower and the Administrative Agent of such setoff or application; provided, that, the failure to give such notice shall not affect the validity of such setoff or application under this Section 9.08. The rights of each Lender

105

and its Affiliates under this Section 9.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws of the State of New York.

(b)    Each of the Lenders and the Administrative Agent hereby irrevocably and unconditionally agrees that, notwithstanding the governing law provisions of any applicable Loan Document, any claims brought against the Administrative Agent by any Secured Party relating to this Agreement, any other Loan Document, the Collateral or the consummation or administration of the transactions contemplated hereby or thereby shall be construed in accordance with and governed by the law of the State of New York.

(c)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York state court sitting in New York, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Administrative Agent or any of its Related Parties may only) be heard and determined in such state court or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction *solely* to the extent required to enforce rights related to the Collateral (including, without limitation, in connection with foreclosure on the Collateral) or to enforce a judgment.

(d)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in clause (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

Section 9.11    Headings. Article and Section headings and the Table of Contents used herein are for

convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    <u>Confidentiality</u>.

(a)    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and their respective directors, officers, employees, principals, managers, equityholders and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent requested by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners) having or purporting to have jurisdiction over the Administrative Agent, such Lender or such Affiliate, (iii) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this <u>Section 9.12</u>, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement (it being understood that the DQ List may be disclosed to any assignee or Participant, or any prospective assignee or Participant, in reliance on this <u>clause (vi)(A)</u>) or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (vii) with the consent of the Borrower, (viii) on a confidential basis to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the credit facilities provided for herein, or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of identification numbers with respect to the credit facilities provided for herein, or (ix) to the extent such Information (A) becomes publicly available other than as a result of a breach of this <u>Section 9.12</u>, or (B) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower. For the purposes of this <u>Section 9.12</u>, "<u>*Information*</u>" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower and other than information pertaining to this Agreement provided by arrangers to data service providers, including league table providers, that serve the lending industry. Any Person required to maintain the confidentiality of Information as provided in this <u>Section 9.12</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS <u>SECTION 9.12</u>) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE OTHER LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW,

INCLUDING FEDERAL AND STATE SECURITIES LAWS.

Section 9.13    <u>Several Obligations; Nonreliance; Violation of Law</u>. The respective obligations of the Lenders hereunder are several and *not* joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall *not* relieve any other Lender from any of its obligations hereunder. Each Lender hereby represents that it is *not* relying on or looking to any margin stock (as defined in Regulation U of the Federal Reserve Board) for the repayment of the Borrowings provided for herein. Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrower in violation of any Requirement of Law.

Section 9.14    <u>USA PATRIOT Act</u>. Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

Section 9.15    <u>Disclosure</u>. Each Loan Party and each Lender hereby acknowledges and agrees that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with, any of the Loan Parties and their respective Affiliates.

Section 9.16    <u>Appointment for Perfection</u>. Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of the Administrative Agent and the Secured Parties, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession or control. Should any Lender (other than the Administrative Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 9.17    <u>Interest Rate Limitation</u>. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "*Charges*"), shall *exceed* the maximum lawful rate (the "*Maximum Rate*") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this <u>Section 9.17</u> shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but *not* above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.18    <u>No Fiduciary Duty, etc</u>.

(a)    Each of the Loan Parties acknowledges and agrees that no Credit Party will have any obligations except those obligations expressly set forth herein and in the other Loan Documents and each Credit Party is acting solely in the capacity of an arm's length contractual counterparty to the Loan Parties with respect to the Loan Documents and the transactions contemplated herein and therein and not as a financial advisor or a fiduciary to, or an agent of, any of the Loan Parties or any other person. Each of the Loan Parties agrees that it will not assert any claim against any Credit Party based on an alleged breach of fiduciary duty by such Credit Party in connection with this Agreement and the transactions contemplated hereby. Additionally, each of the Loan Parties acknowledges and agrees that no Credit Party is advising any of the Loan Parties as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction. Each of the Loan Parties shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated herein or in the other Loan Documents, and the Credit Parties shall

have no responsibility or liability to any of the Loan Parties with respect thereto.

(b)    Each of the Loan Parties further acknowledges and agrees that each Credit Party, together with its Affiliates, is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, any Credit Party may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, any of the Loan Parties and other companies with which any of the Loan Parties may have commercial or other relationships. With respect to any securities and/or financial instruments so held by any Credit Party or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

(c)    In addition, each of the Loan Parties acknowledges and agrees that each Credit Party and its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which the Loan Parties may have conflicting interests regarding the transactions described herein and otherwise. No Credit Party will use confidential information obtained from the Borrower by virtue of the transactions contemplated by the Loan Documents or its other relationships with the Borrower in connection with the performance by such Credit Party of services for other companies, and no Credit Party will furnish any such information to other companies. The Borrower also acknowledges that no Credit Party has any obligation to use in connection with the transactions contemplated by the Loan Documents, or to furnish to the Borrower, confidential information obtained from other companies.

Section 9.19    <u>Marketing Consent</u>. The Borrower hereby authorizes Hancock Whitney and its affiliates (collectively, the "<u>*Hancock Whitney Parties*</u>"), at their respective sole expense, but without any prior approval by the Borrower, to publish such tombstones and give such other publicity to this Agreement as each may from time to time determine in its sole discretion; <u>provided</u>, <u>that</u>, to the extent that such marketing, press releases or other transactional announcements made after the Closing Date include material information, other than (x) the names and logos of the Borrower and its subsidiaries, (y) the amount, type and closing date of the credit facilities provided hereunder, and (z) the roles and any titles of the Arranger and/or Lenders in connection with such credit facilities, Hancock Whitney or other Lender, as applicable, shall obtain prior written consent of the Borrower prior to the publication thereof.

Section 9.20    <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 9.21    Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support, "*QFC Credit Support*"; and each such QFC, a "*Supported QFC*"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "*U.S. Special Resolution Regimes*") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "*Covered Party*") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

## ARTICLE 10
## LOAN GUARANTY

Section 10.01    Guaranty. Each Guarantor (other than those that have delivered a separate Guarantee) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all reasonable costs and expenses including, without limitation, all court costs and reasonable attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent and the Lenders in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, the Borrower, any Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "*Guaranteed Obligations*"); provided, that, the definition of "*Guaranteed Obligations*" shall *not* create any guarantee by any Guarantor of (or grant of security interest by any Guarantor to support, as applicable) any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of any Guarantor. Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

Section 10.02    Guaranty of Payment. This Loan Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require the Administrative Agent or any Lender to sue the Borrower, any Guarantor, any other guarantor of, or any other Person obligated for all or any part of the Guaranteed Obligations

(each, an "*Obligated Party*"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

Section 10.03    No Discharge or Diminishment of Loan Guaranty.

(a)    Except as otherwise provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the Payment in Full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)    Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the Payment in Full of the Guaranteed Obligations).

Section 10.04    Defenses Waived. To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower, any Guarantor or any other Obligated Party, other than the Payment in Full of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice *not* provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person. Each Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. Upon the occurrence and during the continuance of an Event of Default, and subject to the terms and provisions of the Loan Documents, the Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Loan Guaranty, except to the extent the Guaranteed Obligations have been Paid in Full. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

111

Section 10.05    Rights of Subrogation. No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to the Administrative Agent and the Lenders.

Section 10.06    Reinstatement; Stay of Acceleration. If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded, or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent and the Lenders are in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Administrative Agent.

Section 10.07    Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Loan Guaranty, and agrees that none of the Administrative Agent or any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

Section 10.08    Termination. Each of the Lenders may continue to make loans or extend credit to the Borrower based on this Loan Guaranty until three (3) days after it receives written notice of termination from any Guarantor. Notwithstanding receipt of any such notice, each Guarantor will continue to be liable to the Lenders for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations. Nothing in this Section 10.08 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Administrative Agent or any Lender may have in respect of, any Default or Event of Default that shall exist under clause (o) of Article 7 hereof as a result of any such notice of termination.

Section 10.09    Taxes. Each payment of the Guaranteed Obligations will be made by each Guarantor without withholding for any Taxes, unless such withholding is required by law. If any Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law. If such Taxes are Indemnified Taxes, then the amount payable by such Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section 10.09), the Administrative Agent or such Lender (as the case may be) receives the amount it would have received had no such withholding been made.

Section 10.10    Maximum Liability. Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law. In determining the limitations, if any, on the amount of any Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

Section 10.11    Contribution.

(a)        To the extent that any Guarantor shall make a payment under this Loan Guaranty (a "*Guarantor*

*Payment*") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Guarantor if each Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Guarantor's "*Allocable Amount*" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment, the Payment in Full of the Guaranteed Obligations and the termination of this Agreement, such Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Guarantor for the amount of such excess, *pro rata* based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "<u>Allocable Amount</u>" of any Guarantor shall be equal to the excess of the fair saleable value of the property of such Guarantor over the total liabilities of such Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)    This <u>Section 10.11</u> is intended only to define the relative rights of the Guarantors, and nothing set forth in this <u>Section 10.11</u> is intended to or shall impair the obligations of the Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Guarantor or Guarantors to which such contribution and indemnification is owing.

(e)    The rights of the indemnifying Guarantors against other Guarantors under this <u>Section 10.11</u> shall be exercisable upon the Payment in Full of the Guaranteed Obligations and the termination of this Agreement.

Section 10.12    <u>Liability Cumulative</u>. The liability of each Loan Party as a Guarantor under this <u>Article 10</u> is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

Section 10.13    <u>Keepwell</u>. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guarantee in respect of a Swap Obligation (<u>provided</u>, <u>that</u>, each Qualified ECP Guarantor shall only be liable under this <u>Section 10.13</u> for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Section 10.13</u> or otherwise under this Loan Guaranty voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and *not* for any greater amount). Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this <u>Section 10.13</u> shall remain in full force and effect until the termination of all Swap Obligations. Each Qualified ECP Guarantor intends that this <u>Section 10.13</u> constitute, and this <u>Section 10.13</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

*[Remainder of Page Intentionally Left Blank]*

SCHEDULE TO CREDIT AGREEMENT

## Schedule I

## Commitment Schedule

| Lender | Revolving Commitment | | | | Overadvance Term Loan | |
|---|---|---|---|---|---|---|
| | *Revolving Commitment ($)* | *Applicable Percentage (%)* | *Revolving Commitment ($)* | *Applicable Percentage (%)* | *Overadvance Term Loan Commitment ($)* | *Applicable Percentage (%)* |
| | *As in effect on the Closing Date* | | *As in effect on the Second Amendment Effective Date* | | *As in effect on the Second Amendment Effective Date* | |
| Hancock Whitney Bank | $30,000,000.00 | 50.000000000% | $7,500,000.00 | 50.000000000% | $8,000,000.00 | 50.000000000% |
| Synovus Bank | $20,000,000.00 | 33.333333333% | $5,000,000.00 | 33.333333333% | $5,333,333.33 | 33.333333333% |
| Simmons Bank (as successor by merger to Triumph Bank) | $10,000,000.00 | 16.666666667% | 2,500,000.00 | 16.666666667% | $2,666,666.67 | 16.666666667% |
| | | | | | | |
| **TOTAL**: | $60,000,000.00 | 100.000000000% | $15,000,000.00 | 100.000000000% | $16,000,000.00 | 100.000000000% |

*Note*: Dollar amounts in the table above are subject to rounding to two (2) decimal places, and percentage amounts in the table above are subject to rounding to nine (9) decimal places, respectively.

[*Remainder of Page Intentionally Left Blank*]

## EXHIBITS TO CREDIT AGREEMENT

EXHIBIT A

## [FORM OF] ASSIGNMENT AND ASSUMPTION

This ASSIGNMENT AND ASSUMPTION (this "*Assignment and Assumption*") is dated as of the Assignment Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "*Assignor*") and [Insert name of Assignee] (the "*Assignee*"). Capitalized terms used in this Assignment and Assumption but not otherwise defined herein shall have the respective meanings provided for such terms in the Credit Agreement identified below (as modified by that certain Waiver Agreement, dated as of February 17, 2022, as further modified and amended by that certain Forbearance Agreement and First Amendment to Credit Agreement, dated shortly prior to the Second Amendment Effective Date (the "*Forbearance Agreement*"), as further amended by that certain Second Amendment to Credit Agreement and Waiver, dated as of October 5, 2022, and as further amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, the "*Credit Agreement*"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "*Standard Terms and Conditions*") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to, and in accordance with, each of the Standard Terms and Conditions and the Credit Agreement, as of the Assignment Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and other rights of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under, or in connection with, the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby, or in any way based on, or related to, any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims, at law or in equity, related to the rights and obligations sold and assigned pursuant to the foregoing clause (i) (the rights and obligations sold and assigned pursuant to the foregoing clauses (i) and (ii) being referred to herein, collectively, as the "*Assigned Interest*"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

| 1. | Assignor: | [●] |
| --- | --- | --- |
| 2. | Assignee: | [●] [and is an Affiliate / Approved Fund of [identify Lender][1]] |
| 3. | Borrower: | RAC Dealership, LLC, a Delaware limited liability company (the "*Borrower*"). |
| 4. | Administrative Agent: | Hancock Whitney Bank, as the administrative agent under the Credit Agreement. |

---

[1]  Select as applicable.

| 5. | Credit Agreement: | That certain Credit Agreement, dated as of June 29, 2021 (as modified by that certain Waiver Agreement, dated as of February 17, 2022, as further modified and amended by that certain Forbearance Agreement and First Amendment to Credit Agreement, dated shortly prior to the Second Amendment Effective Date (the "*Forbearance Agreement*"), as further amended by that certain Second Amendment to Credit Agreement and Waiver, dated as of October 5, 2022, and as further amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time), by and among the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and Hancock Whitney Bank, as the Administrative Agent. |
|---|---|---|

6.  Assigned Interest:

| Class of Commitments / Loans Assigned | Aggregate Amount of Class of Commitments / Loans for all Lenders | Amount of Class of Commitments / Loans Assigned | Percentage Assigned of Class of Commitments / Loans[2] |
|---|---|---|---|
| Revolving Commitments | $ | $ | % |
| Revolving Loans | $ | $ | % |
| Overadvance Term Loan Commitments | $ | $ | % |
| Overadvance Term Loan | $ | $ | % |

7.  Assignment Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their respective Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including federal and state securities laws.

*[Remainder of Page Intentionally Left Blank*; *Signature Pages Follow]*

---

[2]  Set forth, to *at least* nine (9) decimal places, as a percentage of the applicable Class of Commitments / Loans of all Lenders thereunder.

The terms set forth in this Assignment and Assumption are hereby agreed to as of the Assignment Effective Date:

ASSIGNOR:                          [**NAME OF ASSIGNOR**]


By: _____
Name:
Title:


[*Signature Pages Continue*]

ASSIGNEE:                          [**NAME OF ASSIGNEE**]


By: _____
Name:
Title:


[*Signature Pages* [*Continue*][*End*]]

[CONSENTED TO AND ]³ACCEPTED
<u>AS OF THE ASSIGNMENT EFFECTIVE DATE</u>:


**HANCOCK WHITNEY BANK**,
as [Administrative Agent][ and ][Swingline Lender]


By: _____
Name:
Title:


*[Signature Pages [Continue][End]]*

---

³ To be added only if the consent of the Administrative Agent and/or the Swingline Lender (as applicable) is required by the terms of the Credit Agreement.

[CONSENTED AND AGREED TO
<u>AS OF THE ASSIGNMENT EFFECTIVE DATE:</u>][4]

**RAC DEALERSHIP**, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

[*Signature Pages End*]

---

[4]  To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

ANNEX 1 to
<u>ASSIGNMENT AND ASSUMPTION</u>

**STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AND ASSUMPTION**

1.      <u>Representations and Warranties</u>.

1.1.    <u>Assignor</u>. The Assignor: (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any Subsidiary or Affiliate or any other Person obligated in respect of any Loan Document, (iv) any requirements under applicable law for the Assignee to become a Lender under the Credit Agreement or any other Loan Document or to charge interest at the rate set forth therein from time to time, or (v) the performance or observance by the Loan Parties or any Affiliate, or any other Person of any of their respective obligations under any Loan Document.

1.2.    <u>Assignee</u>. The Assignee: (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement and under applicable law that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Assignment Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 (*Financial Statements*; *Borrowing Base and Other Information*) thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent, Arranger, the Assignor or any other Lender or any of their respective Related Parties, (v) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee, [and] (vi) it is *not* a Disqualified Lender[, and (vii) it is *not* an Affiliated Lender]; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, Arranger, the Assignor or any other Lender or any of their respective Related Parties, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking, or *not* taking, action under the Loan Documents, and (ii) it will be bound by the provisions of the Credit Agreement and the other Loan Documents and will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      <u>Payments</u>. From and after the Assignment Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to, but *excluding*, the Assignment Effective Date and to the Assignee for amounts which have accrued from and after the Assignment Effective Date. The Assignor and the Assignee shall make all appropriate adjustments (if any) in payments by the Administrative Agent for periods accrued prior to the Assignment Effective Date or with respect to the making of this assignment directly between themselves.

3.      <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Acceptance and adoption of the terms of this Assignment and Assumption by the Assignee and the Assignor by Electronic Signature (as defined in the Credit Agreement) or delivery of an executed counterpart of a signature page of this Assignment and Assumption by any Approved Electronic Platform (as defined in the Credit Agreement) shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

[*Remainder of Page Intentionally Left Blank*]

CHAR1\1940131v9

EXHIBIT B-1

**[FORM OF] BORROWING REQUEST**

Hancock Whitney Bank
701 Poydras Street, Suite 1600
New Orleans, Louisiana  70139
Attention:    Matthew Chivleatto
Email:        syndications@hancockwhitney.com

Date: _____ ___, 20___

Ladies and Gentlemen:

This Borrowing Request is furnished pursuant to Section 2.03 (*Requests for Borrowings*) of that certain Credit Agreement, dated as of June 29, 2021 (as amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, the "*Credit Agreement*"), by and among RAC Dealership, LLC, a Delaware limited liability company (the "*Borrower*"), the Guarantors (as defined therein) from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and Hancock Whitney Bank ("*Hancock*"), as the Administrative Agent (as defined therein).  Unless otherwise defined herein, capitalized terms used in this Borrowing Request but not otherwise defined herein shall have the respective meanings provided for such terms in the Credit Agreement.

The Borrower represents that, as of the date first written above, the conditions precedent set forth in Section 4.02(a) of the Credit Agreement are satisfied.

The Borrower hereby notifies Hancock of its request for the following Borrowing:

1.        Type of Borrowing: [Revolving Loan] / [Swingline Loan]

2.        Aggregate Amount of the Borrowing[5]: $[●]

3.        Borrowing Date of the Borrowing (which shall be a Business Day): [●]

4.        The Borrowing shall be ___ an ABR Borrowing or ___ a SOFR Borrowing[6]

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

---

[5]    Each SOFR Borrowing shall be in a minimum aggregate amount of $1,000,000 and, if greater, in an integral multiple of $250,000 in excess thereof. ABR Borrowings may be in any amount; provided, that, each Swingline Borrowing shall be in a minimum amount of $50,000 and, if greater, in an integral multiple of $10,000 in excess thereof.

[6]    If no election is made, then the requested Borrowing shall be an ABR Borrowing. Swingline Borrowings shall bear interest at the rate per annum indicated in that certain letter agreement, dated as of the Closing Date, by and between the Borrower and the Administrative Agent.

CHAR1\1940131v9

IN WITNESS WHEREOF, the Borrower has caused this Borrowing Request to be duly executed and delivered by its below duly authorized Responsible Officer as of the day and year first written above.

BORROWER:                    **RAC DEALERSHIP**, LLC,
a Delaware limited liability company


By: _____
Name:
Title:


[*Signature Page Ends*]

EXHIBIT B-2

**[FORM OF] INTEREST ELECTION REQUEST**

Hancock Whitney Bank
701 Poydras Street, Suite 1600
New Orleans, Louisiana 70139
Attention:    Matthew Chivleatto
Email:        syndications@hancockwhitney.com

Date: _____ ___, 20___

Ladies and Gentlemen:

This Interest Election Request is furnished pursuant to Section 2.07(c) of that certain Credit Agreement, dated as of June 29, 2021 (as amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, the "*Credit Agreement*"), by and among RAC Dealership, LLC (the "*Borrower*"), the Guarantors (as defined therein) from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and Hancock Whitney Bank ("*Hancock*"), as the Administrative Agent. Unless otherwise defined herein, capitalized terms used in this Interest Election Request but not otherwise defined herein shall have the respective meanings provided for such terms in the Credit Agreement.

The Borrower is hereby requesting to convert or continue certain Borrowings as follows:

1.      Borrowing to which this Interest Election Request applies: [●]

2.      Date of conversion/continuation (must be a Business Day): [●]

3.      Amount of Borrowings being converted/continued: $[●]

4.      Nature of conversion/continuation:

☐      a.      Conversion of ABR Borrowings to SOFR Borrowings
☐      b.      Conversion of SOFR Borrowings to ABR Borrowings
☐      c.      Continuation of SOFR Borrowings as such

5.      The undersigned Responsible Officer of the Borrower hereby certifies that, both immediately *before* and immediately *after* giving effect to the request above, no Default or Event of Default has occurred and is continuing under the Credit Agreement.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

Interest Election Request (RAC Dealership, LLC)

IN WITNESS WHEREOF, the Borrower has caused this Interest Election Request to be duly executed and delivered by its below duly authorized Responsible Officer as of the day and year first written above.

BORROWER:                          **RAC DEALERSHIP, LLC,**
                                   a Delaware limited liability company


                                   By: _____
                                   Name:
                                   Title:


[*Signature Page Ends*]

**EXHIBIT E**

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
JULIE  ALLEN 704-331-3745

**B. E-MAIL CONTACT AT FILER (optional)**
JULIEALLEN@MVALAW.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

MOORE & VAN ALLEN PLLC

100 NORTH TRYON STREET

SUITE 4700

CHARLOTTE, NC 28202

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:06 PM 06/29/2021**
**U.C.C. Initial Filing No: 2021 5064127**

**Service Request No:  20212584432**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| RAC DEALERSHIP, LLC | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6775 LENNOX CENTER CT., SUITE 100 | MEMPHIS | TN | 38115 | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HANCOCK WHITNEY BANK, AS ADMINISTRATIVE AGENT | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 701 POYDRAS STREET, SUITE 1600 | NEW ORLEANS | LA | 70139 | US |

4. **COLLATERAL:** This financing statement covers the following collateral:
**See Exhibit A attached hereto and made a part hereof.**
**Collateral Description - please see attached**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**FILED WITH: DE - SOS (045874.000007)**

International Association of Commercial Administrator

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## EXHIBIT A

To UCC-1 Financing Statement

<u>Debtor</u>: RAC Dealership, LLC

<u>Secured Party</u>: Hancock Whitney Bank, as Administrative Agent

All the of Debtor's right, title and interest in (a) all property of the Debtor, or all property in which the Debtor has an interest, that is now or hereafter on deposit with, in the possession of, under the control of or held by any of the Lenders or any financial institution affiliate of any of the Lenders, including, without limitation, all cash, Deposit Accounts, funds on deposit, stocks, bonds, treasury obligations, and other Securities, Investment Property, financial assets, securities accounts, notes, Documents, Instruments, certificates of deposit, items, Chattel Paper, electronic Chattel Paper, tangible Chattel Paper, Letter-of-Credit Rights, Payment Intangibles, and other property (except IRA, pension, and other tax-deferred retirement accounts and any accounts or property held in a trust or fiduciary capacity) and (b) the following described property, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtor (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtor, and regardless of where located:

(i)        all vehicles, vehicle parts, and Inventory of the Debtor;

together with all additions, replacements, substitutions, accessions and improvements, and all Supporting Obligations, profits, products and proceeds including insurance proceeds, cash proceeds, and non-cash proceeds including, but not limited to, all Accounts, Chattel Paper, Documents, Equipment, Fixtures, Goods, Instruments, General Intangibles, Investment Property, and Supporting Obligations relating to or arising out of any of the foregoing and all interest, dividends, income, profits, and distributions (including, without limitation, stock splits and stock dividends), together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto.

<u>Definitions</u>:

As used herein, the following terms shall have the following meanings:

"*Accounts*" shall have the meaning set forth in Article 9 of the UCC.

"*Banking Services*" means each and any of the following bank services provided to Debtor by any Lender or any of its affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, and (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, any direct debit scheme or arrangement, overdrafts and interstate depository network services and cash pooling services.

"*Chattel Paper*" shall have the meaning set forth in Article 9 of the UCC.

"*Credit Agreement*" means that certain Credit Agreement, dated as of June 29, 2021 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) among RAC Dealership, LLC, as the borrower, the other loan parties party thereto, the Lenders party thereto and Hancock Whitney Bank, as the administrative agent.

"*Deposit Accounts*" shall have the meaning set forth in Article 9 of the UCC.

"*Documents*" shall have the meaning set forth in Article 9 of the UCC.

"*Equipment*" shall have the meaning set forth in Article 9 of the UCC.

"*Fixtures*" shall have the meaning set forth in Article 9 of the UCC.

"*Goods*" shall have the meaning set forth in Article 9 of the UCC.

"*General Intangibles*" shall have the meaning set forth in Article 9 of the UCC.

"*Instruments*" shall have the meaning set forth in Article 9 of the UCC.

"*Inventory*" shall have the meaning set forth in Article 9 of the UCC.

"*Investment Property*" shall have the meaning set forth in Article 9 of the UCC.

"*Lender*" means (a) each lender party to the Credit Agreement, (b) the Secured Party, in its capacity as administrative agent under the Credit Agreement, (c) each lender party to the Credit Agreement or any of its affiliates that provides Banking Services to the extent such obligations constitute Secured Obligations (as defined in the Credit Agreement) to the Debtor, (d) each lender party to the Credit Agreement or any of its affiliates that is counterparty to any Swap Agreement with the Debtor, (e) the beneficiaries of each indemnification obligation undertaken by the Debtor under the Credit Agreement and (f) the successors and assigns of each of the foregoing.

"*Letter-of-Credit Rights*" shall have the meaning set forth in Article 9 of the UCC.

"*Payment Intangibles*" shall have the meaning set forth in Article 9 of the UCC.

"*Security*" shall have the meaning set forth in Article 8 of the UCC.

"*Supporting Obligations*" shall have the meaning set forth in Article 9 of the UCC.

"*Swap Agreement*" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Debtor shall be a Swap Agreement.

"*UCC*" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, the Secured Party's security interest in the Collateral.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| MURIEL POWELL (704) 331-1000 |

**B. E-MAIL CONTACT AT FILER** (optional)
MURIELPOWELL@MVALAW.COM

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

MOORE & VAN ALLEN PLLC

100 NORTH TRYON STREET

SUITE 4700

CHARLOTTE, NC 28202-4003

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 03:47 PM 10/07/2022**
**U.C.C. Initial Filing No: 2021 5064127**
**Amendment No: 2022 8400426**
**Service Request No:  20223725702**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| **20215064127** | (or recorded) in the REAL ESTATE RECORDS |
| | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial):  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:   **AND**  Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c

☐ ADD name: Complete item 7a or 7b, and item 7c

☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| OR | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☑ **COLLATERAL CHANGE:**  Also check one of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☑ RESTATE covered collateral   ☐ ASSIGN collateral

Indicate collateral:
**All assets of the Debtor, whether now owned or hereafter acquired.**

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| OR | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **HANCOCK WHITNEY BANK, AS ADMINISTRATIVE AGENT** | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**FILED W/ DE-SOS; DEBTOR: RAC DEALERSHIP, LLC**

International Association of Commercial Administrators
**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**EXHIBIT F**

*Execution Version*

## INTERCREDITOR AGREEMENT

This Intercreditor Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "<u>Agreement</u>") is made and entered into on this 29th day of June, 2021, by and among NextGear Capital, Inc. ("<u>NextGear Capital</u>"), Hancock Whitney Bank, in its capacity as administrative agent for all Senior Lenders from time to time party to the Senior Credit Agreement (as defined below), on its own behalf and on behalf of each other Senior Secured Party (the "<u>Senior Agent</u>") and RAC Dealership, LLC, a Delaware limited liability company (the "<u>Debtor</u>").

## RECITALS

WHEREAS, reference is made to that certain Credit Agreement, dated as of even date herewith (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Senior Credit Agreement</u>") by and among the Debtor, as the borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto (the "<u>Senior Lenders</u>" and, together with the Senior Agent, the "<u>Senior Secured Parties</u>") and the Senior Agent, as the Administrative Agent (as defined in the Senior Credit Agreement), pursuant to which the Senior Lenders agreed, subject to the terms and conditions set forth in the Senior Credit Agreement, to make certain loans and financial accommodations to the Debtor;

WHEREAS, pursuant to the terms of the Senior Credit Agreement, each Senior Lender has expressly authorized the Senior Agent, as the Administrative Agent, to execute and deliver, and to perform its obligations under, the Loan Documents, including this Agreement;

WHEREAS, attached hereto as <u>Exhibit A</u> is a complete list of the Senior Lenders as of the date hereof;

WHEREAS, NextGear Capital has a line of credit with Debtor under which Debtor may from time to time incur obligations, direct or contingent, to NextGear Capital;

WHEREAS, Senior Secured Parties (hereinafter together with NextGear Capital, "<u>Creditors</u>") have a line of credit with Debtor, under which Debtor may from time to time incur obligations, direct or contingent, to Senior Secured Parties; and

WHEREAS, Debtor's obligations to each Creditor are secured by, among other things, Inventory of the Debtor, as herein defined;

WHEREAS, each Creditor has filed (or will file) a financing statement under the Uniform Commercial Code to perfect such security interests; and

WHEREAS, Creditors desire to agree among themselves as to the relative priority of their respective security interests in Inventory and the proceeds thereof.

NOW, THEREFORE, in order to induce the Senior Secured Parties to consummate the transactions contemplated by the Senior Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereby agree as follows:

## AGREEMENT

1.      <u>Definitions</u>.

Unless defined in this section or the context otherwise requires, all terms used herein which are

defined in the Uniform Commercial Code shall have the meanings therein stated.

        (a)      "<u>Advance</u>" shall mean all loans or payments made by Creditors to Debtor or on Debtor's behalf to any third party to allow Debtor to acquire or retain the specific item of Inventory.

        (b)      "<u>Inventory</u>" shall mean all of Debtor's vehicles, vehicle parts, other inventory, and all additions, accessions, accessories, replacements, and proceeds thereof, now owned or hereafter acquired, held for sale, rental, or lease in the ordinary course of Debtor's business.

    2.    <u>Conditions Precedent</u>. The agreements of the Creditors contained herein are expressly conditioned upon the perfection and non-avoidance of each Creditor's security interest in Debtor's Inventory.

    3.    <u>Notice Irrelevant</u>. The agreements of the Creditors contained herein are effective irrespective of the failure of a Creditor to give notice or timely notice of the acquisition or expected acquisition of purchase money or other priority with respect to any such security interest.

    4.    <u>Security Interest</u>.

        (a)      To the extent a Creditor has a perfected security interest in Debtor's Inventory, and subject to Section 4(b) herein, such Creditor shall have a first priority security interest in those specific items of Inventory that: (i) Creditor provided new value to the Debtor or on Debtor's behalf to a third party (including the other Creditor herein) to allow Debtor to acquire or retain the specific item of Inventory; (ii) such new value is in fact used to purchase or hold that specific item of Inventory (or replace the original purchase money financer, including the other Creditor herein); and (iii) said item of Inventory is specifically identified in a bill of sale, vehicle title, consignor ticket, trust receipt, invoice, security agreement, or mortgage, or supplemental document(s) (such as formal Creditor payoff confirmation lists) given to such Creditor, or given to Creditor's designated agent or custodian, at or about the time that such Creditor gives new value.

        (b)      (i) If Creditors each provided funding to the Debtor or on Debtor's behalf to a third party (including the other Creditor herein) to allow Debtor to acquire or retain a specific item of Inventory, and there remains a balance owing on such specific item of Inventory to each Creditor, the Creditor that was first in time to have provided such funding to Debtor or on Debtor's behalf for such item of Inventory shall have priority as to that specific item of Inventory; (ii) For the avoidance of doubt, if one Creditor hereunder provides funding to the Debtor or on Debtor's behalf for the purpose of fully paying off the indebtedness to the other Creditor on one or more specific item(s) of Inventory, and said payoff occurs and said Inventory is identified in a manner pursuant to Section 4(a)(iii) herein, the Creditor providing such payoff funds shall automatically hold a first priority security interest in said specific item(s) of Inventory.

        (c)      The priorities specified in paragraphs 4(a) and 4(b) are applicable to the identified security interests and Inventory contained therein despite the rules of priority set forth in the Uniform Commercial Code or other applicable law.  Except as herein otherwise specifically provided, priority shall be determined in accordance with the rules of priority set forth in the Uniform Commercial Code or other applicable law.

    5.    <u>Termination</u>. This Agreement shall terminate ninety (90) days from the date on which a Creditor gives written notice as provided for herein to the other Creditor of its intention to terminate. Upon termination, each Creditor's obligations and rights arising out of this Agreement concerning security interests in Inventory obtained prior to termination shall survive.

    6.    <u>General</u>.

(a)     This Agreement shall be governed by the laws of the State of Delaware.

(b)     This Agreement and all its provisions shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns and shall not benefit any person other than those enumerated above.

(c)     All notices upon the respective parties hereto shall be deemed to have been duly given or made if by Federal Express, Express Mail or any other overnight delivery service with proof of next day delivery on a business day, one (1) business day after dispatch; and if mailed by certified mail, return receipt requested, five (5) days after mailing. All notices are to be given or made to the respective parties at the address set forth below.

(d)     Each Creditor shall reasonably cooperate in sharing vehicle identification numbers for purpose of conducting audits for all Inventory that a Creditor claims a security interest in and in providing and promptly forwarding any and all documents (together with any necessary endorsements) in the possession of such Creditor related to any Inventory in which other Creditor has a first priority security interest, such documents to be deemed held in trust by such Creditor for the benefit of the first priority security interest Creditor.  Each Creditor hereunder agrees that it shall not hinder, interfere with, object or delay the other Creditor in the enforcement of each Creditor's respective security interests, and each Creditor agrees not to assign or transfer to any third parties any claim that it may have against the other Creditor arising out of or pertaining to the lines of credit referenced hereunder, so long as this Agreement remains effective, unless such assignment or transfer is expressly made subject to this Agreement and the other Creditor is notified in writing prior to any such assignment.

(e)     This Agreement is intended by the parties to be the final expression of their agreement with respect to the terms included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. The parties further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial proceeding involving this Agreement.

(f)     Each party hereto shall be responsible for its own legal fees.

(g)     Any provision of this Agreement that is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining provisions of this Agreement or affecting the validity or enforceability of any provision of this Agreement.

(h)     This Agreement may not be modified or amended except upon the written consent of both parties hereto.

(i)     This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Telecopied, scanned PDF, or facsimiled copies of the Agreement shall be deemed an original for all intents and purposes.

(j)     Headings have been inserted in the Agreement as a matter of convenience of reference only; such headings are not a part of the Agreement and shall not be used in the interpretation of this Agreement.

(k)     The Debtor agrees to provide written notice to NextGear Capital of any change

to Exhibit A within three (3) business days of its occurrence.

[Signature Pages Follow]

The parties are signing this Agreement as of the date first above written.

**Hancock Whitney Bank**
**701 Poydras Street, Suite 1600**
**New Orleans, Louisiana 70139**

By: _Jennifer Pelham_
Name: _Jennifer Pelham_
Title: _Senior VP President_

**NextGear Capital, Inc.**
**11799 N. College Ave.**
**Carmel, IN  46032**

By: _____
Name: _____
Title: _____

The parties are signing this Agreement as of the date first above written.

**Hancock Whitney Bank**
**701 Poydras Street, Suite 1600**
**New Orleans, Louisiana 70139**

By: _____
Name: _____
Title: _____

**NextGear Capital, Inc.**
**11799 N. College Ave.**
**Carmel, IN  46032**

By: _____
Name: __Andrew Rainey_____
Title: __Sr. Manager of Lending Services__

Acknowledged and Agreed:

**RAC Dealership, LLC**
**6775 Lenox Center Court, Ste. 100**
**Memphis, TN 38115**

By: _____

Name:  Eric Harkness
Title:    Chief Executive Officer

<u>Exhibit A</u>

Senior Lenders

Hancock Whitney Bank

Synovus Bank

Triumph Bank

**EXHIBIT G**

## TRANSPORTATION AND STORAGE AGREEMENT

This Transportation and Storage Agreement (the "Agreement") is made and entered into on this 28 day of February, 2023, between NextGear Capital, Inc. ("NextGear Capital") and Hancock Whitney Bank ("HWB"), for itself and in its capacity as administrative agent for all lenders (the "Lender Group") who are party to that certain credit agreement executed on or about June 29, 2021 by the Debtor (defined below), HWB, and such lenders (as amended, modified, or supplemented from time to time, the "HWB Credit Agreement"), and acknowledged and agreed by RAC Dealership, LLC (the "Debtor").

## RECITALS

WHEREAS, NextGear Capital has a line of credit with the Debtor under which the Debtor may from time to time incur obligations, direct or contingent, to NextGear Capital;

WHEREAS, pursuant to the HWB Credit Agreement, the Debtor has a line of credit with the Lender Group under which the Debtor may from time to time incur obligations, direct or contingent, to the Lender Group;

WHEREAS, the Debtor has informed NextGear Capital and HWB, as agent for the Lender Group (together with NextGear Capital, collectively, the "Secured Lenders"), that the Debtor intends to surrender voluntarily certain collateral securing its obligations to the Secured Lenders, which voluntary surrender is acceptable to the Secured Lenders and which the Secured Lenders desire to effectuate expeditiously;

WHEREAS, the collateral to be surrendered to the Secured Lenders consists of, *inter alia*, certain motor vehicle inventory of the Debtor and related titles and keys (the "Inventory");

WHEREAS, the Secured Lenders' respective collateral interests in the Inventory are subject to the terms and provisions of that certain Intercreditor Agreement dated June 29, 2021 between NextGear Capital and HWB (on behalf of the Lender Group) (the "ICA");

WHEREAS, in order to effectuate the orderly transportation of the Inventory to certain secure locations where such Inventory may be marshalled and prepared for liquidation by the respective Secured Lender having priority in each unit of Inventory pursuant to the ICA, the Secured Lenders now desire to cooperate with each other in order to maximize the efficiencies and minimize the cost and expense associated with the transportation of such Inventory to such secure locations; and

WHEREAS, HWB has authority to execute this agreement on behalf of itself and the Lender Group and to bind the Lender Group hereby;

NOW, THEREFORE, for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Secured Lenders hereby agree as follows:

## AGREEMENT

1.      Transportation Arrangements Generally; Identification of Inventory.

a.      NextGear Capital agrees to arrange for the transportation of all Inventory to wholesale vehicle auction locations where such Inventory may be secured against theft and vandalism.  NextGear Capital will engage Strategic Remarketing Solutions ("SRS") to transport all of the Inventory according to the usual and customary prices and terms between SRS and NextGear Capital (the "SRS Pricing Terms"). The locations identified for delivery of the Inventory are as set forth in Schedule 1 hereto.

b.      The list of Inventory to be transported will be provided to both HWB and NextGear Capital by the Debtor and shall include, for each unit of Inventory, the year, make, model, and Vehicle Identification Number; the unit's physical location; the identity of the Secured Lender who specifically financed each unit; and whether there are any liens on the unit to any lenders other than the Secured Lenders (for example, unpaid consumer liens on trade-in vehicles).  HWB and NextGear Capital will cooperate to review the list provided by the Debtor and to identify, at the earliest possible opportunity, any specific units of Inventory that may have been financed for the Debtor by both NextGear Capital and the Lender Group (i.e., "double-floored Inventory").  The Secured Lenders agree that the prompt identification of double-floored Inventory, if any, is essential to the timely resolution of any and all disputes relating to the relative priorities of the Secured Lenders under the terms of the ICA.

2.      Transportation Costs; Reimbursement to NextGear Capital.

a.      Based upon the SRS Pricing Terms and NextGear Capital's understanding of the location and nature of the Inventory as of the date hereof, NextGear Capital estimates that the cost of transportation of each unit of Inventory will range from approximately Three Hundred Seventy-Five Dollars ($375.00) to Seven Hundred Fifty Dollars ($750.00), depending on factors which include but are not limited to the distance the unit needs to be transported; whether or not keys are present for the unit; whether or not the unit will start and run normally; and whether or not the unit requires a flatbed tow truck for transportation.

b.      As compensation for organizing and effectuating the transportation of the Debtor's Inventory pursuant to this Agreement, HWB agrees to pay to NextGear Capital the sum of Thirty-Five Dollars ($35.00) per transported unit (each, a "Coordination Fee"), in addition to NextGear Capital's actual costs to SRS for the transportation of the Lender Group Collateral (defined below) (the "Transportation Costs"), in accordance with Section 2(f) of this Agreement.

c.      Promptly but in no event later than seven (7) business days after all of the Inventory identified by the Debtor pursuant to Section 1(b) of this Agreement has been transported to secure locations, NextGear Capital will provide HWB with a report (the "Transportation Report") identifying all units transported pursuant to this Agreement ("Transported Inventory").  Such report shall indicate NextGear Capital's preliminary, good faith determination concerning whether each unit appears to constitute priority collateral of NextGear Capital or HWB.  No later than seven (7) business days after receipt of the Transportation Report, HWB shall notify NextGear Capital in writing if HWB in good faith disagrees with NextGear Capital's preliminary determination of the priority of each unit.

d.      No later than seven (7) business days after receipt of the Transportation Report, HWB shall notify NextGear Capital in writing if HWB disagrees with or seeks any additional information relating to specific transportation costs incurred relating to particular units financed by the Lender Group.  NextGear Capital shall promptly provide such additional information upon obtaining the related cost justification for such specific units from SRS.  Notwithstanding this subsection, however, HWB agrees with the general cost estimate range set forth in Section 2(a) above and shall not contest the transportation costs of multiple units without good faith justification for such challenges.

e.      NextGear Capital and HWB shall negotiate in good faith to resolve promptly any disputes concerning the priority of all Transported Inventory and any disputes relating to the costs to transport specific units.

f.      Within seven (7) business days after NextGear Capital and HWB reach agreement as to the priorities of all Transported Inventory and resolve any cost disputes relating to any specific units, HWB shall wire to NextGear Capital, at the wire instructions set forth in Exhibit A to this Agreement, the total amount of Transportation Costs and Coordination Fees relating to all Transported Inventory in which HWB and/or

the Lender Group holds the first priority security interest pursuant to the terms of the ICA (the "Lender Group Collateral").

3.      Storage Costs.

Once the Transported Inventory is delivered to wholesale vehicle auction locations where such Inventory may be secured against theft and vandalism, NextGear Capital and HWB shall each be responsible for their own storage fees, if any, relating to the specific Transported Inventory in which NextGear Capital or HWB, as applicable, claims a first-priority security interest pursuant to the terms of the ICA. Prior to delivery of the Transported Inventory, NextGear Capital shall endeavour to confirm with the applicable vehicle auction locations that the applicable storage fees to be charged to HWB are on terms consistent with the storage fees charged to NextGear Capital.

4.      Insurance.

To the extent that NextGear, as loss payee under any insurance policy with respect to the Inventory, is entitled to or receives any insurance proceeds attributable to damage or a loss to a vehicle constituting Lender Group Collateral, NextGear shall cooperate with HWB's reasonable instructions related thereto and shall receive any such proceeds in trust for, and immediately deliver such proceeds to, HWB on behalf of the Lender Group.

5.      Limitations on Liability.

HWB, on behalf of itself and the Lender Group, agrees to hold NextGear Capital harmless from and against any and all claims, damages, losses, and actions resulting from or arising out of NextGear Capital's and SRS's transportation of the Lender Group Collateral pursuant to the terms of this Agreement, as and to the extent determined by a final, non-appealable order of a court of competent jurisdiction. This shall include, without limitation, any claims of consumers who may assert that NextGear Capital or SRS wrongfully repossessed Lender Group Collateral vehicles. However, HWB and the Lender Group specifically do not hold NextGear Capital harmless from any claims, damages, losses, or actions against NextGear Capital or SRS that may arise or be caused by NextGear Capital's or SRS's negligence, intentional injury, willful misconduct, unauthorized acts, or failure to comply with applicable federal and state statutes or regulations.

6.      No Final Determination of Priority Through This Agreement.

The Secured Lenders agree that time is of the essence in performing the terms of this Agreement, and that while the identification of their respective priorities in accordance with Section 2 of this Agreement is necessary to effectuate the expedient transportation of the Inventory, the determination of priorities agreed upon by the parties for the purposes of this Agreement shall not constitute a final determination of the Secured Lenders' respective priorities in any specific unit of Transported Inventory. However, if the respective priorities of the Secured Lenders with respect to a specific unit of Transported Inventory is determined at a later date to have been identified incorrectly (for instance, if a unit is initially agreed by the Secured Lenders to be a unit in which NextGear Capital has first priority, but is later determined to be a unit in which the Lender Group has first priority), the Transportation Costs and Coordination Fees identified in Section 2(f) of this agreement relating to such unit, as well as the storage fees identified in Section 3 of this agreement relating to such unit, shall be paid to, or reimbursed by, NextGear Capital, as applicable.

7.      General.

a.      This Agreement shall be governed by the laws of the State of Delaware.

b.      This Agreement and all its provisions shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns and shall not benefit any person other than those enumerated above.

c.      This Agreement is intended by the parties to be the final expression of their agreement with respect to the terms included in this Agreement related to the transportation and storage of the Inventory and may not be contradicted by evidence of any prior or contemporaneous agreement. The Secured Lenders further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial proceeding involving this Agreement.

d.      Each party hereto shall be responsible for its own legal fees.

e.      Any provision of this Agreement that is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining provisions of this Agreement or affecting the validity or enforceability of any provision of this Agreement.

f.      This Agreement may not be modified or amended except upon the written consent of both parties hereto.

g.      This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Telecopied, scanned PDF, or facsimiled copies of the Agreement shall be deemed an original for all intents and purposes.

h.      Headings have been inserted in the Agreement as a matter of convenience of reference only; such headings are not a part of the Agreement and shall not be used in the interpretation of this Agreement.

The parties are signing this Agreement as of the date first above written.

**Hancock Whitney Bank**
**701 Poydras Street, Suite 1600**
**New Orleans, Louisiana 70139**

**NextGear Capital, Inc.**
**11799 N. College Ave.**
**Carmel, IN  46032**

By: *Richard D Buntin*
Name: *Richard D Buntin*
Title: *Vice President*

By: _____
Name: _____
Title: _____

b.      This Agreement and all its provisions shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns and shall not benefit any person other than those enumerated above.

c.      This Agreement is intended by the parties to be the final expression of their agreement with respect to the terms included in this Agreement related to the transportation and storage of the Inventory and may not be contradicted by evidence of any prior or contemporaneous agreement. The Secured Lenders further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial proceeding involving this Agreement.

d.      Each party hereto shall be responsible for its own legal fees.

e.      Any provision of this Agreement that is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining provisions of this Agreement or affecting the validity or enforceability of any provision of this Agreement.

f.      This Agreement may not be modified or amended except upon the written consent of both parties hereto.

g.      This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Telecopied, scanned PDF, or facsimiled copies of the Agreement shall be deemed an original for all intents and purposes.

h.      Headings have been inserted in the Agreement as a matter of convenience of reference only; such headings are not a part of the Agreement and shall not be used in the interpretation of this Agreement.

The parties are signing this Agreement as of the date first above written.

**Hancock Whitney Bank**
**701 Poydras Street, Suite 1600**
**New Orleans, Louisiana 70139**

**NextGear Capital, Inc.**
**11799 N. College Ave.**
**Carmel, IN  46032**

By: _____
Name: _____
Title: _____

By: _____
Name: _____John Wick_____
Title: _____SVP_____

**Exhibit A**

**NextGear Capital, Inc. Wire Instructions:**

Bank: Wells Fargo, NA

420 Montgomery Street San Francisco, CA 94104

Account Name: NextGear Capital, Inc. Routing #: 121000248

Account #: 4121934046

Ph: 800-869-3557

**Schedule 1**

Auction Locations

| |
|---|
| Manheim Atlanta |
| Manheim Birmingham |
| Manheim Charlotte |
| Manheim Darlington |
| Manheim Jacksonville |
| Manheim Little Rock |
| Manheim Louisville |
| Manheim Mississippi |
| Manheim Nashville |
| Manheim North Carolina |
| Manheim Orlando |
| Manheim Pensacola |
| Manheim St. Louis |
| Manheim St. Pete |
| Manheim Tampa |
| AAA Greenville |
| Charleston Auto Auction SC |
| DAA Huntsville |
| DAA of Memphis |
| Dealers Auto Auction of Mobile |
| Deanco Auto Auction of Dothan |

### Acknowledgment of RAC Dealership, LLC

Reference is made to the foregoing Transportation and Storage Agreement dated as of February 28, 2023. Capitalized terms used herein have the meanings set forth therein.

RAC Dealership, LLC ("RAC") has informed NextGear Capital and HWB (each a "Secured Party" and together, the "Secured Parties") that RAC intends to voluntarily surrender possession of certain collateral securing its obligations to the Secured Parties, which voluntary surrender is acceptable to the Secured Parties and which the Secured Parties desire to effectuate expeditiously. Such collateral to be surrendered to the Secured Parties consists of, *inter alia*, certain motor vehicle inventory of RAC and related titles and keys that can reasonably be made available for surrender to the Secured Parties (the "Inventory"). RAC hereby consents to the repossession by either or both Secured Parties, or their respective agents, of the Inventory of RAC. For avoidance of doubt, such repossession is not intended to constitute a strict foreclosure, or partial strict foreclosure, of such Inventory.

In connection therewith, RAC hereby waives any and all rights it may have to notice prior to seizure by either Secured Party of any such Inventory. Consistent with certain of the debt documents entered into with the Secured Parties, RAC further acknowledges that: (i) the private sale of any Inventory at the amount then owed to either Secured Party on such Inventory, less costs reasonably incurred by the respective Secured Party in preparation of disposition of such Inventory, shall be a commercially reasonable method of disposition of such Inventory; (ii) any Inventory repossessed or otherwise obtained by either Secured Party may be disposed of by Secured Party, in Secured Party's sole discretion, at any regular or online sale of any wholesale auto auction that may be an Affiliate of a Secured Party, or at any National Auto Auction Association member, and, in each case, any such a sale is and shall be deemed commercially reasonable for all purposes; (iii) RAC shall be liable to the Secured Parties for any deficiency resulting from the Secured Parties' disposition of the Inventory in accordance with the respective loan documents; (iv) the Inventory is of the type customarily sold on a recognized market and that the Secured Parties therefore have no obligation to notify RAC prior to a sale of the Inventory; and (v) the Secured Parties shall not be responsible for the accuracy or validity of any document or for the existence or value of any Inventory.

Acknowledged and agreed:

RAC DEALERSHIP LLC

By: _____
Name: NOAH HOGAN
Title: Authorized Signer

**<u>EXHIBIT H</u>**

Hancock Whitney Bank,
as Administrative Agent

**VIA OVERNIGHT COURIER AND ELECTRONIC MAIL**

February 28, 2023

RAC Dealership, LLC
6775 Lenox Center Ct., Suite 100
Memphis, TN 38115
Attention: Noah Hogan, Chief Executive Officer
Email: noah.hogan@americancarcenter.com

*Re:    Notice of Default, Acceleration, Demand for Payment, and Reservation of Rights*

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of June 29, 2021 (as modified by that certain Waiver Agreement dated as of February 17, 2022, that certain Forbearance Agreement and First Amendment to Credit Agreement dated as of September 27, 2022, and that certain Second Amendment to Credit Agreement and Waiver dated as of October 5, 2022, and as may be further amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among RAC Dealership, LLC (the "Borrower"), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and Hancock Whitney Bank, in its capacities as Administrative Agent (the "Administrative Agent") and Swingline Lender.  Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Credit Agreement.

As you know, certain Events of Default have occurred and are continuing under: (i) Section 7(g) of the Credit Agreement as a result of the occurrence of an event that enables the acceleration of Material Indebtedness; (ii) Section 7(i) of the Credit Agreement as a result of the Loan Parties taking action for the purpose of effecting a bankruptcy proceeding; (iii) Section 7(j) of the Credit Agreement as a result of the Loan Parties' inability to pay their debts as they come due; (iv) Section 7(e) of the Credit Agreement as a result of the Loan Parties' failure to perform their obligations under certain Material Agreements, as required under Section 5.07 of the Credit Agreement; (v) Section 7(e) of the Credit Agreement as a result of the Loan Parties' failure to provide written notice to the Administrative Agent within five (5) Business Days of acquiring knowledge of developments that may result in a Material Adverse Effect, as required under Section 5.02(a)(vi) of the Credit Agreement; and (vi) Section 7(d) of the Credit Agreement as a result of the Borrower's failure to timely provide notice of the aforementioned Events of Default, as required under Section 5.01(a)(i) of the Credit Agreement (collectively, the "Acknowledged Events of Default").

As a result of the occurrence and continuance of the Acknowledged Events of Default, pursuant to Article 7 of the Credit Agreement, the Administrative Agent hereby: (a) terminates the Commitments (including the Swingline Commitment); (b) declares the Loans outstanding to be immediately due and payable; and (c) demands immediate payment in full of the principal of the Loans, together with accrued interest thereon, and all fees and other obligations of the Borrower accrued under the Credit Agreement and under any other Loan Documents.  Additionally, the Administrative Agent may exercise any of its rights and remedies provided under the Loan Documents or at law or equity, including all remedies provided under the UCC.

Please be advised that, pursuant to Section 2.12(d) of the Credit Agreement, all Loans and other amounts outstanding under the Credit Agreement shall bear interest at two percent (2%) *plus* the rate otherwise applicable under the Credit Agreement to such Loans and fees or other obligations.

The Administrative Agent, on behalf of itself and the Lenders, hereby expressly reserves any and all of the rights, powers, privileges and remedies available to them under the Loan Documents and applicable laws that have arisen or may arise as a result of the Acknowledged Events of Default or any other Default or Event of Default (regardless of whether any such Default or Event of Default is referenced herein). No failure to exercise or delay in exercising any right, power, privilege or remedy shall constitute a waiver of any such right, power, privilege or remedy or preclude the Administrative Agent or any Lender from exercising such right, power, privilege or remedy in the future.

For the avoidance of doubt, the Borrower is no longer permitted to make transfers of vehicles and associated leases to RAC Asset Holdings or a Subsidiary of RAC Asset Holdings pursuant to Section 6.09 of the Credit Agreement.

At no time shall any prior or subsequent course of conduct by the Administrative Agent, any Lender, any Loan Party or any other Person: (i) directly or indirectly limit, impair or otherwise adversely affect any of the Administrative Agent's or any Lender's rights, interests or remedies in connection with the Loan Documents; (ii) obligate the Administrative Agent or any Lender to agree to, or to negotiate or consider an agreement to, any waiver of any obligation under any Loan Document, any Default or any Event of Default; or (iii) obligate the Administrative Agent or any Lender to agree to, or to negotiate or consider an agreement to, any amendment to any term or condition of any Loan Document.

Please contact Richard Buntin at 251-665-1649 at your earliest convenience to discuss this matter.

Sincerely,

HANCOCK WHITNEY BANK,
as Administrative Agent

By: *Richard Buntin*

Name:  Richard Buntin
Title:   Vice President, Special Credits Department


cc:      Stephen Gruendel, Moore & Van Allen PLLC (via e-mail)

         RAC Dealership, LLC
         6775 Lenox Center Ct., Suite 100
         Memphis, TN 38115
         Attention: John McCann, Executive Vice President and General Counsel
         Email: john.mccann@americancarcenter.com